RCH:EWS/SMS/SME
F. #2025R00435

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

       - against -                     Docket No. 25-CR-346 (S-1) (KAM)

EMMANUEL CLASE DE LA CRUZ,
ROBINSON VASQUEZ GERMOSEN and
LUIS LEANDRO ORTIZ RIBERA,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS COUNT ONE OF THE SUPERSEDING INDICTMENT

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Eric Silverberg
Sean M. Sherman
Sarah M. Evans
Assistant U.S. Attorneys
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

APPLICABLE LAW ......................................................................................................... 5

DISCUSSION .................................................................................................................... 7

    I.      The Motions Should be Denied Because Count One Tracks the Statutory Language ...................................................................................................... 7

    II.     *Ciminelli* Does Not Support Dismissal of Count One .................................... 10

    III.    *Ciminelli* Did Not Create a New "Reverse-Preemption" Basis to Dismiss the Wire Fraud Conspiracy Count ....................................................................... 14

    IV.    The Indictment Sufficiently Alleges a Wire Fraud Conspiracy...................... 18

CONCLUSION................................................................................................................. 29

<u>INTRODUCTION</u>

The government respectfully submits this memorandum of law in opposition to defendant Emmanuel Clase de la Cruz's motion (joined by defendant Luis Leandro Ortiz Ribera) ("Clase Mot.") and defendant Robinson Vasquez Germosen's motion ("Vasquez Mot.") to dismiss Count One of the Indictment. Collectively, the Motions argue that dismissal is warranted considering: (1) the Supreme Court's decision in <u>United States v. Ciminelli</u>, (2) a novel and entirely unprecedented theory of reverse pre-emption and (3) the government's purported failure to allege a material misrepresentation. As set forth below, the defendants' arguments are without merit. The Court should deny the defendants' motions to dismiss in their entirety.

<u>BACKGROUND</u>

On November 5, 2025, the grand jury returned a four-count indictment charging Emmanuel Clase de la Cruz ("Clase") and his teammate, Luis Leandro Ortiz Ribera ("Ortiz"), with (1) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349; (2) conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349; (3) conspiracy to influence sporting contests by bribery, in violation of Title 18, United States Code, Section 224; and (4) money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). <u>See</u> Indictment, ECF No. 1. [1]

On February 12, 2026, the grand jury returned a five-count superseding indictment (the "Superseding Indictment"), which added two additional defendants, Robinson Vasquez Germosen ("Vasquez") and another individual whose identity is under seal ("Defendant-4"), to the wire fraud conspiracy count. <u>See</u> Superseding Indictment, ECF No. 80. The Superseding

---

[1] This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial. Unless otherwise indicated, all statements are provided in sum and substance and in part.

Indictment also charged Vasquez with making materially false statements to law enforcement agents, in violation of Title 18, United States Code, Section 1001(a)(2). The Superseding Indictment did not contain additional charges against Clase or Ortiz.

As alleged in the Superseding Indictment, beginning in approximately May 2023, Clase agreed to share advance information about pitches he would throw in upcoming Major League Baseball ("MLB") games with Vasquez, Defendant-4, and Bettor-1 so that they and other individuals (the "Bettors") could use the information to obtain money through wagers on those fixed pitches. See ECF No. 80 ¶ 18. From May 2023 through June 2025, the Bettors used advance, inside information from Clase to win over $400,000 in fraudulent wagers on fixed pitches thrown by Clase. See id. ¶ 47. Typically, Clase agreed to throw slower "slider" pitches that were "balls" (meaning outside of the strike zone) on the first pitches of at-bats when Clase was brought into the game as a relief pitcher, and the Bettors wagered accordingly. See id. ¶ 23. Vasquez and Defendant-4 were intermediaries between Clase and the Bettors and received a portion of the proceeds from the fraudulent wagers on the fixed pitches. See id. ¶¶ 19–20. In addition, Vasquez placed bets on fixed pitches through an account he opened in the name of another individual, referred to in the Superseding Indictment as Individual-2. See id. ¶¶ 12, 37.

In order to place a bet with the Betting Platforms identified in the Superseding Indictment, the Bettors were required under the respective terms of service to represent and warrant that they were not misusing inside information or placing wagers through proxies. See id. ¶ 15. Specifically, the Superseding Indictment alleges that:

> All bettors wagering on the Betting Platforms were required to agree to their terms of use (the "Terms of Use"), which provided, in sum, substance and in relevant part, that users were prohibited from (i) wagering in connection with sports contests or individual players' statistical performances if the users had access to any pre-release, confidential information or other information that was

not available to all other wagerers, including any information provided by a professional athlete, such as non-public advance information about pitches; and (ii) placing wagers as an agent or proxy for any individual other than the account holder.

Id.

The Superseding Indictment alleges numerous steps that the co-conspirators, including Clase, took to conceal the fraud scheme and evade accountability, including by communicating about the scheme in coded language, using straw betting accounts in violation of the Terms of Use, and transferring fraudulently obtained proceeds through intermediaries in money laundering transactions. See, e.g., ECF No. 80. ¶¶ 12, 19–20, 26, 30, 34, 37–38, 52–54, 59, 67. In particular, the Superseding Indictment alleges that, in furtherance of the conspiracy, the defendants used the code words "rooster" and "chicken" to refer to fixed pitches and communicate advance information about pitches. Id. ¶ 20.

In or about June 2025, Ortiz joined the scheme and agreed to throw fixed pitches in exchange for money. See ECF No. 80 ¶ 48. Clase facilitated Ortiz's entrance into the conspiracy. See id. Before a game on June 15, 2025 (the "June 15 Game"), Ortiz agreed with Clase that in exchange for $5,000, he would throw a ball for his first pitch in the second inning ("Subject Pitch-1"), arranging for the same type of wager that the Bettors typically agreed upon with Clase. See id. ¶ 49. Clase also agreed with Bettor-1 that Clase would receive $5,000 for securing Ortiz's agreement to throw Subject Pitch-1. See id.

The June 15 Game was scheduled to start at approximately 4:10 p.m. Beginning at approximately 1:40 p.m., Bettor-1 sent a text message to Clase asking "how are we doing?" and "everything under control there?" Bettor-1 and Clase then had a brief telephone call. Id. ¶ 50. Shortly thereafter, Bettor-1 and another individual ("Bettor-2") began wagering that Subject Pitch-1 would be a ball. The wagers won, resulting in a payout of approximately $26,000. Id.

3

¶ 51.  In the days after the June 15 Game, Clase facilitated the transfer of the bribe payment from Bettor-1 to Ortiz.  See id. ¶¶ 52–54.  To do so, Clase enlisted the assistance of an individual referred to in the Superseding Indictment as "Clase Associate-1" whom Clase had also previously used as an intermediary to receive a kickback payment from Bettor-1.  See id. ¶¶ 39, 52.  To conceal the kickback scheme, Clase instructed Ortiz by text message to lie about the purpose of the funds.  Id. ¶ 54.

