RCH:EWS/SMS/RMU
F. #2025R00435

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

Docket No. 25-CR-346 (S-1) (KAM)

EMMANUEL CLASE DE LA CRUZ,
ROBINSON VASQUEZ GERMOSEN, and
LUIS LEANDRO ORTIZ RIBERA,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MEMORANDUM OF LAW
<u>IN SUPPORT OF ITS MOTIONS *IN LIMINE*</u>

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Eric Silverberg
Sean M. Sherman
Rebecca M. Urquiola
Assistant U.S. Attorneys
(Of Counsel)

TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iii

PRELIMINARY STATEMENT ... 1

STATEMENT OF FACTS ... 3

I. Factual Background ... 3

A. The Defendants, MLB Policies, and the Betting Platforms ... 3

B. Clase's Fixed Pitches ... 5

C. Ortiz Joined the Criminal Scheme ... 8

II. Procedural History ... 14

ARGUMENT ... 15

[redacted]

II. The Court Should Permit the Government to Admit the Defendants' and Their Co-Conspirators' Statements Made in Furtherance of the Conspiracy ... 19

III. The Court Should Admit Vasquez's Proffer Protected Statements at Trial If the Waiver Provision of the Proffer Agreement Is Triggered ... 28

A. Relevant Background ... 29

B. The Government Will Seek to Admit the Defendant's Proffer Statements If He or His Counsel Trigger the Waiver Provision ... 30

C. The Admission of Vasquez's Sanitized Proffer Statements Accompanied by an Appropriate Limiting Instruction Does Not Implicate the Confrontation Clause ... 33

IV. Evidence of Other Acts Taken by the Defendants Are Admissible as Direct and Background Evidence, and in the Alternative, Admissible Under Rule 404(b) ... 37

A. Relevant Background ... 38

B. The Evidence is Admissible as Direct Evidence or, in the Alternative, Under Rule 404(b) ... 41

C. In Admitting This Evidence, There Is No Unfair Prejudice ... 46

V. The Court Should Admit Summary Charts Pursuant to Federal Rule of Evidence 1006 ... 46

VI. The Court Should Admit Bettor-2's Sworn Declaration as a Prior Consistent Statement If the Defense Opens the Door During Cross-Examination ........ 50

VII. The Court Should Preclude Evidence and Argument of the Defendants' "Good Acts" or Non-Commission of Other "Bad Acts" ........ 53

VIII. The Court Should Preclude the Defendants From Introducing Improper Evidence of Good Character Under Rule 404(a) ........ 55

IX. The Court Should Preclude the Defendants From Admitting Out-Of-Court Statements Made by the Defendants and Their Co-Conspirators ........ 57

X. The Court Should Preclude Ortiz from Admitting Hearsay Declarations as Direct or Impeachment Evidence ........ 59

XI. The Court Should Preclude the Defendants from Calling Attorney-1 as an Impeachment Witness ........ 61

XII. The Defendants Should Be Precluded from Impeaching Witnesses with Agent-Prepared Interview Reports ........ 62

XIII. The Court Should Preclude Evidence or Arguments that Are Irrelevant, Unfairly Prejudicial, Misstate the Law or Invite Jury Nullification ........ 64

XIV. The Defendants Should Be Ordered to Disclose Rule 26.2 Statements ........ 68

CONCLUSION ........ 69

TABLE OF AUTHORITIES

PAGE(S)

Cases

Anderson v. United States,
417 U.S. 211 (1974) ... 23
Bourjaily v. United States,
483 U.S. 171 (1987) ... 15, 20
Bruton v. United States,
391 U.S. 123 (1968) ... 33
E. Afr. v. Odeh,
552 F.3d 93 (2d Cir. 2008) ... 36, 37
Funk v. Belneftekhim,
No. 14-CV-0376 (BMC), 2018 WL 11169575 (E.D.N.Y. 2018) ... 57
Goldenberg v. United States,
No. 09-CV-4005 (NGG), 2012 WL 1599869 (E.D.N.Y. 2012) ... 32
In re Doe,
No. 01-149 (JG), 2001 WL 1152816 (E.D.N.Y. 2001) ... 17
In re United States,
945 F.3d 616 (2d Cir. 2019) ... 65
In re Witness Before Grand Jury,
791 F.2d 234 (2d Cir. 1986) ... 16
Lorber v. Winston,
No. 12-CV-3571 (ADS), 2012 WL 5904522 (E.D.N.Y. 2012) ... 17
Palermo v. United States,
360 U.S. 343 (1959) ... 63
Phoenix Assocs. III v. Stone,
60 F.3d 95 (2d Cir. 1995) ... 51
Quartararo v. Hanslmaier,
186 F.3d 91 (2d Cir. 1999) ... 23
Samia v. United States,
599 U.S. 635 (2023) ... 36, 37
Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
319 F.R.D. 100 (S.D.N.Y. 2017) ... 15
Shannon v. United States,
512 U.S. 573 (1994) ... 67
Sparf v. United States,
156 U.S. 51 (1985) ... 65

Trammel v. United States,
445 U.S. 40 (1980) .... 16
United States v. Adelekan,
567 F. Supp. 3d 459 (S.D.N.Y. 2021) .... 27
United States v. Almonte,
956 F.2d 27 (2d Cir. 1992) .... 63, 64
United States v. Amato,
15 F.3d 230 (2d Cir. 1994) .... 21
United States v. Ammar,
714 F.2d 238 (3d Cir. 1983) .... 25
United States v. Arena,
180 F.3d 380 (2d Cir. 1999) .... 60, 61
United States v. Banks,
556 F.3d 967 (9th Cir. 2009) .... 16, 19
United States v. Barone,
913 F.2d 46 (2d Cir. 1990) .... 23
United States v. Barrow,
400 F.3d 109 (2d Cir. 2005) .... 31
United States v. Battaglia,
No. 05-CR-774 (KMW), 2008 WL 144826 (S.D.N.Y. 2008) .... 55
United States v. Beech–Nut Nutrition Corp.,
871 F.2d 1181 (2d Cir.1989) .... 26, 27
United States v. Bellomo,
176 F.3d 580 (2d Cir. 1999) .... 22, 25, 27
United States v. Benedetto,
571 F.2d 1246 (2d Cir. 1978) .... 54
United States v. Benitez,
920 F.2d 1080 (2d Cir. 1990) .... 33
United States v. Blackwell,
853 F.2d 86 (2d Cir. 1988) .... 56
United States v. Blackwood,
366 F. App'x 207 (2d Cir. 2010) .... 48
United States v. Blake,
195 F. Supp. 3d 605 (S.D.N.Y. 2016) .... 57
United States v. Boykoff,
67 F. App'x 15 (2d Cir. 2003) .... 53
United States v. Bray,
139 F.3d 1104 (6th Cir. 1998) .... 49
United States v. Breton,
740 F.3d 1 (1st Cir. 2014) .... 16

United States v. Broome,
732 F.2d 363 (4th Cir. 1984) ........ 17
United States v. Cardascia,
951 F.2d 474 (2d Cir. 1991)........ 58
United States v. Casamento,
887 F.2d 1141 (2d Cir. 1989)........ 50
United States v. Carboni,
204 F.3d 39 (2d Cir. 2000)........ 44, 45
United States v. Citron,
783 F.2d 307 (2d Cir. 1986)........ 49
United States v. Conlin,
551 F.2d 534 (2d Cir. 1977)........ 50
United States v. Cook,
No. 05-CR-424, 2007 WL 130326 (W.D. Wash. 2007),
aff'd, 288 F. App'x 351 (9th Cir. 2008) ........ 17
United States v. Coonan,
938 F.2d 1553 (2d Cir. 1991)........ 42
United States v. Damti,
109 F. App'x 454 (2d Cir. 2004) ........ 54, 55
United States v. Darif,
446 F.3d 701 (7th Cir. 2006) ........ 17
United States v. Davis,
890 F.2d 1373 (7th Cir. 1989) ........ 23
United States v. Dawkins,
999 F.3d 767 (2d Cir. 2021)........ 25, 27, 53
United States v. Desena,
260 F.3d 150 (2d Cir. 2001)........ 25
United States v. Detrich,
865 F.2d 17 (2d Cir. 1988)........ 22
United States v. DiMarzo,
80 F.3d 656 (1st Cir. 1996)........ 67
United States v. Dominguez-Gabriel,
511 F. App'x 17 (2d Cir. 2013) ........ 23
United States v. Dupree,
833 F. Supp. 2d 255 (E.D.N.Y. 2011) ........ 65, 66
United States v. Edwards,
342 F.3d 168 (2d Cir.2003)........ 41
United States v. Eisen,
974 F.2d 246 (2d Cir. 1992)........ 22, 27

United States v. Elias,
No. 23-6626, 2025 WL 2857883 (2d Cir. 2025) .................................................................. 47
United States v. Estes,
793 F.2d 465 (2d Cir. 1986)................................................................................... 16, 17
United States v. Fiumano,
No. 14-CR-518 (JFK), 2016 WL 1629356 (S.D.N.Y. 2016) .................................................. 54
United States v. Flom,
256 F. Supp. 3d 253 (E.D.N.Y. 2017), aff'd, 763 F. App'x 27 (2d Cir. 2019) ........................ 45
United States v. Flores,
945 F.3d 687 (2d Cir. 2019)................................................................................... 51, 52
United States v. Folkes,
No. 18-CR-257 (KAM), 2020 WL 4586390 (E.D.N.Y. 2020)................................................ 17
United States v. Frank,
869 F.2d 1177 (8th Cir. 1989) ....................................................................................... 16
United States v. Gentile,
No. 21-CR-54 (RPK), 2024 WL 3046193 (E.D.N.Y. 2024) ............................................ 47, 48
United States v. George,
779 F.3d 113 (2d Cir. 2015)........................................................................................... 46
United States v. Gigante,
166 F.3d 75 (2d Cir. 1998)....................................................................................... 20, 21
United States v. Goffer,
721 F.3d 113 (2d Cir. 2013)........................................................................................... 27
United States v. Gonzalez,
110 F.3d 936 (2d Cir. 1997)..................................................................................... 41, 45
United States v. Gotti,
784 F. Supp. 1013 (E.D.N.Y. 1992) ............................................................................... 54
United States v. Gramins,
939 F.3d 429 (2d Cir. 2019)........................................................................................... 42
United States v. Graziano,
558 F. Supp. 2d 304 (E.D.N.Y. 2008) ............................................................................ 67
United States v. Harris,
491 F.3d 440 (D.C. Cir. 2007) ........................................................................................ 56
United States v. Harwood,
998 F.2d 91 (2d Cir. 1993)............................................................................................. 58
United States v. Ho,
984 F.3d 191 (2d Cir. 2020)........................................................................................... 50
United States v. Inniss,
No. 18-CR-134 (KAM), 2019 WL 6999912 (E.D.N.Y. 2019)................................................ 54
United States v. James,
No. 02-CR-778 (SJ), 2007 WL 2702452 (E.D.N.Y. 2007) .................................................... 58

United States v. Jass,
569 F.3d 47 (2d Cir. 2009)........................................................................................ 33
United States v. Javice,
No. 23-CR-251 (AKH), 2025 WL 278885 (S.D.N.Y. 2025) .................................................. 68
United States v. Jefferson,
215 F.3d 820 (8th Cir. 2000) ..................................................................................... 22
United States v. Kahale,
789 F. Supp. 2d 359 (E.D.N.Y. 2009) .......................................................................... 22
United States v. Kerley,
784 F.3d 327 (6th Cir. 2015) ..................................................................................... 49
United States v. Knox,
687 F. App'x 51 (2d Cir. 2017) .................................................................................. 66
United States v. Kone,
216 F. App'x 74 (2d Cir. 2007) .................................................................................. 20
United States v. Kurland,
No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897 (E.D.N.Y. 2022) ....................................... 21
United States v. LaFlam,
369 F.3d 153 (2d Cir. 2004)....................................................................................... 41
United States v. Lasko,
146 F. App'x 530 (2d Cir. 2005) ................................................................................ 50
United States v. Lee,
660 F. App'x 8 (2d Cir. 2016) .................................................................................... 47
United States v. Lewis,
110 F.3d 417 (7th Cir. 1997) ..................................................................................... 67
United States v. Lights,
No. 15-CR-721, 2016 WL 7098633 (S.D.N.Y. 2016)........................................................ 65
United States v. Livoti,
196 F.3d 322 (2d Cir. 1999)....................................................................................... 42
United States v. Lung Fong Chen,
393 F.3d 139 (2d Cir. 2004)....................................................................................... 36
United States v. Lyle,
919 F.3d 716 (2d Cir. 2019)....................................................................................... 42
United States v. Mahaffy,
No. 05-CR-613 (ILG), 2007 WL 1094153 (E.D.N.Y. 2007) .................................................. 57
United States v. Malka,
602 F. Supp. 3d 510 (S.D.N.Y. 2022)........................................................................... 21
United States v. Marashi,
913 F.2d 724 (9th Cir. 1990) ..................................................................................... 17
United States v. Marin,
669 F.2d 73 (2d Cir. 1982)................................................................................... 57, 59

