UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

EMMANUEL CLASE DE LA CRUZ,
LUIS LEANDRO ORTIZ RIBERA, and
ROBINSON VASQUEZ GERMOSEN,

*Defendants.*

Docket No. 25-CR-346 (KAM) (S-1)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LUIS LEANDRO ORTIZ RIBERA'S MOTION FOR SANCTIONS PURSUANT TO THE COURT'S RULE 5(f) ORDER**

## PRELIMINARY STATEMENT

The government's case against Luis Leandro Ortiz Ribera is remarkably thin. It consists, in essence, of the anticipated testimony of two cooperating bettors, Bettor-1 and Bettor-2, and a handful of wagers that Bettor-1, Bettor-2, and two of their relatives placed on two pitches Mr. Ortiz threw, one on June 15, 2025 and the other on June 27, 2025. Bettor-1 and Bettor-2 were prolific gamblers. Yet even on the government witnesses' accounts, neither of them ever communicated with Mr. Ortiz. Not once. Not by text, not by phone, not in person.

The government's theory depends entirely on a chain of alleged hearsay that never touches Mr. Ortiz directly. Bettor-1 claims that Emmanuel Clase relayed inside information from Mr. Ortiz to him, and that Bettor-1 then passed that information to Bettor-2 in exchange for a share of any winnings. Bettor-2, in turn, says only that Bettor-1 repeated this account to him, which is what led Bettor-2 to place his own wagers and to enlist a relative to place others. Every link in that chain runs through a single source: Bettor-1's word.

In response to repeated requests by Mr. Ortiz and Mr. Clase for exculpatory material, the government produced only brief summaries reporting that both Bettor-1 and Bettor-2 had denied possessing any inside information about Mr. Ortiz's pitches. (Ex. 1 (Gov't Ltr., dated Jan. 5, 2026)).[1] The government refused to produce the underlying reports in which those denials were recorded. The Court did not require the government to produce the report, but directed the government:

> I order the government to comply with its *Brady* obligations. I think we understand how *Brady* material is defined. I would say that even if you think something is actually better classified as *Giglio* material, in an excess of caution, as you like to say, give them the information.

(Ex. 2 (Jan. 15, 2026 Tr.) at 32:10-14). The government insisted that it understood its obligations and would comply. (*See, e.g.*, *id.* at 32:21-22, 33:5-21). It did not.

Instead, the government suppressed a fact that strikes at the very premise of its theory. During a February 19, 2026 interview, Bettor-1 admitted to the government that there were many times he did not have exact or inside information but nevertheless gave others the impression that a bet was fixed and that he did so in order to earn money. (Ex. 3 (Feb. 19, 2026 Bettor-1 302) at 10). Bettor-1's admission is textbook exculpatory evidence. We anticipate that the government will introduce the wagers that Bettor-2 and the relatives of Bettor-1 and Bettor-2 placed on Mr. Ortiz's pitches, and argue that those bets prove the bettors possessed inside information traceable to Mr. Ortiz. But Bettor-1's admission that he routinely manufactured that very appearance when he had no inside information at all drains those wagers of any probative value. The same is true of Bettor-2's anticipated testimony. The government presumably intends to call Bettor-2 because he told investigators that, based on what Bettor-1 said, he understood

---

[1] Exhibits 1 and 2 - 5 were provided in material the government deemed "Sensitive Information" subject to the protective order entered by the Court on November 30, 1997 (ECF No. 37), and are therefore submitted under seal,

Bettor-1's tips, including those concerning Mr. Ortiz, to rest on fixed pitches. But if Bettor-1 fabricated the existence of inside information, Bettor-2's derivative belief proves nothing about Mr. Ortiz.

The government should have disclosed Bettor-1's admission immediately after its February 19, 2026 interview. Instead, it sat on the most exculpatory statement in the case. For months. In doing so, the government violated this Court's Rule 5(f) Order, which required it to disclose favorable, material information promptly after its existence becomes known to the government so that the defense may make effective use of the information in the preparation of its case.[2] (ECF No. 15 at 1).

