# Exhibit G

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 19-CR-576(BMC)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

GENARO GARCIA LUNA, :

January 24, 2023

Defendant. : 9:30 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES SENIOR DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government: BREON PEACE
United States Attorney
BY: SARITHA KOMATIREDDY,
ERIN REID,
PHILIP PILMAR,
MARIETOU DIOUF,
ADAM AMIR,
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York

For the Defendant: CESAR DE CASTRO, ESQ.
VALERIE GOTLIB, ESQ.
FLORIAN MIEDEL, ESQ.
SHANNON MCMANUS, ESQ.

Court Reporter: Andronikh M. Barna
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2178

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE COURTROOM DEPUTY: All rise. Honorable Brian M. Cogan now presiding.

THE COURT: Okay. Have a seat, please.

We have two jury issues that we will take one at a time.

First of all, Juror No. 2, right? Quadri, 2?

THE COURTROOM DEPUTY: Yes.

THE COURT: Juror 2 advised us yesterday that her employer will only pay for ten days of jury service and she cannot live on the stipend.

I will give you a couple of ideas and then you tell me what you want to do.

First, I do not think we should release her now. If the parties think it is appropriate, I can obtain from her, in confidence, her name and her employer; and towards the end of the ten-day period, I can make a pitch to the employer to continue paying her. My track record on that is about 50/50. It depends who she works for and what she does and how reasonable the employer is and things like that. I am inclined to do that.

The other thing we could do is just let her go.

Any views?

MS. KOMATIREDDY: We like your suggestion, Your Honor.

MR. DE CASTRO: I concur with the first.

THE COURT: So that is Juror No. 2.

Juror No. 10 reports this morning that he has an ear infection. He does not want to be or is not asked to be -- he may want to, but he hasn't asked, to be released. But he has asked that everybody speak up as much as possible. I think all we need to do is turn up the mics as high as we can without getting feedback and hopefully that will solve any problem he has.

Any other suggestions on that?

MS. KOMATIREDDY: No, Your Honor.

MR. DE CASTRO: No, Judge. I just think you could also just tell him if he's not hearing, raise his hand.

THE COURT: Okay.

MR. DE CASTRO: And the person will increase volume.

THE COURT: Good idea.

Quadri, are they all here yet?

THE COURTROOM DEPUTY: Yes.

THE COURT: Okay. Let's have them in, please.

Oh, one other thing. When you all file your motions and responses to motions, would you please designate the response by number, docket number, to the motion that is there. As happens in these cases, it is getting a little bit jungle-like on the docket, and it would help us to put things in proper order.

Also, if you file a motion, designate it as a motion

on ECF. Because on our docket sheet we see a little gavel, and that stands out that there is a motion pending that we have to deal with.

MR. PILMAR: Okay.

(Jury enters.)

THE COURT: Everyone be seated.

Good morning, ladies and gentlemen. I hope you had a good evening. We will continue in just a moment, but one thing I wanted to mention to you. I know a couple of you have individual things you want me to address, and I will talk to you individually.

But if any of you, for any reason, have a problem hearing or seeing things, we are going to turn up the mics a little to the extent we can to help you with that. But if you do not hear something, please signal Mr. Scott. You know, just raise your hand, say -- or you can say out loud, can't hear or something like that. Because obviously you are the stars of this show. We have got to make sure everything gets through to you.

Okay. Let's have the government witness back, please.

MS. REID: Yes, Your Honor.

We recall Sergio Villarreal Barragan.

THE COURT: Okay. Ms. Reid, please proceed.

MS. REID: Yes, Your Honor.

**SERGIO VILLARREAL BARRAGAN,** having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. REID: (Continuing)

Q Good morning.

A Good morning.

THE COURT: Quadri, I am not sure her mic is working.

MS. REID: I think it just broke, actually, Your Honor.

(Pause in proceedings.)

Q Okay. Good morning.

A Good morning.

Q When we left yesterday, I believe we were talking about a time period just before around 2006.

A Can you repeat the question, please? I couldn't hear it.

Q Yes. I haven't asked you a question yet, but I just wanted to orient us.

I believe yesterday when we left off, we were talking about a time period just before 2006.

A Yes.

Q In 2006, was there a national election?

A Yes.

Q And what happened?

A There was a change from President Fox to President

Calderon.
Q And what happened with respect to the defendant, Genaro Garcia Luna, if anything?
A A federal secretariat of public security was created, and he was the head of it.
Q And what was the name of that secretariat?
A Federal secretariat of public security.
Q And did the Sinaloa Cartel continue to pay the defendant, Genaro Garcia Luna, after he became the head of the secretariat of public security?
A Yes.
Q Was it important to the cartel to understand what the defendant's new role was?
A Yes.
Q And what was the secretariat of public security?
A It was a merging of what before had been called the preventive federal police with all of its branches, meaning highways, airports, ports.
Q And what, if anything, happened to AFI in 2006?
A AFI was an independent organization, independent from the secretariat for public security and independent on the Attorney General's office for the republic.
Q Now, after the defendant became head of the secretariat of public security, did the nature of the cartel's payments to him change?

A The amount and the form of payment did change.
Q How did they change?
A That he no longer went to the ready alert meetings with Arturo as he used to do six months before that murder.
Q And if he wasn't coming to in-person meetings with Arturo Beltran, how did Arturo pay the defendant?
A Through Cardenas Palomino.
Q Did Arturo Beltran meet with Cardenas Palomino after the defendant became the head of the secretariat of public security?
A Yes.
Q How often did he meet with Cardenas Palomino after that?
A On average, once a month.
Q And where did those meetings occur?
A In safe houses.
Q And how -- what would happen at those meetings?
A Same thing. They would eat, they would chat, they would talk about problems that were coming up, and those problems were solved.
Q And how did Arturo pay Cardenas Palomino at those meetings?
A Same way as before, with black bags full of money.
Q I believe you mentioned earlier that the amount of money that was being paid to the defendant changed after he became of the -- after he became the secretariat of public security?

A Yes.
Q And how did it change?
A The cartel had expanded greatly all over the republic and the business, the drug business had increased greatly. There were larger cargos. And for that reason, there were larger profits.
Q And after -- so, first of all, who was the money coming from in those payments to Garcia Luna through Cardenas Palomino?
A For some time, it was the pooled money that the Sinaloa Cartel would put together. But after the break up, it was Arturo Beltran who would pay it.
Q And speaking first just about the time before there was any break within the Sinaloa Cartel, can you remind us who was part of the pooled payments to the defendant?
A Ismael Mayo Zambada, El Chapo Guzman, Azul Esparragoza, Nacho Coronel, the Valencias and the Beltran Leyvas.
Q After the defendant stopped coming to in-person meetings with Arturo Beltran, did Arturo still have any communication with him?
A Yes.
Q How did that occur?
THE INTERPRETER: I'm sorry?
MS. REID: How did that occur?
A Through communication radios, but it was very sporadic.

Q And were there ever occasions when Cardenas Palomino was meeting with Arturo Beltran in person and they spoke with Garcia Luna?
A Yes.
Q How often did that occur?
A It was sporadic, not too often.
Q After the defendant became the head of the secretary of public security, what kind of benefits did the Sinaloa Cartel get from their payments to him?
A There were greater benefits, greater benefits than when he was at AFI.
Q Can you explain that to us?
A Now the Sinaloa Cartel had control, more control over the roads all over the country, airports and ports.
Q After the defendant became the secretary of public security, did the Sinaloa Cartel continue to receive information from him about law enforcement operations?
A Yes.
Q Can you give us some examples of that?
A Yes. One example was when a relative of mine was coming to visit me from the United States to Mexico, in Acapulco, and I was warned that the person was being followed by the DEA.

Also, there was a time, there was a residence where Arturo's family was at in Cuernavaca. We were warned about that, and we were able to take everything out belonging to the

family. I mean, the house was raided, but there was nothing left there. There were many times like that.

Also, when Mochomo was captured, Bayardo told us about a raid that was coming in a residence in Bosques del Pedregal in the southern part of the city.

Q Okay. I want to break that down.

You mentioned a time that you learned about a relative of yours being followed by the DEA. How did you learn that?

A Yes. My relative wasn't the one who had the information. It was me. Borrado told me that Cardenas Palomino called him with information saying that the DEA was following my brother-in-law from Laredo.

Q And can you remind us, who is Borrado?

A Alberto Pineda Villa, a lieutenant of the Sinaloa Cartel.

Q And did you or your relative take any action when you learned that information?

A Well, it was Christmas and I canceled the get-together I was going to have with him.

Q You mentioned a time in Cuernavaca when members of Arturo's family were able to get out of a house that was going to be raided.

A Yes.

Q On that occasion, how did you learn the information before that raid?

A Same way. Cardenas Palomino warned that that house was going to be raided.
Q And was there ever -- before we get to your next example, were there other times when you would be -- when you took action based on information you received from Cardenas Palomino?
A Not just me; everyone in the organization. Another example would be Barbie's wedding in Acapulco.
Q And remind us, who is Barbie?
A Another lieutenant for the Sinaloa Cartel.
Q And I would like to show you, actually, on the screen what's marked as Government Exhibit 41 for identification.
MS. REID: I think it's loading.
Q Do you recognize this person?
A The screen is dark.
Yes.
Q Is the screen showing a picture now?
A Yes.
Q And do you recognize the picture -- the person in that picture?
A Yes.
Q Who is that?
A That's Barbie.
MR. DE CASTRO: No objection.
THE COURT: Received.

(Government Exhibit 41 received in evidence.)
Q And just remind us, what is Barbie's full name?
A Edgar Valdez Villareal.
Q And what, if anything, happened with Barbie's wedding?
A The party took place, but none of us went, not even him. The government raided it, but they didn't find anything.
Q Now, was there ever a time that the cartel ever received any equipment from the defendant, Garcia Luna?
A He gave us a connection so we could get equipment for wiretaps and spying.
Q And who did the defendant connect you to?
A It was an Israeli guy that sold equipment in Mexico City.
Q Did you have any direct role in that?
A Not really, but a couple of times I did pick up some equipment at an office that they had on Insurgentes.
Q And what was the equipment?
A There were call inhibitors, cameras, recorders, wiretap equipment. They were very cutting edge. Arturo liked to renew all this kind of counterintelligence equipment.
Q And did Arturo Beltran use that equipment?
A Yes.
Q And how did he use it?
A There was a person in charge of handling that kind of equipment. And personally, Arturo would carry these cards. And if someone was carrying a mic on them, they would vibrate

in the bag.
Q And I want to -- during this time period, by the way, around 2006, you mentioned the cartel had grown. What volume of drugs was the Sinaloa Cartel trafficking at this time?
A They were very large. Arturo would no longer receive shipments if they were not 5,000 kilos or more of cocaine.
Q Now, earlier or yesterday, I think you talked a little bit about a group of people called the Zetas.
A Yes.
Q Who is that?
A At one point in time, they were our rivals. They belonged to the Gulf Cartel.
Q And was that a group within the Gulf Cartel at one time?
A Yes.
Q In 2006, did anything change about the Sinaloa Cartel's relationship with the Zetas?
A Yes.
Q What happened?
A There was a truce.
Q And just briefly, can you tell us what led up to that truce?
A They kidnapped my brother. And so what I did, I actually kidnapped their accountant, Lazcano, and other people. I took their cargo, their money. And over the radio I told Quarenta -- Forty -- and Lazcano that they should return my

brother; and if they did, I would then return that person and their things.

