CORVA
LAW
110 West 40th Street, Suite 1003 · New York, N.Y. 10018 · (646) 974-1143 · www.corvalaw.com

September 25, 2026

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Clase, et al., Criminal Docket No. 25-346

Dear Judge Matsumoto:

We represent defendant Luis Leandro Ortiz Ribera and submit this brief reply to the government's response (ECF No. 251) to our motion for sanctions (ECF No. 228). Stunningly, in its opposition, the government barely acknowledges that the Court's Rule 5(f) Orders require "prompt" production of *Brady* information or that Bettor-1's information about pretending to have inside information about pitches in order to earn money for himself (directly undermining the government's theory of prosecution) is even *Brady*. Instead, the government essentially asks the Court to adopt a 'no harm, no foul' approach, arguing that Bettor-1's admission was effectively the same as his earlier denials about the existence of an alleged scheme, and, in any event, the defense has it now. With this argument, the government seeks to render the word "prompt" in the Court's Orders meaningless. The government's unwillingness to meaningfully engage with the gravity of their witness's admission – and the time-sensitive disclosure obligation it triggered – underscores why the heavy sanctions we seek are warranted.

I. Bettor-1's Statement is Plainly Exculpatory

Bettor-1's admission during the February 19, 2026 interview – that "many times" he falsely told associates that he had inside information about a pitch when in fact he did not and that he did so to earn money (the "Admission") – is classic *Brady* material. Notably, during that interview, the government did not ask Bettor-1 whether this Admission applied to the June 15 and June 27 pitches thrown by Mr. Ortiz, and Bettor-1 did not disclaim that the Admission applied to those pitches. Upon information and belief, the government then went more than six months without interviewing Bettor-1. Regardless, Bettor 1's Admission is clearly favorable to the defense as it wholly calls into question the critical tether between the pitch that was thrown and the bet that was placed: was it preplanned with a complicit pitcher or mere happenstance?

Other information provided in discovery suggests the government also may have appreciated in real-time the seriously defense-favorable nature of this information. The government disclosed a text message exchange that occurred one day after the February 19 proffer where Bettor-1 made the Admission. In the exchange, in recounting how the proffer had

gone, the FBI linguist who attended remarked that the prosecutors were "worried" about Bettor-1. (*See* Ex. 1 (3500-JA-28)).[1] At a minimum, this exchange reveals that at some point after the proffer, the government debriefed and reflected upon the information provided by their lone witness against Mr. Ortiz. It was in this moment of reflection that the government should have recognized the exculpatory nature of the Admission and their obligation to promptly disclose it to the defense.

To try to remedy its inexcusable failure to disclose, the government attempts to equate Bettor-1's August 6, 2025 declaration denying advance information with the Admission on February 19, 2026, where he described to the government how he manufactured the appearance of having advance information when in fact he did not. (Gov't Opp. at 15-17, 20). But denying the existence of a scheme and explaining how he actively deceived bettors about the basis upon which he was steering them toward a given bet are fundamentally different propositions. Bettor-1's Admission during the February 19, 2026 interview offers specific facts about the betting activity, not merely evidence that Bettor-1 once denied wrongdoing. Neither the earlier declaration, nor the government's January 5 letter disclosed the exculpatory mechanism by which Bettor-1 and others may well have bet on Mr. Ortiz's pitches. Nor did knowing Bettor-1's identity give Mr. Ortiz the essential facts of the materially different account in the Admission. Notwithstanding efforts by defense counsel, counsel for Bettor-1 repeatedly told the defense that the attorney could not speak with us about Bettor-1. (ECF No. 252). As such, the defense had no meaningful opportunity to obtain the information from Bettor-1.