A few days later, Ortiz agreed with Clase to throw another fixed pitch for money ("Subject Pitch-2").  See id. ¶ 55.  This time, Ortiz agreed to throw a ball for his first pitch in the third inning during a game held on June 27, 2025 (the "June 27 Game") in exchange for $7,000.  Clase also agreed with Bettor-1 that Clase would receive $7,000 for obtaining Ortiz's agreement to throw Subject Pitch-2.  Id.

Before the June 27 Game began, Clase went to the bank and withdrew $50,000 in cash.  Id. ¶ 56.  He provided $15,000 to Bettor-1 to use to wager that day.  Id.  Before the June 27 Game began, some of the Bettors wagered that Ortiz's first pitch in the bottom of the third inning would be a ball.  Id. ¶ 57.  The wagers won, resulting in a payout of approximately $37,000.  Id.

Shortly after the June 27 Game, the scheme was detected.  By July 2, 2025, MLB had already launched investigations and submitted information requests to both defendants Clase and Ortiz.  By July 3, 2025, Ortiz was placed on leave.  Clase was placed on leave on July 28, 2025.

On a motion alleging a defect in the indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B), "an indictment is sufficient as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Aiyer, 33 F.4th 97, 116 (2d Cir. 2022) (cleaned up). "To satisfy these requirements, an indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Dawkins, 999 F.3d 767, 779 (2d Cir. 2021) (cleaned up); see also Fed. R. Crim. P. 7(c) (an indictment need only set forth a "plain, concise, and definite written statement of the essential facts constituting the offense.").

Even where the above requirements are satisfied, a defendant will sometimes attempt to argue pretrial that the "factual allegations in the" indictment are not "consistent with the charged violations." Dawkins 999 F.3d at 780. The Second Circuit has repeatedly held that such arguments are improper, explaining: "At the indictment stage, we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense. That is something we do after trial." United States v. Wedd, 993 F.3d 104, 121 (2d Cir. 2021); accord Dawkins, 999 F.3d at 780; see also United States v. Melzer, No. 20-CR-314 (GHW), 2021 WL 4847383, at *3 (S.D.N.Y. Oct. 15, 2021) ("The Second Circuit has twice recently reminded us that a district court does not evaluate the adequacy of the facts set forth to satisfy the elements of a charged offense.").

Such an argument "ask[s] district courts to engage in summary judgment proceedings — something that does not exist in federal criminal procedure." Dawkins, 999 F.3d at 780; accord Aiyer, 33 F.4th at 117 ("summary judgment does not exist in federal criminal procedure"). In United States v. Sampson, 898 F.3d 270 (2d Cir. 2018), the Second Circuit

explained why motions raising such arguments are inconsistent with the structure of the Federal Rules of Criminal Procedure. First, to "overcome such motions, the government might need to reveal its complete case before trial," which "would upset the policy choices reflected in the criminal discovery rules — and provide an advantage to the defense that the Rules' drafters did not intend." Id. at 280 – 81. Second, and "more fundamentally, authorizing district court judges to resolve dispositive fact-based evidentiary disputes on Rule 12(b) motions risks invading the inviolable function of the jury in our criminal justice system." Id. at 281. "[W]hen a defense raises a factual dispute that is inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion." Id.

The sole potential exception to this rule is where the government makes "a full proffer of the evidence it intends to present at trial," which must include "a detailed presentation of the entirety of the evidence[.]" Id. at 282. This exception "is extraordinarily narrow." Id.; see also id. at 283 n.11 (noting that exception was satisfied in prior case where government provided "a point-by-point outline of how [it] would establish each element of the indictment's counts, including testimony that the government intended to present at trial"). This exception is not satisfied by a "speaking indictment," even where the allegations provide "significant detail about the factual nature of the charges." Dawkins, 999 F.3d at 779; compare id. (describing indictment in that case as "a 'speaking indictment' that provided significant detail about the factual nature of the charges"), with id. at 780 (refusing to consider "whether certain factual allegations in the Superseding Indictment . . . were consistent with the charged violations").[2]

---

[2]    See also United States v. Phillips, 690 F. Supp. 3d 268, 278 (S.D.N.Y. Sept. 1, 2023) ("A speaking indictment alone does not satisfy the 'full proffer' requirement; the government must proffer all of its evidence." (emphasis in original)); United States v. Ji, No. 21-CR-265 (PKC), 2022 WL 595259, at *7 (E.D.N.Y. Feb. 28, 2022) (exception not satisfied "where, as here, the indictment is a 'speaking indictment' — i.e., an indictment that contains details beyond

6

I.   The Motions Should be Denied Because Count One Tracks the Statutory Language

The defendants fail to address the actual standard for dismissal of an indictment, which, as set forth above, requires merely that the government do little more than track the language of the statute charged. The defendants' arguments are entirely inappropriate for a pretrial motion to dismiss and the Court can deny the motions on this ground alone.

Here, Count One tracks the relevant statutory language in §§ 1343 and 1349 and specifically alleges that the defendants conspired to devise a scheme to defraud "betting platforms, including the Betting Platforms, and to obtain money and property from [them], by means of one or more materially false and fraudulent pretenses, representations, and promises . . . " ECF No. 80 ¶ 61. The Superseding Indictment's inclusion of that language alone is a sufficient basis to deny the defendants' motions. See United States v. Yannotti, 541 F.3d 112, 127 (2d Cir. 2008) ("[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."). And the Superseding Indictment likewise states the time and place, in approximate terms, of the alleged offense. Dawkins, 999 F.3d at 779; see ECF No. 80 ¶ 61. Here, where the government has not made a "full proffer" of the evidence it will admit at trial to support the charges, the Court need look no further.

The defendants utterly fail to grapple with the relevant standard and instead rely on inapposite cases to suggest—incorrectly—that the Court should "evaluate whether [the] facts alleged could support conviction." Clase Mot. at 3 (citing United States v. Pirro, 212 F. 3d 86, 92 (2d Cir. 2000)); Vasquez Mot. at 11 (same). To the contrary, it is black letter law that the Court

---

those typically necessary under Rule 7(c)(1)"; "the Court declines to restrict the Government because it elected to provide more detailed allegations than are required").

cannot and should not evaluate the adequacy of factual allegations at the motion to dismiss stage. See, e.g., Wedd, 993 F.3d at 121 (holding there is no requirement that the indictment contain details of how the defendants engaged in the scheme, and courts should not evaluate adequacy of the facts at the indictment stage); Sampson, 898 F.3d at 273 (reversing district court and reinstating dismissed counts where district court had improperly waded into a factual dispute).  Likewise, the defendants rely on Russell v. United States to argue that that the wire fraud count must do more than track the statutory language and instead must "descend to particulars."  Clase Mot. at 3 (quoting Russell v. United States, 369 U.S. 749, 765 (1962)); Vasquez Mot. at 12.  But as numerous courts in this Circuit have repeatedly found, the arguably heightened standards set forth in Pirro and Russell (on which Pirro relies) are the exception, not the rule, and have no application to the wire fraud conspiracy charged in Count One.