United States v. McDaniel,
398 F.3d 540 (6th Cir. 2005) .................................................................................... 57
United States v. McDonald,
756 F. App'x 964 (11th Cir. 2018) ............................................................................ 45
United States v. Mendoza,
574 F.2d 1373 (5th Cir. 1978) ................................................................................... 17
United States v. Mermelstein,
487 F. Supp. 2d 242 (E.D.N.Y. 2007) ........................................................................ 22
United States v. Miller,
626 F.3d 682 (2d Cir. 2010)....................................................................................... 64
United States v. Milstein,
401 F.3d 53 (2nd Cir. 2005)....................................................................................... 60
United States v. Motovich,
No. 21-CR-497 (WFK), 2024 WL 3303723 (E.D.N.Y. July 2, 2024) .................................... 66
United States v. Ndubuisi,
460 F. App'x 436 (5th Cir. 2012) ............................................................................... 45
United States v. Neumann,
No. 21-CR-439 (NSR), 2023 WL 8700974 (2023) ...................................................... 21, 47
United States v. O'Connor,
580 F.2d 38 (2d Cir. 1978)......................................................................................... 53
United States v. Paccione,
949 F.2d 1183 (2d Cir. 1991)...................................................................................... 55
United States v. Palmieri,
No. 97-CR-0356 (JG), 1998 WL 765138 (E.D.N.Y. 1998)................................................. 15
United States v. Parnas,
No. 19-CR-725 (JPO), 2022 WL 669869 (S.D.N.Y. 2022) ................................................ 47
United States v. Pedroza,
750 F.2d 187 (2d Cir. 1984)........................................................................................ 23
United States v. Persico,
No. 04-CR-911 (SJ), 2006 WL 3246922 (E.D.N.Y. 2006) ................................................ 58
United States v. Pinto,
850 F.2d 927 (2d Cir. 1988)........................................................................................ 49
United States v. Pugh,
162 F. Supp. 3d 97 (E.D.N.Y. 2016), aff'd, 937 F.3d 108 (2d Cir. 2019)
amended and superseded, 945 F.3d 9 (2d Cir. 2019), aff'd, 945 F.3d 9 (2d Cir. 2019)..... 15, 16
United States v. Purcell,
967 F.3d 159 (2d Cir. 2020).................................................................................. 51, 52
United States v. Rahme,
813 F.2d 31 (2d Cir. 1987)..................................................................................... 21, 25

United States v. Ray,
No. 20-CR-110 (LJL), 2022 WL 813942 (S.D.N.Y. 2022) ........ 52
United States v. Rivera,
22 F.3d 430 (2d Cir. 1994) ........ 21
United States v. Rivera,
No. 13-CR-149 (KAM), 2015 WL 1725991 (E.D.N.Y. 2015) ........ 33, 56
United States v. Roberts,
660 F.3d 149 (2d Cir. 2011) ........ 32, 33
United States v. Roldan Zapata,
916 F.2d 795 (2d Cir. 1990) ........ 42
United States v. Rosado,
728 F.2d 89 (2d Cir. 1984) ........ 66
United States v. Rosemond,
958 F.3d 111 (2d Cir. 2020) ........ 42
United States v. Russo,
302 F.3d 37 (2d Cir. 2002) ........ 21
United States v. Saldarriaga,
204 F.3d 50 (2d Cir. 2000) ........ 66
United States v. Salerno,
868 F.2d 524 (2d Cir. 1987) ........ 22
United States v. Scarpa,
897 F.2d 63 (2d Cir. 1990) ........ 53, 55
United States v. Scarpa,
913 F.2d 993 (2d Cir. 1990) ........ 54
United States v. Schlesinger,
372 F. Supp. 711 (E.D.N.Y. 2005) ........ 21
United States v. Sedaghaty,
728 F.3d 885 (9th Cir. 2013) ........ 23
United States v. Stewart,
433 F.3d 273 (2d Cir. 2006) ........ 21
United States v. Stewart,
No. 03-CR-717 (MGC), 2004 WL 113506 (S.D.N.Y. 2004) ........ 66
United States v. Tellier,
83 F.3d 578 (2d Cir.1996) ........ 20
United States v. Thomas,
116 F.3d 606 (2d Cir. 1997) ........ 67
United States v. Tutino,
883 F.2d 1125 (2d Cir. 1989) ........ 33
United States v. Wainright,
351 F.3d 816 (8th Cir. 2003) ........ 49

United States v. Walker,
191 F.3d 326 (2d Cir. 1999) ... 53
United States v. Weingarten,
No. 19-CR-497 (NSR), 2024 WL 677995 (S.D.N.Y. 2024) ... 22
United States v. Williams,
936 F.2d 698 (2d Cir. 1991) ... 33

Statutes

18 U.S.C. § 224 ... 14
18 U.S.C. § 1001(a)(2) ... 28, 29
18 U.S.C. § 1349 ... 14
18 U.S.C. § 1956(h) ... 14
18 U.S.C. § 3500 ... 63
18 U.S.C. § 3500(e) ... 63

Rules

Fed. R. Evid. 104(a) ... 15, 18, 19
Fed. R. Evid. 402 ... 64, 66
Fed. R. Evid. 403 ... 64
Fed. R. Evid. 404(a)(2)(A) & 405(a) ... 54
Fed. R. Evid. 404(b)(1) ... 41, 55
Fed. R. Evid. 404(b)(2) ... 41
Fed. R. Evid. 405(a) ... 56
Fed. R. Evid. 613(b) ... 62
Fed. R. Evid. 801 ... 51
Fed. R. Evid. 801(c) ... 20
Fed. R. Evid. 801(d)(2) ... 59
Fed. R. Evid. 801(d)(2)(A) ... 20, 23
Fed. R. Evid. 802 ... 20
Fed. R. Evid. 803(3) ... 57
Fed. R. Evid. 1006(a) ... 47
Fed. R. Evid. 1006(b) ... 47

Other Authorities

6 Weinstein's Federal Evidence § 1006.04 ... 49

## PRELIMINARY STATEMENT

Defendants Emmanuel Clase de la Cruz ("Clase") and Luis Leandro Ortiz Ribera ("Ortiz") are charged in a five-count superseding indictment with (1) conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349; (2) conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349; (3) conspiracy to influence sporting contests by bribery, in violation of Title 18, United States Code, Section 224; and (4) money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). See ECF No. 80 ("Superseding Indictment"). Defendant Robinson Vasquez Germosen ("Vasquez") and another individual whose identity is under seal[1] ("Defendant-4") are also charged with conspiracy to commit wire fraud. See id. The superseding indictment also charges Vasquez with making materially false statements to law enforcement agents, in violation of Title 18, United States Code, Section 1001(a)(2). The above-referenced charges arise out of the defendants' scheme to rig pitches in Major League Baseball ("MLB") games for money.

In advance of trial, which is scheduled to begin on November 2, 2026, the government submits this memorandum of law in support of the following motions in limine:[2]

### Motions to Admit Evidence

[redacted]

---

[1] Unless otherwise indicated, the anonymized persons described herein are the same as those referenced in the superseding indictment and are referenced herein using those same identifiers.

[2] This memorandum cannot anticipate every type of evidence and testimony that will be offered at trial and does not detail all the specific testimony the government will elicit at trial. The government respectfully reserves its right to supplement this filing with additional papers setting forth legal authority for the introduction of evidence and/or additional motions in limine as legal issues are identified closer to trial, including as the government interviews potential witnesses, or in response to any objection by the defense to the introduction of evidence. The

[redacted]

2. Motion to admit co-conspirator statements in furtherance of the conspiracy, including text messages, photographs, and audio messages involving the defendants and their co-conspirators.

3. Motion to admit certain proffer-protected statements made by Robinson Vasquez Germosen should he choose to testify, and to admit his proffer-protected statements as evidence in its case-in-chief, should Vasquez, any witness called on his behalf, or his attorney make any factual assertion—either while addressing the jury or during the examination of a witness—that is inconsistent with his proffer statements.

4. Motion to admit evidence of other acts by defendants Clase and Vasquez.

5. Motion to admit summary charts pursuant to Rule 1006.

6. Motion to admit Bettor-2's sworn declaration as a prior consistent statement if the defense opens the door during cross-examination.

<u>Motions to Preclude Evidence and to Compel Discovery</u>

7. Motion to preclude the defendants from introducing evidence of prior good acts under Rule 402.

8. Motion to preclude defendants from introducing improper evidence of good character under Rule 404(a).

9. Motion to preclude defendants from admitting out-of-court statements made by the defendants and their co-conspirators.

10. Motion to preclude the defendants from introducing declarations as direct or impeachment evidence.

11. Motion to preclude the defendants from calling an attorney from Dinsmore & Shohl LLP as an impeachment witness.

12. Motion to preclude the improper use of agent reports to impeach witnesses.

government will meet and confer with defense counsel to attempt to resolve any issues as they arise prior to engaging in motion practice.

13. Motion to preclude evidence and argument directed at jury nullification.

14. Motion to compel disclosure of Rule 26.2 material.

For the reasons set forth below, the government's motions in limine should be granted.

## STATEMENT OF FACTS

### I. Factual Background

At trial, the government will prove that Clase and Ortiz, former Cleveland Guardians pitchers, engaged in a scheme to rig particular pitches in MLB games for money. From May 2023 through June 2025, bettors (the "Bettors") used advance, inside information provided by Clase to place fraudulent wagers on fixed pitches Clase threw. Typically, Clase agreed to throw slower "slider" pitches that were "balls" (meaning outside of the strike zone) on the first pitches of at-bats when Clase was brought into the game as a relief pitcher, and the Bettors wagered accordingly. In or around June 2025, Ortiz, a starting pitcher, joined the criminal scheme and agreed to throw rigged pitches in two MLB games in exchange for money. Overall, the Bettors won at least $450,000 from online betting platforms (the "Betting Platforms") on pitches thrown by Clase and Ortiz.

#### A. The Defendants, MLB Policies, and the Betting Platforms

Clase and Ortiz were MLB pitchers from the Dominican Republic, teammates on the Cleveland Guardians, and friends. During the 2025 MLB season, Clase and Ortiz exchanged hundreds of WhatsApp messages with one another.[3] Defendant-4 was also a citizen of the Dominican Republic, had been longtime friends with Clase, and resided with Clase in Ohio during

[3] Unless otherwise indicated, all text messages and phone calls referred to throughout this memorandum occurred on WhatsApp. Unless otherwise indicated, messages described herein have been translated from Spanish to English and are in draft form.

the scheme between 2022 and 2023. Vasquez, who was also a citizen of the Dominican Republic, was closely associated with Clase. For example, ticketing data obtained from MLB indicates that, between April 15, 2024, and April 17, 2025, Clase set aside tickets for MLB games under Vasquez's name on 28 occasions. The listed designation in MLB's records for the "relation" between Clase and Vasquez is "family" and "friends." From May 2023 through June 2025, Clase and Vasquez exchanged over six hundred messages with one another. Notably, Ortiz also set aside tickets for Vasquez on April 16, 2025, under the "family" designation.

MLB rules and policies prohibited MLB players like Clase and Ortiz from gambling on MLB games in which they were involved, assisting others with wagers, and benefitting financially from bets placed by others. With limited exceptions for personal use—such as a time sensitive text message to a spouse—MLB rules also prohibited MLB players from using cellular telephones during MLB games. Under the terms of their contracts with the Cleveland Guardians, Clase and Ortiz agreed to accept and abide by all MLB rules, including the prohibition on betting on baseball games and the use of cellular telephones during games. Their contracts with the Cleveland Guardians further provided that each player owed a duty of loyalty to the Cleveland Guardians and "pledge[d] himself to the American public and to the [Cleveland Guardians] to conform to high standards of personal conduct, fair play and good sportsmanship."

Throughout the scheme, the Bettors used advance inside information from Ortiz and Clase to place fraudulent wagers on Betting Platforms, including Betting Platform-1, Betting Platform-2, and Betting Platform-3. All bettors wagering on the Betting Platforms were required to agree to their terms of use (the "Terms of Use"), which provided, in sum, substance and in relevant part, that users were prohibited from (i) wagering in connection with sports contests or individual players' statistical performances if the users had access to any pre-release, confidential

information or other information that was not available to all other wagerers, including any information provided by a professional athlete, such as non-public advance information about sporting events; and (ii) placing wagers as an agent or proxy for any individual other than the account holder.

Bets placed on an individual player's performance during a game, rather than on the final outcome of the game, are referred to as a "proposition bet" or "prop bet." For example, the Betting Platforms offered "Pitch Type" wagers that a specific pitch thrown by Clase or Ortiz would be either a ball or a batter hit by pitch, as opposed to a strike ("Ball/HBP"). In addition, the Betting Platforms also offered users the ability to place wagers on the speed of a given pitch ("Pitch Speed"), such as whether the pitch would be above 94.95 miles per hour ("mph").

B. <u>Clase's Fixed Pitches</u>

As the government will prove at trial, beginning in approximately May 2023, Clase agreed to share advance information about certain pitches he would throw in upcoming MLB games with Vasquez, Defendant-4, and Bettor-1 so that they and the other Bettors could use the information to win wagers on those pitches.

As part of the scheme, Bettor-1, Vasquez, and Defendant-4 acted as intermediaries between Clase and other Bettors. In addition, Vasquez placed bets on fixed pitches through an account he opened in the name of another individual ("Individual-2"). If the advanced information about the fixed pitches was not relayed in person, the defendants and their co-conspirators often used code words in text and audio messages, including but not limited to "rooster" and "chicken."

For instance, on June 3, 2023, the Guardians played an MLB game against the Minnesota Twins. At approximately 9:15 p.m. local time, in the middle of the game, Defendant-4 wrote to Bettor-1 by text message, "Active." Shortly thereafter, at approximately 9:47 p.m., Bettor-1 and eight other Bettors won approximately $38,000 on Betting Platform-2 by placing

multiple bets that the first pitch thrown by Clase would be a Ball/HBP and/or would be slower than 94.95 mph.

On June 4, 2023, Defendant-4 forwarded Bettor-1 a screenshot of a text message conversation between Defendant-4 and Clase. In that conversation, Defendant-4 asked Clase in a coded message about throwing another fixed pitch on the first pitch: "And the rooster [t]he same??" Clase responded, "Yes, the same rooster." Defendant-4 replied, "Okay" and noted that he would tell Bettor-1. Later that day, the Cleveland Guardians played an MLB game against the Minnesota Twins. As part of the scheme, Bettor-1 had a group chat (the "Group Chat") that included three of the Bettors who are brothers (the "Three Brothers"), as well as one additional Bettor, who was their cousin (the "Cousin"). At approximately 4:14 p.m., Bettor-1 initiated a group call on the Group Chat. Shortly thereafter, Bettor-1 and seven other Bettors, including the Three Brothers and the Cousin—all of whom had also bet on the fixed pitch the day before—won approximately $33,000 on Betting Platform-2 by placing multiple bets that the first pitch thrown by Clase would be slower than 94.95 mph. That same day, one of the Bettors sent approximately $1,200 to Defendant-4.