Given the gravity of that violation, Mr. Ortiz asks the Court to enforce the Rule 5(f) Order with an evidentiary remedy directed to the evidence the violation infected. The Court should preclude the government from calling Bettor-1 as a witness. Alternatively, the Court should give a specific adverse-inference instruction explaining that the government failed to disclose, as required, Bettor-1's admission that he sometimes conveyed guesses in a manner that led bettors to believe he had inside information. At an absolute minimum, the Court should order the immediate production of all grand jury testimony, agent reports and agent interview notes in connection with the government's investigation into this matter.

## BACKGROUND

### I. The Court ordered prompt disclosure of favorable information.

On November 12, 2025, the Court entered an order under Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No. 116-182, 134 Stat. 894 (Oct. 21, 2020). (ECF No. 15). The Order confirms that the government must disclose information

---

[2] The government has advised that it did not seek leave of the Court to delay disclosure, as contemplated by the Rule 5(f) Order. (ECF No. 15 at 2).

favorable to the accused and material to guilt or punishment, regardless of whether the defense requests it and regardless of whether the information itself would be admissible. (*Id.* at 1). The obligation is continuing, applies whether or not the government credits the information, and extends to information known to federal, state, and local prosecutors, law-enforcement officers, and other officers who participated in the investigation or prosecution. (*Id.* at 2).

The Order separately addresses impeachment material. It requires such information to be disclosed sufficiently before trial to permit effective use at trial, or at another time set by the Court. (*Id.* at 1). For favorable information material to guilt or punishment, however, the Order commands prompt disclosure so that the defense can use it in preparing the case. (*Id.*).

The Order also specifies consequences for noncompliance. In addition to compelling production, the Court may specify production terms, grant a continuance, impose evidentiary sanctions, impose contempt or other sanctions on a responsible attorney, dismiss charges or vacate a conviction, or enter any other order that is just under the circumstances. (*Id.* at 2).

## II. Bettor-1's admission undermines the only alleged link between Mr. Ortiz and the bettors.

Bettor-1 told the government on February 19, 2026 that he often advised friends based on his own assessment rather than inside information. The agent's report states that Bettor-1 advised that he frequently placed bets without inside information, yet conveyed tips about these bets in a manner that caused others to believe a bet had been fixed. (Ex. 3 at 10). Bettor-1 also acknowledged that his friends may have assumed he possessed more fixed information than he did. (*Id.* at 13).

The same reports establish why that admission is material to Mr. Ortiz. Bettor-1 never communicated directly with Mr. Ortiz. Bettor-2's account also does not independently establish Mr. Ortiz as a source. Bettor-2 initially told the government that he did not know whether the

pitches were fixed, did not know the outcome in advance, and did not know how Bettor-1 selected the wagers. (Ex. 4 (Nov. 3, 2025 Bettor-2 302) at 2). In a later interview, Bettor-2 said he came to understand that Bettor-1's tips concerned fixed pitches, but still did not know how Bettor-1 knew the pitches were fixed. (Ex. 5 (Dec. 8, 2025 Bettor-2 302) at 2-3). Bettor-2's belief was therefore derivative of Bettor-1's representations, precisely the type of representations Bettor-1 now admits did not always rest on inside information.

Trial is scheduled to begin on November 2, 2026, and the deadline for expert disclosures has passed.

## ARGUMENT

## POINT I

### THE SUPPRESSED ADMISSION IS SUBSTANTIVE EXCULPATORY *BRADY* EVIDENCE THAT NEGATES THE GOVERNMENT'S PROOF THAT MR. ORTIZ SUPPLIED INSIDE INFORMATION.

Due process requires the Government to disclose evidence favorable to an accused when it is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty does not turn on prosecutorial good or bad faith. *Id.* Evidence may be favorable because it is exculpatory or because it impeaches a government witness. *United States v. Bagley*, 473 U.S. 667, 676 (1985). It is material when there is a reasonable probability that timely disclosure would have produced a different result, meaning a probability sufficient to undermine confidence in the outcome. *Id.* at 682.