Q Okay. Wait. Before you go further. Who kidnapped your brother?

A The Zetas.

Q And when you say you kidnapped their accountant, are you referring to an accountant with the Zetas?

A The accountant for the Zetas, Lazcano.

Q And you also mentioned someone named Forty. Is that also someone associated with the Zetas?

A Yes.

Q What happened next?

A Well, then we negotiated over the radio so that we could have a truce. Because the war was turning very violent and there were many casualties on both sides, as well as the fact that it was a very expensive war.

Well, the Sinaloa Cartel then was very supportive of my negotiations to reach a truce. I went with Hector Huerta, La Burra, to Reynosa where we met with the Zetas, with the family Michoacana and Vicente Carrillo, as well as all of them.

And we had gone there by private jet. That same day we came back on the same jet. Miguel Trevino, Forty, came back with us together with a person by the last name Reyes, whom I knew. We then went to Cuernavaca. And we had already

notified Arturo Beltran about the people who were coming with me so that we could negotiate the truce.

The next day at a safe house in Cuernavaca, all of us met, all of the Sinaloa Cartel with the exception of Chapo and Miguel Trevino and the other person who accompanied him.

There, we ensued a negotiation where we split up the country. So there were some states that would belong to them, but the majority of the states would belong to us. And then we would share some of the states. We reduced crime. We reduced the amount of casualties and everyone was working.

Q And just to be clear, without going through all of the names you mentioned, is it fair to say that at this bigger meeting, representatives of the Sinaloa Cartel met with members of the Zetas and a few other cartels?

A Yes.

Q And what was the general result of that meeting, or those meetings?

A We appeased the country. Everything was calm. There were no more deaths. Everyone was working. And, in fact, we were generating more work and more money.

Q About how long did that last?

A It lasted months. I would say less than a year.

Q I want to now talk about someone -- some people you've mentioned, the Valencias.

A Yes.

Q Who are they?
A It was an organization that worked the Manzanillo port in Colima state. They were affiliated from the Sinaloa Cartel on behalf of the Beltran Leyvas for a time.
Q I want to show you what's on the screen marked for identification as Government Exhibit 11.
Do you recognize this person?
A Yes.
Q Who is that?
A That is Lobo Valencia.
Q And what is that person's full name, if you know?
A Oscar Nava-Valencia.
MR. DE CASTRO: No objection.
THE COURT: Received.
(Government Exhibit 11 received in evidence.)
Q And is Lobo a nickname?
A Yes.
Q And what was the relationship like between Lobo Valencia and Arturo Beltran?
A They were partners, partners with Arturo.
Q Did Lobo ever invest in drug loads with Arturo Beltran?
A Yes, they had a partnership.
Q Are you familiar -- I think you said something about an area called Manzanillo?
A Yes.

Q Where is that?
A It is a port on the Mexican Pacific side where containers with cargo are received.
Q Was there ever a time when anything unusual happened at the Port of Manzanillo?
A Yes.
Q What happened?
THE INTERPRETER: The interpreter needs to clarify with the witness for a second.
A There was a time when there were two seizures of drugs.
Q And when was this, approximately?
A I don't remember the dates.
Q Was it before or after the 2006 national election?
A After.
Q And what do you mean by "seizures"? What happened?
A Lobo Valencia and Arturo were constantly working out of that port. And all of a sudden, the Customs officers, they didn't want to release a shipment that came there.
Q And how big was that shipment of drugs?
A Very large.
Q Can you give us an approximate number of kilos?
A About 20 tons.
Q And how did you learn about those seizures?
A Well, I found out because of a problem that ensued, that they didn't want to release them.

Q Were you personally involved in any efforts to get those drugs back?
A Could you repeat the question, please?
Q Yes.
Were you personally involved in any efforts to get those drugs back?
A Yes.
Q And what were you personally involved in?
A In one of them, at an interview that Arturo had with the father of the deputy administrator of Customs, who was his friend.
And secondly, at a drug exchange, meaning we exchange fake drugs for the good drugs.
Q Okay. And this effort to exchange false drugs for real drugs, first of all, how did you get false drugs?
A At a ranch where we trained our hit men, we created a small factory so that we could develop the bricks.
Q And did you do that?
A Yes.
Q And just briefly, how did you do that?
A Well, we had somebody work with the steel, an ironworker, who then developed some presses with steel so that we could use them, hydraulic ones. We made a mixture of sugar and flour so that we could compress them. They were actually mixed with acetone and ether. And we had them dry out.

Once they were dried, we would cover them with varnish so that they would look shiny. And we would package them as any other cocaine brick. And that's how we did it.
Q And what, if anything, did you do with the fake bricks of drugs that you had made?
A We transferred them to the Manzanillo port, and I delivered them to Lobo Valencia.
Q And did you actually go to the port of Manzanillo?
A Not to the port itself, but to the city of Manzanillo.
Q Where did you go?
A To a -- one of Lobo's warehouses.
Q And after you dropped off those fake bricks, did you ever see them again?
A No.
Q Did you speak to Arturo Beltran after doing that?
A Yes.
Q And what, if anything, did he tell you?
A The plan was to have the real drugs go to Mexico City, but then it changed. He told me that Lobo would be in charge of everything and for me to go back with the empty trailers.
Q And did you do that?
A Yes.
Q Did you ever speak to Arturo about how this was resolved?
A Yes.
Q And what did he say, if anything?

A Well, he was very happy. There hadn't been too many losses, and he was happy because he was able to recover that.
Q And was it unusual to have this quantity of drugs in 2010 seized?
A Those were Arturo's and Lobo's deals. I cannot say if those were the usual quantities that they would get in. I would deal directly with Arturo.
Q Now I want to talk a little bit more about things that happened during the whole of your time with the Sinaloa Cartel. You've told us about several wars or fights with rivals?
A Yes.
Q Did you ever fight for the cartel?
A Yes.
Q Did you fight against members of other cartels?
A Yes.
Q And what kinds of things did you do?
A We would defend ourselves in shootings.
Q Did you shoot a weapon?
A Yes.
Q How often did you do that?
A There were several times.
Q More than ten times?
A Yes.
Q More than 20 times?

A More or less, I think.
Q And during these shootings, were people killed?
A Yes.
Q Did you ever shoot at members of law enforcement?
A Yes.
Q How many times?
A Few times, but four or five times, possibly.
Q Did you carry a weapon the whole time you worked for the Sinaloa Cartel?
A Yes.
Q What kinds of weapons did you have?
A Usually you use short guns, like .38 Super or a Beretta. And also long weapons, like an M16 with a grenade launcher and an MP5.
Q Did other members of the Sinaloa Cartel also have weapons like that?
A Yes.
Q Did Arturo Beltran carry weapons?
A Yes.
Q And were you present for violence committed by Arturo?
A Yes.
Q Did Arturo kill people?
A Yes.
Q And did he ever order that certain people be killed?
A Yes.

Q Were there times that you were aware of those orders before they were carried out?
A Yes.
Q Did Arturo ever torture anyone?
A I didn't see him.
Q Were you ever aware of times that he ordered torture of others?
A Yes.
Q Did he ever order that people be kidnapped?
A Yes.
Q And did you kidnap people sometimes?
A Yes.
Q Did you ever stand guard when cartel members killed people?
A Yes.
Q Did you ever stand guard when anyone committed torture?
A Yes.
Q Earlier yesterday you told us about working for someone named Arturo Hernandez, also known as Chuky, with the Juarez Cartel.
A Yes.
Q When you worked with him, was he violent?
A Yes.
Q What kinds of things did he do?
A He liked it. He liked violence. He was very violent.

He liked to torture.
Q And were you aware of times when he tortured people?
A Yes.
Q And were you present on occasion for those times?
A Yes.
Q What kinds of things did he do to torture people?
A I remember one time he stabbed a person in the ear with a knife.
Q And did you intervene or stop that?
A No. He would have killed me. I couldn't.
Q And did Chuky carry weapons?
A Yes.
Q How about some other people in the cartel. What about Barbie? Did he ever carry weapons?
A Yes.
Q What kinds of weapons did he carry?
A Like me, 38 Super, M16, MP5.
Q Did he ever have a long gun?
A Yes.
Q What about Bayardo Alberto Pineda Villa, did he have guns?
A Yes.
Q And his brother, MP?
A Yes.

(Continued on the next page.)

(Continued.)

Q Now, did there come a time when members of the Sinaloa Cartel started fighting against each other?

A Yes.

Q Approximately when was that?

A It was after Mochomo's arrest.

Q Who is Mochomo?

A Alfredo Beltran Leyva, Arturo's brother.

Q Approximately when was it that he was arrested?

A I'm not sure of the year, but it was in January. I don't remember the year.

Q How do you remember it being in January?

A Because it had just been Alfredo's birthday.

Q Was Alfredo's arrest before or after the Manzanillo seizure of 20 tons that you told us about?

A That was after. I believe. The truth is I'm not certain.

Q What happened when Alfredo was arrested?

A Arturo realized that there had been a betrayal on the part of other members of the cartel to get Arturo out of the way. The truth was interrupted and a very violent war ensued.

Q Who was that war between?

A It was, well, the Sinaloa Cartel. There was Chapo, Mayo, National Coronel and Azul were fighting against all of

the Beltran's, the Zetas, who had lied to them and who also was on the Beltran side.
Q When did that war between those leaders of the Sinaloa Cartel break out in relation to Alfredo's arrest?
A Some months after Alfredo's arrest.
Q What was happening in those intervening months?
A Well, people from the government starting hitting us hard like the day of Alfredo's arrest. The Bayardo people came on us. We had been told they were going to come. Each time that Arturo spoke to Chapo or Mayo, the army would come or federal police would come and hit us until Arturo recognized or was sure that this betrayal was going on and that's when the war started.
Q When the war started, was there violence?
A Yes.
Q After the war started, did Arturo Beltran speak to the defendant, Genaro Garcia Luna, about this development?
A Yes.
Q How did he do that?
A On the radio, on the communications radio.
Q And were you present for that?
A Yes.
Q Was anyone else present?
A Cardenas Palomino, Roberto, R. I don't remember if Barbie or someone else was there. Borrado was there as

well.
Q Was Cardenas Palomino there in person?
A Yes.
Q What happened during this radio call between Arturo and the defendant?
A Arturo did not like the answer he got from Garcia Luna.
Q Did Arturo ask a question?
A Yes.
Q What did he ask?
A Which side he was on. Was he with his cousin Chapo, or was he on his side.
Q What did the defendant say when Arturo asked him what side he was on?
A That that was their problem, that wasn't his problem. That he was neutral.
Q What did it mean to you when the defendant said he was neutral?
A That he was going to continue working for both.
Q Sorry, when you say both, just to clarify, what do you mean?
A Both for Chapo, May, Ray and them, and then for Arturo. That he was going to keep on giving information. Arturo told him that he would cover the complete payments and not even then.
Q Okay. So when Arturo talked about payments, what

exactly did he say to the defendant?
A To not worry about the money. That he was going to cover the full amount of the monthly payments.
Q And was that different than the way it had been paid before the war?
A Yes.
Q Was -- just to be clear. Would there still be a pool payment between all of the leaders of the Sinaloa Cartel?
A No. Not anymore. Not anymore for that payment that Arturo would make.
Q And what was Arturo's reaction when the defendant said he was neutral?
A Very violent.
Q What was Cardenas Palomino's demeanor during this conversation?
A He was scared. He was scared from Arturo's reaction.
Q When you say Arturo was violent, what do you mean?
A He was very angry. Arturo was not the kind of person who swore, only -- he only swore when he was very mad.
Q Did he swear during or after this call?
A After.
Q After this call with the defendant, did Arturo Beltran continue to pay Garcia Luna?
A Yes.
Q And how did those payments occur?