Nor does it matter if other (albeit earlier) statements by Bettor-1 are inculpatory as to Mr. Ortiz. (The Admission post-dated those inculpatory statements and the government apparently did not meet with Bettor-1 until September 2026, leaving the Admission as Bettor-1's unrebutted statement for months). Moreover, in *United States v. Mahaffy*, 693 F.3d 113, 130-31, 135 (2d Cir. 2012), withheld testimony supported the defense that the disputed information was not treated as confidential, despite aspects consistent with the prosecution's theory. Its dual character did not eliminate its exculpatory force. The same reasoning applies here: Bettor-1's account supplies an alternative explanation, entirely contrary to the government's theory of prosecution, for why bettors affiliated with Bettor-1 placed bets on Mr. Ortiz's pitches. Similarly, *United States v. Triumph Capital Grp.*, 544 F.3d 149, 162-64 (2d Cir. 2008), treated an earlier account as material because it supported a defense theory that a cooperator later fabricated an inculpatory version to increase the value of his cooperation. And *United States v. Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004), required a new trial where a witness's admission that he carried drugs aboard a ship supported the defense's account, even though it remained compatible with his accusation against the defendant. Each decision requires examination of what the additional evidence proves, not simply whether the witness has contradicted himself.

This distinction also shows how the government's reliance on this Court's February 2, 2026 Memorandum and Order is misplaced. As quoted in the opposition, the Court found that defendants had not explained how the requested material harmonized with their defense theory. (Gov't Opp. at 9-10). The February 19 interview occurred afterward, and the missing explanation is now concrete: fabricated tips and falsely attributed payments can produce the appearance of a

---

[1] Exhibit 1 was provided in material the government deemed "Sensitive Information" subject to the protective order entered by the Court on November 30, 1997 (ECF No. 37), and is therefore submitted under seal,

pitch-fixing scheme without Mr. Ortiz's participation. Applying the Court's stated reasoning to this record therefore requires the opposite conclusion about the exculpatory character of the Admission, not blanket treatment of every subsequent statement as impeachment.

II. The government overlooks how the Admission undermines Bettor-2's account and the betting-data inference.

Moreover, Mr. Ortiz's argument does not depend solely on whether Bettor-1 will withstand cross-examination. It concerns the evidentiary force of Bettor-2's statements and the purportedly anomalous betting on the June 15 and June 27, 2025 pitches by Mr. Ortiz. The government's opposition addresses Bettor-1's consistency and its anticipated proof, but never explains (because it cannot) why his admitted practice of manufacturing apparent inside information does not undermine those two sources of purported corroboration. (Gov't Opp. at 15-17, 20-22).

Bettor-2's purportedly admitted previously lying and said he came to understand that pitches placed by Mr. Ortiz were fixed. Yet he repeatedly said he did not know how Bettor-1 knew pitches were fixed and identified Bettor-1 as the only person who had ever told him about fixed pitches. (ECF No. 228, Ex. 5 at 1-3, 5). The defense can accept that Bettor-1 made those representations without accepting their truth. Bettor-1's Admission that he manufactured the appearance of advance information, therefore attacks the substance of what Bettor-2's account can establish, not Bettor-2's honesty.

The same reasoning applies to the betting data. Coordinated winning wagers may corroborate that bettors followed a common recommendation; they do not independently identify the source or truth of that recommendation. Bettor-2 described passing a purported tip to a relative and, in his later account, to another bettor. (ECF No. 228, Ex. 4 at 2; ECF No. 228, Ex. 5 at 4-5). Bettor-1 acknowledged that recipients could assume his recommendations rested on inside information when they instead reflected his own assessment. (ECF No. 228, Ex. 3 at 13-14). Thus, confident guesswork transmitted through a betting group, followed by successful outcomes, supplies an alternative explanation consistent with Mr. Ortiz's innocence. The defense need not establish statistical equivalence between competing explanations to show that the admission undercuts the inference of fixing. The inference the government wants the jury to draw from the betting data is that the pitches were fixed, because the subject bettors bet more and made more than most other bettors. But that inference is unjustified if the subject bettors merely *believed* they were betting on inside information. The Admission provides a reason for the jury to think that the bettors only believed they were betting on inside information. The Admission is exculpatory, and the government suppressed it for months.

III. The government's retrospective prejudice analysis does not discharge the Court's prompt-disclosure requirement.

The government mentions Rule 5(f), but gives no operative effect to the obligations described in the Court's Orders pursuant to Rule 5(f). (Gov't Opp. at 13-14, 21-22). Instead, the government simply rehashes the retrospective definition of the constitutional right in *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001), as though it answered *when* – in light of the Rule 5(f) Order – disclosure must occur. It does not. Mr. Ortiz's application rests on the Court's

Rule 5(f) Orders, not the constitutional right (or Rule 5(f) itself), which means the government should have disclosed Bettor 1's Admission "prompt[ly]" upon learning of it, *i.e.*, in February 2026.