In Russell, which arose out of McCarthy-era congressional hearings of the Committee on Un-American Activities of the House of Representatives, the Supreme Court ruled that indictments charging refusal to answers questions of the congressional subcommittee were insufficient because they failed to specify the subject matter of the congressional inquiry.  United States v. Stringer, 730 F.3d 120, 125 (2d Cir. 2013) (citing Russell v. United States, 369 U.S. 749, 759 (1962)).  But as the Second Circuit has explained, Russell "is one of the very rare cases in which an indictment that tracked the statutory language and furnished the pertinent dates was held insufficient."  Id.  In analyzing Russell, the Second Circuit explained that "it is clear that the Supreme Court's decision in Russell must be seen as addressed to the special nature of a charge of refusal to answer questions in a congressional inquiry and not as a broad requirement applicable to all criminal charges that the indictment specify how each essential element is met."  Stringer, 730 F.3d at 125–26 (emphasis added).  The defendants cite no precedent to suggest that this more

stringent pleading standard applies to a wire fraud conspiracy. It does not. In <u>United States v. Wey</u>, the defendant moved to dismiss the indictment and argued for the heightened pleading standard the defendants cite to here. Judge Nathan (then a district judge), explicitly rejected the defendant's efforts to supplant the typical sufficiency framework for the alternative, more stringent standard set forth in <u>Russell</u>. <u>See</u> No. 15-CR-611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017) (rejecting defendant's argument "that the Indictment must satisfy the arguably more stringent sufficiency standard set forth" in <u>Russell</u> in a wire fraud prosecution); <u>see also</u> <u>Stringer</u>, 730 F.3d at 126–27 (collecting cases applying the standard set forth in <u>Russell</u> to a limited number of specific statutes, which do not include wire fraud or wire fraud conspiracy); <u>United States v. Almaleh</u>, No. 17-CR-25 (ER), 2022 WL 602069, at *2 (S.D.N.Y. Feb. 28, 2022) (noting that courts apply the typical pleading standard to "indictments containing counts of mail and wire fraud and conspiracy to commit such fraud."); <u>United States v. Fishbein</u>, No. 21-CR-296 (PAC), 2022 WL 1188424, at *2 (S.D.N.Y. Apr. 21, 2022) (same).

Similarly, the Second Circuit has noted that <u>Pirro</u> is an example of the unusual case in the "less-common category," where the indictment must do more than recite the statutory language and specify "how a particular element of a criminal charge will be met." <u>Stringer</u>, 730 F.3d at 126. Indeed, just as <u>Russell</u> arose out of the peculiarities of vague and meandering Congressional hearings where it was impossible to isolate the subject without more specificity, <u>Stringer</u>, 730 F.3d at 125, <u>Pirro</u> arose out of confusion over the "esoteric" federal tax law, where "there was a lack of clarity in the tax law as to whether the defendant improperly failed to disclose information[.]" <u>United States v. Hwa</u>, No. 18-CR-538 (MKB), 2021 WL 11723583, at *33 (E.D.N.Y. Sept. 3, 2021), <u>aff'd sub nom.</u> 161 F.4th 127 (2d Cir. 2025) (collecting cases in which Courts have rejected <u>Pirro</u> as inapposite); <u>see also</u> <u>United States v. Watson</u>, No. 23-CR-82 (EK),

9

2024 WL 1858199, at \*4 (E.D.N.Y. Apr. 29, 2024) (applying traditional sufficiency framework to wire fraud conspiracy motion to dismiss and distinguishing <u>Pirro</u> as inapposite).

Neither circumstance animating <u>Russell</u> or <u>Pirro</u> is present here. As numerous courts have explained, <u>supra</u> at 9, courts in this circuit apply the common pleading standard—and not the heightened standard proffered by the defendants—to wire fraud and wire fraud conspiracy on motions to dismiss. <u>See</u>, <u>e.g.</u>, <u>United States v. Chang</u>, No. 18-CR-681 (NGG), 2024 WL 2817494, at \*3 (E.D.N.Y. May 31, 2024); <u>Watson</u>, 2024 WL 1858199, at \*4; <u>Wey</u>, No. 15-CR-611 (AJN), 2017 WL 237651, at \*5; <u>United States v. Burdorf</u>, No. 22-CR-50A, 2023 WL 3078950, at \*5 (W.D.N.Y. Mar. 28, 2023), <u>report and recommendation adopted,</u> No. 22-CR-50-A, 2023 WL 3075957 (W.D.N.Y. Apr. 25, 2023); <u>United States v. Blakstad</u>, No. 19-CR-486 (ER), 2021 WL 5233417, at \*15 (S.D.N.Y. Nov. 9, 2021), <u>aff'd</u>, No. 21-2859, 2023 WL 2668477 (2d Cir. Mar. 29, 2023); <u>United States v. Kozel</u>, No. 19-CR-460 (KMW), 2020 WL 4751498, at \*2 (S.D.N.Y. Aug. 17, 2020); <u>United States v. Kim</u>, No. 09-CR-1160 (DLC), 2010 WL 1780959, at \*2 (S.D.N.Y. May 4, 2010).

In short, the defendants fail to identify the correct standard for the Court. They do so because the standard is fatal to their claims. Because the Superseding Indictment tracks the language of the statute charged and states the time and place in approximate terms of the alleged crime, the Court should deny the defendants' motions.

II.      *Ciminelli* Does Not Support Dismissal of Count One

Defendant Vasquez argues that the Court should dismiss Count One because the Superseding Indictment purportedly "alleges a scheme aimed at depriving the Betting Companies of economically valuable information," in contravention of the Supreme Court's decision in <u>Ciminelli v. United States</u>, 598 U.S. 306 (2023). Vazquez Mot. at 16. Vasquez is wrong both factually and as a matter of law. Specifically, Vasquez misconstrues the Superseding Indictment,

10

which does not rely upon the "right to control" theory of wire fraud invalidated in <u>Ciminelli</u>, but rather alleges a classic wire fraud theory, in which the co-conspirators engaged in a scheme to defraud the Betting Platforms of money.

The wire fraud statute makes it a federal crime to use interstate wire, radio, or television communications to defraud someone of either money or property (or both). <u>See</u> 18 U.S.C. § 1343. Focusing on the property prong, the Supreme Court has issued a series of opinions clarifying what constitutes a property interest that may be vindicated by the wire fraud statute. As reiterated most recently in <u>Ciminelli</u>, the Court has explained that a classic wire fraud charge resting on a deprivation-of-property theory must involve deprivation of a traditional property interest. <u>Ciminelli</u>, 598 U.S. at 309. Specifically, <u>Ciminelli</u> reversed a Second Circuit decision affirming a wire fraud conviction where the jury was instructed that the "property" that was the object of the scheme could include "intangible interests" including the "right to control the use of one's assets." <u>Ciminelli</u>, 598 U.S. at 311. In <u>United States v. Percoco</u>, the Second Circuit had affirmed the district court, holding that the wire fraud statute criminalized denying the victim the "right to control its assets by depriving it of information necessary to make discretionary economic decisions." 13 F.4th 158, 170 (2d Cir. 2021). The Supreme Court reversed, holding that the "right to valuable economic information needed to make discretionary economic decisions" is not a traditional property interest vindicated by the wire fraud statute. <u>Ciminelli</u>, 598 U.S. at 316.[3]

---

[3] By contrast, contracts can constitute a traditional property interest. <u>See</u> <u>Ciminelli</u>, 598 U.S. at 317 – 18 (Alito, J., concurring) (noting that nothing in <u>Ciminelli</u> would prevent the government from retrying the same defendant on the theory that he deprived the victim of "valuable contracts"). So, too, is confidential business information. <u>Carpenter v. United States</u>, 484 U.S. 19, 25 (1987) (the Wall Street Journal's confidential pre-publication information constituted property).