On September 30, 2023, the Cleveland Guardians were scheduled to play the Detroit Tigers. In separate conversations with two of the Bettors (one of the Three Brothers and the Cousin), Bettor-1 sent a screenshot of a portion of Bettor-1's conversation with Clase. In that portion of the conversation, Clase wrote coded messages about throwing a fixed pitch: "Did [Defendant-4] tell you is chicken number 3, after I kill the first 2, play the 3." Clase further wrote, "And if I can't kill it, don't play it. I have to kill the first 2." In response, the Cousin wrote to Bettor-1, "Ok" and asked, "[t]he guys know?" Bettor-1 responded, "Yes." And, in the

conversation with the other Bettor and one of the Three Brothers, Bettor-1 revealed the truth behind Clase's coded language:

> Bettor-1: The third one
> If somebody gets to base, nothing happens
> That's what came in

Beginning in or around April 2025, on several occasions, Clase requested and received bribe and kickback payments in exchange for agreeing to throw specific pitches. For example, on April 12, 2025, after receiving advance information from Clase about a specific pitch that Clase intended to throw, Bettor-1 and the Three Brothers won approximately $27,000 on Betting Platform-2 and Betting Platform-3 by placing multiple bets that a pitch thrown by Clase would be a Ball/HBP and/or would be slower than 98.45 mph. The next day, Bettor-1 and two of the Three Brothers transferred approximately $5,840 to Vasquez.

That day, April 13, 2025, Clase asked Bettor-1 by text message whether Bettor-1 had been able to "wager anything." After Bettor-1 responded, in sum and substance, that Bettor-1 had bet and won money, Clase directed Bettor-1 to "send some of it to DR," referring to the Dominican Republic. Clase provided Bettor-1 with contact information for a recipient for the money, "Recipient-1", and directed Bettor-1 to "[s]end it as if it were someone else." The same day, Bettor-1 sent Vasquez screenshot images of Bettor-1's text message exchange with Clase about sending money. The following day, April 14, 2025, Vasquez (using the name of Individual-2) sent $1,500 to Recipient-1, just as Clase had directed Bettor-1 to do the day before.

On some occasions, Clase provided money to Bettor-1 to wager on Clase's behalf on pitches thrown by Clase. For example, on May 13, 2025, Bettor-1 sent Clase a text message with a phone number and told Clase to "[s]end it there if you can," but also noted that "[i]f not, we can work with what we have. No problem." Clase responded, "[o]kay" and asked, "[h]ow much

do I send?" Bettor-1 replied, "[h]owever much you can, 2,500 and under." Clase wrote back, "[o]kay," and also asked for the name of the individual "on the account." Bettor-1 advised Clase of the individual's first name. Later that day, Clase electronically transferred approximately $2,500 to an individual with the same first name—Bettor-1's brother—who subsequently transferred $2,500 to Bettor-1.

As part of the scheme, Clase used his cellular telephone during his MLB games—contrary to MLB rules—to coordinate with Bettor-1. For example, on May 17, 2025, the Cleveland Guardians played an MLB game against the Cincinnati Reds. The game began at approximately 6:40 p.m. At approximately 8:24 p.m., Clase sent a text message to Bettor-1 asking if Bettor-1 was "ready." Bettor-1 responded, "[b]ut of course." Approximately ten minutes later, Vasquez (using Individual-2's account)—as well as Bettor-1, Bettor-2, the Three Brothers, and one other Bettor won approximately $27,000 on Betting Platform-2 and Betting Platform-3[4] by placing multiple bets that a pitch thrown by Clase would be a Ball/HBP and/or would be slower than 97.95 mph. Approximately twenty minutes later, Bettor-1 sent a screenshot image to Vasquez of Bettor-1's winning wager on Clase's pitch. As described below, in a subsequent interview with law enforcement, Vasquez told the government that he understood that Clase told Bettor-1 in advance about the pitch on May 17, 2025. The following day, May 18, 2025, one of the Bettors sent approximately $500 to Vasquez.

C. <u>Ortiz Joined the Criminal Scheme</u>

In or about June 2025, Ortiz joined the criminal scheme and agreed to throw two rigged pitches in exchange for money.

---

[4] Three of the Bettors placed wagers on both Betting Platform-2 and Betting Platform-3.

1. <u>The June 15 Game</u>

Before a game on June 15, 2025, between the Cleveland Guardians and the Seattle Mariners (the "June 15 Game"), Ortiz agreed with Clase that in exchange for $5,000, he would throw a ball for his first pitch in the second inning ("Subject Pitch-1"), the same type of wager that the Bettors typically agreed upon with Clase. Clase also agreed with Bettor-1 that Clase would receive $5,000 for securing Ortiz's agreement to throw Subject Pitch-1.

The June 15 Game was scheduled to start at approximately 4:10 p.m. Beginning at approximately 1:40 p.m., Bettor-1 sent a message to Clase asking "how are we doing?" and "everything under control there?" Bettor-1 and Clase then had a brief phone call. Beginning at approximately 2:10pm, Ortiz and [redacted] co-conspirator ("CC-1") engaged in a text message conversation. During the discussion, CC-1 repeatedly told Ortiz to [redacted] CC-1 also told Ortiz to [redacted] Ortiz responded [redacted] At approximately 2:30pm, Ortiz and CC-1 had a brief call. [redacted]

Before the June 15 Game had begun, and thus before they knew which batter would hit first in the second inning, Bettor-1 and Bettor-2 through another individual ("Individual-1") began wagering that the Subject Pitch-1 would be a Ball/HBP. The wagers won, resulting in a payout of approximately $48,000.[5]

The June 15 Game went poorly for Ortiz. During the six innings Ortiz pitched, he allowed six runs to be scored against the Guardians. Despite this, at approximately 5:45pm, CC-1

---

[5] While the Superseding Indictment alleged that Bettor-1 and Bettor-2 won approximately $26,000 on Subject Pitch-1 being a Ball/HBP, over the course of the investigation, the government has determined that Bettor-1 and Bettor-2 won approximately $48,000.

texted Ortiz, [redacted] Ortiz [redacted] CC-1 responded, [redacted], [redacted] Ortiz responded, [redacted] CC-1 then stated [redacted]

2. Ortiz's Receipt of a Bribe for Subject Pitch-1

In the days following the June 15 Game, Clase facilitated the transfer of the bribe payment from Bettor-1 to Ortiz. To do so, Clase enlisted the assistance of an associate ("Clase Associate-1"), whom Clase had also previously used as an intermediary to receive kickback payments from Bettor-1. On June 16, 2025, Bettor-1 and Clase Associate-1 exchanged messages and voice memos about Bettor-1 transferring money to individuals in the Dominican Republic. That day, Bettor-1 sent Clase Associate-1 wire transfer confirmations reflecting the transfer of money to individuals in the Dominican Republic. Shortly after the conversation between Bettor-1 and Clase Associate-1, Bettor-1 and Clase had a conversation about the money. Clase told Bettor-1, "You said you were going to do it today, but you didn't tell me anything." Bettor-1 responded, "everything is there already," referring to the money having been sent.

A few minutes after Bettor-1 and Clase's exchange, Ortiz and Clase exchanged messages about the kickback money Bettor-1 owed to them. Specifically, Ortiz wrote, "Tell me what the guy told you about the thing." Clase responded, "They're receiving it tomorrow, and I'll send it to you over there." The following day, June 17, 2025, Clase Associate-1 advised Bettor-1

---

6 [redacted]

that Clase had reached out informing Clase Associate-1 that the transactions had not cleared. The same day, Ortiz told Clase that the money was not going through and said, “Let me send you my aunt’s account so you can send it to me there.” Clase responded, “Okay” and also suggested that Ortiz provide “an ID, get it sent through Caribe Express,” a money remitting business.

The following day, June 18, 2025, Ortiz sent Clase a photograph of a driver’s license belonging to an associate of Ortiz (“Ortiz-Associate-1”) and told Clase: “Clase, tell them to send me 90,000 pesos and to save the rest for me[.] For them to save the 200, and to send the 90 that person for me, please.” 290,000 Dominican pesos is roughly equal to $4,900, slightly less than the $5,000 that Bettor-1 agreed to pay Ortiz for throwing Subject Pitch-1.

On June 19, 2025, Ortiz and Clase had a discussion that appears to be about the purchase of a horse in the Dominican Republic. An hour after that discussion, Clase sent a photograph of a wire transfer receipt documenting a transfer of 90,000 pesos from Clase Associate-1 (to whom Bettor-1 had sent the bribe payments) to Ortiz Associate-1. Clase then told Ortiz in a voice memo: “They’re gonna ask you what that payment is from. You tell them that it’s a horse payment - a horse payment, you hear?” Ortiz responded, “Ok, perfect.” The memo line on the receipt indicates that the payment was for a horse, just as Clase and Ortiz had discussed. Ortiz Associate-1 subsequently delivered the funds to CC-1 and sent Ortiz photographs documenting that the funds had been provided, including the following photograph:



3. The June 27 Game

A few days later, Ortiz agreed with Clase to throw another pitch for money ("Subject Pitch-2"). This time, in exchange for $7,000, Ortiz agreed to throw a ball for his first pitch in the third inning during a game held on June 27, 2025, between the Cleveland Guardians and the St. Louis Cardinals (the "June 27 Game"). Clase also agreed with Bettor-1 that Clase would receive $7,000 for obtaining Ortiz's agreement to throw Subject Pitch-2.

A few hours before the June 27 Game began, Clase went to the bank and withdrew $50,000 in cash. Clase provided $15,000 to Bettor-1 to use to wager that day, which Bettor-1

deposited at the same bank branch approximately one hour after Clase. Bank surveillance footage captured both transactions:






Before the June 27 Game began—and thus before anyone knew which batter would hit first in the third inning—Bettor-1, Bettor-2, Bettor-1's brother, and Bettor-2's daughter wagered that Ortiz's first pitch in the bottom of the third inning would be a ball. The wagers won, resulting in a payout of approximately $49,000.[7]

About five hours after Ortiz finished pitching in the June 27 Game, at approximately 11:27 pm, Ortiz and CC-1 had a phone call lasting approximately three minutes and eleven seconds. After the call, CC-1 sent messages to Ortiz [redacted] Ortiz assured CC-1 [redacted] to which

[7] While the Superseding Indictment alleged that the Bettors won approximately $37,000 on Subject Pitch-2 being a Ball/HBP, over the course of the investigation, the government has determined that the Bettors won approximately $49,000.

CC-1 directed him once again to [redacted] adding, [redacted]

As a result of the suspicious wagering on Ortiz's two pitches, shortly after the June 27 Game, the pitch-rigging scheme was detected. By July 3, 2025, Ortiz was placed on leave. Clase was placed on leave weeks later.

## II. Procedural History

On July 11, 2025, the government executed search warrants and seized electronic devices from Clase, Ortiz, and several of the Bettors, thus alerting them to the government's ongoing investigation. The government uncovered hundreds of text and audio messages between and among the co-conspirators, which, together with financial records, gambling records, geolocation data, and other information, established that the defendants engaged in the charged conspiracies.

On or about November 5, 2025, for their roles in the pitch-rigging scheme, the grand jury returned a four-count sealed indictment charging Clase and Ortiz with wire fraud conspiracy, in violation of 18 U.S.C. § 1349, honest services wire fraud conspiracy, in violation of 18 U.S.C. § 1349, conspiracy to influence sporting contests by bribery, in violation of 18 U.S.C. § 224, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). See ECF No. 1. Sealed arrest warrants were also issued that day.

On February 12, 2026, the grand jury returned a five-count superseding indictment (the "Superseding Indictment"), which added two additional defendants, Vasquez and Defendant-4, to the wire fraud conspiracy count. See Superseding Indictment, ECF No. 80. The Superseding Indictment also charged Vasquez with making materially false statements to law enforcement agents, in violation of Title 18, United States Code, Section 1001(a)(2). The Superseding Indictment did not contain additional charges against Clase or Ortiz.

## ARGUMENT

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted][9]

[redacted]

II. <u>The Court Should Permit the Government to Admit the Defendants' and Their Co-Conspirators' Statements Made in Furtherance of the Conspiracy</u>

At trial, the government will seek to admit, pursuant to Federal Rule of Evidence 801)(d)(2), the defendants' and co-conspirators' statements through the testimony of cooperating witnesses and through WhatsApp communications, including messages, voice notes, and calls between the defendants and co-conspirators.

---

9 [redacted]

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; [the Rules of Evidence]; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802.

Not all out-of-court statements offered for their truth are hearsay. First, out-of-court statements made by a defendant are not hearsay when introduced by the government to prove the truth of the facts stated therein because they are admissions of an opposing party. See Fed. R. Evid. 801(d)(2)(A) (a statement offered against an opposing party that "was made by the party in an individual or representative capacity" is not hearsay); United States v. Kone, 216 F. App'x 74, 76 (2d Cir. 2007) ("Statements made by the defendant, where relevant, may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party.").

Second, Rule 801(d)(2)(E) excludes from the definition of hearsay statements admitted by the government that were "made by the party's co-conspirator during and in furtherance of the conspiracy." A co-conspirator statement may be admitted by the government if the court finds by a preponderance of the evidence that (1) the conspiracy existed at the time the statement was made; (2) both the declarant and the defendant were part of the conspiracy; and (3) the statement was made in furtherance of the conspiracy. Bourjaily, 483 U.S. 171; see also United States v. Gigante, 166 F.3d 75 (2d Cir. 1998). While the hearsay statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy." Gigante, 166 F.3d at 82; citing United States v. Tellier, 83 F.3d 578, 580 (2d Cir.1996).

As to the third "requirement that the challenged statement be 'in furtherance of' the conspiracy," it "is satisfied if the statement's objective is 'designed to promote or facilitate achievement of the goals of the conspiracy.'" United States v. Malka, 602 F. Supp. 3d 510, 533 (S.D.N.Y. 2022) (quoting United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994)). Courts in this District have repeatedly held that this standard is "is not very restrictive." E.g., United States v. Kurland, No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. 2022). "[S]tatements made during the course and in furtherance of a conspiracy must be such as to prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." Gigante, 166 F.3d at 82. "This can include those statements that provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." Id.; see also United States v. Russo, 302 F.3d 37, 46 (2d Cir. 2002) (statements which "inform . . . [co-conspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)"); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987) (statements "that apprise a coconspirator of the progress of the conspiracy" are in furtherance of the conspiracy). Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E). United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994); see also United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy); United States v. Schlesinger, 372 F. Supp. 711, 720 (E.D.N.Y. 2005). Notably, "[a] statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy." Malka, 602 F. Supp. 3d at 533; accord United States v. Neumann, No. 21-CR-439 (NSR), 2023

WL 8700974, at *3 (2023); United States v. Weingarten, 19-CR-497 (NSR), 2024 WL 677995, at *12 (S.D.N.Y. 2024).