Favorable evidence is not limited to a statement in which a witness declares the defendant innocent. Evidence is favorable, and therefore subject to disclosure, whenever it tends to undermine the government's proof, whether by casting doubt on an element of the offense or by weakening a critical part of the theory the government asks the jury to accept. Evidence that severs a critical link in the government's chain of proof is a paradigmatic example of favorable,

material evidence. Such evidence is favorable not because it announces the defendant's innocence, but because it removes the connection on which guilt depends.

That principle governs here. Bettor-1 did not need to say that Mr. Ortiz is innocent for his admission to be exculpatory. The admission is favorable because it undermines the single inferential link on which the government's case against Mr. Ortiz depends: that the bettors' confidence reflected authentic inside information traceable to Mr. Ortiz. Information that defeats that link is exculpatory within the meaning of *Brady*, and the government was not free to withhold it merely because it fell short of an express declaration of innocence.

Here, Bettor-1's admission supports a defense proposition independent of his general credibility, namely, that the bettors' belief that Bettor-1 possessed inside information does not establish that such information existed or that it originated with Mr. Ortiz. Bettor-1 concedes that the very same appearance arose when he was merely lobbing educated guesses. And under the Court's Rule 5(f) Order, it is irrelevant whether the government has subjectively concluded that Bettor-1's admission does not reach the information he allegedly relayed to Bettor-2 about Mr. Ortiz. The Order applies regardless of whether the government credits the favorable information (ECF No. 15 at 2), and the duty to disclose does not turn on the prosecutor's own assessment of the statement's reach or reliability. The admission amounts to *Brady* material because it negates an inference the government needs to prove the charged agreement; it does not merely supply another reason to distrust Bettor-1.

Put another way, the admission is exculpatory even if the jury credits Bettor-1 completely. Impeachment evidence asks the jury to disbelieve a witness; this admission requires disbelieving no one. Taken entirely at his word, Bettor-1 still cannot establish that genuine inside information ever existed or that it originated with Mr. Ortiz, because he admits that he repeatedly

manufactured the impression of inside information when he had none. Evidence that defeats the government's proof on its own terms goes to the heart of guilt or innocence; it is substantive exculpatory material, not a matter of credibility.

But even assuming *arguendo* that Bettor-1's admission is only impeachment as to Bettor-1, overall, it is still exculpatory in nature because the admission strips the government's betting evidence and Bettor-2's information of their probative force. As to the betting evidence, we anticipate that the government intends to prove that bettors affiliated with Bettor-1 wagered on Ortiz-related games, and to urge the jury to infer from those wagers that the tips were genuine and that Mr. Ortiz supplied the inside information behind them. But Bettor-1's admission collapses that inference. If Bettor-1 produced the identical appearance of a fixed bet when he was only guessing, the wagering shows nothing more than that the bettors believed Bettor-1, not that inside information existed or came from Mr. Ortiz. The betting data is as consistent with innocence as with guilt, and so it proves neither.

Likewise, Bettor-2 told the Government that he came to believe Bettor-1's tips concerned fixed pitches, but he acknowledged that he did not know whether the pitches were in fact fixed, or how Bettor-1 supposedly knew. Bettor-2's belief is therefore wholly derivative of what Bettor-1 told him, and Bettor-1 now admits that those representations were at times invented. Because Mr. Ortiz never communicated with Bettor-1 or Bettor-2, the chain does not merely weaken at this point; it breaks at its only connection to Mr. Ortiz.

## POINT II

## THE GOVERNMENT VIOLATED THE RULE 5(f) ORDER BY WITHHOLDING THE ADMISSION INSTEAD OF DISCLOSING IT PROMPTLY FOR USE IN PREPARING THE DEFENSE.