A Through Cardenas Palomino.
Q Was there ever a time after this war began or fighting began between the Beltran Leyva's on one side and Chapo and Mayo's people that anything happened with Oscar Nava-Valencia?
A Yes.
MS. REID: And if we could just bring back Government Exhibit 11.
(Exhibit published to the jury.)
Q What happened?
A There was a problem over money about some deals that went bad between Lobo and Arturo.
Q Okay. And what happened?
A Barbie kidnapped him. Together with another person. Barbie spoke for himself he said that he had to pay -- spoke for him and said he was going to pay the debt that he owed. He was going to pay one part. So Lobo Valencia was let go and he went to work with Chapo and Mayo.
Q I'm sorry. What does that mean that he went to work with Chapo and Mayo?
A With the Sinaloa Cartel. At that time, they were rivals.
Q Is it fair to say that after being kidnapped by Arturo's people, Lobo Valencia switched alliances to the other leaders of the Sinaloa?

A Yes.
Q What was Arturo's reaction to that?
A Well, we already had him pegged as an enemy. He was upset, but he was our enemy.
Q Now, earlier we talked about some members of the government that the Sinaloa Cartel paid.
A Yes.
Q Did certain members of law enforcement who worked with the Sinaloa Cartel take sides during this war?
A Yes.
Q Can you tell us about that?
A There were members of the federal police that went to the side of Mayo and ray. And others went to Arturo's side. And people started killing each other in both of those groups.
Q Did Arturo ever take action with respect to certain members of law enforcement that he believed were aligned with Mayo and Chapo?
A Yes.
Q What did he do?
A He knew who was, as we say, 100 percent with them and he started killing them.
Q Who did Arturo kill?
A I remember there was Millan and several others. I maybe be able to remember some of the other names shortly.

Q Is it fair to say this was a very violent time?
A Yes.
Q Let's talk about Millan. Is that Edgar Millan?
A Yes.
Q Who is that?
A He was a commissioner for the federal police at that time.
Q How did you learn that he was killed?
A Arturo told me about it.
Q What did you learn?
A The way that he had been killed and how they had been able to obtain the keys to his home and go in and everything.
Q Tell us what you learned about how he was killed and the other details.
A Yes. The federal police under Millan started conducting many operations to hit the Beltran Leyva cartel and that's when Arturo decided, well, to kill Millan. They had people, you know, both groups, they knew each other. We used to be, you know, friends altogether before. Borrado was able to get the keys to Millan's house. He gave them to a gunman who went into the house and was in there before Millan arrived. He killed him and he left.

MS. REID: Your Honor, this might be a good time for a break or I'm happy to keep going.

THE COURT: If you're more than happy, let's keep going. It's kind of early.

MS. REID: Yes, your Honor.

Q During the war, did Arturo Beltran ever take any action with respect to the defendant, Garcia Luna?

A Yes.

Q What happened?

A He kidnapped him.

Q When was that?

A I don't remember the year.

Q Was it before or after Arturo had Edgar Millan killed?

A I believe it was after.

Q And how did you learn about this?

A Both Arturo and Borrado told me about it.

Q What did they tell you about kidnapping the defendant?

A That they had kidnapped him on a road on the way to, a Morelos road on the way to Cocoyoc. And that they took him to see Arturo at an office.

Q And what, if anything else, did you learn?

A Of what Arturo had told Garcia Luna.

Q What was that?

A That there was nothing impossible for Arturo.

Q And what, if anything, led up to this kidnapping of the defendant?

A That he didn't want to answer calls anymore. When he

called him through Cardenas Palomino and the operations were constant against the Beltrans and they were minimal against Chapo and Mayo.

Q What was the result of this meeting between Arturo and the defendant?

A He let him go.

Q Arturo let the defendant go?

A Well, they took him back to the place where they had picked him up from and according to what Borrado told me, right.

Q Did the defendant continue to pay Arturo after this?

A Yes.

Q After this happened, were you ever in the safe house that you had described?

A Yes.

Q And what was the condition of that safe house?

A Well, Arturo and them, they were eating, possibly Borrado was there, Roberto, possibly Barbie. And in the corner from where we were all, like, talking, there were lots of, like, clips thrown in there.

Q What's a clip?

A It's the magazines for the short guns and the long weapons.

Q Did you learn where those came from?

A Yes.

Q What did you learn?
A Borrado and Arturo told me while smiling those belonging to Garcia Luna's bodyguards. They had taken those from them when they took them.
Q You have talked to us a little bit about someone named Mario Pineda Villa or MP.
A Yes.
Q After the fighting started between the Beltran Leyvas on one side and Mayo and Chapo on the other, what, if anything happened with MP?
A When the fight was still going on, MP and Borrado helped Mayo and Chapo receive some fast boats on the coast of Gurrero.
Q What was Arturo's reaction to that?
A Arturo picked up Borrado and interrogated him and killed him. And he sent me to go and pick up MP.
Q Did you do that?
A Yes.
Q What happened when you did that?
A We had a confrontation between MP's group and the group that I had in Cuernavaca. We overcame the confrontation and MP was wounded, so we took him. It wasn't a lethal wound, he had just been shot on the leg.
Q When you say confrontation, do you mean a shooting?
A Yes.

Q Were you and the people with you shooting at people with MP?
A Yes.
Q And what kind of injury did MP have as a result of that?
A It was like a wound in and out on his thigh.
Q And after you were able to capture MP, what did you do?
A From Arturo's orders, he had told me to transfer him to the city of Puebla.
Q Did you do that?
A Yes, he was taking him.
Q And what happened?
A Halfway through the place, he tried to bribe me and he said that he would give me money if I would release him. But I didn't do that. And on the way Hector called me and he asked me where I was, so I told him my location. And he told me to wait for him on the side of the road. And so our SUV convoy stopped on the side so that we would wait for him. And Hector Beltran, together with another person came. And he told us to pull MP out of the SUV. We brought him out of the SUV. He placed him against this rock. And he killed him.
Q Who was Hector again?
A Arturo's brother.
MS. REID: I want to now show you or talk about

another person. And I'd like to show you what's marked as Government Exhibit 10 for identification.

(Exhibit published to the witness.)

Q Do you recognize this person?
A Yes.
Q Who is that?
A Conejo.
Q Do you know what person's full name?
A Yes.
Q What is that?
A Harold Poveda. He's Colombian.

MR. CASTRO: No objection.

THE COURT: Received.

(Government's Exhibit 10 received in evidence.)

Q Who is Harold Poveda or Conejo, as you described him?
A A friend and a very important partner of Arturo Beltran.
Q What kinds of things did he do with Arturo Beltran?
A They trafficked cocaine.
Q Now during this period of internal fighting between the Beltran Leyva side and the Chapo Mayo side, what, if anything, happened with Conejo?
A He stayed on the Arturo Beltran's side.
Q And were there ever any attempts to arrest him?
A Yes.

Q Were you directly involved in any of those events?
A Yes.
Q When was that?
A Well, one time and I don't recall the year.
Q Was this during the period of war that you've been talking about?
A Yes.
Q And what happened?
A At one time Bayato and Garrai had hit a house where Conejo was in a place that is called Desierto de los Leones. They had hit him, he had been gathered there with many Colombians and many women. He managed to escape running towards the back of the house. He had reported to Arturo what had happened. And Arturo sent me a message saying send somebody to go pick him up.
Q Did you do that?
A Yes.
Q And did you see him after that?
A Yes.
Q And generally, what was his condition?
A Well, he arrived and he was all scratched up and he was bleeding from his wounds and his hair was a mess.
Q A few times you've mentioned someone named Bayardo. Can you remind us who is that?
A A corrupt police officer who was part of the federal

police. And who worked directly for Mayo and Ray.

Q And after the war started within the Sinaloa Cartel, did Bayardo take a side, based on your understanding?

A Yes.

Q Which side was that?

A Mayo and Rays. Zambada.

MS. REID: I want to now go back to what's in evidence on the screen as Government Exhibit 13.

(Exhibit published to the jury.)

Q Can you remind us who is this?

A Ray Zambada.

Q And what, generally, during the years that the cartel was aligned, what role did he have in the cartel?

A Well, he was the person in charge of the Mexico City Airport and of all of the shipments that belonged to him, his brother, Mayo Zambada, and Chapo that was in Mexico City.

Q During this period of the war between the Beltran Leyva and Mayo and Chapo, what, if anything, happened with Ray?

A Well, during the war he took sides. His side; Mayo and Chapos.

Q And did your side with Arturo Beltran ever take any efforts against Ray?

A Yes.

Q What did you do?

A Arturo's first plan was to kill him. And I told him not to do that because if he did that, then they would kill Alfredo Beltran in jail. So Arturo ordered for him to be arrested by the government.
Q And was he ultimately arrested?
A Yes.
Q Were you involved in that?
A Yes.
Q Tell us about that.
A I had people infiltrate his organization. And so they were giving us the location of where Ray and all his people were at in Mexico City. There were two attempts to capture him. The first one, we had given the information to the army and the army sold that information to Ray. And on the second attempt, Arturo told me to handle it with the people from SIEDO. So we hit him when he was meeting with his entire organization in Mexico City. He was captured and he was then surrendered to the real SIEDO agents.
Q To be clear. When you say you hit him, what do you mean?
A That I was part of the operation to capture him.
Q You made a reference to real SIEDO agents. Was there anyone dressed at SIEDO agents during this operation to capture him?
A Yes.

Q Who was that?
A Well, among those people there was me, and also hit men for the Beltran Leyva.
Q And after the fake SIEDO agents arrested or captured Ray, did you turn him over to the real SIEDO?
A Yes.
Q What is SIEDO?
A It is the attorneys office that's specialized in investigating organized crime.
Q And is it part of the federal police?
A Yes. Of AFI. Part of AFI.
Q And during this operation to capture Ray, was there any violence?
A Yes.
Q What happened?
A Well, we exchanged shots and Ray wanted to leave, but we had placed some armored SUV's right by the gates. He was in an armored vehicle and he was trying to exit, leave, but he couldn't. He crashed on one of our armored vehicles. We kept shooting. Ray was asking Bayardo for support and he never made it. The municipal Mexico City police arrived. And Ray and all of the other members were detained. Those of us who were not officers, we left.
Q And you said earlier that SIEDO was involved in this. What happened when the municipal police took Ray in custody?

A There were only four SIEDO people and the municipal police, there were a lot of them. I ordered the SIEDO people to take a picture of the arrested people before loading them onto the vehicles for the municipal police. Because it was possible that they would try to swap them. Up until that moment, nobody knew who was Ray. Until the SIEDO agents let their superiors know and some of the directors of the SIEDO police they went there and the municipal police surrendered Ray and everyone from the organization to the SIEDO.

Q When you say you were concerned about someone being swapped, what are you referring to?

A That in Mexico, everything is possible. Corruption is huge and an arrested person can be exchanged during transport.

Q Were you concerned that would happen with Ray Zambada?

A Yes.

Q Is that why you took efforts to make sure there was a picture taken of the arrest?

A Yes.