Nor does counting 73 days until trial resolve the breach. (Gov't Opp. at 21-22). The government's "no harm, no foul" argument essentially dissolves their obligation to treat *Brady* differently. Seventy-three days is not enough time to use the information "with some degree of calculation and forethought," including the investigation needed to make it useful. *Leka v. Portuondo*, 257 F.3d 89, 100-03 (2d Cir. 2001). This is particularly so given the voluminous betting data that the government has disclosed in discovery and plans to have an expert witness opine on at trial. Evidence rich investigative leads like the Admission requires more time, not less. *DiSimone v. Phillips*, 461 F.3d 181, 196-97 (2d Cir. 2006).

Finally, the government's suggestion that seeking Bettor-1's preclusion disproves the favorable character of his admission confuses evidence with remedy. (Gov't Opp. at 1, 24). Seeking to preclude inculpatory testimony because of delayed disclosure does not make the withheld portions of that witness's account any less exculpatory. The government's assurance that all required material has now been produced (even if true) likewise does not resolve whether it timely disclosed the substantive admission at issue. (Gov't Opp. at 25-26).

IV. The government's disregard of its prompt-disclosure obligation and its refusal to acknowledge the exculpatory nature of Bettor-1's statement confirm that the proposed sanctions are warranted.

The manner in which the government has reflexively denied wrongdoing and minimized its obligation to thoughtfully assess on a continuing basis whether newly learned information may constitute *Brady* (and disclose it promptly if it does), underscores why a substantial sanction is needed. Rather than treat the Court's Rule 5(f) Orders as imposing a duty of prompt disclosure, the government reduces those Orders to nothing more than a reminder of a purely retrospective standard and defends its timing by counting days to trial. (Gov't Opp. at 13-14, 21-22). A prosecutor who understood the forward-looking obligation the Order requires would have disclosed a cooperator's admission of this significance when it was made in February, not months later at the *Giglio* deadline. That is the difference between a prosecutor who, "anxious about tacking too close to the wind," discloses favorable evidence, and one who does not. *Kyles v. Whitley*, 514 U.S. 419, 439 (1995).

The government's continuing refusal to acknowledge that Bettor-1's admission is exculpatory compounds the problem. In seeking to refute the exculpatory value of the Admission, the government characterizes the Admission as "at best *Giglio*" in one instance, and as "classic *Giglio*" impeachment at another. (Gov't Opp. at 15-17, 20). The government's characterization suggests an unwillingness to meaningfully engage with the gravity and import of the Admission, as was their obligation under *Brady*. It also reflects the same misunderstanding of the government's obligations that produced the delay. A government that hesitates to concede even the impeachment value of such an Admission cannot be relied upon to self-police the favorable material it still holds under a bare reminder standard.

These failures bear directly on the remedy. The government argues that preclusion and an

adverse-inference instruction are extraordinary and reserved for cases of bad faith or prejudice. (Gov't Opp. at 23-25). But its refusal to recognize a plainly forward-looking disclosure duty, and its insistence on recharacterizing exculpatory substance as mere impeachment, are precisely the circumstances in which a lesser response would neither cure the prejudice to Mr. Ortiz nor deter repetition as trial approaches. A meaningful sanction is necessary to ensure that the government discloses the remaining favorable material promptly and completely, rather than parceling it out at the outer limits of the schedule. Mr. Ortiz's proposed sanctions are calibrated to that need. Mr. Ortiz respectfully requests that the Court grant the relief sought in his motion (ECF No. 228): preclusion of Bettor-1's testimony or, alternatively, an adverse-inference instruction, together with the prompt production requested in that motion.

Respectfully submitted,

Elizabeth Geddes

Elizabeth Geddes
CORVA LAW LLP
110 West 40th Street, Suite 1003
New York, New York 10018
liz@corvalaw.com

Paul Flannery
Christos N. Georgalis
FLANNERY GEORGALIS, LLC
1621 Euclid Avenue, Floor 20
Cleveland, Ohio 44115

*Attorneys for Defendant Luis Leandro Ortiz Ribera*