Importantly, <u>Ciminelli</u> does nothing to disturb the propriety of wire fraud charges where the object of the scheme is to deprive a victim of money (rather than property).  Schemes in which the object is to deprive a victim of money do not require analysis of whether something is a traditional property interest, since the protection against deprivation of money is clear from the plain language of the statute.  As such, district courts considering challenges to indictments and convictions post-<u>Ciminelli</u> have routinely rejected the argument that <u>Ciminelli</u> applies to cases alleging that the object of the conspiracy was money.  <u>See</u> <u>United States v. Griffin</u>, 76 F.4th 724, 738 & n.16 (7th Cir. 2023) (indictment alleging that Small Business Administration "incurred losses" that it would not have incurred but for defendants' misrepresentations was proper post-<u>Ciminelli</u> because it properly alleged a scheme to obtain money); <u>United States v. Aronov</u>, No. 19-CR-408 (MKB), 2024 WL 554577, at *3 – 4 (E.D.N.Y. Feb. 12, 2024) (rejecting <u>Ciminelli</u> challenges where the indictment alleges that the defendants schemed to defraud others of money and real property based on false or fraudulent pretenses);  <u>United States v. Runner</u>, No. 18-CR-578 (JS), 2023 WL 3727532, at *2 (E.D.N.Y. May 30, 2023) (finding <u>Ciminelli</u> inapposite to indictment alleging that defendant "intended to and tangibly harmed victims by causing money and personal property to be sent" to defendants); <u>United States v. Bankman-Fried</u>, 680 F.Supp.3d 289, 305 (S.D.N.Y. 2023) (rejecting defendant's contention that indictment failed to properly allege bank and wire fraud post-<u>Ciminelli</u> where indictment alleged that defendant "conspired to obtain money or property in violation of the statute") (internal quotations omitted); <u>United States v. Hayman</u>, No. 23-CR-307 (MAK), 2023 WL 5488429, at *7 (E.D. Pa. Aug. 24, 2023) (rejecting claim that <u>Ciminelli</u> barred defendant's prosecution for fraudulently obtaining vacant lots from the city because "[r]eal estate and money are traditional property interests").

Additionally, a wire fraud charge is appropriate where misinformation is the <u>means</u> of accomplishing the fraud rather than the <u>object</u> of the fraud. Thus, in <u>Kousisis v. United States</u>, 605 U.S. 114 (2025), the Supreme Court recently held that a scheme in which a defendant seeks to deprive a victim of a traditional property interest by making a misrepresentation that is core to the benefit of the parties' bargain—<u>i.e.</u>, a material lie—may be prosecuted under the wire fraud statute irrespective of any actual loss to the victim. <u>Id.</u> at 123.

Here, the Superseding Indictment clearly alleges a deprivation of money as the object of the defendants' conspiratorial scheme charged in Count One. The co-conspirators agreed to (and did) lie to the Betting Platforms and engage in other deceptive conduct, including rigging pitches, to defraud the Betting Companies of money. <u>See e.g.</u>, ECF No. 80 ¶¶ 15, 18, 22. Because the object of the scheme was to obtain money (and not to deprive the victim of some non-traditional notion of property), <u>Ciminelli</u> has nothing to do with this case. <u>See</u> <u>Bankman-Fried</u>, 680 F. Supp. 3d at 307 ("Thus, the indictment sufficiently alleges a scheme to defraud, an object of which was obtaining customer funds, which plainly constitute both 'money' and 'property' within the meaning of Section 1343.").

Vasquez makes the conclusory assertion that "the government's theory is that . . . defendants and co-conspirators deprived the Betting Companies of their right to decide whether to enter into certain transactions." Vasquez Mot. at 12. Not so. Nowhere does the Superseding Indictment allege that the <u>object</u> of the fraud was the deprivation of potentially valuable economic information. While the co-conspirators certainly lied about their access to inside information to accomplish the fraud, there is no allegation that depriving the Betting Platforms of that information was anything but one of the <u>means</u> by which the co-conspirators conducted the fraud. Rather, the Superseding Indictment makes plain that the object of the fraud

was money.  See e.g., ECF No. 80 ¶¶ 18, 21, 22, 24–29, 31, 35–37, 39–41, 43, 45–47.  This Court should reject Vasquez's efforts to transform this case from a classic wire fraud—which alleges material misstatements as a means by which the fraud was perpetrated and not deprivation of information as the object of the fraud—into a "right-to-control" case.  See Runner, 2023 WL 3727532, at *2 ("Defendant cannot use Ciminelli as a shield to prevent the Government from introducing the misrepresentations or omissions underlying the alleged scheme to defraud under the guise of construing those same deceptions as exclusively relevant to a victim's property interest to 'mere information' to render them unactionable."); see also United States v. An, 733 F. Supp. 3d 77, 93 (E.D.N.Y. 2024) (holding, on a Ciminelli-based motion to dismiss in the bank fraud context, that a scheme to deprive a victim of money self-evidently implicates a property interest, and is in no way prohibited by Ciminelli).

Moreover, not only does Vasquez misread and misconstrue the indictment, but his argument is not appropriate on a motion to dismiss.  As this Court explained in An, "[i]n the context of [the defendant's] motion to dismiss the Indictment, Ciminelli is inapposite. Ciminelli concerned an 'instructional error, not the sufficiency of an indictment.'" 733 F. Supp. 3d at 91 (E.D.N.Y. 2024) (quoting United States v. Xu, No. 23-cr-133 (JMF), 2024 WL 1332548, at *2 n.1 (S.D.N.Y. Mar. 28, 2024)).  And as set forth above, the Superseding Indictment sufficiently tracks the statutory language and sets forth the elements of the offense.  At best, Vasquez's argument amounts to a request that the Court properly instruct the jury on the elements of wire fraud, which the Court will assuredly do.

III.    *Ciminelli* Did Not Create a New "Reverse-Preemption" Basis to Dismiss the Wire Fraud Conspiracy Count

All three defendants argue that the Superseding Indictment must be dismissed because it constitutes an "impermissible federalization of alleged violations of state law," Clase

Mot. at 7, "upsetting the 'coherent federal policy' regarding sports wagering."  Vasquez Mot. at 18; Clase Mot. at 7.  In essence, the defendants argue that because the states can—and do—regulate sports betting, a fraudulent scheme involving sports betting is somehow outside the ambit of the federal wire fraud statute.  This argument is grounded in self-serving policy interpretations, not fact or law, and it lacks merit, logic, and analogous precedent.