Statements apprising co-conspirators of past events also often further the conspiracy. See, e.g., United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) ("Statements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group."); United States v. Salerno, 868 F.2d 524 (2d Cir. 1987) (statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators). In addition, statements in furtherance of concealing an ongoing conspiracy are in furtherance of that conspiracy and, therefore, are relevant and admissible at trial. See United States v. Eisen, 974 F.2d 246, 269 (2d Cir. 1992) ("[C]learly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."); United States v. Kahale, 789 F. Supp. 2d 359, 384 (E.D.N.Y. 2009) (holding that "an act taken to conceal an ongoing illegal agreement . . . constitutes an act in furtherance of the charged conspiracy, and is admissible"); cf. United States v. Mermelstein, 487 F. Supp. 2d 242, 261 (E.D.N.Y. 2007) ("Efforts to conceal an ongoing conspiracy may properly be charged as overt acts in furtherance of it.").

Statements that are not being offered for their truth also are not hearsay. For example, out-of-court statements made by a third party are not hearsay if offered as circumstantial evidence of the defendant's state of mind or knowledge, rather than for their truth. See United States v. Detrich, 865 F.2d 17, 21 (2d Cir. 1988). Similarly, questions or commands do not generally constitute hearsay. See United States v. Bellomo, 176 F.3d 580, 586-87 (2d Cir. 1999);

United States v. Dominguez-Gabriel, 511 F. App'x 17, 20 (2d Cir. 2013); Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir. 1999).

Statements that are introduced for the purpose of proving that they were made and as a predicate for other proof that they were, in fact, false are also not hearsay because they are not offered for the truth of the matter asserted. Anderson v. United States, 417 U.S. 211, 219-20 (1974); United States v. Pedroza, 750 F.2d 187, 203 (2d Cir. 1984) (statement "offered for its patent falsity" is not hearsay); see also United States v. Sedaghaty, 728 F.3d 885, 916 (9th Cir. 2013) ("The hearsay rule does not apply to evidence offered to establish a foundation for later showing, through other admissible evidence, that it was false."). And when a defendant makes statements in the context of a conversation with a third party, the statements of the third party are admissible non-hearsay to the extent that they are necessary to place the defendant's statements in proper context. See United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990); United States v. Davis, 890 F.2d 1373, 1380 (7th Cir. 1989).

In addition to the defendants' own statements—which are plainly admissible as statements of an opposing party, see Fed. R. Evid. 801(d)(2)(A)—the government intends to admit WhatsApp communications and other statements by co-conspirators that were exchanged between and among themselves and the defendants. All three requirements of Rule 801(d)(2)(E) are met by, at a minimum, a preponderance of the evidence: (1) there was a conspiracy; (2) the members included the Bettors (the declarants) and the parties against whom the statements are offered (the defendants); and (3) these statements were made during the course of and in furtherance of the conspiracy.

First, all defendants are charged with wire fraud conspiracy, and defendants Ortiz and Clase are additionally charged with conspiracy to influence sporting contests through bribery,

money laundering conspiracy, and honest services wire fraud conspiracy. The WhatsApp messages between the defendants and the Bettors, phone calls between the Bettors following the receipt of illicit information about rigged pitches, and other evidence establishing relationships between the defendants and their co-conspirators establish at a minimum, the existence of the conspiracies by a preponderance of the evidence, as found twice by a grand jury.

Second, the statements the government seeks to introduce were made in furtherance of the charged conspiracies because they show: (1) how the members of the conspiracy were kept apprised about which pitches were rigged, the timing of the rigged pitches, and when to place bets on the rigged pitches; (2) prepared the Bettors for specific pitches and when to place bets according to the illicit information, often in coded language, provided by Clase and Ortiz; (3) provided reassurance to the Bettors; and (4) served to foster trust and cohesiveness among the defendants and the Bettors.

Third, the statements the government seeks to admit were made in furtherance of a conspiracy.[10] As noted above, the evidence at trial will establish that Clase agreed to share advance information about pitches he would throw in upcoming MLB games with Vasquez, Defendant-4, and Bettor-1 so that they and the other Bettors could use that information to win wagers on pitches. For example, after Defendant-4 forwarded Bettor-1 a screenshot between Defendant-4 and Clase on June 4, 2023 about an anticipated rigged pitch, Bettor-1 communicated with four other Bettors in the Group Chat. The Group Chat would generally discuss Clase's pitches through text messages, audio messages, and group calls. For example, on June 4, 2023, Better-1 initiated a

---

[10] To the extent that the government seeks to admit statements between co-conspirators not referenced in this brief, the government proposes submitting said statements to the Court and defense counsel when the parties are due to submit their exhibits to give the Court time to consider the admission of such statements prior to the start of trial.

group call at approximately 4:14 p.m. with Bettors on the Group Chat during an MLB game between the Guardians and the Minnesota Twins. Shortly thereafter, Clase threw the anticipated rigged pitch at 4:24 p.m. As a result of the information shared by Bettor-1 to the other Bettors, the Bettors on the Group Chat won approximately $33,000 by placing multiple bets on the rigged pitch.

The statements outlined above, and others like them, were made, among other reasons, for the purpose of keeping members of the conspiracy who collectively participated in the betting of rigged pitches informed about the defendants' actions and to facilitate the carrying out of the conspiracy. By informing Bettor-1, Vasquez, and Defendant-4 about the rigged pitches, Clase was equipping his co-conspirators with information to use for himself and for the Bettors to wager on fixed pitches and profit off the scheme. See, e.g., Rahme, 813 F.2d at 35-36 (quoting United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983)) (statement admissible where its purpose is "inform[ing] [co-conspirators] of the current status of the conspiracy"); see also United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001) (statement admissible where it provides an update as to the "progress or status of. the conspiracy").

Further, statements between the co-conspirators served to reassure members of the conspiracy about their roles in the conspiracy and facilitated relationships of trust. See Desena, 260 F.3d at 158. For instance, on September 30, 2023, Clase had written to Bettor-1 to make sure he knew which pitch to bet on: "Did [Defendant-4] tell you is chicken number 3, after I kill the first 2, play the 3. And if I can't kill it, don't play it. I have to kill the first 2."[11] By sending these

[11] For these and many other co-conspirator statements to be offered at trial, they would also be admissible in the first instance because they are not being offered for their truth (and thus are not hearsay), but rather, are instructions to Bettor-1 and others. See United States v. Dawkins, 999 F.3d 767, 789 (2d Cir. 2021); see also Bellomo, 176 F.3d at 586 ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the

messages to Bettor-1, Clase provided illicit information to assure that Bettor-1 and other Bettors would benefit from the scheme and served to keep Bettor-1 in the loop about his conversations with Defendant-4. Additionally, the use of coded language to provide information about the rigged pitches (i.e., referring to a pitch as "chicken" or "rooster") is evidence of the co-conspirators' active efforts to further the conspiracy. See United States v. Beech–Nut Nutrition Corp., 871 F.2d 1181, 1198-99 (2d Cir.1989) (finding co-conspirator statements admissible because they were designed to "cover up" the conspiracy and encourage the listener to "not [ ] reveal incriminating information.").

Moreover, Ortiz's communications with CC-1 between June 15 and June 27, 2025 were also made in furtherance of criminal conspiracies to throw fixed pitches, launder money, and [redacted], the government moves to admit CC-1's statements as co-conspirator statements under Rule 801(d)(2)(E).

As noted, CC-1 received a deposit of illicit funds following Ortiz's rigged pitch on June 15. After Ortiz's rigged pitch on June 27, 2025, CC-1 directed Ortiz to [redacted] As demonstrated from the conversations prior to June 27, and CC-1's instruction to Ortiz to [redacted] CC-1 knew that the funds were proceeds from the illegal scheme and

matter asserted therein, are not hearsay."). Regardless, however, even if the Court were to determine that the statements were being offered for their truth, they would be admissible as co-conspirator statements for the reasons described above.

actively sought to conceal any evidence of this scheme.[12] See Beech–Nut Nutrition Corp., 871 F.2d at 1198–99; see also Eisen, 974 F.2d at 269 n. 8 (finding that withdrawal from the conspiracy was not achieved by resignation from the firm because defendant was still a member of the conspiracy at the time of these efforts, "and, clearly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."). Given CC-1's receipt of funds from the illicit activities [redacted], it's evident that the communications were made in furtherance of the charged conspiracies. See United States v. Adelekan, 567 F. Supp. 3d 459, 468 (S.D.N.Y. 2021) (statements discussing how to disburse funds from a fraudulent wire made to an uncharged co-conspirator were found admissible).

Additionally, the fact that CC-1 told Ortiz [redacted] is highly probative of the nature of their relationship as co-conspirators who trusted each other, relied on each other and believed themselves to have engaged in wrongdoing. Cf. United States v. Goffer, 721 F.3d 113, 126 (2d Cir. 2013) ("[A] rational juror could readily infer from the trust that Goffer showed in Kimelman by asking him about the signature pages and the matter-of-fact manner in which Kimelman answered—without astonishment as to Goffer's knowledge or expression of concern about the sensitivity of such information—that Kimelman shared a relationship of trust with Goffer that Plate did not.").

---

[12] Similar to Clase's directives to Bettor-1, CC-1's instructions to Ortiz are not offered for their truth and thus are not hearsay. See Dawkins, 999 F.3d 789; see also Bellomo, 176 F.3d at 586 ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."). But even if the Court disagreed, they are admissible as co-conspirator statements.

For the foregoing reasons, to the extent that the defendants and their co-conspirators' statements are offered for their truth—as opposed to instructions, questions or other non-hearsay reasons—they are admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence.

## III. The Court Should Admit Vasquez's Proffer Protected Statements at Trial If the Waiver Provision of the Proffer Agreement Is Triggered[13]

At the trial on Counts One through Four, the government seeks to introduce Vasquez's proffer statements in its case-in-chief or rebuttal case in the event that Vasquez or his counsel offer evidence or make arguments that trigger the "waiver provision" of his proffer agreement.[14] As part of the decision denying the motion to sever and bifurcating Count Five, the Court held that the government could "avail itself of the waiver provision of Mr. Vasquez's proffer agreement at the trial for Counts One through Four, provided that the Government file 'a full set of potential Vasquez proffer statements' along with 'proposed redactions,' as part of its motions in limine, for the Court's review." See ECF No. 208 at 32-33. Accordingly, the government details below the bounds of the waiver provision and the proposed proffer statements.

---

[13] At the bifurcated portion of the trial on Counts One through Four, Vasquez's statements described herein and their accompanying context are redacted because they describe information that is currently subject to proffer protection, subject to waiver. See, e.g., ECF No. 211, at 32 ("If the Government had to forgo admission of Mr. Vasquez's statements completely, the Government would be left without a remedy at trial even if Mr. Vaquez directly contradicted the proffer statements . . . The waiver provision also may not be triggered at all.") (internal citations and quotation marks omitted).

[14] As noted in the government's March 20, 2026, letter response to Clase's motion to sever, ECF No. 111, the government proposed that the Court bifurcate Count Five of the Superseding Indictment—charging Vasquez with a violation of 18 U.S.C. § 1001(a)(2) for his lie during his proffer—to cure any potential prejudice to Clase from the introduction of Vasquez's proffer statements at trial. The Court subsequently issued a memorandum and order bifurcating Count Five in accordance with the government's proposal. See ECF No. 211 at 32.

A. Relevant Background

As described above, the government anticipates proving at trial that Vasquez was involved in the pitch-rigging scheme from 2023 through 2025, as charged in Count One of the Superseding Indictment.

On August 14, 2025, Vasquez was interviewed by attorneys associated with Clase. [redacted]. See id.; see also ECF No. 125-2.

Vasquez met with the government on January 9, 2026. The meeting was held pursuant to a proffer agreement, which provided certain protections against the government's use of any such statements in its case-in-chief at trial. See January 9, 2026 Proffer Agreement attached as Exhibit A. The proffer agreement provided, in what is commonly referred to as the "waiver" provision, that the government may use the defendant's proffer-protected statements "as substantive evidence to cross-examine [the defendant], should [the defendant] testify," and to "rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the defendant]" at trial or any other proceeding. Id. ¶ 4.

[redacted]:

[redacted]

[redacted]

See FBI-302 from January 9, 2026, attached as Exhibit B, at 2. [redacted] The government charged Vasquez with making materially false statements in the Superseding Indictment (Count 5) based on his misrepresentations during the January 9, 2026, meeting with the government.

[redacted]

B. <u>The Government Will Seek to Admit the Defendant's Proffer Statements If He or His Counsel Trigger the Waiver Provision</u>

Should Vasquez or his counsel offer evidence or make arguments that trigger the "waiver" provision of the proffer agreement, the government will seek to introduce Vasquez's

proffer statements at trial through an FBI witness who was present for the January 9, 2026, meeting.[15] Under Second Circuit precedent, it is well-established that "[s]pecific or direct contradiction between [a defendant's] proffer statement and an assertion by counsel" is not required to trigger the waiver. United States v. Barrow, 400 F.3d 109, 117-118 (2d Cir. 2005).