The Court's Rule 5(f) Order controls the timing of the government's disclosure of exculpatory evidence. It requires "prompt" disclosure after favorable information becomes

known so that the defense can use it to prepare the case. (ECF No. 15 at 1). Bettor-1 made the admission during a February 19, 2026 interview attended by two Assistant United States Attorneys and two FBI agents. (Ex. 4 at 1). The government therefore knew the information when Bettor-1 made the statement. It could not postpone disclosure by assigning the statement to a *Giglio* or § 3500 production date.

Significantly, the Rule 5(f) Order is not a restatement of the constitutional standard; it is a court order. Congress enacted the Due Process Protections Act to require the Court, at the outset of the case, to enter an order confirming the prosecutor's disclosure obligations and the consequences of violating that order. Due Process Protections Act, Pub. L. No. 116-182, 134 Stat. 894 (2020); Fed. R. Crim. P. 5(f). The Court entered that Order here. (ECF No. 15). The government's breach of that Order is therefore sanctionable as the violation of a judicial command, and the Court's authority to enforce it does not depend on the retrospective, trial-focused materiality analysis that governs a post-conviction *Brady* claim.

Congress did not legislate in a vacuum, and it did not simply restate *Brady*. It responded to a documented failure of enforcement. In the prosecution of Senator Ted Stevens, a court-appointed investigation concluded that "the investigation and prosecution of Senator Stevens were permeated by the systematic concealment of significant exculpatory evidence which would have independently corroborated [his] defense and his testimony, and seriously damaged the testimony and credibility of the government's key witness." *In re Special Proceedings*, 842 F. Supp. 2d 232, 235 (D.D.C. 2012). Yet even after findings of significant, widespread, and at times intentional misconduct, criminal contempt was unavailable, because no order to disclose that was "clear and unequivocal" had ever been entered. *Id.* at 244. The reason was that the court had "accepted the repeated representations of the subject prosecutors that they were familiar with

their discovery obligations, were complying with those obligations, and were proceeding in good faith." *Id.*

That episode exposed a structural gap, and it changed practice. The Stevens case "has come not only to symbolize the dangers of an overzealous prosecution and the risks inherent when the government does not abide by its discovery obligations, but it has also been credited with changing the way other courts, prosecutors, and defense counsel approach discovery in criminal cases." *Id. at* 245. The gap was not due to a shortage of internal guidance. DOJ's Justice Manual requires the disclosure of exculpatory evidence "reasonably promptly" after its discovery. Justice Manual § 9-5.001. But before the Act, courts recognized that DOJ's disclosure policy was "not judicially enforceable," "does not create a general right of discovery," and did not "provide defendant with any additional rights and remedies." *United States v. Jones*, 620 F. Supp. 2d 163, 173 (D. Mass. 2009).

The Due Process Protections Act closed that gap prospectively. It requires a standing order in every criminal case, entered before any dispute arises, and it requires that the order state the consequences of violating it. The design is forward-looking by necessity: a court need not wait until after a verdict and then reconstruct whether suppression was "material" before it may act. It may enforce the command it issued. That authority is what this case calls for. Like in Stevens, the government assured this Court that it understood its obligations and would comply, and then suppressed for months the single most exculpatory statement in the case.

Courts applying Rule 5(f) and the Due Process Protections Act have treated the order's disclosure duty as analytically separate from *Brady*. In *United States v. Sutton*, the court explained that "[a] separate question is whether the government has violated its broad pre-trial duty of disclosure" under the court's local rules, its "order pursuant to the DPPA and Rule 5(f),"

and held that "[a]lthough such a violation may not be constitutional in magnitude ... the imposition of sanctions may nevertheless be appropriate to prevent the violation from tainting these proceedings." 2022 WL 2383974, at *8 (D.D.C. July 1, 2022).

Because the Rule 5(f) Order is a standing judicial command, the government cannot defeat enforcement by insisting that its favorable-information duty is measured only by the trial-stage materiality test, or by deferring the admission to the *Giglio* and Jencks Act schedule. The Court may, and should, enforce its Order on its own terms.