Q By the way, did you ever speak with Ray Zambada again after he was arrested?

A No.

Q And after the war began, were you ever in contact with the Sinaloa leaders aligned with Chapo and Mayo?

A Mayo spoke to me.
Q When is the last time you spoke with Mayo?
A When the war had just started.
Q Is that before you were arrested?
A Yes.
Q Now during this time period of the war, were there ever efforts to arrest Arturo Beltran?
A Yes.
Q Can you tell us about that?
A There were efforts on the part of the Army and the federal police, specifically Commander Bayardo and his people.
Q And were there ever confrontations during efforts to capture Arturo?
A Yes.
Q What would happen during those confrontations?
A We exchanged gunfire.
Q Did anything significant ever happen in Acapulco, Mexico?
A Yes.
Q What happened?
A During one of these attempts to capture Arturo Beltran and his people, Beltran and his people were surrounded by some Army departments. Arturo spoke to some military leaders and we walked out the back as if there was nothing

going on and nothing happened.

Q And at this time, did Arturo have relationships in which he paid members of the military too?

A Yes.

Q I want to direct you to December of 2009. What, if anything, happened to Arturo Beltran then?

A That was when he was killed.

Q And who was involved in his death?

A The Marines.

Q I want to direct you to a few days before Arturo Beltran's death. Did anything significant happen then?

A Yes.

Q What happened?

A Arturo had arrived from Puebla in a helicopter for a party that we were going to have in Cuernavaca. They're called posadas in Mexico.

Q What is a posada?

A Like a Christmas party.

Q Okay. Continue.

A We were at a house, there were live music groups. There were women. We were drinking, well, I wasn't drinking, Arturo was drinking and doing drugs. And suddenly, the Marines came. There was a confrontation and we left. Arturo went on his way with some people and he sent me to Mexico City to talk to the government people to

see how this had happened.
Q What branch of the government did you try to speak with?
A With some people from the Army.
Q And after you did that, what happened?
A Those people did not get back to me. My people in Cuernavaca told me that there was some strange movements on the part of Marines in the streets San Diego and Rio Mayo in Cuernavaca. I asked Arturo if he was arrested there, I didn't know where Arturo was then. I told Arturo that if he was arrested that area, he should get away from there because there were quite a few people from the Marines there. After that, there was a shoot out and Arturo and everyone who was there were killed.
Q After Arturo Beltran's death, what did you do?
A I stayed on with Hector Beltran.
Q And what role did Hector Beltran have at that point?
A He became the leader of the Beltran Leyva's.
Q And how long did you work for him?
A Until the day of my arrest.
Q And when were you arrested?
A 2010.
Q Now, before we talk about your arrest, did you ever speak with Hector Beltran after you were arrested?
A No.

Q What, if anything, happened to Hector Beltran following your arrest?
A He was arrested.
Q And what, if anything, happened after he was arrested?
A They put him in Altiplano, a federal prison, and he supposedly died there.

(Continued on the next page.)

DIRECT EXAMINATION

BY MS. REID: (Continued)

Q Now, do you remember the day that you were arrested?
A Yes.
Q What day was that?
A It was a Sunday.
Q What month was it?
A September.
Q And what year?
A In 2010.
Q And can you tell us about your arrest?
A Yes. I was at home with my wife and my children, you know, with my family. A group of Marines came. They knocked in the gate and came in.

At that time, I surrendered my weapon to the Marine who arrested me, and I told them it was me that they were looking for and to leave -- to please leave my family out, alone. They stole what they could and they arrested me and took me.

Q And after the Marines arrested you, what happened?
A I was transferred to an office of the Secretariat of the Navy in Mexico City.
Q And what happened there?
A I asked an admiral who was -- whose face was covered, he was wearing a hood. I told him that I wanted to speak to DEA

agents.
Q And without telling us what you said, did you speak with someone from the DEA?
A Yes.
THE COURT: Ms. Reid, any time you want to break now is fine.
MS. REID: This is a good time now, Your Honor.
THE COURT: Yes?
MS. REID: Yes.
THE COURT: Okay.
Ladies and gentlemen, we will take our morning break. Please remember not to talk about the case amongst yourselves. We will see you in 15 minutes.
Let's get the government to move the board, please, so that the jury can get out.
(Jury exits.)
THE COURT: Recess until 11:17.
Although, I want to make one more comment about filing. The reason that chambers got messed up about the filing, it is okay for everybody to send courtesy copies to the chambers e-mail address, but you still have to file it on the docket. Okay? If it is confidential, file it under seal. But it has got to be on the docket for a lot of reasons.
Okay, thank you.
(Recess taken.)

THE COURT: All right, let's have the jury back in.

By the way, I just got the defense motion. You do not really need to send it to chambers. We see it as soon as you file it on ECF.

MR. MIEDEL: Okay.

(Jury enters.)

(Continued on the next page.)

THE COURT: Everyone be seated.

Please continue, Ms. Reid.

MS. REID: Thank you, your Honor.

BY MS. REID:

Q Before we broke you mentioned that after your arrest you spoke with someone from the DEA.

A Yes.

Q And without telling us what you said, did you ever speak to people in the Mexican Government following your arrest?

A Yes.

Q Generally who were the people that you spoke with?

A I spoke to Marcella Morales. At that time she was assistant attorney for the SEIDO, and with different prosecutors.

Q While you were in custody in Mexico, did you ever sign affidavits?

A Yes.

Q Without telling us any specifics, generally did those affidavits contain information?

A Yes.

Q About how many affidavits did you sign while you were in custody in Mexico?

A I don't know, many.

Q Was it more than ten?

A Yes.

Q More than 20?
A I believe so.
Q While you were in custody in Mexico, did you ever sign an affidavit about the defendant Garcia Luna?
A No.
Q Why not?
A I was afraid for my life.
Q Why were you afraid for your life?
A Because the jail that I was going to be sent to, he was the chief of all the prisons. And he had, or has, a lot of power in Mexico.
Q About how long you were in prison in Mexico after your arrest?
A About a year and eight months until my extradition.
Q During that time, how were you generally treated?
MR. DE CASTRO: Objection. Relevance.
THE COURT: Sustained.
Q While you were in custody in Mexico, were you in touch with anyone else from the Sinaloa cartel?
A Some of the other inmates in prison, yes.
Q Like who?
A Mochomo was there, Hector Huerta La Burra, Cara Quintero was there, among others.
Q And have you spoken to any of those individuals in the past ten years?

A No.
Q You talked to us about Barbie. When was the last time you spoke with him?
A When I was arrested barbie had also been arrested. So the last time I spoke to him was at the SEIDO facilities.
Q After you left Mexico, did you ever speak to Barbie again?
A No, no.
Q Earlier you talked about Conejo, Arturo's associate. When is the last time you spoke with him?
A Also the time of my arrest, he was also arrested around the same time.
Q Did you ever speak to him after you left Mexico?
A No.
Q By the way, earlier you talked about Lobo Nava Valencia. After he switched alliances during the war, did you speak to him again?
A No.
Q After you were arrested, at some point were you extradited to the United States?
A Yes.
Q About when was that?
A Around 2011 approximately.
Q Did you plead guilty to any crimes in the United States?
A Yes.

Q What were those crimes?
A Conspiracy to traffic more than 5 kilos of cocaine and money laundering.
Q When you pled guilty, did do you so with a cooperation agreement?
A Yes.
Q What is your understanding of what you had to do under that agreement?
A To cooperate when it is requested of me and sticking to the truth.
Q Without that cooperation agreement, what was the minimum penalty you were facing on the charges you pled guilty to?
A Ten years.
Q What was the maximum?
A Life.
Q Were you ever sentenced for those crimes?
A Yes.
Q Who sentenced you?
A A judge.
Q What did you get?
A Ten years for conspiracy and three years for money laundering.
Q Were those to run at the same time?
A Yes, they were concurrent.
Q Did you serve time in prison in the United States?

A Yes.
Q Have you completed your sentence?
A Yes.
Q At the time that you left Mexico, was the Sinaloa cartel still operating in Mexico?
A Yes.
Q Who were the leaders of that cartel?
A Chapo and Mayo.
MS. REID: No further questions.
THE COURT: Cross examination.
MR. DE CASTRO: Yes, Judge. Thank you.

CROSS-EXAMINATION

BY MR. DE CASTRO:

Q You would agree with me that the cartel business, it's very dangerous?
A Yes.
Q Especially the Sinaloa cartel, right?
A Yes, everything.
Q Yes. But when you were a member of the Sinaloa cartel, they were the most powerful and the most feared?
A Of course.
Q You were a leader of that organization, right?
A Yes.
Q So you were feared, right?
A Yes.

Q By many, many people?
A Some.
Q The cartel had sicarios, right, hitmen?
A Yes.
Q Hundreds of hitmen that worked for the cartel?
A Yes.
Q They were the cartel's soldiers, right?
A Yes.
Q To fight its wars and protect its territory.
A Yes.
Q With violence.
A Yes.
Q Murder.
A Yes.
Q Kidnapping.
A Of the opposite people, yes.
Q Well, not just opposites, right, anybody who crossed the cartel even if it they were a member of the cartel?
A People involved in drug trafficking.
Q The sicarios were trained and committed torture, right?
A Yes.
Q And assault?
A Yes.
Q They had to fight against rival cartels.
A Yes.

Q They had to fight against police soldiers, right?
A Yes.
Q They had to fight against the country's military, right?
A Yes.
Q They needed to root out informants in the organization, right?
A Yes.
Q And kill them, correct?
A Yes.
Q Many people were killed.
A Yes.
Q You ordered many people killed.
A No.
Q Those orders came from your boss, right?
A Yes.
Q You never communicated those orders to any of the soldiers?
A Yes, I did communicate it to them.
Q So people were killed based on your words?
A Yes.
Q Sometimes even the families of people were killed, correct?
A No.
Q Nobody's family was ever killed by the cartel?
A There were rules.

Q Many people were disappeared, right?
A Yes.
Q What does that mean to disappear somebody?
A They made them disappear, their bodies didn't appear anywhere, nothing appeared.
Q Tell me how that is done. You trained some of these hitmen, right?
A Yes.
Q How do you disappear somebody?
A Well, usually they are buried in sort of land plot. Then through corruption, the police they won't file any report whatsoever, so nothing ever happened.
Q So the decisions to disappear someone for example, those all came from the top, right?
A Yes.
Q And as you mentioned earlier, Arturo was a very hands on leader, right?
A Yes.
Q He personally ordered violence on numerous occasions?
A Yes.
Q You saw him commit acts of murder, correct?
A He would shoot at, I saw him shooting at our enemies.
Q You never have seen him murder anybody?
A Not that I remember, I'm not sure.
Q We'll do that later. You were his chief strategist,

right?
A Yes.
Q His right-hand man?
A For that purpose, yes.
Q You were, as I think you testified yesterday, the architect of the cartel's expansion plan.
A Yes.
Q So you had a plan to open up different routes for drug trafficking, right?
A Arturo was the one who made the decision to grow the Sinaloa cartel; and I just complied with his decision.
Q It was your idea, though, right?
A No. It was their idea. The strategy was mine, but it was their idea.
Q Got it. So the sicarios, the hitmen, they were a key component to that plan or strategy, right?
A Yes.
Q When we talk about opening routes, what we're really talking about is killing people, right?
A Not necessarily.
Q Well, did the other cartels that owned those routes just accept that you all were moving in?
A Well, usually they would just leave once we would get there and made our presence felt.
Q Made your presence felt, which meant show up with guns,

men, and -- withdrawn.
You would show up with men and elements of war, right?
A Yes, of course.
Q We've talked about opening routes, but you also have used the term we would "hit" them a lot.
A They barely made any resistance.
Q But in your direct testimony you used that term "hit" in a lot of different contexts.
A Yes.
Q So for example we would hit our rivals.
A Yes.
Q Hit generally means kill, right?
A No, that's different. To hit them is to fight them.
Q It doesn't always mean people end up dead. It could though?
A Yes, it could happen.
Q It could also mean capture them and torture them.
A They were captured. And then we would bring them to the local authorities in Chiapas at the time, the state authorities.
Q Except when you testified yesterday, apparently the sicarios on their own started murdering people, right?
A Yes. Referring to Miguel Aleman in Tamaulipas, and in Loredo.