In Ciminelli, the Supreme Court observed that "the right-to-control theory vastly expand[ed] federal jurisdiction without statutory authorization . . . [b]ecause the theory treats mere information as the protected interest" and therefore "almost any deceptive act could be criminal." Ciminelli, 598 U.S. at 315.  The Court thus reminded lower courts that "absent a clear statement by Congress, courts should not read the mail and wire fraud statutes to place under federal superintendence a vast array of conduct traditionally policed by the States."  Id. at 315–16 (cleaned up).  The defendant relies on this dicta to now suggest that any federal wire fraud prosecution relating to a state-regulated industry should be preempted.

But such an approach would subvert Congress's "clear statement" in the plain language of the wire fraud statute, which imposes no such blanket limitation on its enforcement. See 18 U.S.C. § 1343.  The federal wire fraud statute is not displaced merely because a state has chosen to regulate the underlying industry.  The wire fraud statute is a statute of general applicability, designed to protect the integrity of interstate wires and to criminalize schemes to defraud that use those wires, regardless of the substantive field in which the fraud occurs.  See, e.g., United States v. Trapilo, 130 F.3d 547, 552 (2d Cir. 1997) ("The statute reaches any scheme to defraud involving money or property, whether the scheme seeks to undermine a sovereign's right to impose taxes, or involves foreign victims and governments.").  Of note, the defendants fail to cite a single case in which a court has created an exemption from federal fraud laws based on

the existence of a state regulatory framework—whether governing gambling, insurance, or any other state-regulated industry.[4]  To the contrary, so long as the government proves the elements of the crime, federal jurisdiction is proper even if the conduct also implicates state regulatory concerns.  E.g., United States v. Rubin, 743 F.3d 31, 34 (2d Cir. 2014) (gambling); United States v. Battista, 575 F.3d 226, 228 (2d Cir. 2009) (gambling); United States v. Rybicki, 354 F.3d 124, 127 (2d Cir. 2003) (insurance); United States v. Peterson, 896 F. Supp. 2d 305, 319 (S.D.N.Y. 2012) (insurance). State regulation may define the lawful contours of an industry, but it does not immunize deceptive schemes operating within that industry from federal criminal liability under 18 U.S.C. § 1343.

In any event, the Second Circuit has rejected this argument in no uncertain terms. In United States v. Rybicki, in which the government charged a wire fraud scheme relating to fraudulent payments to insurance company adjusters to expedite the settlement of personal injury lawsuits, the Second Circuit unequivocally rejected the notion that a wire fraud prosecution violates principles of federalism merely because the underlying conduct concerns a state-regulated industry.  Specifically, the Circuit declared the argument "frivolous," holding that "[h]aving proved the elements of mail and wire fraud, this case rests squarely within the group of cases that

---

[4]    The criminal cases the defendants cite do not even address—let alone support—this reverse preemption argument.  As relevant to this argument, they merely include generic language cautioning against expansive application of the wire fraud statute.  The holdings of those cases instead pertain to the notion that the wire fraud statute does not criminalize the deprivation of non-traditional property such as the government's regulatory power, Kelly v. United States, 590 U.S. 391, 400 (2020); Cleveland v. United States, 531 U.S. 12, 20 (2000), potentially valuable economic information necessary to make discretionary decisions, Ciminelli, 598 U.S. at 309, and confidential business information that lacks commercial value to the business, United States v. Chastain, 145 F.4th 282, 293 (2d Cir. 2025).  Again, because the Superseding Indictment in this case has nothing to do with those notions of property, such cases have no application to this matter, and they do not support the defendants' novel reverse preemption challenge to the Superseding Indictment.

have prosecuted similar private sector frauds under federal law, and appellants' conduct is precisely the type of misuse of the mails and wires the statutes were meant to address." 38 F. App'x 626, 630 (2d Cir. 2002).[5] See also Almaleh, No. 17-CR-25 (ER), 2022 WL 602069, at *4 (rejecting argument that wire fraud prosecution in area "traditionally regulated by the states" should be dismissed because of "federalism concerns."). Likewise, in United Sates v. DeFiore, the Second Circuit rejected an argument that "principles of federalism" warranted a finding that the wire fraud statute did not reach a scheme to defraud states of taxes owed them. 720 F.2d 757, 762 (2d Cir. 1983). There, the Court held that "Section 1343 on its face is not limited in the manner suggested by DeFiore, nor does it purport to exempt the conduct in which he engaged. It plainly applies to 'any scheme or artifice to defraud' in which the jurisdictional means—the wires—are employed. Its focus is upon the misuse of the wires, not the regulation of state affairs." Id. at 761 (2d Cir. 1983) (emphasis in original).

Ciminelli did not create new law offering a reverse-preemption basis for dismissal of an indictment. Indeed, the Supreme Court recently rejected analogous arguments post-Ciminelli. See Kousisis, 605 U.S. at 135 ("In [defendants'] view, this result threatens fair notice and, by encroaching into States' police powers, runs headlong into principles of federalism. We are not persuaded .... The language of the wire fraud statute is undeniably broad. But

---

[5]    Rybicki was initially decided by a three-judge panel in both a summary order and a published panel opinion. The case was subsequently heard en banc, and the en banc panel noted that it approved of the resolution of issues in the summary order. United States v. Rybicki, 354 F.3d 124, 128 (2d Cir. 2003) ("On appeal, the defendants raised a host of legal and factual challenges to their convictions, most of which were disposed of by a summary order, United States v. Rybicki, Nos. 00–1043, 00–1055, 00–1044, 00–1052, 2002 WL 655214, 2002 U.S. App. LEXIS 7472, 38 Fed.Appx. 626 (2d Cir. Apr. 22, 2002), issued simultaneously with the published panel opinion. We confirm the resolution of those issues by the panel and do not revisit them here.").

Congress enacted the wire fraud statute, and it is up to Congress—if it so chooses—to change it." (citation modified). An indictment is sufficient if it tracks the statutory language, sets forth the essential elements of the offense, and fairly informs the defendant of the charges to be defended against. The defendants' unpersuasive and self-serving policy-based objections provide no basis for dismissal.

IV.     The Indictment Sufficiently Alleges a Wire Fraud Conspiracy

Defendant Clase, joined by Ortiz, argues that the wire fraud conspiracy must be dismissed because the Superseding Indictment fails to allege a material misstatement or omission. This argument willfully ignores key portions of the detailed speaking indictment and misstates the law.

First, as he does repeatedly throughout his memorandum of law, Clase inaccurately describes the standard on a motion to dismiss. Clase suggests that for an indictment to sufficiently allege a material misrepresentation, it must detail "the nature of these misrepresentations, how those misrepresentations were false and material, and where they were offered." Clase Mot. at 4 (quoting United States v. Peraire-Bueno, No. 24-CR-293 (JGLC), 2025 WL 2062021, at *8 (S.D.N.Y. July 23, 2025)). But Peraire-Bueno says no such thing. Rather, while the government in that case had provided that degree of detail, the court observed that on a motion to dismiss the government was required to "do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Id. at *7; see also Dawkins, 999 F.3d at 779 (same). The fact that the government in Peraire-Bueno provided additional detail in a speaking indictment (as the government did here) doesn't revise the standard for what is necessary to survive a motion to dismiss.