Pursuant to Barrow (which interpreted a substantively identical agreement), the defendant can trigger the waiver provision not only through presentation of testimony or other evidence, but also if his counsel contradicts the defendant's proffer statements either in counsel's jury addresses or through cross-examination. Id. at 118 ("Factual assertions made by a defendant's counsel in an opening argument or on cross-examination plainly fall within this broad language."). Thus, in an opening statement, counsel could trigger the waiver through an assertion of fact that is contrary to the defendant's proffer-protected statements. See id. at 119. For instance, if counsel claims in a jury address that Vasquez was unaware of the pitch-rigging scheme or was unaware that Clase told others about pitches in advance, then counsel would open the door for the government to introduce contrary proffer statements through an agent. And on cross-examination of a witness who is testifying consistently with Vasquez's statements, counsel would trigger the waiver by asserting a contrary fact in the form of a question to suggest that the witness is fabricating his testimony. See id. at 114, 119 (noting that the question, "You made up about meeting the [confidential informant] there that day, didn't you?" opened the door for the

---

[15] As noted below, to avoid implicating the Confrontation Clause, the government will seek to sanitize the witness testimony and proffer statements to substitute Clase's name with neutral pronouns.

government to introduce the proffer statements because it was an implicit factual assertion contrary to those statements).[16]

Moreover, the defendant's introduction of evidence—such as evidence implying that a witness is lying—that contradicts a proffer statement also triggers the waiver provision. Roberts, 660 F.3d at 163 ("The factual assertion thus being urged from the documents was that [the government's witness] could not have been on the ramp for the offloading of the Barbados flight. Because that fact was rebutted by [the defendant's] proffer statements, the district court properly admitted excerpts from those statements into evidence."). Finally, in the event that defense counsel triggers the waiver provisions of the agreement in closing arguments, the government should be permitted to reopen its case and call an FBI witness to testify about the defendant's statements. See, e.g., United States v. Goldenberg, No. 04-CR-159 (NGG), ECF No. 364, (E.D.N.Y. 2005) (denying Rule 33 motion and adhering to ruling made during trial to permit government to reopen its case after defendant triggered waiver provisions during closing arguments); see also Goldenberg v. United States, No. 09-CV-4005 (NGG), 2012 WL 1599869, at *4-5 (E.D.N.Y. 2012) (discussing trial ruling to admit proffer statements after counsel triggered waiver provision during closing statements).[17]

---

[16] The Second Circuit has recognized the distinction between challenging perception or recollection of an event and implying that an event did not occur is "more easily stated than applied." United States v. Roberts, 660 F.3d 149, 158 (2d Cir. 2011). "In close cases, the identification of what facts are being implied by counsel's questions and arguments may depend on the 'unique insights' a district court gains from actually seeing and hearing these matters pursued in the dynamic context of a trial." Id. The Second Circuit is "disinclined to second guess [the district court's] reasonable assessments informed by such insights." Id.

[17] To be clear, the proffer waiver is not automatically triggered by any and all defense arguments and thus does prevent the defendant from presenting a defense or challenging the government's proof. "The Second Circuit has cautioned that 'arguments or questions challenging the sufficiency of government proof, or the credibility of a witness without a factual assertion contradicting facts admitted in the proffer statement do not trigger a waiver provision.'" United

C. The Admission of Vasquez's Sanitized Proffer Statements Accompanied by an Appropriate Limiting Instruction Does Not Implicate the Confrontation Clause

It is well-settled that, in a joint trial, statements by one defendant to law enforcement that implicate a co-defendant are admissible and do not violate the defendant's Sixth Amendment's Confrontation Clause rights as recognized in Bruton v. United States, 391 U.S. 123 (1968), as long as they are redacted such that the declarant's statements, when viewed in isolation, do not implicate his co-defendant. See United States v. Williams, 936 F.2d 698 (2d Cir. 1991). The Second Circuit has established a framework for the appropriate redactions to a defendant's statements or sanitization of a witness's testimony. Specifically, "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's Bruton rights." United States v. Jass, 569 F.3d 47, 56 (2d Cir. 2009) (quoting United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989) (internal quotation marks omitted) (approving substitution of neutral words "others," "other people," and "another person" for names of co-defendants)); see also United States v. Benitez, 920 F.2d 1080, 1087 (2d Cir. 1990) (upholding redaction of co-defendant's name to "friend").

Here, should Vasquez trigger the waiver provision of the proffer agreement, the government will seek to introduce the following statements during the January 9, 2026 proffer at which he admitted to knowing of at least one fixed pitch. In accordance with Second Circuit authority, the government will ensure that any references to Clase are appropriately sanitized and replaced with neutral pronouns, such as the following (in bold):

---

States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1725991, at *3 (E.D.N.Y. 2015) (quoting Roberts, 660 F.3d at 158).

[redacted]

Similarly, the government would seek to introduce evidence and/or testimony regarding the following sanitized statements:

[redacted].

[redacted]

[redacted]

Accordingly, the introduction of Vasquez's proffer statements will not violate Clase's rights under the Confrontation Clause.

In addition to the above statements implicating Clase's participation in the charged conduct, depending upon the nature of the waiver, the government may seek to offer other statements from Vasquez's proffer. Pursuant to the Court's order, the government here lists the potential proffer statements, and, where applicable, the proposed sanitization:

| [redacted] | [redacted] |
| --- | --- |
| [redacted] | [redacted] |

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| [redacted] | [redacted] |
| --- | --- |
| [redacted] | [redacted] |

While Clase may argue that the other evidence in the case will indicate that Vasquez was referencing Clase in his proffer statements, the Second Circuit has held that there is no error from admission of such a statement at a joint trial even if other evidence introduced at trial sheds light on the identity of that "other person" in the sanitized statement. See United States v. Lung Fong Chen, 393 F.3d 139, 150 (2d Cir. 2004) (no Bruton violation even where other evidence "link[ed]" the complaining defendant to the incriminating statement), accord In re Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh, 552 F.3d 93, 133-34 (2d Cir. 2008) (same, where moving defendant complained that the combination of grand jury testimony and the incriminating statement violated Bruton; reaffirming that incriminating inference must be compelled by the statement alone).

The Supreme Court reaffirmed this framework in Samia v. United States, 599 U.S. 635 (2023). In Samia, Samia's co-defendant's confession, which implicated Samia by name in its original form, was admitted at trial through a testifying agent "in a way that eliminated Samia's name while avoiding any obvious indications of redaction." Id. at 641. Specifically, in Samia, two men—Stillwell and Samia—committed a murder together. See id. at 640. Stillwell gave a post-arrest statement in which he admitted to driving the van used in the murder but claimed that Samia had been the shooter. See id. At trial, the government called an agent to testify to Stillwell's confession, during which the agent described Stillwell's confession without identifying Samia by name. See id. at 641-42. In particular, each time the agent referred to Samia, he referred to him only as "the other person." See id. ("He described a time when the other person he was with pulled

the trigger on that woman in a van that he and Mr. Stillwell was driving.") (emphasis added by Samia Court). The trial court "instructed the jury that [the agent's] testimony was admissible only as to Stillwell and should not be considered as to Samia or [a third defendant]." Id. at 642. Samia argued that this procedure violated his rights. The Supreme Court disagreed, explaining that "the District Court's admission of Stillwell's confession, accompanied by a limiting instruction, did not run afoul of this Court's precedents" because it "was redacted to avoid naming Samia." Id. at 653.

Similarly here, should Vasquez trigger the waiver provision such that the government is permitted to introduce his proffer statements in sanitized form, the Court should also instruct the jury as follows:

> You are cautioned that the evidence of one defendant's statement to the authorities after his arrest about his own conduct may not be considered or discussed by you in any way with respect to any defendant on trial other than the defendant who made the statement.

See Sand, Modern Federal Jury Instructions, Instruction 5-20.[18]

## IV. Evidence of Other Acts Taken by the Defendants Are Admissible as Direct and Background Evidence, and in the Alternative, Admissible Under Rule 404(b)

The government intends to offer evidence of multiple other acts committed by the defendants as direct evidence of the charged criminal scheme and essential background for the charges in the Superseding Indictment. In the alternative, these acts are admissible under Federal Rule of Evidence 404(b). As set forth below, the government respectfully asks the Court to admit in limine: (1) evidence that Clase and Ortiz violated MLB Rule 21, the prohibition on betting on baseball, and evidence of their intent to conceal their violations of MLB Rule 21; (2) evidence that

[18] Substantively identical instructions were provided by the district court in Samia v. United States, 599 U.S. 635 (2023) (see United States v. Samia, No. 13-CR-521 (RA) (S.D.N.Y.), ECF No. 593 at 32-33) and by the district court in In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d at 136 (approvingly quoting district court's jury instructions).

Clase additionally violated MLB's On Field Regulation 1-2, the prohibition on using cellular phones during games, and evidence of Clase's efforts to conceal the prohibited use of his phone; and (3) evidence of Vasquez's efforts to conceal the existence of his primary phone to law enforcement.[19]

A. Relevant Background

1. Clase and Ortiz Violated MLB Rule 21

MLB Rule 21(d)(2) provides that "any . . . employee, who shall bet any sum whatsoever upon any baseball game in connection with which the better has a duty to perform, shall be declared permanently ineligible." MLB requires all players to participate in training about compliance with MLB's Rule 21. In connection with their roles as pitchers with the Cleveland Guardians, Clase participated in Rule 21 training, which was also conducted in Clase's native language of Spanish, on February 24, 2023, February 16, 2024, and February 28, 2025. Ortiz also attended the Guardians' Rule 21 training on February 28, 2025. Clase and Ortiz signed attendance sheets certifying that they attended Rule 21 trainings and thus were aware that they were prohibited from betting on baseball or sharing advance information with bettors.

In July and August 2025, after Ortiz threw his two fixed pitches the prior month, MLB initiated an investigation into both Clase and Ortiz for potential violations of Rule 21. As part of that investigation, the league made two requests for information through the Major League Baseball Players Association ("MLBPA") (the "MLB Requests"). In the MLB Requests, among

[19] During their careers, the defendants received additional disciplinary sanctions and warnings related to MLB rules violations. The government does not presently anticipate offering evidence of such disciplinary sanctions and warnings in its case-in-chief pursuant to Rule 404(b). However, should either defendant open the door by arguing to the jury or pursuing lines of inquiry suggesting, inter alia, that they abide by the rules, the government reserves the right to offer such evidence against that defendant, pursuant to Rule 404(a)(2)(A).

other things, MLB requested that Clase and Ortiz provide all documents, communications, and records of financial transactions with a number of the Bettors.

Through the MLBPA, the defendants provided responses to the MLB Requests. For example, as relevant here, when asked to identify documents and communications evidencing any financial transaction with Clase, Ortiz did not identify his exchange purportedly about a horse from June 18 and 19, 2025, instead claiming that he could not locate any responsive documents. Ortiz also represented that "he does not believe that he knows any of the individuals identified in" one of the MLB Requests—his codefendant, Robinson Vasquez—even though he had reserved game tickets for Vasquez just a few months earlier. As for MLB's request for documentation related to Clase's financial transactions with Bettors, Clase provided the MLB with a redacted bank statement that redacted a financial transaction with one of the Three Brothers, even though that person was specifically identified in MLB's request for information.[20]

2. Clase Violated MLB Rules Prohibiting the Use of Cell Phones During Games

MLB's On-Field Regulation 1-2(A) ("Use of Electronic Devices By Club Personnel During Games") provides in relevant part that "[d]uring the game (i) On-Field Club Personnel may not use or access any Electronic Devices anywhere in the stadium (including the clubhouse) …[.]" Further, the provision provides that club personnel can only access personal cell phones during games in limited scenarios like "a time sensitive text message to a spouse" or "playing music."

[20] The information described in this paragraph encompasses a handful of examples as opposed to all the ways that the defendants' representations to MLB, through MLBPA, were false and misleading.

Clase violated this rule on at least two occasions.[21] On April 24, 2024, Clase used his cellphone during the bottom of the first inning in a game against the Boston Red Sox. Separately, Clase used his cell phone on June 23, 2024, in the home clubhouse during the bottom of the fifth inning in a game against the Toronto Blue Jays. Clase received warnings after each game advising him that his conduct violated MLB On-Field Regulation 1-2(A) and that future violations could result in discipline.

3. <u>Vasquez Lied to Law Enforcement About His Primary Phone Upon Arrest</u>

Immediately before Vasquez's arrest, law enforcement agents analyzed prospective location information that was obtained for one of Vasquez's phones ("Vasquez Phone-1") pursuant to a search warrant and were thus able to approximate Vasquez's location in anticipation of his arrest. As documented on body worn camera footage, in response to law enforcement's question about the location of his phone (asked in Spanish so as to leave no room for misunderstanding), Vasquez told law enforcement agents that his cellular telephone was located in a white van parked at Vasquez's residence and provided consent for them to retrieve it from the vehicle. When they retrieved the phone ("Vasquez Phone-2"), the agents noted that Vasquez Phone-2 was turned off and had no battery power. After arresting Vasquez and while in transport to the United States District Court for the Eastern District of New York, law enforcement agents observed that the location data for Vasquez Phone-1 indicated that the phone was still at Vasquez's residence. Law

[21] Although the government does not have evidence of rigged pitches on these days, the government still seeks to admit these instances as evidence of Clase's disregard for MLB rules and his easy access to his phone during MLB games.

enforcement agents thus concluded that Vasquez Phone-2 was not Vasquez's primary phone (Vasquez Phone-1).

After the government told Vasquez's attorney that they were aware that Vasquez had not turned over Vasquez Phone-1, Vasquez (through his counsel) authorized agents to return to his residence and obtain Vasquez Phone-1. When FBI agents arrived at the residence, Vasquez's girlfriend provided Vasquez Phone-1, which had been turned off and, when turned on, was in airplane mode.

B. The Evidence is Admissible as Direct Evidence or, in the Alternative, Under Rule 404(b)

Federal Rule of Evidence 404(b)(1) prohibits admission of "[e]vidence of any other crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion a person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The Rule allows such evidence to be admitted, however, "for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004) (citing United States v. Edwards, 342 F.3d 168, 176 (2d Cir.2003)).

Evidence of uncharged criminal activity is also admissible, without reference to Rule 404(b), when it constitutes direct proof of a charged crime, if it provides the jury with background for the events alleged in the indictment, or if it arose out of the same transaction or series of transactions as the charged offenses. See, e.g., United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997) (holding that background evidence may be admitted to show the circumstances surrounding the events alleged in the indictment or to furnish an explanation of the understanding

or intent with which certain acts were performed). In such circumstances, evidence is generally admissible if it is relevant under the "very broad" standard of Rule 401. See, e.g., United States v. Gramins, 939 F.3d 429, 450 (2d Cir. 2019) (noting that "[r]elevance" under Rule 401 is "easily satisfied" and citing cases for the proposition that Rule 401 "is very broad").

Finally, Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime[s]," United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999), or, put another way, when it involves conduct that is no "more sensational or disturbing than the crimes with which" the defendant is charged, United States v. Roldan Zapata, 916 F.2d 795, 804 (2d Cir. 1990). See also United States v. Rosemond, 958 F.3d 111, 125 (2d Cir. 2020) ("The probative value of prior bad-act evidence is not substantially outweighed by the risk of prejudice if the conduct is not 'any more sensational or disturbing' than the charged crime.") (citing United States v. Lyle, 919 F.3d 716, 737 (2d Cir. 2019)).