## POINT III

## PRECLUSION OF BETTOR-1, OR A SPECIFIC ADVERSE-INFERENCE INSTRUCTION, IS AN APPROPRIATE TAILORED REMEDY.

The Court has multiple sources of authority to remedy the violation. Its Rule 5(f) Order expressly authorizes evidentiary sanctions and any other just order. (ECF No. 15 at 2). Fed. R. Crim. P. 16(d)(2) independently permits the Court to order disclosure, grant a continuance, prohibit the introduction of undisclosed evidence, or enter another just order. The Court also retains inherent authority to protect the integrity of its proceedings and enforce its orders.

In determining an appropriate sanction, the Second Circuit directs courts to weigh the government's culpability against the prejudice to the defense. *United States v. Miranda*, 526 F.2d 1319, 1324-25 (2d Cir. 1975). Recognized sanctions include exclusion or suppression of evidence concerning the subject matter of the undisclosed material, with dismissal of charges reserved for exceptional circumstances. *Id.* at 1324 n.4.

Both sides of the *Miranda* balance favor meaningful relief. The government's conduct was not a single accidental delay. The defense repeatedly demanded favorable witness reports and explained why summaries were inadequate. The government repeatedly answered that full reports would await the *Giglio* and 18 U.S.C. § 3500 deadlines. It continued that approach even

after the Court directed prompt *Brady* disclosure and encouraged the government to disclose helpful material as soon as possible. When Bettor-1 later made this favorable admission in the presence of prosecutors and agents, the government did not promptly provide it. That sequence supports a finding of bad faith or, at minimum, the sort of continuous nondisclosure that warrants a stronger remedy than another production order.

The prejudice is equally concrete. Bettor-1 is the government's indispensable witness against Mr. Ortiz. The suppressed evidence concerns whether Bettor-1's representations to bettors reflected actual inside information at all. The defense was deprived of that evidence while investigating the central factual issue, litigating pretrial matters and securing experts. A bare opportunity to cross-examine Bettor-1 at a later trial does not restore the lost pretrial uses.

The violation has now produced concrete and unrecoverable prejudice to Mr. Ortiz's trial preparation. The government's summaries of the extent of *Brady* information led the defense to understand that Bettor-1 claimed to have supplied inside information for every wager placed by the bettors affiliated with him. On that understanding, the defense had no reason to individually review the voluminous betting data associated with those bettors, or to retain and disclose an expert to analyze that data, because the premise the summaries conveyed was that every such wager rested on inside information. Bettor-1's suppressed admission wholly changes that premise. If Bettor-1 often generated the appearance of inside information when he was merely guessing, the betting data becomes central to the defense: expert analysis of which wagers are consistent with genuine inside information and which are consistent with Bettor-1's own guesswork could directly undermine the inference the government must draw to connect Mr. Ortiz to the betting. The defense was deprived of the opportunity to conduct that analysis when it could still be used.

That prejudice cannot be cured by another continuance.[3] The deadline for expert disclosures has passed, and trial is scheduled to begin on November 2, 2026. The defense's ability to retain, prepare, and timely disclose an expert to review the betting data in light of Bettor-1's admission was foreclosed by the government's nondisclosure. Because the suppression deprived the defense of the ability to test the betting data through expert analysis before the deadlines expired, the appropriate remedy is to preclude the government from calling Bettor-1, whose testimony would otherwise permit the government to benefit from the very nondisclosure that foreclosed the defense's response. *Cf. United States v. Thomas*, No. 2:25-CR-33, 2026 WL 1972091, at *7 (D. Vt. July 8, 2026) (precluding testimony of government witness after observing that in determining a remedy, "courts consider the reason for the nondisclosure, the extent of prejudice to the opposing party, whether a continuance or other lesser remedy would cure the prejudice, and the surrounding circumstances").