Q Now hit, when you say hit, you also, it also could mean steal their product, right?
A Drugs or money they might have from drug trafficking, yes.
Q So that term can mean a lot of things, right?
A Yes.
Q You testified that you would receive information -- withdrawn.
You would agree with me that from 2001 to 2010, when you were part of the Sinaloa cartel, whichever side you were on during that time, it was very well armed?
A Yes.
Q It had a lot of fire power?
A Yes.
Q Armored vehicles?
A Yes.
Q Arturo alone had 15 to 20 armored vehicles, right?
A Yes.
Q When you say armored vehicles, what do you mean by armored?
A Those are vehicles are made so that bullets don't go through them.
Q And you also witnessed many shipments of weapons, correct?
A Yes.

Q Shipments of AK-47s.
A Yes.
Q Those are automatic rifles, right?
A Yes.
Q Designed and built for the battlefield, right?
A Yes.
Q AR15 assault rifles as well, correct?
A Yes.
Q Also battlefield weapons.
A Yes.
Q And Arturo would pay what around $500 per rifle?
A I don't know how much, I don't know how much he paid.
Q They also had grenades, right?
A Yes.
Q And you witnessed hundreds of shipments -- withdrawn.
And you witnessed shipments of hundreds of these types of weapons, right?
A Yes.
Q Including a weapon I left off which was the M16 assault rifle too, right?
A Yes.
Q That was a preferred weapon, right?
A Yes.
Q Because it had a grenade launcher attached to it, right?
A Yes.

Q That means it had an attachment where grenades would come out of the weapon and explode wherever you aimed it, right?
A Yes.
Q You could maximize the death that it caused.
A Well, you know we were confronting each other, we were facing people who were also shooting at us.
Q You had to defend yourself, right?
A Of course.
Q Some of the AK-47s that were shipped were decorated, specially made, right?
A Yes.
Q Gold-plated AK-47s for the cartel, right?
A Yes.
Q These were weapons that were coming from the United States, right?
A Some of them, yes.
Q Some of them said, property of the United States Government, right?
A Yes.
Q There were also bazookas that you would acquire, correct?
A Something similar to bazookas.
Q What is that?
A There were, bazookas but those were obsolete already. We had some sort of missiles that those were Russian-made or they came from other countries.

Q You also would acquire .50 caliber weapons, right?
A Yes.
Q Tell the jury, what a .50 caliber weapon is like?
A It's a very powerful weapon that is usually used for air fire and it has a very long reach. And it perforates armored things.
Q So you shoot down planes or helicopters with .50 caliber weapons?
A They were designed for that purpose, but we didn't necessarily use them for that purpose.
Q What did you use them for?
A For whenever we were fighting our enemies who had brought armored vehicles, so we could go through those armored vehicles.
Q You could perforate the armored police vehicles, right?
A Yes.
Q You could perforate the armored vehicles of the military?
A Yes.
Q When you worked for the cartel, you weren't sort of -- you didn't normally dress the way you're dressed now, did you?
A Sometimes I did in Mexico City.
Q In Mexico City you were dressed in a suit when you were working for the cartel.
A Yes.
Q But when you were on missions, you were in military gear,

right?
A Yes.
Q You were armed at all times.
A Yes.
Q You even had a gun with your initials on it in diamonds, right?
A Yes.
Q I think you mentioned it on direct, your Colt Super .38, right?
A It had my nickname engraved, not my initials.
Q El Grande, right?
A Yes, sir.
Q In diamonds, right?
A Yes, sir.
Q Was the version of your gun the Day Of The Dead version?
A Yes.
Q It also had a map of Latin America in diamonds as well, right?
A Yes.
Q What was the handle made of?
A Sapphires and diamonds and in gold.
Q Solid gold, right?
A Yes.
Q A specially made gun just for you?
A The holder, yes.

Q Disloyalty within the cartel was dealt with swiftly, right?
A Yes.
Q If somebody made the mistake of playing both sides of the cartel, they would be killed, right?
A Yes.
Q You could even be tortured before being killed, right?
A That's possible, yes.
Q I think you mentioned times where Zetas, or other rivals, were captured?
A Yes.
Q On direct examination I think the word that was used was they were interrogated, right?
A Yes.
Q Interrogation means to question, right?
A Yes.
Q But they weren't simply questioned, were they?
A It varied.
Q It varied. They would be questioned and tortured, correct?
A I didn't have the chance to see something like that at the time of the Beltran Leyvas.
Q But you certainly saw a lot of torture during your time, didn't you?
A Yes, yes.

Q You standing right there while someone is being tortured, right?
A Yes.
Q How tall are you?
A Two meters.
Q And now I have to try to convert. I'll do that after lunch.
Someone, I think you testified to on direct, like your friend and colleague Chuky, right?
A Yes.
Q That's an example of someone you saw torturing somebody right in front of your eyes.
A Yes.
Q The one that you were so upset about when you heard that the commander had slapped his mother, right?
A Yes.
Q And that's someone you had worked with for many years.
A Yes.
Q First when you were with Corrillo (sic) right -- your first cartel boss, my apologies?
A Cabrillo.
Q Sorry. Then when you were with the Sinaloa cartel as well?
A Yes.
Q And he was pretty well known for enjoying torture, right?

A Yes.
Q You also saw him kill people in front of you as well, right?
A Yes.
Q I think you mentioned this on your direct examination, correct?
A Yes.
Q But you left out how he liked to kill people. What did he like to kill people with?
A He was sadistic. He was a very sadistic person. I did see him at some point puncture a person with a liposuction needle through their navel.
Q He did that because it was necessary for the cartel's operations, right?
A I really had just started out with the cartel. I had no way or no leadership to even know why those people were there.
Q You didn't stop him, right?
A No.
Q You had seen him kill and torture people more than ten times, right?
A No, no.
Q How many times?
A Maybe twice.
Q Then you're standing outside the other times, standing guard?

A The truth is, I didn't like to see that.
Q You saw him choke people to death with a curtain cord, right?
A Yes.
Q You're also aware he had beheaded people, correct?
A As far as I remember no, the decapitating people, El Chuky, no.
Q What about burying people alive?
A Yes.
Q I think you mentioned on direct he tortured somebody with a knife in their ear, right?
A Yes.
Q All the while he appeared to enjoy it?
A Yes.
Q Didn't he also put lye on someone that he thought that he had killed?
A Yes.
Q And that person got up and begged for their life before he shot them and killed them, right?
A Yes.
Q This was your friend and colleague, right?
A Yes.
Q You testified on direct examination about the execution of Millan, right?
A Yes.

Q Arturo Beltran executed Edgar Eusebio Millan Gomez the general coordinator of regional security for AFI, correct?
A I believe he was in the federal police.
Q In 2008, correct?
A I don't remember the date.
Q Arturo Beltran thought that he had betrayed him by arresting his brother Alfredo?
A The Sinaloa cartel.
Q You're also aware that Ray Zambada wanted to kill the commander of the SSP in Mexico City named Pegaso, right?
A Yes.
Q He wanted to plant a bomb and he asked Arturo Beltran for help, right?
A Yes.
Q A month later you saw a report of a failed bombing against Pegaso, correct?
A Yes. Arturo had refused to help Ray in doing that.
Q Arturo Beltran Leyva also tried to murder commander Palomino's father-in-law because Palomino wasn't answering his calls, right?
A He was starting to give trouble. The truth is, I don't know what was behind the death of Palomino's father-in-law. I just know that he killed him.
Q I think we said earlier grande means big or tall, right?
A Yes.

Q And you had a reputation for violence, right?
A Yes.
Q That's why you were feared?
A I was good at fighting.
Q You were the right-hand man to one of the most ruthless cartel tell bosses as well?
A Yes.
Q People feared you and rumored that you beheaded people, right?
A Yes. I don't know if there those rumors, but I was feared.
Q How many people have died at your hand?
A I don't know that. At shoot-outs we were all shooting, I don't know if one of my bullets killed a person. I could not tell you specifically.
Q You can't appropriate how many people are no longer breathing on this earth because of you?
A During confrontations we were all shooting, so I don't know. I can't specify to you if one of my bullets killed someone.
Q You hunted a man named Miguel Trevino Morales, right?
A For a certain amount of time he was one of our enemies, right.
Q He was also your personal enemy, right?

(Continued on next page.)

CROSS-EXAMINATION

BY MR. DE CASTRO: (Continued)

A Not personally. It was with a group. He was from the Zetas group and an enemy of the Sinaloa group.

Q So it was just business?

A Yes.

Q You didn't think he was responsible for murdering your brother-in-law?

A It wasn't exactly Quarenta, 40, who killed my brother-in-law.

Q You didn't think he was responsible for that and you didn't hunt him for that?

A No. I wanted to protect my life. It wasn't personal. It was survival.

MR. DE CASTRO: Judge, one second.

Q Do you remember meeting with the government way back in July of 2012 and being asked questions about this man?

A About what? I don't remember that.

Q Do you remember telling them that you hated Miguel Trevino-Morales, a/k/a 40?

A Well, the truth is, I didn't like him.

Q Do you remember telling them that the reason you didn't was because of the murder and disappearance of your brother-in-law?

A No. I remember having said that it was because he

kidnapped my brother.
Q So it wasn't your brother-in-law; it was your brother?
A No. My brother-in-law was killed in Laredo, but my brother was kidnapped during the truce, years later.
Q Was your brother kidnapped -- did you believe your brother was kidnapped by Miguel Trevino-Morales?
A Yes.
Q So it was personal?
A I asked him during the truce why he did it.
Q But you hunted him for years, right?
A He was our enemy.
Q And you searched for him on the weekends for years?
A Every day, not just weekends.
MR. DE CASTRO: Can I approach, Judge?
THE COURT: Yes.
Q Can I show you -- would the -- you don't remember telling the government that this was something personal, right?
A Well, no, I mean the truth is, I didn't like him.
Q And you didn't tell the government that you did this searching for him on the weekends?
A I don't remember. I mean, I saw him every single day, not just the weekends.
Q So you searched for him for years every single day, and it wasn't personal; it was business, right?
A He was our enemy. He was also looking for us so that he

could kill us.
Q So there's also a couple of people called Gaucho and Rayito, right?
Gaucho?
A You mean Gaucho? I do know a Gaucho.
Q Were Gaucho and Rayito cartel members that were working in maybe Culiacan?
A Yes.
Q And they were working for the cartel, and they were finding rivals and killing them for the cartel, right?
A Yes.
Q And you stepped in and told them that they needed to do an interrogation first before you killed them, right?
A Not to interrogate them, but not to make a mistake and kill somebody who was innocent.
Q Oh. So you were worried that they were killing innocent people?
A Yeah, it was about doing the appropriate operations so that innocent people wouldn't fall; only the people that we were fighting against.
Q So you need to interrogate them to make sure they're cartel members, right?
A Well, not to interrogate them, but to make sure to check the information they had, if they had been set to be part of the Zetas. It wasn't that they were going to pretty much kill

all the other people.
Q And these were conversations you were having over your daily breakfast meetings, right?
A Well, there were rules. There were rules and we all had to abide by them.
Q You said earlier in your testimony that you did not see Arturo Beltran kill anybody, right?
A Not that I remember.
Q Do you recall him killing two women in front of you?
A Yes, I do remember.
Q You were with Arturo Beltran at one of the houses?
A Yes.
Q And he's -- I mean, he was your boss, but he was a good friend, right?
A Yes.
Q And these two women were at his house with you and Arturo, right?
A Yes.
Q And they gave their opinion about Arturo's wife, didn't they?
A Yes.
Q And he did not like what they said, right?
A That's right.
Q And he picked up an AK-47 and he blew their heads off in front of you?