18

Moreover, Clase ignores the fact that Count One alleges a conspiracy.[6] ECF No. 80 ¶ 61. Where an indictment charges only a conspiracy to commit a federal offense, it need not allege the conspiracy with the same "technical precision" and "detail" as would be required in an indictment if the object offense had been charged. Wong Tai v. United States, 273 U.S. 77, 81 (1927) (indictment for conspiracy to violate the Opium Act sustained where charge provided reasonable particularity as to time, place, identity of co-conspirators, object crime, and overt acts); see United States v. Bidloff, 82 F. Supp. 2d 86, 91 (W.D.N.Y. 2000) (rejecting motion to dismiss in which defendants argued the indictment failed to state the specific false pretenses made by each defendant and instead asserted only statutory language in conclusory form; because the government charged a conspiracy, such specificity was not required). A conspiracy indictment "is sufficient if the allegation of the scheme to defraud provides sufficient details as to the fraudulent nature of the scheme without alleging specifics of the fraudulent misrepresentation." Bidloff, 82 F. Supp. 2d at 91 (citing United States v. Wydermyer, 51 F.3d 319, 326 (2d Cir. 1995)). The "rationale" for this distinction is that "the crime of conspiracy is complete whether or not the substantive offense which was its object was committed." Wydermyer, 51 F.3d at 325.

---

[6] Clase likewise ignores this when pointing out that "the Indictment does not allege that Mr. Clase placed any wagers himself" and that it "fails to allege that Mr. Clase personally made any material misstatements or omissions." Clase Mot. at 4, 6. Clase is charged with conspiracy. There is no need to allege specific misstatements or wagers on his part. See, e.g., United States v. Vario, 943 F.2d 236, 240 (2d Cir. 1991) ("it is a fundamental tenet of the law of conspiracy that reasonably foreseeable acts of individual co-conspirators taken in furtherance of the conspiracy count against all members equally[.]") Of course, the Superseding Indictment alleges plenty of deceptive conduct by Clase—each rigged pitch is a deceptive act in furtherance of the conspiracy.

In any event, here, not only does the Superseding Indictment track the statutory language, see ECF No. 80 ¶ 61, but also it provides additional detail about the fraudulent scheme beyond the baseline criteria:

- "the defendants . . . conspired . . . to rig pitches in professional baseball games so that the defendants and their co-conspirators would profit from illegal wagers made based on that inside information. The defendants CLASE and ORTIZ agreed in advance with VASQUEZ . . . and other co-conspirators to throw specific types and speeds of pitches, and VASQUEZ and other co-conspirators used that inside information to place wagers on those pitches. In some instances, CLASE and ORTIZ received bribes and kickback payments—funneled through third parties—in exchange for rigging pitches. Through this scheme, the defendants defrauded betting platforms . . . " ECF No. 80 ¶ 1.

- "All bettors wagering on the Betting Platforms were required to agree to their terms of use (the 'Terms of Use'), which provided, in sum, substance and in relevant part, that users were prohibited from (i) wagering in connection with sports contests or individual players' statistical performances if the users had access to any pre-release, confidential information or other information that was not available to all other wagerers, including any information provided by a professional athlete, such as non-public advance information about pitches; and (ii) placing wagers as an agent or proxy for any individual other than the account holder." Id. ¶ 15.

- "The defendants ROBINSON VASQUEZ GERMOSEN and [Defendant-4] provided advance information from CLASE to the Bettors about the pitches that CLASE would throw in exchange for proceeds from the Bettors' fraudulent wagers on the pitches thrown by CLASE." Id. ¶ 20.

- "In or around June 2025, the defendant LUIS LEANDRO ORTIZ RIBERA joined the criminal scheme and agreed to throw specific pitches in certain MLB games in exchange for money." Id. ¶ 21.

- "Overall, the Bettors won at least $450,000 from the Betting Platforms on pitches thrown by the defendants EMMANUEL CLASE DE LA CRUZ and LUIS LEANDRO ORTIZ RIBERA." Id. ¶ 22.

- Beginning in or around May 2023, [the co-conspirators] agreed in advance . . . on specific pitches that CLASE would throw in certain

MLB games. . . . With CLASE's knowledge and approval, VASQUEZ, Bettor-1, Bettor-2, and other Bettors used this information to place over a hundred fraudulent Pitch Speed and Ball/HBP straight bets and parlays on CLASE's pitches on the Betting Platforms." Id. ¶ 23.

- The Superseding Indictment is replete with specific instances in which co-conspirators placed bets while in possession of inside information about the rigged pitches, rendering those bets fraudulent. See generally, ECF No. 80 Section I ("Fraudulent Wagers Associated with CLASE's Pitches") and Section II ("Fraudulent Wagers Associated with ORTIZ's Pitches"). These examples typically provide the date of the game when the rigged pitch was thrown, the fact that the Bettors placed wagers while in possession of advance information from Clase or Ortiz, details of the fraudulent wager, and amount of fraudulent proceeds obtained from the relevant Betting Platform(s).

- The Superseding Indictment further alleges that Bettor-2 and Vasquez used straw betting accounts nominally controlled by other individuals, in violation of the Betting Platforms' Terms of Use, to place fraudulent bets. Id. ¶ 11, 12, 37, 43, 45.

This information, all of which is incorporated into the wire fraud conspiracy count, see id. ¶ 60, provides more than sufficient detail to "fairly inform[] a defendant of the charge against which he must defend, and . . . enable[] the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." Aiyer, 33 F.4th at 116 (citation modified). Given these allegations, the defendants cannot seriously claim they lack notice of the fraudulent nature of the conspiratorial agreement such that the Superseding Indictment is rendered defective.

Clase initially claims that the Superseding Indictment is insufficient because it "does not identify any specific instance in which any of the Bettors made a misrepresentation" and because it "fails to include an allegation explaining what, if anything, the Bettors said to the Betting Platforms about whether they possessed nonpublic information when they placed wagers." Clase Mot. at 4.