1. Clase and Ortiz's Violations of MLB Rules and Their Attempts to Conceal These Violations

Clase and Ortiz's violation of MLB Rule 21, and efforts to conceal their repeated violations of this rule, are direct evidence of, and inextricably intertwined with, the charged schemes. Both players received extensive training, and thus were on notice, that sports betting was strictly prohibited by MLB. The reason why they received the training—MLB's Rule 21—is necessary to telling the story of this case. See, e.g., United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (noting that a trial court "may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the

indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."). The substance of the training is squarely relevant. The training warned Clase and Ortiz that Rule 21 prohibited them from, among other conduct, betting on baseball, having others bet for them, and revealing inside information to other bettors. It also stressed that players were prohibited from betting and facilitating bets on both the outcomes of games and, as relevant here, player prop bets—the very conduct charged in the Superseding Indictment. And it warned the players that, depending upon the circumstances, sports betting was potentially criminal, even citing examples of players from other sports who faced criminal prosecution. Despite these annual reminders of prohibited betting behavior, Ortiz and Clase violated this rule and engaged in efforts to conceal their participation in the conspiracy, i.e., using code words like "gallo," or rooster, to refer to pitches.

The admission of the defendants' violations of Rule 21 and their repeated disregard of a cardinal MLB rule, despite clear instruction, is also necessary context for the defendants' later false statements to the MLB in response to the MLB Requests. Through the MLBPA, both defendants provided false and incomplete information to MLB in an apparent effort to conceal their association with their co-defendants and/or certain Bettors and, thus, their involvement in a pitch-rigging scheme. Those efforts to hide evidence constitute direct evidence of wrongdoing and consciousness of guilt. The defendants knew they were under criminal investigation when they gave false information to MLB because their phones had already been seized by the FBI. Doing so was also part of the broader pattern they and their co-conspirators employed during the conspiracy—using financial intermediaries, straw bettors, and coded language, all in an effort to conceal their criminal conduct.

Taken together, the government's Rule 21 evidence establishes that the defendants knew it was wrongful to conspire to throw fixed pitches and illustrates why the defendants went to great lengths to conceal their conduct. Because this evidence places the defendants' conduct in the necessary context for assessing all the other evidence in the case, it should be admitted as direct evidence of the charged schemes.

2. Clase's Violation of MLB Rules Prohibiting Cell Phone Use During Games

Clase's cited violations of MLB's rule against the use of cell phones during games are also inextricably intertwined with the charged offenses. Though he did not throw a fixed pitch on either violation date, Clase threw rigged pitches both before and after he received those citations, and his use of a phone during games was critical in facilitating the charged crimes. By way of example, during a game against the Cincinnati Reds on May 17, 2025, Clase sent a text message to Bettor-1 in the middle of the game asking if Bettor-1 was "ready." Bettor-1 responded, "but of course." That night, the Bettors won approximately $27,000 after betting on a rigged pitch thrown by Clase later that evening. In using a phone during a game to facilitate the Bettors' wagers on his pitch, Clase defied multiple warnings from MLB that he was prohibited from doing so and even subjected himself to possible discipline for yet another violation of MLB rules, all because it was necessary to fulfilling the objectives of the charged schemes.

The Second Circuit's reasoning in United States v. Carboni is instructive. 204 F.3d 39 (2d Cir. 2000). In Carboni, the defendant was charged with making false statements to a bank by overstating an entity's revenue and assets. Id. at 42-43. The district court permitted the government to offer evidence that Carboni had also falsely represented on the entity's books and records the amount of the entity's inventory. Id. at 44. The Second Circuit affirmed, holding, in part, that the false inventory entries occurred around the same time of the other false statements and were intended to mislead the bank, and thus were "inextricably intertwined with the charged

conduct and not subject to Rule 404(b)." Id.; see also Gonzalez, 110 F.3d at 941-42 (evidence concerning uncharged burglary was admissible as background evidence for defendants' possession of firearms). So too here. Clase's in-game use of his cell phone was in the middle of the charged conspiracy and involved the exact same conduct that, the evidence will show, was used to facilitate the charged crimes.

Moreover, even if it were not direct evidence of the crimes charged or inextricably intertwined with such evidence, Clase's use of his cell phone during MLB games would be admissible for any number of non-propensity purposes, among them, to establish his ready access to his phone during games, opportunity, plan, and absence of mistake. See, e.g., United States v. Flom, 256 F. Supp. 3d 253, 267-69 (E.D.N.Y. 2017) (denying post-trial motions challenging admission under Rule 404(b) of evidence of prior money laundering scheme where the defendant used the same bank account in both the charged and the uncharged schemes), aff'd 763 F. App'x 27 (2d Cir. 2019); see also United States v. McDonald, 756 F. App'x 964, 968 (11th Cir. 2018) (evidence related to uncharged crime was admissible where, inter alia, the challenged evidence involved the same bank account as the charged crime, in the same time period, with the same methods); United States v. Ndubuisi, 460 F. App'x 436, 438 (5th Cir. 2012) (evidence of uncharged fraud committed using same bank account as charged fraud is admissible to demonstrate intent).

3. Vasquez's Concealment of His Phone is Admissible

Vasquez's attempt to conceal his phone from law enforcement when he was arrested is direct evidence of his participation in the charged conspiracies. It provides crucial evidence of his consciousness of guilt because it illustrates that the defendant's instinct when first confronted by law enforcement was to make misrepresentations about his primary device. During the course of the conspiracy, Vasquez and his co-conspirators attempted to conceal their behavior

by using coded language because they knew that they were engaging in illegal conduct. Moreover, Vasquez's lie to agents is of a piece with the false statement charge in the superseding indictment. Both at the time of his arrest and when he proffered with the government, Vasquez attempted to hide incriminating evidence—first by directing agents to another phone (rather than his primary device), then by dramatically minimizing his knowledge and the extent of his participation in the crimes. Notably, it was only after Vasquez's attorney was confronted regarding Vasquez Phone-1 that Vasquez decided to allow law enforcement to return to Vasquez's residence and obtain Vasquez Phone-1. His ongoing attempt to conceal the illegal scheme is necessary to complete the story of the crime and to demonstrate the defendant's role in the conspiracy as Clase's close associate. This evidence is also admissible under Rule 404(b) as Vasquez was aware of his guilt and took affirmative steps to avoid being caught. See United States v. George, 779 F.3d 113, 122 (2d Cir. 2015) ("A factfinder could similarly infer consciousness of guilt from [the defendant's] efforts at obstruction, both in urging [a witness] to lie to law enforcement officials . . . and in her own lying at trial[.]").

C. In Admitting This Evidence, There Is No Unfair Prejudice

Any danger of unfair prejudice to the defendants here is minimal. The defendants' MLB rules violations pale in comparison to the charged crimes. And Vasquez's attempt to conceal his primary phone from law enforcement is within the same course of conduct he is charged with under the false statements charge. None of the conduct is more inflammatory than the conduct underlying the charges. Nor is there any real danger of jury confusion. There is thus no basis to exclude the evidence under Rule 403.

V. The Court Should Admit Summary Charts Pursuant to Federal Rule of Evidence 1006

The government anticipates calling a witness at trial to testify regarding financial transactions related to each of the charges in the Superseding Indictment. The witness will testify

that he reviewed the underlying bank records cited in summary charts and prepared those summary charts to identify certain, relevant financial transfers from peer-to-peer payment platforms to co-conspirators' bank accounts. For instance, on May 13, 2025, after being told by Bettor-1 to send money to an individual, Clase electronically transferred approximately $2,500 to an individual with the same first name—Bettor-1's brother—who subsequently transferred $2,500 to Bettor-1. This transaction and others like it will form the basis for the witness' summary charts. The witness is expected to testify that he has reviewed each of the exhibits cited in the charts and that the charts display a fair and accurate summary of information contained in those exhibits. A draft of the proposed summary exhibits will be provided to the Court and defense counsel in advance of the witness's testimony.

Federal Rule of Evidence 1006 ("Rule 1006") provides that a party "may use a summary, chart, or calculation to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence." Fed. R. Evid. 1006(a). While the underlying admissible records need not be actually admitted, the "proponent must make the underlying originals or duplicates available for examination or copying, or both, . . . ." Fed. R. Evid. 1006(b). "'A summary must of course be based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent evidence already before the Court.'" United States v. Gentile, No. 21-CR-54 (RPK), 2024 WL 3046193, at *1 (E.D.N.Y. June 18, 2024) (quoting United States v. Neumann, No. 21-CR-439 (NSR), 2023 WL 8700974, at *7 (S.D.N.Y. 2023)). The use of charts to summarize voluminous records has been "regularly reaffirmed" by the Second Circuit. United States v. Elias, No. 23-6626, 2025 WL 2857883, at *4 (2d Cir. 2025); see also United States v. Lee, 660 F. App'x 8, 19 (2d Cir. 2016); United States v. Parnas, No. 19-

CR-725 (JPO), 2022 WL 669869, at *7 (S.D.N.Y. 2022), aff'd sub nom. United States v. Kukushkin, 61 F.4th 327 (2d Cir. 2023). The Second Circuit "ha[s] regularly affirmed the use of such charts." Gentile, 2024 WL 3046193, at *1 (quoting United States v. Blackwood, 366 F. App'x 207, 212 (2d Cir. 2010)).

The Court should permit the government to introduce summary charts pursuant to Rule 1006. Courts in this district have regularly permitted the government to introduce similar charts summarizing relevant transactions. Most recently in United States v. Berko, 20-CR-328 (DG) (E.D.N.Y.), Judge Gujarati admitted summary charts to summarize bribe payments made by the defendant to officials of the government of the Republic of Ghana. See Exhibit D at 10:17–12:5 (explaining that the testimony will not be in the nature of expert testimony). In United States v. Aguilar, 20-CR-390 (ENV) (E.D.N.Y.), Judge Vitaliano admitted summary charts to summarize bribe payments in an FCPA and money laundering conspiracy. See Exhibit E at 3124:3–9 (admitting non-expert flow of funds charts into evidence under Rule 1006); see also No. 20-CR-390 (ENV), Feb. 5, 2024 Minute Order (E.D.N.Y. 2024) (denying defendant's motion to preclude summary slides). In Gentile, Judge Kovner admitted summary charts summarizing cash flows between a series of accounts bank accounts controlled by the defendants. Gentile, 2024 WL 3041693, at **2–3. Other examples abound. See, e.g., United States v. Small, No. 16-CR-640 (BMC) (E.D.N.Y.), Trial Tr. 1021:24-1022:3 (admitting charts prepared by non-expert forensic accountant regarding flow of funds analysis into evidence as summary exhibit); United States v. Ng, No. 18-CR-538 (MKB) (E.D.N.Y. 2022), ECF No. 253, at Tr. 2838-2839 (admitting into evidence summary charts prepared by non-expert forensic accountant tracing bribe payments through various accounts); United States v. Barayev, No. 18-CR-318 (ERK) (E.D.N.Y. Feb. 25, 2020), ECF No. 77, at Tr. 299–300 (admitting summary charts in evidence).

The summary charts the government seeks to introduce at trial should likewise be admitted.[22] As in Aguilar (and the other cases cited above), the witness will testify that he reviewed the underlying bank records to identify relevant transactions. Those underlying bank records, which are hundreds, if not thousands, of pages, are admissible and have been produced to the defendants, satisfying the prerequisites of Rule 1006. The witness then prepared summary charts which show the flow of funds across financial accounts in the relevant transactions.

To the extent the Court finds that some of the charts are not Rule 1006 summary evidence, but rather demonstratives or a combination of the two, courts have repeatedly found that such "hybrid" charts may be admitted into evidence "to assist the jurors" as long as the charts "'accurately and reliably summarize[] complex or difficult evidence.'" 6 Weinstein's Federal Evidence § 1006.04 (2019) (quoting United States v. Kerley, 784 F.3d 327, 341 (6th Cir. 2015)). These charts "may include assumptions and conclusions" where "said assumptions and conclusions [are] based upon evidence in the record." United States v. Wainright, 351 F.3d 816, 821 (8th Cir. 2003). And while the proponent of a chart must provide "enough explanation to allow the jury to see how the [data] on a chart were derived from the underlying evidence," the proponent need not "provide detailed testimony stating the basis of each" particular entry on the chart. United States v. Citron, 783 F.2d 307, 317 (2d Cir. 1986).

[22] When summary charts are admitted into evidence, courts typically require a limiting instruction "'that the summary is not independent evidence of its subject matter, and is only as valid and reliable as the underlying evidence it summarizes.'" 6 Weinstein's Federal Evidence § 1006.04 (quoting United States v. Bray, 139 F.3d 1104, 1112 (6th Cir. 1998)); see also United States v. Pinto, 850 F.2d 927, 935 (2d Cir. 1988) (affirming "court's decision to allow the properly admitted summary charts into the jury room during deliberations" where "court repeatedly reminded the jurors of their responsibility to determine whether the charts accurately reflected the evidence presented"). The government will propose a similar instruction in this case based on the charge given by Chief Judge Brodie in Ng. See No. 18-CR-538 (MKB) (E.D.N.Y.), ECF No. 199, at 15-16.

The Second Circuit "has long approved the use of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, so long as the judge properly instructs the jury . . . that it is not to consider the charts as evidence." United States v. Ho, 984 F.3d 191, 210 (2d Cir. 2020) (quoting United States v. Casamento, 887 F.2d 1141, 1151 (2d Cir. 1989)); United States v. Lasko, 146 F. App'x 530, 532 (2d Cir. 2005) ("The use of charts summarizing evidence 'is a common procedure whose use [the Circuit] ha[s] repeatedly approved.'" (quoting United States v. Conlin, 551 F.2d 534, 538 (2d Cir. 1977))).