Even if the Court were to conclude that Mr. Ortiz cannot show prejudice or bad faith, preclusion remains warranted to vindicate the Rule 5(f) Order and to deter future disregard of it. The Rule 5(f) Order does not simply restate the constitutional minimum; it is a judicial command that, by its terms, carries "consequences" for its violation. An order whose only "consequence" is the same after-the-fact materiality inquiry that governs a post-trial *Brady* claim is no order at all. It adds nothing the Constitution did not already supply, and it leaves prosecutors free to make the same calculated bet the government made here: assure the Court of compliance, withhold the favorable statement, and wager that any violation will later be excused as harmless. Congress enacted the Due Process Protections Act precisely to foreclose that calculus by arming district

---

[3] Mr. Ortiz sought a brief continuance until December 1, 2026, to allow the amendment to Rule 801 of the Federal Rules of Evidence to take effect. (ECF No. 227). A continuance beyond shortly after December 1, 2026 is not appropriate given Mr. Clase's reasonable objection to further delay of the trial (ECF No. 223 at 18) and the Court's denial of Mr. Ortiz's motion for severance (ECF No. 211).

courts with enforcement authority they had previously lacked. Deterrence of official misconduct is a recognized office of the Court's supervisory power. *United States v. Hasting*, 461 U.S. 499, 505 (1983) (the purposes of the supervisory power include "a remedy designed to deter illegal conduct"). If the Court declines to impose a meaningful sanction whenever the government can characterize its suppression as harmless, the Rule 5(f) Order becomes a nullity, and the promise of the Due Process Protections Act becomes an empty formality. To preserve the Order's force, and to signal that assurances of compliance to this Court are not costless to break, the Court should preclude the government from calling Bettor-1.

If the Court declines preclusion, it should give a specific adverse-inference instruction. The instruction should tell the jury that the government did not timely disclose Bettor-1's admission that he sometimes advised bettors without inside information while conveying those tips in a manner that led them to believe a bet was fixed, and that the jury may infer that timely disclosure would have supported the defense contention that the bettors' beliefs do not establish that Mr. Ortiz supplied inside information.

At minimum, the Court should order immediate production of all grand jury testimony, agent reports and agent interview notes in connection with the government's investigation into this matter. That relief is the minimum needed to permit the defense to assess the full scope of the violation and prepare for further proceedings.

**CONCLUSION**

For the foregoing reasons, Mr. Ortiz respectfully requests that the Court preclude the government from calling Bettor-1 at trial. Alternatively, the Court should give a specific adverse-inference instruction concerning the government's failure to promptly disclose Bettor-1's favorable admission. At minimum, the Court should order the immediate production of all grand

jury testimony, agent reports and agent interview notes in connection with the government's investigation into this matter, together with such other relief as the Court finds just under its Fed. R. Crim. P. 5(f) Order, Fed. R. Crim. P. 16(d)(2), and its inherent authority.

Dated: September 16, 2026
New York, New York

Respectfully submitted,

/s/ Elizabeth Geddes
Elizabeth Geddes
Corva Law LLP
110 West 40th Street, Suite 1003
New York, New York 10018
liz@corvalaw.com

Christos N. Georgalis (OH 0079433 *pro hac vice*)
Paul M. Flannery (OH 0091480 *pro hac vice*)
Flannery | Georgalis, LLC
1621 Euclid Avenue, Floor 20
Cleveland, Ohio 44115
(216) 466-0169 (Chris)
(216) 466-0162 (Paul)
chris@flannerygeorgalis.com
paul@flannerygeorgalis.com

*Attorneys for Defendant Luis Leandro Ortiz Ribera*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2026, a true and correct copy of the foregoing was filed electronically and under seal via the Court's CM/ECF system and served on all counsel of record via email.

/s/ Elizabeth Geddes
Elizabeth Geddes
Corva Law LLP
110 West 40th Street, Suite 1003
New York, New York 10018
liz@corvalaw.com

*Attorney for Luis Leandro Ortiz Ribera*