A Yes.
Q And you just remembered that again now?
A Well, the thing is that we were talking about whether Arturo would torture and kill people.
Q My question was -- my apologies. Go ahead.
A I was stuck with that thought.
Q That's not something you could really forget, is it?
A Well, there are many things that I have talked about.
Q There was blood all over you, wasn't there?
A I wasn't covered in blood. I mean, it did splash me, because, you know, they were sitting to the side. And if I may, Arturo was shooting and I had to move my arm like this because he was pointing the rifle at where I was. And I pushed the rifle upwards, and well, yes, their blood splashed me.
Q And the bodyguards or sicarios who were there, they cleaned up and took the women out, right?
A Yes.
Q Burned them in a car, right?
A Yes.
Q And Arturo just continued on with his day, correct?
A Yes.
Q And you did as well?
A Well, yes.
Q That was not an unusual day working with the cartel,

right?
A Well, I mean, it wasn't work. Arturo was having fun. He was talking to the women.
Q Sort of similar incident, I think you testified a little bit about on direct, was Borrado, right?
A Yes.
Q So he was -- I think you said he got picked up and brought to the house, right?
A Yes.
Q Because Arturo suspected him of disloyalty?
A Yes.
Q And he was kidnapped, right?
A Yes.
Q And they kept him there for a day or two, right?
A I really don't know. I don't know how many days they kept him there, but -- and I don't know who grabbed him, what had --
Q You were --
A -- happened.
Q My apologies, sorry.
You were there, correct?
A I don't remember having been there.
Q When he was kidnapped, right, you were not there?
A No.
Q But you were there when he was brought back to the house,

right?
A Well, as far as I remember, they always kept him at only one residence. It's not that they were moving him from one place to the next, as far as I know.
Q As far as you know, Borrado was kidnapped, interrogated and murdered, correct?
A Yes.
Q He was with someone else, too, and that person was also kidnapped, interrogated and killed?
A Yes.
Q And you are aware that Arturo Beltran himself slit their throats?
A I don't know if he slit their throats.
MR. DE CASTRO: My apologies. One second, please.
(Pause in proceedings.)
Q Do you remember -- I know you've met with the government a lot, correct?
A Yes.
Q Do you remember meeting with the government in or around July of 2015 and talking about Borrado's murder?
A I really don't remember.
Q Do you remember telling agents and prosecutors that Arturo Beltran grabbed a knife and cut their throats?
A I didn't see it. That's what was being said, that that's how it had happened, but I didn't see that event.

Q So my question is, are you aware that Arturo Beltran slit their throats?
A Well, that's what was said. I mean, I don't know exactly if that's how it happened.
Q You were told by your colleagues that he slit their throats and they put them in a car and burned them?
A Yes.

MR. DE CASTRO: Judge, do you want to take a break? I can keep going, but it's 12:30.

THE COURT: We can take a break now if you want.

Okay, ladies and gentlemen, we will come back from lunch at 1:30. Please remember not to talk about the case amongst yourselves and do not do anything connected with the case. Lunch will be there for you shortly. We will see you at 1:30.

(Jury exits.)

THE COURT: Let me see counsel at sidebar for just a moment.

(Sidebar.)

(Continued on the next page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT: So Mr. de Castro, I think you have gotten out that he is a very violent guy, he has done a lot of very violent things, he is in an organization that was close with guys who have done a lot of violent things. I have been letting you do that, number one, because the government is not objecting, but also, number two, because the government raised the nature of the cartel and I think you are entitled to feel that out. But I am not seeing how it goes to voracity, so you may be at the beating-the-dead-horse stage.

MR. DE CASTRO: That's why I broke. It's amazing, your timing.

THE COURT: Thank you. Have a good lunch.

We are in recess.

(Sidebar ends.)

(Recess taken.)

(Continued on the next page.)

AFTERNOON SESSION

(In open court.) (Parties present.)

THE COURT: Bring in the jury, please.

(Jury enters.)

THE COURT: All right. Everyone be seated.

Ladies and gentlemen, I know you are a little cold. I see some of you are wearing jackets. I will tell you it is a constant struggle between jurors and me to get the right temperature. I like it really cold. If you were to walk into my chambers, the thermometer reads 64. But I know nobody can take that, so I try to keep it around 70 and get it up to 72 if the jury is still cold. But I see it has fallen to 68, so I know that is too cold for you. So we are going to bring it up to 72 as quickly as the GSA can get to it.

Okay. Let's continue cross-examination.

MR. DE CASTRO: May I, Judge?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. DE CASTRO: (Continuing)

Q Now, on your direct examination, you talked about alleged communications that you had or that Arturo Beltran Leyva had with Mr. Garcia Luna, correct?

A Yes.

Q And you said that they talked using the radio waves, radios, right?

A Sometimes they did.
Q Of course you testified that they also met in person, right?
A Yes.
Q But your -- but Arturo Beltran Leyva's preferred means of communication, unless someone was there, was radio?
A No.
Q Well, there was a person who walked around with radios, right?
A Yes.
Q And so in order to communicate with a person, you're saying that they would have to beep and say hello?
A Arturo didn't say hello.
Q Okay. And you are saying that Arturo Beltran and all these people would talk freely over this radio waves?
A Yes.
Q And not only that, but Arturo Beltran later would put it on speaker, right?
A All the time, yes.
Q So he would speak with the highest levels of the Mexican government on speaker over radio waves?
A With everybody.
Q Everybody, including you?
A No. Arturo and everybody else, and that included his family.

Q Now, on direct examination, you testified about Mr. Garcia Luna's various positions in government, right?
A Yes.
Q And that was not a secret, right?
A No.
Q He's a very public figure, correct?
A Yes.
Q He was in the news a lot?
A Yes.
Q On TV?
A Yes.
Q On the evening news at times, right?
A Well, we didn't watch the news, but maybe if you happen to be watching TV you would catch him on it.
Q Stories and stories would be written about him, right?
A Yes. He was very well-known.
Q Very famous?
A Yes.
Q And it was also well-known that members of the government would travel in these huge kind of motorcades, right, with security?
A Yes.
Q Because he was an official in law enforcement, he had a lot of security around him?
A Probably so. I don't know.

Q Well, you testified earlier about this alleged kidnapping where there was a security detail?
A Yes.
Q So you do know that he had a security detail with armed guards?
A Yes.
Q But he didn't have any of those people when he was meeting with Arturo Beltran Leyva?
A That is correct.
Q The man who had an AK-47 by his side, as you described in detail this morning?
A Yes.
Q And in these meetings that would happen at this safe house, Mr. Garcia Luna, you claim, would not come with his security detail or those vehicles?
A That is correct.
Q You say that he would wait along with other high-level law enforcement officials in the parking lot of a shopping mall?
A Yes.
Q This famous man standing in the parking lot waiting to get picked up by the cartel?
A Yes.
Q And you say that he had been to Arturo Beltran's house many times, right?

A Yes.
Q And so he would know where it is, right?
A Yes.
Q No one would need to show him the way?
A Possibly not.
Q But he would need a ride from the parking lot at the mall?
A Yes. That's how Arturo handled all of his meetings.
Q And now these meetings were happening in the middle of the day, right?
A The time would vary, but mostly.
Q Mostly during the day though, right?
A Yes, most of them were during the day.
Q In the middle of the workweek, right?
A Yes.
Q And Mr. Garcia Luna would sit with Arturo Beltran in the middle of the workweek for three or four hours?
A Yes.
Q So they would spend quality time talking about the business of the cartels for three or four hours in the middle of the day?
A Yes.
Q And you knew at the time that Mr. Garcia Luna was in charge of thousands of people, right?
A Yes.

Q And you say that Arturo Beltran Leyva would pay Mr. Garcia Luna at these meetings, right?
A Yes.
Q So I want to make sure we have all the payments you claim that was made to Mr. Garcia Luna straight. Okay?
So -- go ahead.
A Yes.
Q So you say that from 2001 until your arrest in 2010, Mr. Garcia Luna was getting paid by the cartels?
A For a time, it was the Sinaloa Cartel when it was all united, and then another time just Arturo himself.
Q So we're on the same page, that's nine years of payments, give or take?
A Yes.
Q And the payments were monthly?
A Yes.
Q So I think you testified that they were either 1 million or $1.5 million for each payment, right?
A At the beginning, yes.
Q And, now, you've met with the government, you've met with government agents sort of probably hundreds of times now, right?
A I don't know. I don't know how many there were, but yes, many.
Q And it's fair to say that it's hard to remember what you

told them at different times?
A Well, I've always told them the same thing from the beginning until now.
Q Do you remember telling the government in April of 2020, a couple years ago, that Arturo Beltran Leyva was paying Mr. Garcia Luna $3 million monthly?
A Yes. The payments increased because business increased.
Q I see. So on direct you couldn't remember how much. Now you remember it is 3 million, so we're going to -- can we go with 3 million then?
A Well, no. I don't know exactly what date you're referring to because they grew over time, from 2001 until Arturo's death.
Q So it was a million or a million and a half at some time, and then at some other time it was 3 million?
A Over time as business grew. So I don't know exactly when.
Q Okay. So let's do some math, and let me suggest that we go with 2 million as sort of maybe an average.
A Whatever you say. I am explaining my past as I lived through it.
Q Completely understand.
But what I'm saying is, I want to just go through some math. So I'm going to use 2 million, because you said earlier it was one to one and a half, and then maybe later it

was three. So I'm just going to use 2 million for us to do this math.

MS. REID: Objection, Your Honor.

THE COURT: Sustained.

Let's do it this way. Just assume for purposes of this question that it was 2 million, even though you have not said it was 2 million. Just assume that.

THE WITNESS: Yes.

Q So nine years is 108 months, right?

A Yes.

Q That would be -- I'm sorry.

Right. That would be 108 months of payment, correct?

A Yes.

Q So if it's $2 million a payment, that would be $216 million paid to Mr. Garcia Luna?

A Yes.

Q Then there might be extra payments, right?

A Yes.

Q For example, the warehouse in -- the warehouse you discussed where the payment was $14 million extra, right?

A Yes.

Q So now we're up to 230 million; is that right?

A Yes.