Clase's argument sets up a false premise requiring correction: a scheme to defraud does not <u>require</u> false statements or omissions. As the Second Circuit has long held, and reaffirmed as recently as last year, wire fraud does not require proof of an explicit lie and may be based on deceptive conduct alone. "[A]s commonly understood among both lawyers and laypersons, 'fraud' refers to <u>conduct or speech</u> intended to mislead the putative victim into parting with money or property." <u>United States v. Klein</u>, 476 F.3d 111, 113 (2d Cir. 2007) (emphasis added), as corrected (Mar. 8, 2007). "The term 'scheme to defraud' is measured by a nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society. The scheme exists although no misrepresentation of fact is made." <u>Trapilo</u>, 130 F.3d at 550 n.3 (citation modified); <u>see also</u> <u>United States v. Autuori</u>, 212 F.3d 105, 115 (2d Cir. 2000) (explaining that a scheme to defraud "is characterized by a departure from community standards of fair play and candid dealings") (citation modified);[7] <u>United States v. Hild</u>, 147 F.4th 103, 111 (2d Cir. 2025) (approvingly citing <u>Trapilo</u> and <u>Autuori</u> for the notion that a deceptive course of conduct that misleads investors can constitute a scheme to defraud even if a defendant's statements are not strictly false); <u>United States v. Martin</u>, 411 F. Supp. 2d 370, 372 (S.D.N.Y. 2006) ("a misrepresentation or omission is not a necessary element of a 'scheme to

---

[7]    Of course, acts of deception alone, absent deprivation of a victim's property rights, are not actionable as wire fraud. <u>Chastain</u>, 145 F.4th at 295 (holding that district court ran afoul of <u>Ciminelli</u> because the jury instructions erroneously suggested that the defendant could be guilty of wire fraud where he departed from traditional notions of honesty and fair play to improperly obtain information that did not constitute money or property); <u>see also</u> <u>United States v. Pierce</u>, 224 F.3d 158, 165 (2d Cir. 2000) ("In the context of mail fraud and wire fraud, the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" (internal quotation marks omitted) (quoting <u>McNally v. United States</u>, 483 U.S. 350, 358 (1987)). But conduct departing from "traditional notions of fundamental honesty and fair play" that also deprives a victim of money or property constitutes wire fraud—even if the perpetrator's scheme involved trickery or deceptive conduct rather than deceptive statements.

defraud' under the wire fraud statute"); <u>A. Terzi Prods., Inc. v. Theatrical Protective Union</u>, 2 F. Supp. 2d 485, 501 (S.D.N.Y. 1998) (Sotomayor, J.) ("I read <u>Trapilo</u> as underscoring the accepted notion that a defendant, by his conduct alone, can intend to deceive another and engage in a scheme to defraud, even though the defendant's statements themselves contain no misrepresentations.") Indeed, as this Court and others regularly instruct juries regarding schemes to defraud: "a 'scheme to defraud' is a plan to deprive another of money or property by trick, deceit, deception or swindle, or overreaching. . . The deception need not be premised upon spoken or written words alone. The arrangement of words, or the circumstances in which they are used may convey a false and deceptive appearance. If there is intentional deception, the manner in which it is accomplished does not matter." Jury Instructions in <u>United States v. Shkreli</u>, 15-CR-637 (KAM), ECF No. 295 at 65 – 66.

The scheme alleged here involves not only misrepresentations but also trickery, false pretenses and other forms of (non-verbal) deceptive conduct, such as Clase's and Ortiz's rigged pitches. <u>Martin</u>, which applied <u>Trapilo</u>'s interpretation of a "scheme to defraud" in connection with sports betting, is instructive. In <u>Martin</u>, the defendants were charged with both substantive wire fraud and wire fraud conspiracy. 411 F. Supp. 2d at 371. The government alleged that "the defendants devised and effectuated a scheme to fix a horse race by giving a racehorse a performance-enhancing substance, and then profit[ed] from their actions by placing bets on that racehorse to win a horse race." Id. The defendant moved to dismiss on the grounds that "the scheme to dope a horse, which he allegedly conspired to devise, is not a 'scheme to defraud' within the meaning of the wire fraud statute because the scheme did not involve any misrepresentations or fraudulent omissions." Id. at 372. In denying the defendant's motion, the court held that "a misrepresentation or omission is not a necessary element of a 'scheme to defraud' under the wire

fraud statute." Id. The court added that, "[l]ike the scheme in Trapilo, [the defendants'] scheme did not involve any affirmative misrepresentations. However, breaking the rules of the horserace by doping a horse, like smuggling, violates fundamental notions of honesty, fair play and right dealing and is therefore an act within the meaning of a 'scheme to defraud.'" Id. at 373.

In any event, the charged scheme also involves (and adequately alleges) the misrepresentations described in the Superseding Indictment and discussed herein. Clase even acknowledges that paragraph 15 of the Superseding Indictment addresses this very issue, but he ignores the information it provides, namely the descriptions of two forms of misrepresentations made to the Betting Companies: that Bettors agreed they would not place wagers while in possession of inside information, and that Bettors agreed they would not place wagers as a proxy for any other individual. See ECF No. 80 ¶ 15. Then Clase complains not that the Superseding Indictment fails to describe alleged false statements, but rather that it (1) does not provide the specific instances (i.e., dates, time) of those false statements and (2) does not explicitly allege that such statements are "material." See Clase Mot. at 5 (the Superseding Indictment "does not say whether or when the Bettors agreed to the relevant terms and conditions, or whether their alleged inside knowledge would have affected the Betting Platforms' decision to accept or pay out a bet even if the Platforms had provided a way to disclose or withhold that information.").

Clase's meandering argument entirely lacks merit. First, there is simply no requirement that an indictment detail the "specific instance" of any particular fraudulent misrepresentation to pass muster on a motion to dismiss. That is particularly the case where the government has alleged a conspiracy, and the conspiratorial agreement itself is the crime. Wydermyer, 51 F.3d at 325 (indictment need not allege each element essential to the object the conspiracy with precision because "the crime of conspiracy is complete whether or not the

substantive offense which was its object was committed.").  Indeed, courts routinely reject motions for bills of particulars seeking this level of detail about fraudulent statements (as the Court did in this very case, <u>United States v. Clase de la Cruz</u>, 818 F. Supp. 3d 472, 487 (E.D.N.Y. 2026) (ECF No. 75)); let alone require that such details be alleged with particularity in an indictment.[8]

<u>Second</u>, the Superseding Indictment sufficiently alleges materiality.  ECF No. 80 ¶ 61 (alleging fraud by means of "<u>materially</u> false and fraudulent pretenses, representations, and promises" (emphasis added)).  It is likewise glaringly apparent from the description of the scheme and the Betting Platforms' Terms of Use—and indeed, the very use of the word "fraud"—that the Betting Platforms considered the possession of inside information while wagering to be important. <u>See</u> <u>Klein</u>, 476 F.3d at 113 ("[A]n allegation of materiality can be inferred from use of the word fraud in the indictment . . .".