## VI. The Court Should Admit Bettor-2's Sworn Declaration as a Prior Consistent Statement If the Defense Opens the Door During Cross-Examination

On August 4, 2025, Bettor-2 submitted a sworn affidavit to MLB investigators admitting to his participation in the charged schemes to bet on fixed pitches. See Exhibit C. In sum and substance, Bettor-2 averred that Bettor-1 advised him to bet on pitches thrown by Clase and Ortiz, and the two agreed to share the proceeds. At trial, the government anticipates that Bettor-2 will testify that he participated in the charged conspiracies. If one or more of the defendants attacks his credibility by suggesting that he is testifying falsely, the government will seek to introduce Bettor-2's prior consistent statements, including Bettor-2's sworn affidavit, under Rule 801(d)(1)(B) to rebut claims of inconsistencies.

Pursuant to Rule 801(d)(1)(B), where a declarant-witness testifies and is subject to cross-examination, the witness's prior consistent statements are "not hearsay" when offered (i) "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying," or (ii) "to rehabilitate the declarant's credibility as a witness when attacked on another ground." The Advisory Committee amended Rule 801 in 2014 to expand the reasons for which prior consistent statements may be offered, to admit "consistent statements that rebut . . . attacks on a witness—such as the charges of inconsistency or faulty

memory." Fed. R. Evid. 801 adv. cmte. note. Prior consistent statements are admissible for their truth. United States v. Flores, 945 F.3d 687, 705 (2d Cir. 2019).

Under the first prong of Rule 801(d)(1)(B), prior consistent statements are admissible to rebut a claim of improper influence or motive once the proponent establishes, by a preponderance of the evidence: "(1) that the prior consistent statement is consistent with the witness's in-court testimony; (2) that the prior consistent statement is being offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive; and (3) that the prior consistent statement was made prior to the time that the supposed motive to falsify arose." Phoenix Assocs. III v. Stone, 60 F.3d 95, 103 (2d Cir. 1995)

Under the second prong of Rule 801(d)(1)(B), when offered to "rehabilitate the declarant's credibility," there is no established test for admissibility. However, the Second Circuit has upheld the admissibility of prior consistent statements to rebut claims that the witness could not be trusted and that the testimony being provided was inconsistent with earlier statements. For example, in United States v. Purcell, 967 F.3d 159, 196-97 (2d Cir. 2020), the Second Circuit affirmed the admissibility of prior consistent statements of a sex trafficking victim, after she was cross-examined, concerning alleged inconsistencies between her testimony at trial and her prior statements to the police. "By introducing [a third party's] testimony, which recounted [the victim's] statements to police in full and largely matched the version of events that [the victim] had recounted at trial, the government plainly sought to rebut the charge of inconsistency and to rehabilitate [the victim's] credibility by placing the alleged discrepancies in context." Id. at 197. Similarly, in Flores, the Circuit affirmed the admissibility of an agent's contemporaneous notes to rebut the defendants' arguments in opening—albeit "brief and were not their main challenges"—

that, among other things, the jury could not rely on the agent's recollection of what had been said during those interviews. 945 F.3d at 705.

Procedurally, Rule 801(d)(1)(B) can be triggered as early as opening statements. Id. at 706. In such circumstances, the government may introduce prior consistent statements in a witness's direct examination. Id. (finding Rule 801(d)(1)(B) "does not restrict admissibility to statements of one who has already been cross-examined"). Moreover, a witness's prior statements need not be "identical to a precise statement challenged" to be admissible. United States v. Ray, 20-CR-110 (LJL), 2022 WL 813942, at *2 (S.D.N.Y. 2022). Rather, it is sufficient that the defense "challenged statements on the same or closely related topics and that the prior statement operated not just to rehabilitate the witness's credibility generally but also to rehabilitate the witness's credibility with respect to the testimony that has been challenged." Id.

Here, the government anticipates that Bettor-2 will testify, in sum and substance, that he bet on certain Clase and Ortiz pitches because Bettor-1 told him that the pitches were fixed; that he shared the proceeds of the bets with Bettor-1; and that he tipped others about certain fixed pitches, who also successfully wagered. While it is premature to say how the defense will attack Bettor-2's testimony, if the defense suggests that Bettor-2 is testifying falsely about his participation in the charged scheme, the government should be permitted to introduce Bettor-2's affidavit to rebut any accusation that he recently fabricated his testimony to curry favor with the government. Rather, Bettor-2 swore to his participation in a scheme to bet on fixed pitches thrown by Clase and Ortiz months before he was contacted by the government. Bettor-2's sworn statement to MLB investigators would serve the purposes that Purcell identified as proper under Rule 801(d)(1)(B)—rebutting accusations of inconsistency and placing purported discrepancies in context, see Purcell, 967 F.3d at 196-97—and would therefore be admissible.

## VII. The Court Should Preclude Evidence and Argument of the Defendants' "Good Acts" or Non-Commission of Other "Bad Acts"

The Court should preclude evidence and argument of Ortiz and Clase's "good acts"—including evidence and argument that they threw many legitimate pitches that they did not communicate to Bettors in advance—to attempt to disprove the defendants' guilt of the crimes charged. Such testimony is not relevant or admissible.

It is well-settled that evidence that a criminal defendant did not engage in criminal activity in other instances is irrelevant to the charged crimes. The Second Circuit has repeatedly held that evidence of a defendant engaging in legal, honest conduct on other occasions is simply irrelevant to whether the defendant engaged in the criminal conduct charged by the government. See, e.g., United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence, however, through proof of the absence of criminal acts on specific occasions"); Dawkins, 999 F.3d at 792 (affirming district court's exclusion of defendant's proffered evidence that he did not bribe certain basketball coaches and reasoning "[n]o less than evidence of a defendant's prior 'bad acts' used to show that he committed the crime charged, such 'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—i.e., if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit"); United States v. Boykoff, 67 F. App'x 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant" (citation omitted)); United States v. Walker, 191 F.3d 326, 336 (2d Cir. 1999) (affirming district court's exclusion of non-fraudulent applications, reasoning "[w]hether [defendant] had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); United States v. O'Connor, 580 F.2d 38, 43 (2d Cir. 1978) (affirming district court's exclusion of testimony that witnesses did not pay defendant any bribes "because

such testimony would in effect be an attempt to demonstrate appellant's good character by proof of specific good acts"); United States v. Fiumano, 14-CR-518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. 2016) ("The principle is rather elementary. A defendant charged with robbing a bank in Manhattan on April 22 cannot offer as evidence to disprove the charged crime that he did not rob the bank's branch on April 20, 21, 23, and 24, because this evidence is irrelevant to the charge that he robbed the Manhattan bank on April 22."); United States v. Gotti, 784 F. Supp. 1013, 1017 (E.D.N.Y. 1992) ("[A] defendant cannot establish that he did not commit a crime as to A because he did not commit a crime as to B.").

Indeed, "[e]vidence of past 'good acts' by a defendant is generally not probative unless a defendant is alleged to have 'always' or 'continuously' committed 'bad acts.'" United States v. Damti, 109 F. App'x 454, 455-56 (2d Cir. 2004) (citing Scarpa, 913 F.2d at 1010 for proposition that "'good acts' evidence 'would only be relevant if the indictment charged [defendants] with ceaseless criminal conduct'" (alterations and emphasis in original).). And, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait," or the witness' opinion of the defendant regarding that trait, see Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. See, e.g., United States v. Benedetto, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (finding defense-proffered character evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912, at *7-8 (E.D.N.Y. 2019) (precluding "evidence or argument concerning [the defendant's] prior commission of 'good acts' or non-commission of other bad acts").

Here, the government has not alleged that the defendants engaged in "ceaseless" criminal conduct or that they "continuously" committed illegal acts. Rather, the government alleges that Clase told the Bettors about fixed pitches in advance on specific occasions between 2023 and 2025, and that Ortiz did so on two occasions in June 2025. Any evidence that Clase and Ortiz did not throw fixed pitches on other occasions is not relevant to the charged crimes. See, e.g., Damti, 109 F. App'x at 456; Scarpa, 897 F.2d at 70. As such, the only possible purpose for testimony or evidence of particular instances in which the defendants did not tell the Bettors in advance about fixed pitches would be to try to prove propensity—that is, an argument by the defense that if the defendants threw pitches on some occasions that were not fixed with the Bettors in advance, then on other occasions they would not have done so. This is precisely the type of evidence precluded under Federal Rule of Evidence 404(b). See Fed. R. Evid. 404(b)(1) ("Evidence of any other . . . act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

## VIII. The Court Should Preclude the Defendants From Introducing Improper Evidence of Good Character Under Rule 404(a)

The government is unaware of any lawful basis for defense counsel to offer evidence or argument concerning the defendants' personal and family backgrounds, including the defendants' involvement in charitable or other "good acts," winning awards, lack of criminal history, or any other similar personal factors. Defense counsel should be precluded from doing so, and from mentioning such subjects in their opening statements, absent a showing that any such factor bears on their guilt. See, e.g., United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy); United States v. Battaglia, No. 05-CR-774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether

Defendant committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man"); United States v. Rivera, 13-CR-149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. April 15, 2015) (precluding evidence of unrelated charitable giving).

The Federal Rules of Evidence ordinarily prohibit witnesses from proving good character through specific instances of conduct. See Fed. R. Evid. 405(a). The Second Circuit has concluded, however, that evidence of a lack of prior convictions or arrests is sometimes admissible for the purpose of gauging the credibility of a witness. See United States v. Blackwell, 853 F.2d 86, 88 (2d Cir. 1988) (noting the "relatively low probative value" of this evidence). Thus, such evidence becomes relevant and admissible if—and only if—the defendant testifies, and even then, only for the limited purpose of providing background information relating to his credibility as a witness.

Consistent with Blackwell, the government requests that the defendants be precluded from informing the jury of their lack of criminal history or other "good acts," such as charitable giving or awards won, unless and until they choose to testify. Counsel should not be permitted to advise the jury of the defendants' lack of criminal history in opening statements or through cross-examination. Counsel also should not be able to use the absence of a prior criminal record, or any other evidence of specific instances of conduct, to prove good character, or to show lack of intent or motive. To allow otherwise would confuse the issues under consideration, in violation of Federal Rule of Evidence 403, and violate Rule 405(b)'s restrictions against proving good character through specific instances of conduct.

## IX. The Court Should Preclude the Defendants From Admitting Out-Of-Court Statements Made by the Defendants and Their Co-Conspirators

The Court should preclude the defendants from admitting other statements or portions of statements made by any of the defendants, their agents or co-conspirators, either on cross-examination or in their case-in-chief, because such testimony would constitute hearsay not subject to any exception.

It is well established that a defendant generally is prohibited from introducing his own out-of-court statements at trial. See United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("[W]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). Therefore, a "court may . . . exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay." United States v. Mahaffy, No. 05-CR-613 (ILG), 2007 WL 1094153, at *2 (E.D.N.Y. 2007). Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." United States v. McDaniel, 398 F.3d 540, 545 (6th Cir. 2005).

Nor, except in extremely limited circumstances, may a defendant introduce his own out-of-court statements as evidence of his state of mind. The state-of-mind exception to the hearsay rule allows into evidence "[a] statement of the declarant's then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). The state of mind must be relevant, and the statement cannot be offered for any underlying truth independent of the state of mind. See Funk v. Belneftekhim, No.

14-CV-0376 (BMC), 2018 WL 11169575, at *3 (E.D.N.Y. 2018) (denying admission of statements under Rule 803(3) because "[n]either statement shows [declarant's] knowledge or state of mind independent from the truth of what it asserts and it is not clear how [declarant's] state of mind is relevant.") (citing United States v. Harwood, 998 F.2d 91, 98 (2d Cir. 1993). "The exclusion of 'statement[s] of memory or belief [proffered] to prove the fact remembered or believed' is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." United States v. Cardascia, 951 F.2d 474 , 487 (2d Cir. 1991).

Finally, a defendant also may not admit his agents' or co-conspirators' statements under Rules 801(d)(2)(D) or (E). Such statements are not "opposing party" statement as to a defendant. Thus, for example, courts have held that the "co-conspirator exception is a one-way street down which only the government may travel." United States v. Persico, No. 04-CR-911 (SJ), 2006 WL 3246922, at *1 (E.D.N.Y. 2006); see also United States v. James, No. 02-CR-778 (SJ), 2007 WL 2702452, at *1 (E.D.N.Y. 2007) (a co-conspirator statement made "during the course and in furtherance of the conspiracy is one type of '[a]dmission by party-opponent' defined as nonhearsay, but only if 'offered against' the party. The statement of a co-conspirator, offered for its truth by a co-conspirator, does not fall within this Rule.").

Here, while it is unclear what evidence the defendants may offer, the government anticipates that Clase may seek to introduce hearsay evidence about betting on rooster fighting as a means of arguing that the coded communications between him and his co-conspirators—which often used "gallo," or rooster, to refer to pitches—are innocuous communications being misrepresented by the government. While Clase may have communicated with others, including

co-conspirators, about wagering on rooster fighting, the government's ability to introduce the defendants' illicit statements under Fed. R. Evid. 801(d)(2) does not create a parallel ability for the defendants to introduce "non-illicit statements," and any attempts by them to do so should be precluded. See Marin, 669 F.2d at 84.[23] And to the extent the government only offers a portion of a statement, the government may seek to preclude the defendants from offering additional portions of those communications into evidence as inadmissible hearsay. To the extent practicable, the government will endeavor to notify the defendants in advance if it intends to admit only a portion of any specific statement of the defendants. This should allow the defendants the opportunity to make any motions they may wish to make pursuant to Federal Rule of Evidence 106.

## X. The Court Should Preclude Ortiz from Admitting Hearsay Declarations as Direct or Impeachment Evidence

On August 24, 2026, in accordance with the Court's Second Amended Scheduling Order, the parties exchanged their exhibit lists. See ECF Nos. 201, 203, 206. Ortiz's list of trial exhibits includes declarations by Bettor-1, Clase Associate-1, and Defendant-4 (collectively, the "Subject Declarations"). See ECF No. 201. Given that the Subject Declarations constitute impermissible hearsay evidence under Federal Rule of Evidence 802 not subject to any exception, the Court should preclude their admission at trial. Nor are the Subject Declarations admissible as prior inconsistent statements for impeachment purposes.

---

[23] Indeed, even if those communications were otherwise excluded from the prohibition against hearsay evidence (which they are not), Clase and others' communications about wagers on rooster fighting, which the defense represents is legal in the Dominican Republic, constitute additional other acts evidence that should also be precluded under Federal Rule of Evidence 404(b). The defendants cannot use hearsay communications about legal wagers on rooster fights occurring on other occasions as evidence that communications about the pitch-rigging scheme were also about rooster fighting. See supra VII.