Q Then you testified about Manzanillo, right, where there

was an extra payment that had to be made to release those drugs, right?
A Yes.
Q That was where you testified that Mr. Garcia Luna came to the warehouse and there wasn't enough room for all the cash, right?
A Yes.
Q And Manzanillo, that's -- how far away from Mexico City is that?
A It's approximately 400 or 500 kilometers away.
Q Ten hours in a car?
A Maybe by car, seven, eight hours, because there's the highway.
Q Now, on top of those payments, there would also be additional monies if drugs were seized, right?
A Yes.
Q And I think that would've been $4 million per ton?
A I didn't understand your question.
Q Did -- have you told the government in meetings with them that Arturo Beltran Leyva charged four -- excuse me, withdrawn.
Have you told the government in meetings with it that Mr. Garcia Luna charged $4 million per ton to release any seized drugs?
A No, no.

MR. DE CASTRO: One second, Your Honor.
Q So are you saying that you did not tell the government that or you're not sure?
A Well, no, I don't remember having said that because it's not true. We didn't pay per ton; we paid per month.
MR. DE CASTRO: Your Honor, can I approach?
THE COURT: Yes. Carefully.
MR. DE CASTRO: Sure.
MS. REID: Can I ask --
THE COURT: What I mean by "carefully" is, careful how you frame your question.
MR. DE CASTRO: For sure.
Q Can I ask you to look at what I'm going to hand the interpreter?
Ah, I moved it.
THE INTERPRETER: Your Honor, for the Interpreter, would you like for me to turn my mic off while I read back for the witness?
THE COURT: Yes.
THE INTERPRETER: Thank you.
Q Review that and let me know whether that refreshes your recollection about the $4 million.
Have you had a chance to review what I showed you?
A Yes.
Q Does that refresh your recollection that you told the

government that you had -- that Arturo Beltran Leyva had to pay an additional $4 million per ton to release drugs that had been seized by AFI?
A No. I think that the person who wrote that down misunderstood me.
Q Okay. So going back to -- we were up to about $230 million paid to Mr. Garcia Luna, right?
A Yes.
Q And then there was also Christmas where Arturo Beltran gave out even more money, right?
A Yes.
Q So like a Christmas bonus, he would then give $5 million, right?
A I don't remember how much, but he would give us all some, including myself.
Q But millions, right?
A Yes.
Q Now, all those millions paid, they were all kept track of, right?
A Yes.
Q The cartel earned billions in profits?
A Yes.
Q This was a huge business, right?
A Yes.
Q Would you agree with me that the cartel was making

hundreds of millions of dollars per load of drugs to the United States at one time?
A Yes.
Q And the cartel had accountants working for it, right?
A Yes.

(Continued on the next page.)

BY MR. DE CASTRO:

Q Many people in charge of tracking expenses and profits, right?

A Yes.

Q There were so many people to pay, correct?

A Yes.

Q And there was all the properties, cars, boats that the cartel had purchased as well, correct?

A Yes.

Q The jewelry and the weapons as well, right?

A Yes

Q I think on your direct testimony you mentioned how you had kidnapped the accountant for the Zetas.

A Yes.

Q That was very strategic of you, correct?

A Yes.

Q Because the accountants are a huge, huge part of their business, right?

A Yes.

Q You also testified on direct that Arturo Beltran Leyva he liked the finer things in life, correct?

A Yes.

Q Everything with him was luxury?

A Yes.

Q Ferraris, Rolls Royce, Lamborghinis, BMWs.

A Yes.
Q A BMW or Mercedes was probably a low-end purchase for Mr. Beltran Leyva?
A Yes.
Q He had his own, or maybe other people did as well, their own exclusive fashion designers?
A Yes.
Q Mansions, right?
A Yes.
Q Humongous homes?
A Yes.
Q Yachts as well?
A Yes.
Q Are you aware of my members of the cartel owning football teams?
A Not that I remember.
Q And you, as sort of second in command, you were paid very well, correct?
A Yes.
Q You testified on direct examination that just for that one seizure you got a one million-dollar bonus.
A Yes.
Q You were working for the cartels for nine years, right?
A Yes.
Q And I'm sure overtime you got paid more and more money as

your responsibilities grew.
A Yes.
Q You got extras, as well as we discussed.
A Yes.
Q And Christmas bonuses?
A Yes.
Q Fair to say you made hundreds and hundreds of millions of dollars?
A I wouldn't say possibly hundreds and hundreds.
Q How much would you say you made?
A Oh, I don't know.
Q Part of your sentence you're required, you agreed, to forfeit the proceeds of your crime, right?
A Yes.
Q You pled guilty to just importing 5 kilos or more of cocaine to the U.S., right?
A Yes.
Q And money laundering, right?
A Yes.
Q You agreed to forfeit $100 million, didn't you?
A Yes.
Q A fraction of your profits, right?
A I really don't know how much I made.
Q You just agreed to forfeit $100 million and you have no idea how much money you made?

A Yes.
Q When you were arrested, how many cars were seized?
A Well, when I was arrested they might have taken two officially but they stole about eight.
Q So you had ten cars?
A Yes.
Q Can you tell us about them, what kind of cars were they?
A Most of them were gifts from Arturo.
Q The question is what kind of cars were they?
A Well, Mercedes, BMWs, Porsches, Land Cruiser, Toyotas, and majority of them were armored.
Q After you got arrested, you had to now spend money on lawyers, right?
A Yes.
Q First in Mexico then in the United States, correct?
A Yes, but here I had a public defender.
Q And you're forfeiting $100 million in property?
A I signed an agreement with the Government.
Q Now you testified that you bribed Mr. Garcia Luna and others for information and assistance for the cartel, right?
A Yes.
Q And that Arturo was paying Mr. Garcia Luna so that the entire organization was protected by the federal police, right?
A Yes.

Q I think you said yesterday in response to a question from the Government, that you paid lower levels not that you needed them but just so that they would commit to you, so they were with you 100 percent.
A Yes.
Q Let me ask you about some of your former colleagues.
A Yes.
Q Arturo Beltran Leyva was killed in December 2009 in a shoot-out with the Marines?
A Yes.
Q You were arrested in 2010.
A Yes.
Q And you were extradited to the United States?
A Yes.
Q Jesus Sevilla was arrested and extradited to the United States?
A Yes.
Q Richard Arroyo Guizar was arrested and extradited to the United States.
A Yes.
Q Arturo Guzman, El Chapo's brother, was arrested and killed in jail?
A Yes.
Q Gilibrando Cifuentes Villa, El Menor, was arrested and extradited to the United States?

A Yes.

Q Tirso Martinez Sanchez was arrested and extradited to the United States.

A Yes.

Q El Pidio Ramirez Mojarro, El Pilo, was arrested and extradited to the United States.

A I down remember many of the names but possibly so yes.

Q It's okay if you don't know say you don't know.

A I'm not certain of all of them but yes, there were many people who were extradited.

Q Oscar Nava Valencia Lobo was arrested and extradited to the United States?

A Yes.

Q El Conejo, arrested and extradited to the United States?

A Yes.

Q Israel Avila, arrested and extradited to the United States.

A Yes.

Q Let's take a time let me do a compound name a number of names: Ever Villafane, La Barbie, Hector Villarreal Hernandez and Jesus Zambada Garcia, all arrested and extradited to the United States?

A Yes.

Q Now in April of 2013, you pled guilty in federal court in Texas, correct?

A Yes.
Q So that's about three years after your arrest.
A Yes.
Q And for those three years before, you were meeting with Government agents, right?
A Yes.
Q And you knew right away that your exposure in the U.S. for your criminal conduct was a potential life sentence, correct?
A Yes.
Q You learned that the process of cooperating in federal court is a bit complicated, isn't it?
A Well, not to me, it's simply about telling the truth.
Q It's not simply that you say I want a deal, they give you a number, then you just take it, right?
A I was never given a number. I was always told it would depend on the judge who would sentence me. The prosecutor never gave me a number.
Q The prosecutor won't make you any promises that you will receive a particular sentence until you meet with them many times, right?
A I was never promised a particular sentence.
Q You have to meet with them many, many times before they even make you an offer of a cooperation agreement, right?
A I was never promised anything. I just started to

cooperate.
Q I haven't asked you if you were promised anything. I'm asking you if the process takes a lot of time?
A Yes.
Q Because you don't just walk in the door for the first meeting and they say, here is a deal, right?
A No.
Q And that's why you didn't plead guilty for three years, right?
A Yes.
Q You got extradited in 2012 and you met with the Government for an entire year before they gave you that cooperation agreement.
A I think I was extradited in 2011.
Q And you learned that even if they sign you up and they give you that deal, as you mentioned earlier, they don't guarantee you a sentence, right?
A Yes, that's correct.
Q But if you provide substantial assistance in the prosecution of others, the Government agrees to file a special letter with the Court.
A I think that's how it works.
Q It's a letter that tells the Court how helpful you have been, which will support your lawyer's argument for a much lesser sentence than that which you would have faced

otherwise.
A Yes.
Q And so understanding all of that, you started that process and you started meeting with the Government.
A Yes.
Q And I'm sure, which is understandable, you would have been very nervous.
A Yes.
Q You had a lot riding on -- excuse me -- you had a lot riding on them wanting to use you as a witness.
A I had, I have a lot of information. I spent many years with the cartel.
Q But the Government could have taken all your information and not given you a deal, right?
A Yes.
Q So with your history of crimes, you must have been uncertain as to whether you would be able to earn that cooperation agreement.
A What I was told by the prosecutor was to trust that I trusted.
Q But you knew that as a very high-ranking member of the cartel, one of the most powerful and violent cartels, that they may not offer you that agreement, despite what you knew.
A That was possible.
Q And you must have been surprised, even shocked, when the

U.S. Government said you made it through the process and you were going to get your cooperation agreement.

A I wasn't in shock or anything. I trusted and I trusted.

MR. DE CASTRO: One second.

BY MR. DE CASTRO:

Q You weren't surprised because that was your plan all along, right?

A No, no.

Q Well, from the minute you got arrested you immediately wanted to talk to the DEA, right?

A My plan was to cooperate, but I didn't know what the results would be. Thank God things went well for me.

Q There certainly had been other members of the cartel arrested during the nine years that you were a member, right?

A Yes.

Q Members arrested and extradited to the United States.

A I don't know exactly.

Q So you weren't aware that members of the cartel had been extradited and prosecuted in the United States before you got arrested?

A Oh, yeah, sure over the years, of course I knew that. But people close to me, that I didn't know.

Q Not necessarily close to you, but you knew that members of the cartel had been extradited and had cooperated and got great deals, right?

A To tell you the truth, I didn't know that. I had no clue that that happened.
Q Now, you were in fact sentenced in November of 2017, right?
A Yes.
Q And you were facing a ten-year mandatory minimum to life in prison, right?
A Yes.
Q And you learned that we have something here in our federal system called the United States Sentencing Guidelines, correct?
A Yes, I think that's what they are called. I don't know.
Q Well, there is a calculation or a recommended sentence under those Guidelines for the crimes that you have committed.
A Yes.
Q And it takes into consideration a person's past crimes as well, right?
A I guess so. It depends on the level of crime.
Q And you came in with a the lowest level because you'd never been to the U.S. and never been convicted of a crime here, right?
A I really don't know what number I came in with.
Q Well, you had no criminal history that was discussed, correct?
A I never had a criminal history.