In service of its argument that the Superseding Indictment failed to allege any cognizable misrepresentation, Clase seeks to downplay the seriousness of the offense by claiming that "the Indictment can only be read to allege that Mr. Clase and the Bettors 'conspired' to violate

---

8        Clase suggests, by way of footnote, that it will be "uncontested" that users of the Betting Platforms were only presented with terms and conditions at the time of account opening. Clase Mot. at 5, n.2.  Clase is incorrect. The government expects the evidence at trial to show that the Bettors affirmed the Terms of Use described in paragraph 15 of the Superseding Indictment on numerous occasions throughout the course of the scheme.  Though by no means necessary to prove the scheme, it is also true that affirmations of the Terms of Use even coincided with wagers at times.  For example, on June 27, 2025, at 5:22 p.m., Bettor-1 affirmed the Terms of Use for Betting Platform-1. Those Terms of Use stated, <u>inter</u> <u>alia</u>, that "It is a condition of our acceptance of Bets from you, and by offering to place a Bet with us you represent and warrant, that . . . [w]here the Bet is placed on the outcome of a race, competition or other event or process or on the likelihood of anything occurring or not occurring ("the event"), you do not know the outcome of the event . . . [and] [y]ou are not misusing Inside Information (as defined in Section 8.22) to place a Bet." The Betting Platform-1 Terms of Use defined Inside Information as "any information which has not been made public and, if it were made public, would be likely to have a material effect on the relevant market relating to the event."  Minutes later, at 5:24 p.m., Bettor-1 placed his initial wager on Subject Pitch-2, the fraudulent pitch described in paragraph 57 of the Superseding Indictment.

the Betting Platforms' house rules." Clase Mot. at 6. This statement is both wrong and a vast oversimplification of the facts; Clase, Ortiz and the Bettors conspired to defraud the Betting Platforms of money. The crime is not a technical rule violation, but a scheme to defraud. The violation of the rules is one component of how the co-conspirators perpetrated their fraud, but the violation of the rules was not the object of the scheme. See Kousisis, 605 U.S. 114 at 133 ("Here, for example, [the defendants] had money in mind. Nothing suggests that they concocted their scheme with the goal of thwarting PennDOT's disadvantaged-business initiative. Such a result was downstream of their 'object' to line their pockets."). The rules matter because they provide context for the defendants' deceptive behavior and fraudulent misrepresentations to the Betting Platforms. And every time a co-conspirator bet on inside information or affirmed the Terms of Use while engaged in the scheme, he engaged in or made a "false or fraudulent pretense[], representation[], or promise[]," 18 U.S.C. § 1343, to the relevant Betting Platform.[9]

Clase cites case law ostensibly for the principle that "failing to follow private rules is not enough to plead a fraudulent omission[.]" Clase Mot. at 6. None warrants the relief he seeks. In Hunt, the Court held that the mere existence of stock exchange rules—where the defendant was not alleged to have made any representations at all—did not support a material omission allegation for purposes of securities fraud. United States v. Hunt, No. 05-CR-395 (DAB), 2006 WL 2613754, at *4 (S.D.N.Y. Sept. 6, 2006) ("Subsection (b) is inapplicable to the instant case because the Government has not alleged that the Defendant made statements of any kind"). Here, the co-conspirators are alleged to have engaged in deceptive conduct and false pretenses

---

[9] Accordingly, Clase's claim that there were no material misstatements because the Betting Platforms did not offer a "text field for a bettor to provide a written message" or a "box" to certify compliance with terms of service when placing a bet, Clase Mot. at 5, n.1, is an irrelevant straw man.

26

(rigged pitches, wagers placed while in possession of inside information) as well as specific misrepresentations (false affirmations of Terms of Use and placing wagers warranting that the Bettors do not possess inside information), not mere rule violations.[10]

United States v. Finnerty and United States v. Cochran are likewise inapposite (nor are these post-trial cases even in the context of a motion to dismiss). In Finnerty, the district court granted a judgment of acquittal and the Second Circuit affirmed, where the defendant had engaged in "interpositioning"—trading that violated NYSE rules—but no evidence at trial established that the customer victims were deceived by the defendant's conduct or even had any expectation that he would not engage in such conduct. United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008). The Circuit explained that deceptive conduct is a well-founded basis for a securities fraud prosecution, but that "[b]road as the concept of 'deception' may be, it irreducibly entails some act that gives the victim a false impression," which the government had not proved. Id. Similarly, in Cochran, a Tenth Circuit case, the failure to disclose a fee was held to be an insufficient basis for a wire fraud prosecution where, "[t]he record makes it clear that even among the government's industry witnesses no consensus existed concerning proper reinvestment fee disclosure." United States v. Cochran, 109 F.3d 660, 666 (10th Cir. 1997). Here, by contrast, there can be no serious question that the defendants have "given the victims a false impression." The Bettors affirmed— over and over again—that they would not place bets while in possession of inside information. Each affirmation during the scheme and each wager with inside information was deceptive, in

---

[10] As explained, Hunt is not analogous to the facts of this case. But Hunt, if anything, stands for the proposition that fraudulent and deceptive acts that overlap with rule violations can be a sound basis for a fraud prosecution. Id. at *8 ("The Court finds that more than a violation of NYSE rules has been alleged here. As analyzed above, if the Government proves its case against Defendant, there can be no question that his acts of trading ahead and interpositioning constituted fraudulent acts perpetrated upon the trading public, not mere violations of quasi-regulatory rules.").

furtherance of the fraud scheme, and specifically deceived the victims.  Indeed, the Terms of Use the defendants violated in this case were rules established <u>by the victims of the fraud</u> to protect their interests.  <u>Finnerty</u> and <u>Cochran</u> have no bearing on the propriety of a wire fraud conspiracy prosecution in this context.

Finally, Clase's reliance on <u>United States v. Chandler</u>, 376 F.3d 1303 (11th Cir.), on reh'g, 388 F.3d 796 (11th Cir. 2004), likewise fails to support his argument.  In <u>Chandler</u>, individuals were charged with participating in a scheme to defraud McDonald's by cheating on its Monopoly promotional game, in which people collected game stamps when they purchased food. <u>Id.</u> at 1306.  An individual who had access to the stamps (the "Embezzler") embezzled winning stamps and had them disseminated across a large network of individuals who then submitted them to McDonald's for the prize money (the "Winners").  <u>Id.</u>  The government conceded the Winners did not know the Embezzler or that he had stolen the stamps; its theory rested on the idea that by submitting the stamps knowing they did not obtain them "legitimately"—<u>i.e.</u>, from the wrapper of a Big Mac, Happy Meal, or the like—the Winners had participated in a mail fraud conspiracy.  <u>Id.</u> at 1307.  The government's theory in that case thus rested entirely on the purported violation of the game's rules, which the Eleventh Circuit rejected, since mere breach of contract itself is not a crime.  <u>Id.</u> at 1312.  (Moreover, the trial evidence proved that it was not actually a violation of the rules to transfer stamps for redemption—as government witnesses testified, game stamps were publicly traded, including on McDonald's own website.)

Needless to say, that case is a far cry from this one.  Redeeming stamps that were given to the defendants rather than obtained from a McDonald's purchase does not make out a scheme to defraud or evidence any sort of corrupt intent.  In contrast, plotting to rig pitches (and doing so), sharing that information with co-conspirators so that Bettors could (and did) make

28

fraudulent wagers with inside information, obtaining fraudulent proceeds, and making kickbacks does. The intentional deception alleged here places this case squarely outside <u>Chandler</u> and within the heartland of federal fraud.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the defendants' motions to dismiss Count One of the Superseding Indictment should be denied in their entirety.

Dated:     Brooklyn, New York
            June 12, 2026

                                 Respectfully submitted,

                                 JOSEPH NOCELLA, JR.
                                 UNITED STATES ATTORNEY
                                 Eastern District of New York
                                 271 Cadman Plaza East
                                 Brooklyn, New York 11201

By:   /s/ _____
        Eric Silverberg
        Sean M. Sherman
        Sarah M. Evans
        Assistant United States Attorneys
        (718) 254-7000