The Subject Declarations are not admissible under any exception to the rule against hearsay. As detailed above, see supra X, because the declarants to the Subject Declarations are not Ortiz's "party opponent" as described in Rule 801(d)(2), they are not admissible on that basis. The Rule specifically provides that the statements must be offered "against a party" where that statement was made by that party himself, the party's agent or a "coconspirator of the party." Here, the party-opponent of the defendant is the government. Because the Subject Declarations are not statements of the government, of its agent, or of its co-conspirators, Ortiz is prohibited from offering these out-of-court statements under Rule 801. See United States v. Milstein, 401 F.3d 53, 73 (2nd Cir. 2005) (defendants may not rely on the co-conspirator exception to introduce out-of-court statements by co-conspirators offered for the truth.).

The Subject Declarations are also not admissible for impeachment purposes. Rule 613(b) allows extrinsic evidence of a witness's prior statement to be offered to impeach that witness's credibility if the statement is inconsistent with trial testimony. However, neither Clase Associate-1 nor Defendant-4 is expected to testify at trial. Thus, the admission of their declarations would not serve to impeach either witness.

Moreover, none of the defendants should be permitted to offer Bettor-1's declaration into evidence under Rule 613(b) either. If Bettor-1 is called as a witness at trial, the government anticipates that Bettor-1 will testify on direct examination that he knowingly signed a false declaration denying his participation in a scheme to wager on fixed pitches, thereby eliminating the need to impeach him with extrinsic evidence. As the Court noted in its decision denying Ortiz's severance motion, under United States v. Arena, 180 F.3d 380, 400 (2d Cir. 1999), "the district court retains the discretion to allow extrinsic evidence of a prior inconsistent statement when that inconsistent statement is admitted to by the witness, as the Government expects its

witness to do." ECF No. 211, at 24. The Court must "assess the probative value of the additional extrinsic evidence" under Rule 403. See id. Where, as here, the trial witness will testify to making a prior untrue statement, there is no "inconsistency" with the prior statement that warrants additional evidence, and, because the extrinsic evidence is more cumulative than probative, it ought to be excluded. Thus, the Court should find that the admission of Bettor-1's declaration would be "consistent with and duplicative of that portion of" Bettor-1's anticipated direct examination testimony, and exclude is under Arena. 180 F.3d at 400.

## XI. The Court Should Preclude the Defendants from Calling Attorney-1 as an Impeachment Witness

The government understands that Ortiz intends to call Attorney-1 as a witness to impeach Bettor-1.

For the reasons described above and in the government's opposition to Ortiz's severance motion, ECF No. 86 at 11–14, no defendant should be permitted to call Attorney-1 for impeachment purposes. Where, as here, a defendant is admitting to a prior inconsistent statement, the Court retains the discretion to preclude additional extrinsic evidence of the same prior inconsistent statement under Rule 403. See Arena, 180 F.3d at 400; ECF No. 211, at 24. As noted above, the defense should not be permitted to introduce extrinsic evidence to establish that Bettor-1 made a prior inconsistent statement when, as the government anticipates, Bettor-1 will readily admit to making the prior inconsistent statements. Permitting the defense to impeach Bettor-1 through witness testimony—particularly from a witness employed by the same law firm representing a defendant—is thus both unnecessary and would be especially problematic. Attorney-1's testimony would have little, if any, probative value while posing extraordinary peril under Rule 403.

In particular, in the event the Court permits Attorney-1 to testify, the government must be given wide latitude to impeach Attorney-1 for bias. Among other areas, the government should be permitted to elicit from Attorney-1 that he previously represented and was paid by Clase; that as Clase's attorney, he had a duty of zealous advocacy for Clase and all related duties that an attorney owes to his client, even after the representation ends; that he is employed by the law firm representing Clase at trial and being paid by Clase; and that he helped prepare a presentation given to the government seeking to persuade it not to bring charges against Clase. It should also be permitted to inquire whether the defendant has assisted in the preparation of Clase's defense at trial. While any one of these areas is potentially perilous, preventing the government from establishing Attorney-1's obvious bias would put the government at an unfair disadvantage. Rule 403 is designed to guard against precisely that sort of unfair prejudice. If the Court permits any of the defendants to call Attorney-1 (and it should not), the government must be permitted to conduct a fair cross-examination.

## XII. The Defendants Should Be Precluded from Impeaching Witnesses with Agent-Prepared Interview Reports

The defendants should be precluded from imputing to witnesses summaries of prior interviews prepared by law enforcement officers. While the government has produced summaries of witness interviews prepared by law enforcement, the defendants should be precluded from introducing the contents of those reports to impeach such witnesses during cross-examination, publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports are statements of witnesses who did not write, review, or adopt them.

A witness may be impeached with his prior inconsistent statement, but the statement must in fact be the witness' prior statement and he must be afforded an opportunity to explain or deny it. See Fed. R. Evid. 613(b). "A third party's characterization of a witness's

statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization." United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992) (citation omitted and quotation marks omitted). Thus, absent a witness's endorsement of another's characterization of his prior statement, the third party's notes or summary is irrelevant. Id. The burden of proving that the record actually reflects the witness's statement belongs to the party seeking to introduce it. Id.

The Jencks Act, which is codified in 18 U.S.C. § 3500, defines a witness's "statement" as "a written statement made by said witness and signed or otherwise adopted or approved by him;" a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury." 18 U.S.C. § 3500(e). An "agent's interpretations or impressions" of a witness are not a witness's prior statement under the Jencks Act. Palermo v. United States, 360 U.S. 343, 352-53 (1959).

The government has provided the defendant with discovery, including investigators' reports and notes summarizing interviews with witnesses. The government's prospective witnesses have not reviewed, approved, or adopted any of the reports drafted by the government's agents. The reports were drafted after interviews and meetings were completed and contain investigators' interpretations. They are not verbatim recitals or transcripts of witnesses' statements. Therefore, these reports are not the statements of any witness other than the law enforcement officer who authored them, should that person be called to testify as a witness. The reports cannot be used for impeachment purposes and should not be read aloud or shown to the

jury. See Almonte, 956 F.2d at 29-30. The defendants should be precluded from suggesting or arguing that material in a law enforcement report is a witness' statement.[24]

## XIII. The Court Should Preclude Evidence or Arguments that Are Irrelevant, Unfairly Prejudicial, Misstate the Law or Invite Jury Nullification

The defendants and their counsel should be precluded from introducing evidence or making arguments before the jury that urge nullification, put the government on trial, or otherwise seek to impugn or put at issue the government's conduct or motive in its prosecution of this matter or invite the jury to render its decision based on improper legal and factual considerations.

Under Federal Rule of Evidence 402, "irrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Federal Rule of Evidence 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; see also United States v. Miller, 626 F.3d 682, 689-90 (2d Cir. 2010). Further, a defendant is not entitled to advance an argument or introduce evidence to obtain an acquittal or mistrial through jury nullification. A defendant's attempt to focus the jury on sympathy, prejudice or public opinion in coming to a verdict, rather than on the evidence and facts before it, "subverts the jury's solemn duty to 'take

[24] Based on the contents of a law enforcement report, the defendants may ask a witness whether he or she made a particular statement to law enforcement. However, if the witness denies making the statement, the defense should be precluded from publishing the report or otherwise introducing the report as the witness' prior inconsistent statement, and counsel should no longer question the witness on the statement. A report may be shown to the witness for purposes of refreshing the witness' recollection if the witness says he or she does not remember making a statement. This may only be done in a manner that does not suggest the report or its contents are the witness's prior statement and the report may not be published to the jury. See generally Order on Guidelines Regarding Appropriate Use of 302 Forms in Criminal Trials, United States v. Harrell, No. 20-CR-239 (BMC) (E.D.N.Y.), ECF No. 1634; Nov. 2, 2018 Order, United States v. Guzman Loera, No. 09-CR-466 (BMC) (E.D.N.Y.).

the law from the court, and apply that law to the facts of the case as they find them to be from the evidence.'" See In re United States, 945 F.3d 616, 627 (2d Cir. 2019) (quoting Sparf v. United States, 156 U.S. 51, 102 (1985)).

The Court should preclude the defendants from introducing such improper arguments here, including variations of the following:

First, the Court should preclude the defendants from introducing evidence or argument concerning the government's charging decisions. That could take many forms, but it includes arguing, suggesting, or presenting evidence to the jury that the charge is somehow a novel or unusual application of the wire fraud statute. The defendants made similar arguments in their pretrial motion to dismiss Count One of the Superseding Indictment, claiming that the charge constitutes an "impermissible federalization of alleged violations of state law," ECF No. 142, at 7 (Clase and Ortiz), and would "upset[] the 'coherent federal policy' regarding sports wagering," id., see also ECF No. 149, at 18 (Vasquez). It would be improper for the defendants to relitigate their pretrial motions before the jury. See, e.g., United States v. Lights, No. 15-CR-721, 2016 WL 7098633, at *1-2 (S.D.N.Y. 2016) ("The stop and subsequent searches were all based on valid probable cause. This issue has been litigated and decided. No reference to the illegality of the stop or subsequent searches will be permitted at trial . . ."); cf. United States v. Dupree, 833 F. Supp. 2d 255, 272 (E.D.N.Y. 2011) ("The court cannot and will not permit this case to become a referendum before the jury on the appropriateness or legality of government conduct that has already been found appropriate and lawful and which has no bearing on the reliability of evidence offered against defendants. Therefore, the court grants the government's motion to preclude defendants from presenting evidence or eliciting testimony during direct or cross-examination

regarding their allegations of prosecutorial misconduct."), rev'd and remanded on other grounds, 706 F.3d 131 (2d Cir. 2013).

Nor is it appropriate to put the government on trial for its charging decisions. See, e.g., United States v. Knox, 687 F. App'x 51, 54-55 (2d Cir. 2017) (instructing jury that "government is not on trial" is "appropriate"); United States v. Saldarriaga, 204 F.3d 50, 52 (2d Cir. 2000) (affirming jury charge stating that "[t]he government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true, and the fact that there are a thousand[] other things they could have done is wholly irrelevant"); United States v. Rosado, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"). What's more, evidence or argument about the legal propriety of the government's fraud charges would only serve to confuse and mislead the jury, whose sole role is to consider the evidence and defendants before it. See, e.g., Fed. R. Evid. 402 & 403; United States v. Stewart, No. 03-CR-717 (MGC), 2004 WL 113506, at *2 (S.D.N.Y. 2004) (precluding defense counsel from arguing that government's charging theory was a novel application of securities law); United States v. Motovich, No. 21-CR-497 (WFK), 2024 WL 3303723, at *6 (E.D.N.Y. July 2, 2024) ("The novelty or unusualness of the bank fraud charges is irrelevant to the question presented to the jury—whether or not Defendant committed bank fraud.").

Second, the Court should preclude the defendants from offering evidence or argument concerning the possible penalties they face if convicted. Such evidence or argument concerning sentences and the possible punishment the defendants might face if convicted—

including bans from MLB and/or possible immigration consequences—is irrelevant to the jurors' fact-finding task. It is well-settled law that "juries are not to consider the consequences of their verdicts" and should reach their verdicts "without regard to what sentence might be imposed." Shannon v. United States, 512 U.S. 573, 579 (1994). The possible punishment a defendant might face is simply not the jury's concern and is entirely irrelevant. Moreover, providing information about possible punishment to the jury would create a danger of unfair prejudice and confusion that would substantially outweigh its null probative value. Such information "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." Id. In particular, information about possible punishment poses the obvious danger that the jury will decide guilt not on the evidence presented but on whether the jury believes that the punishments fit the alleged crimes. In other words, such information would serve to facilitate jury nullification, a danger that this Court has an affirmative "duty to forestall or prevent." United States v. Thomas, 116 F.3d 606, 614-16 (2d Cir. 1997) (jury nullification is a violation of a juror's oath and courts may not permit jury nullification to occur "when it is within their authority to prevent"). For this reason, courts have repeatedly precluded evidence and argument about potential punishment on the grounds that it is irrelevant and unduly prejudicial. See, e.g., United States v. Graziano, 558 F. Supp. 2d 304, 327 (E.D.N.Y. 2008) (reference to mandatory minimum sentence should be precluded under Rule 403 because such information "creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to impact on their deliberations on the question of the defendant's guilt or innocence" and thereby presents a "danger of unfair prejudice"); see also United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996).

XIV. The Defendants Should Be Ordered to Disclose Rule 26.2 Statements

Rule 26.2(a) provides that defense counsel must produce to the government "any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." Courts in this Circuit routinely order defendants to abide by their Rule 26.2 obligations. See, e.g., United States v. Watson, 23-CR-82 (EK), Dkt. Ent. Apr. 12, 2024 (E.D.N.Y.) (ordering disclosure of Rule 26.2 material); United States v. Lopez, et al., 15-CR-252 (PKC), Trial Tr. 5872, attached as Exhibit F (where witness statements were contained in memoranda over which defense counsel asserted work product privilege, ordering defense to produce summaries prepared by defense counsel of anticipated witness testimony); United States v. Javice, No. 23 Cr. 251 (AKH), 2025 WL 278885, at *1 (S.D.N.Y. 2025) (ordering the defense to produce "statements that fall within the scope of Rule 26.2, including notes taken by a witness's interviewer or materials shown to and adopted or approved by the witness, but excluding other attorney work product").

Here, the government made its initial § 3500 disclosure on August 21, 2026—approximately two-and-a-half months before trial—to afford the parties time to prepare and make appropriate motions. To avoid any unfair advantage, the Court should order the defendants to produce Rule 26.2 material by no later than five days before a witness testifies, which is consistent with schedules set by other judges in this District. See, e.g., Memorandum and Order at 17-18, United States v. Chen, No. 22-CR-158 (ENV), ECF No. 366 (Oct. 17, 2024).

CONCLUSION

For the reasons described above, the government's motions in limine should be granted.

Dated: Brooklyn, New York
August 28, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/ Eric Silverberg
Eric Silverberg
Sean M. Sherman
Rebecca M. Urquiola
Assistant United States Attorneys
(718) 254-7000