Q Despite all the crimes you had committed in Mexico, you didn't have extra points against you because you had been committing other crimes.
A I don't know.
THE COURT: When judges and lawyers refer to criminal history, they are talking about convictions and arrests, they are not talking about criminal conduct.
MR. DE CASTRO: Thank you, Judge.
BY MR. DE CASTRO:
Q Your Guidelines or recommended sentence was 300 to -- 324 to 405 months imprisonment, right?
A I don't know.
MR. DE CASTRO: Judge, can I approach the interpreter?
THE COURT: Yes.
BY MR. DE CASTRO:
Q I'm going to show you something, read it to yourself, the interpreter will. And then let me know that if that refreshes your recollection that you were facing a Guideline of 324 to 405.
(Interpreter translating for witness.)
A Yes.
Q That's around 27 to 33 years in prison, right?
A Yes.
Q And in our federal system you would not be released on

parole, right?
A I really don't know.
Q The Court didn't explain that to you when you pled guilty?
A I remember that I did have some sort of a conditional release.
Q You got credit for good time, right?
A Yes.
Q So you don't have to do the full amount, you get 15 percent off.
A Yes.
Q And so you were facing a minimum of ten years, a maximum of life, right?
A Yes.
Q And a recommended sentence under the Guidelines of around 27 to 33 years.
A Yes.
Q And the Government argued for 162 months, and your lawyer argued for 120 months.
A Well, yes, according to what I just read.
Q Well, your own lawyer was arguing for the minimum sentence, right?
A Yes.
Q That's what you got, right?
A I was given ten years for the conspiracy, three years for

money laundering but they ran together.
Q So that meant ten years total minus your 15 percent credit.
A Yes.
Q And so you're already out.
A I did.
Q And the Government has also given you a visa?
A Well, I don't know if it's a visa. It's like a deferred action.
Q So you have deferred action and they are going to support you getting what is called an S-Visa, right?
A I don't know.
Q You hope so.
A I'm trusting in them.
Q And your family has been brought to the United States; isn't that right?
A My family are Americans.
Q I only have a couple more questions for you.
I just want to get back to the communications again between Arturo Beltran Leyva and Genaro Garcia Luna, okay?
THE INTERPRETER: You're voice dropped at the end.
MR. DE CASTRO: I just said okay.
A Yes, sir.
Q And you said that Mr. Beltran Leyva had Mr. Garcia Luna on speaker all the time, right?

A With everybody, not exclusively Mr. Garcia Luna.
Q And he was paying Mr. Garcia Luna, as we discussed, hundreds of millions of dollars, right?
A Yes.
Q And Mr. Beltran Leyva was a very smart cartel boss, right?
A Yes.
Q In fact, he made sure to record meetings that he had with public officials, didn't he?
A It's probable.
Q You know it to be true because you told the Government that; isn't that right?
A That's what Arturo said. I knew there were tapes, that's what Arturo would say. I never had them in my own possession -- in some occasions, excuse me.
Q You told the Government that it was the cartel's practice to record meetings, right?
A Sometimes, yes.
Q Even take video as well, right?
A Yes.
Q You claim that he recorded meetings with Mr. Garcia Luna too, right?
A Some of them.
Q That would corroborate or prove what you're trying to tell this jury is true, right?

A Yes.
Q But you haven't produced any audios or videos to the Government, right?
A I never stored them myself.
MR. DE CASTRO: Nothing further.
THE COURT: Redirect?
MS. REID: Yes, your Honor.
MS. KOMATIREDDY: Do you mind if we confer for a minute?
THE COURT: Sure. We're going to take our 15-minute break now, ladies and gentlemen. Don't talk about the case amongst yourself.
(Jury exits the courtroom.)
THE COURT: See you at five to three.
(Brief recess.)
THE COURT: Have a seat, please. What is up.
MR. MIEDEL: As you know we filed a motion to preclude testimony, Motion 185 on the docket. The Government responded in its Motion 184. Before --
THE COURT: Is Martinez the next witness?
MR. MIEDEL: The next witness. I think the Government will tell you that they are not probably not going to get to that part of the testimony by the end of today. We can discuss it later. I just want to make sure it's discussed before it comes up.

THE COURT: Okay. We can put it off, that part of the testimony?

MR. PILMAR: I think we will not get to it. If I can't move it around, I'll ask for a sidebar; but I feel confident we will not get there.

(Jury enters the courtroom.)

THE COURT: Everyone be seated. Redirect.

REDIRECT EXAMINATION

BY MS. REID:

Q Defense counsel asked you a lot of questions on cross about math and numbers and how payments to public officials work. Do you remember those questions?

A Yes.

Q When you were paid as a federal judicial police officer by the Juarez cartel, did you ever share the payments you got with other people?

A The ones that were below me.

Q Just to be clear, who were those people? Were they also police officers?

A They are called like assistants.

Q Defense counsel asked you some questions about the cartel's expansion plan and hitmen for the cartel. Do you remember those questions?

A Yes.

Q I believe he asked you if the cartel's hitmen were

important to the expansion plan. Do you remember that?
A Yes.
Q Were the defendant Garcia Luna's AFI officers important to the cartel's expansion plan?
A Yes.
Q And did AFI officers help the cartels hitmen?
A Sometimes they did.
Q Defense asked you on cross about what you wore during, some times when you and others fought for the cartel. Do you remember questions about what you wore?
A Yes.
Q Did you wear AFI uniforms when you fought for the Sinaloa cartel?
A Sometimes I did.
Q Defense counsel asked you some questions about items that were seized from you at the time of your arrest like cars, for example. What happened to your AFI credentials when you were arrested?
A The Marines took them from me.
Q Defense counsel asked you some questions about times when the defendant Garcia Luna met with Arturo Beltran Leyva and you.
A Yes.
Q Do you remember him asking you about weapons that Arturo had when Garcia Luna would visit?

A Yes.
Q Did the defendant Garcia Luna ever try to take Arturo's weapons from him?
A No, never.
Q On cross-examination you were asked about many different names of people. Do you remember that?
THE INTERPRETER: Clarification. Meeting did you say?
MS. REID: Many different names.
A Yes.
Q I believe the question was phrased about people who were possibly arrested and brought here to the U.S.
A Yes.
Q Do you know whether the defendant Garcia Luna had any involvement in those arrests?
A For example, in Lobo Valencia's case, no, it was the army. In mine, I was arrested by the Marines, he didn't have participation there either. In Ray Zambada's, we were the ones who went together with some corrupt police officers for SIEDO; it was us who arrested him. About Sandra Avila Beltran, I believe he asked me, and she was detained by the federal police, but I believe it was Commander Benito, the corrupt official. And the other names, I truly don't remember.
Q By the way do you have, do you know who is a witness in

this trial other than you?
A No, I don't know.
Q Defense counsel also asked you several questions about your guilty plea. Do you remember being asked about that?
A More or less, there are some things that I don't understand.
Q But do you remember just a few minutes ago when you were asked when you pled guilty?
A Yes.
Q I want to show you on the screen what is marked as 3500SVB2. Do you recognize that?
A It's in English.
Q Okay. If you go to the last page there is a signature there. Do you recognize that?
A Yes, it's my signature.
Q Is this your plea agreement?
A Yes.

MS. REID: I'd ask, your Honor, that Government Exhibit -- or that this SVB2 be admitted into evidence.

MR. DE CASTRO: No objection.

THE COURT: Received.

(Government Exhibit SVB2, was received in evidence.)

BY MS. REID:
Q Defense counsel asked you, I believe, if you pled guilty to trafficking just 5 kilograms or more of cocaine; is that

right?
A No.
Q I want to go to page 11 of the exhibit. Isn't it true that you accepted responsibility for multiple loads of cocaine, including 40 tons of cocaine brought per month from Colombia into Mexico?
A Yes.
Q The defense asked you many questions about cooperation and how it works. Do you remember being asked about that?
A Yes.
Q I believe he asked you how it worked in the very first meeting when you sat down with U.S. prosecutors.
A Yes.
Q In your very first meeting with U.S. prosecutors in 2012, did you mention payments to the defendant Garcia Luna?
A Yes, and many other people possibly. We talked about a lot of things.
Q Did you also mention the defendant Genaro Garcia Luna and payments to him after your arrest in Mexico?
MR. DE CASTRO: Objection.
THE COURT: Leading?
MR. DE CASTRO: Objection.
THE COURT: One word.
MR. DE CASTRO: Hearsay.
THE COURT: Overruled.

Q Did you also mention the defendant Genaro Garcia Luna and payments to him after your arrest in Mexico?
A Yes.
Q How soon after you were arrested?
A Hours later.
Q You were also asked on cross about your sentencing. Do you remember being asked about that?
A Yes.
Q Didn't you testify before your sentencing about Ivan Reyes?
A Yes.
Q Have you completed your sentence?
A Yes.
Q Just to be clear, are you currently in custody?
A No.
Q If you didn't testify here today, would that have any impact on your sentence?
A No.
Q Have you been back to Mexico since you were released from prison?
A No.
Q What is your understanding of what would happen if you went back to Mexico?
MR. DE CASTRO: Objection.
THE COURT: Sustained.

Q Mr. Villarreal Barragan, does the outcome of this case have any impact on you at all?
A No.
Q If you lied here in court under oath, what would happen to you?
A I would get in trouble.
Q What kind of trouble?
A I think I would have new charges against me.
MS. REID: No further questions.
THE COURT: Recross. Briefly, please.
RECROSS-EXAMINATION
BY MR. DE CASTRO:
Q Every one of those individuals I talked to you about that had been arrested an extradited were arrested under the Calderon administration, weren't they?
MS. REID: Objection, your Honor.
THE COURT: I'll allow it but, sure.
A The truth is that I'm not sure. Some of them I'm sure they were, for others I don't know.
Q And Mr. Garcia Luna was the Calderon administration's secretary of public security, right?
A Yes, sir.
Q And you understood that that he was a member of the cabinet of the president, correct?
A Yes.

Q You just testified on redirect that, oh, some of those people were arrested by the army not really the police, right?
A Yes.
Q Are you aware that as also part of that cabinet was the ministry of the army and the navy?
A Yes.
Q You were asked some questions a minute ago about your plea agreement that the Government put on the screen, right?
A Yes.
Q They showed you the part where you admitted to importing 40 tons of cocaine per month, correct?
A Yes.
Q How much is 40 tons of cocaine worth?
A The truth is I don't know. But Arturo used to earn more than $400 million per month.
Q You were asked a question about the fact that you were you're already sentenced and released, right?
A Correct.
Q But you're also on what we call supervised release, right?
A Correct.
Q If you violate your supervised release, you could go back to prison, right?
A I got a reduction on my supervised release or probation; I'm not sure how to say it.

Q How far was it reduced?
A One year, I just did one year.
Q So if you were to be have found to have lied here, you could be in trouble right?
A Yes.

(Continued on next page.)

(Continued.)

Q So if the government Decides to charge you with perjury, you can be in trouble, right?

A Yes.

MR. DE CASTRO: Nothing further.

THE COURT: All right.

MS. REID: Your Honor, can I just ask one question from here?

THE COURT: You think you're going to ask one question?

MS. REID: Yes, your Honor.

RECROSS EXAMINATION

BY MS. REID:

Q Just to be clear, is your supervised release completed?

A It ended with the probation of the city where I live in, but I am supervised by the government.

MS. REID: Nothing further, thank you.

THE COURT: All right. You may step down. Thank you.

(Witness leaves the witness stand.)

THE COURT: Government's next witness, please.

MR. PILMAR: Your Honor, Government calls Mr. Tirso Martinez Sanchez.

THE COURT: How are we doing with the government's next witness?