United States District Court
Eastern District of New York

------------------------------------X

United States of America,

- against -

Emmanuel Clase de la Cruz, et al.,

Defendants.

------------------------------------X

**Sealed Memorandum & Order**

No. 25-CR-346 (KAM)

**Kiyo A. Matsumoto, United States District Judge:**

Pending before the Court are motions to suppress, or, in the alternative, for a *Franks* hearing, by Defendants Emmanuel Clase de la Cruz ("Mr. Clase") and Luis Leandro Ortiz Ribera ("Mr. Ortiz"), (ECF Nos. 143, 145), and a motion to suppress by Defendant Robinson Vasquez Germosen ("Mr. Vasquez") (ECF No. 149). Briefing concluded on June 23, 2026. Messrs. Clase and Ortiz are Major League Baseball pitchers for the Cleveland Guardians who were charged with a pitch-rigging conspiracy in which a group of bettors, including Mr. Vasquez, allegedly placed fraudulent wagers on Mr. Clase and Mr. Ortiz's pitches based on inside information.

For the reasons that follow, the Court **DENIES** Messrs. Ortiz's and Mr. Clase's motions to suppress, and in the alternative, for a *Franks* hearing, and also **DENIES** Mr. Vasquez's motion to suppress.

## Background

The Court assumes familiarity with the facts and procedural

history of this case, which is set forth in the Court's February 2, 2026 Memorandum & Order (ECF No. 75) and September 8, 2026 Memorandum & Order (ECF No. 219).

On May 22, 2026, Mr. Ortiz moved to suppress the two cell phones seized from him and searched in July 2025 and November 2025 (the "July Phone" and "November Phone," respectively) on the basis that the affidavits authorizing their search and seizure failed to show probable cause. (*See* ECF No. 143-1 at 14, 34; *see id.* ECF No. 143-2 "Ortiz July Aff."; ECF No. 143-3 "Ortiz Nov. Aff.") In particular, Mr. Ortiz argues that the Ortiz July Affidavit contained no evidence that Mr. Ortiz coordinated to fix pitches, communicated with Mr. Clase, nor communicated with any bettor. (*Id.* at 16.) Absent more specific evidence of Mr. Ortiz's involvement in the conspiracy, Mr. Ortiz alleges that the search of Mr. Ortiz's July Phone improperly "sought to discover what the government [had] hoped to find" and not to "confirm what the government already knew." (*Id.* at 16-17.) Second, aside from its alleged defects as to probable cause, Mr. Ortiz argues that the July Affidavit contained "misrepresentations and material omissions" that warrant suppression of the evidence seized from the phone, or, in the alternative, for a *Franks* hearing. (*Id.* at 14.) Mr. Ortiz reiterates these two arguments with respect to the November Affidavit, and also contends that the FBI agents' seizure of the November Phone was warrantless. (*See id.* at 14.) Mr. Clase

joins in Mr. Ortiz's motion. (ECF No. 145 at 5; ECF No. 145-1 "Clase Aff.")

Mr. Vasquez moves to suppress all evidence seized from Mr. Vasquez's Android cell phone pursuant to a search warrant allegedly issued without probable cause, arguing that the search warrant affidavit, in large part, does not implicate Mr. Vasquez but rather implicates Mr. Clase and other bettors. (ECF No. 149 at 3, 8.) Further, Mr. Vasquez argues that the one allegation that does implicate Mr. Vasquez -- specifically, that Mr. Vasquez and several other alleged bettors used inside information about what pitch Mr. Clase was going to throw and used it to win money on a betting platform -- "does not establish probable cause to believe a violation of the wire fraud statute occurred since it . . . does not constitute a scheme to deprive people of 'traditional property interests.'" (*Id.* at 7-8.)

## I. July Affidavits in Support of Search Warrant Applications for Messrs. Ortiz and Clase's Phones

### A. Ortiz July Affidavit

The Ortiz July Affidavit sets forth the following facts in support of probable cause. (*See* ECF No. 143-2, "Ortiz July Aff.") To begin, FBI Special Agent Dominic Mariani, the affiant to the July Affidavits, stated that Messrs. Clase and Ortiz, as well as certain others, were investigated for their involvement in certain offenses related to a pitch-rigging conspiracy (the "Subject

Offenses").[1] Five individuals (together, the "Bettors"[2]) placed suspicious wagers on Betting Platforms[3] in furtherance of the pitch-rigging conspiracy. (Ortiz July Aff. ¶ 12.) One of the Bettors, referred to in these proceedings as Bettor-1, shared a close association with Mr. Clase, including spending "a significant amount of time at a residence associated with [Mr. Clase]" and attending Cleveland Guardians' games using tickets reserved for him by Mr. Clase. (*Id.* ¶¶ 12, 19-20.) The other Bettors were primarily involved in the conspiracy through their relationships to Bettor-1. (*Id.* ¶¶ 22-23.) At the time the Government sought the July Phone, the Government had obtained but not executed warrants for historical and ongoing cell-site location information for mobile cellular devices associated with Bettors. (*See id.* ¶¶ 13-14.)

According to both the Ortiz July Affidavit and the Clase Affidavit,[4] the Bettors, and particularly Bettor-1, had placed

---

[1] These "Subject Offenses" are: "violations of Title 18, United States Code, Sections 224 (bribery in sporting contests), 371 (conspiracy), 1343 (wire fraud), 1346 (honest-services wire fraud), 1349 (wire fraud conspiracy), 1956 (money laundering and money laundering conspiracy), 1957 (money laundering), 1952 (use of interstate facility to promote unlawful activity), and 1084 (transmission of wagering information)," which were alleged in the July Affidavit to have been "committed by [Mr. Ortiz] and other known and unknown co-conspirators from June 15, 2025, through June 27, 2025." (Ortiz July Aff. ¶ 4.)

[2] The individual Bettors have been referred throughout these proceedings as Bettor-1 ([redacted]), Bettor-2 ([redacted]), Bettor-3 ([redacted]), Bettor-4 ([redacted]), and Individual-1 ([redacted]).

[3] The Betting Platforms refer to Betting Platform-1 ([redacted]) and Betting Platform-2 ([redacted]).

[4] The two July Affidavits in support of the applications to search Mr. Clase's and Mr. Ortiz's phones contained substantially the same statements in support of the existence of probable cause as to the pitch-rigging conspiracy.

numerous suspicious wagers on Messrs. Clase's and Ortiz's pitches. (*Id.* ¶ 18.) Bettor-1 joined the pitch-rigging conspiracy with Mr. Clase beginning in May 2023, (*see id.* ¶ 24), while Mr. Ortiz joined the conspiracy two years later in June 2025, (*see id.* ¶ 30). In support of the fraudulent nature of Bettor-1's wagers, the affiant stated that Bettor-1 won twice as many pitch speed wagers[5] made on Mr. Clase's pitches as he lost. (*Id.* ¶ 25 (of Bettor-1's 158 pitch speed bets, Bettor-1 won 98 for a gain of $110,386, and lost 53 for a loss of $15,314.51).) Bettor-1's win rate on his larger pitch speed bets was higher still -- of the 17 wagers on Mr. Clase's pitches valued between $1000 and $5000, Bettor-1 won fifteen and lost one. (*Id.*) Of the 18 wagers between $700 and $999, Bettor-1 won fifteen and lost two. (*Id.*) The wagers not accounted for were cancelled. (*Id.*) Bettor-1 also won 70% of his 37 Ball/Hit-By-Pitch (HBP) wagers for net profit of $28,526.[6] (*Id.*)

Besides the seemingly anomalous winning patterns of Bettor-1's wagers on Mr. Clase's pitches, the Ortiz July Affidavit provided evidence supporting the inference that several of the

---

[5] A bet on the pitch speed of a particular pitch is a "proposition bet" or "prop bet," which is a bet made "regarding the occurrence or non-occurrence during a game of an event that does not directly affect the game's final outcome." (*Id.* ¶ 10.) For example, a bettor could place a wager that the speed of a given pitch is above or below 89.95 miles per hour. (*Id.*) As is true generally with wagers, the more unlikely an occurrence is, the higher the potential payout.

[6] A wager that a pitch will be a Ball/Hit-By-Pitch ("HBP") will be successful if (i) the pitched ball is outside of the strike zone and the batter does not swing, or (ii) the pitched ball strikes the batter, the batter's clothing, or protective gear and the batter does not swing.

wagers had been placed in coordination with Mr. Clase, including geolocation data showing that Bettor-1 accessed his gambling accounts in the vicinity of Mr. Clase's address the day before and on the day of games with allegedly rigged pitches. (*See, e.g.*, *id.* ¶¶ 27 (April 30, 2025 game), 29 (May 14, 2025 game).) Around one month later, on June 15, 2025, the betting accounts of Bettor-1 and two other Bettors, within one hour of one another, placed wagers totaling $13,438 on Betting Platform-1 that Mr. Ortiz's first pitch of the Guardians' game on that same date would be a Ball/HBP. (*Id.* ¶ 33.) The Ortiz July Affidavit contained a screenshot from a video of the pitch, which the affiant had reviewed, showing that the pitched ball landed far outside the strike zone and was not swung at by the batter, resulting in a ball. (*Id.* ¶ 34.) The total payout for the three Bettors on this June 15, 2025 pitch by Mr. Ortiz was approximately $25,000. (*Id.* ¶ 33.)

Based on the affiant's training and experience, Bettor-1, Bettor-2, and Individual-1, the subset of Bettors who wagered on this Ortiz pitch, placed bets on the June 15 pitch that were "outside of their regular gambling behavior." (*Id.* ¶ 35.) Bettor-1's two $1,500 wagers on this particular Ortiz pitch, both of which were placed within one minute of one another, "matched [Bettor-1]'s largest wager on a single event on [Betting Platform-1]." (*Id.* ¶¶ 35-36.) Bettor-1's average wager on Betting Platform-1

was also only $22. (*Id.* ¶ 36.) Individual-1's wager of $2,000 on this Ortiz pitch was her "largest ever on the platform," with the "next largest wager being roughly half the size" at $1,296. (*Id.* ¶ 35.) Individual-1's average wager on Betting Platform-1 was approximately $19, and the June 15 wager was also the only instance in which Individual-1 bet that a pitch would be a Ball/HBP. (*Id.*) Likewise, though Bettor-2 had made 26 wagers on Mr. Ortiz's pitches, only five bets were valued at over $1,000, and the remainder of bets were valued between $25 and $380. (*Id.* ¶ 37.) Bettor-2's five bets over $1,000, all of which Bettor-2 won, were each placed on Mr. Ortiz's pitches at the June 15 or June 27 games, the latter of which is discussed below. (*Id.*) Based to these facts, Agent Mariani stated in the Affidavit that Bettor-1, Individual-1, and Bettor-2's wagers on the June 15 pitch by Mr. Ortiz were outside of their regular gambling behavior.

On June 27, 2025, again within approximately one-hour of each other, the betting accounts of four of the Bettors placed wagers totaling $7,950 on Betting Platform-1 and Betting Platform-2 that Mr. Ortiz's first pitch of the Guardians' June 27, 2025 game would be a Ball/HBP. (*Id.* ¶ 39.) The Ortiz July Affidavit contained several screenshots from a video of the pitch, which the affiant had reviewed, showing that the pitch that Mr. Ortiz threw on June 27, 2025, like Mr. Ortiz's June 15, 2025 pitch, was far outside the strike zone and was not swung at by the batter. (*Id.* ¶ 42.)

In fact, the June 27 pitch was so far outside the strike zone that the pitch was not retrieved by the catcher. (*Id.*) The total profit for the Bettors on this June 27 Ortiz pitch was approximately $37,059, consisting of $3,900 from Betting Platform-1 and $26,235 from Betting Platform-2. (*Id.* ¶ 41.) As with the June 15 pitch, the affiant stated that the Bettors' wagers on the June 27 pitch were "outside of their regular gambling behavior." (*Id.* ¶ 43.) For example, the June 27 wager was the only wager that Bettor-3 ever made on Betting Platform-1, and the only instance in which Bettor-4 wagered on a Ball/HBP. (*Id.*) In addition, aside from his $1,000 wager on June 27, Bettor-4's average wager on Betting Platform-1 was $175, and Bettor-2's three bets, which totaled $3,250, were far larger than his average wager on Betting Platform-1 of approximately $335. (*Id.*)

Agent Mariani affirmed that, based on his training, experience, and participation in the investigation, there was probable cause indicating that the Bettors had engaged in suspicious wagers involving Mr. Ortiz, and that coordination among Messrs. Clase and Ortiz and the Bettors likely involved the use of communication via mobile cellular devices. (*Id.* ¶ 49.) Further, Agent Mariani affirmed that "persons engaged in criminal activity, just as ordinary people, frequently use their personal electronic devices to, among other things, communicate with other individuals they work and/or associate with, document and store information

about their day-to-day lives and process financial transactions and sports wagers via mobile applications." (*Id.* ¶ 50.) "[B]ased upon [Mr. Ortiz's] . . . debt to Rock Fence Capital, the pre-existing associations" between Messrs. Ortiz and Clase, between Messrs. Clase and [redacted], and between the Bettors, and the "close temporal proximity of their wagers to one another strongly indicate" that Messrs. Ortiz, Clase, and the Bettors "likely engaged in communications regarding the Subject Offenses." (*Id.* ¶ 50.) The magistrate judge issued the search warrant on July 10, 2025 for Mr. Ortiz's July Phone. (Ortiz July Aff. at 30.)

**B. Clase Affidavit**

On July 10, 2026, in addition to applying for the search warrant for Mr. Ortiz's July Phone, Agent Mariani applied for a search warrant for Mr. Clase's phone ("Clase Phone") in the Northern District of Illinois, where Mr. Clase was scheduled to play a Guardians game.

In addition to the allegations in the Ortiz July Affidavit, the Clase Affidavit states that Bettor-1 engaged in suspicious wagers with Mr. Clase "in over 200 instances, and that those wagers involved pitches in the middle of professional baseball games." (Clase Aff. ¶ 48.) Based on the agent's training, experience, and participation in investigations, the agent affirmed that the coordination of such wagers across baseball games played across the United States "likely involved the use of communication via

mobile cellular devices." (*Id.*) The magistrate judge found that the application satisfied the requisite probable cause showing and issued the search warrant for Mr. Clase's phone on July 10, 2025. (*Id.* at 30.)

## II. November Affidavit in Support of Search Warrant Application for Mr. Ortiz's Replacement Phone

On November 5, 2025, a grand jury returned an indictment charging Messrs. Ortiz and Clase with the subject offenses. (Ortiz Nov. Aff. at 2.) When Mr. Ortiz was arrested on November 9, 2025, FBI agents also seized Mr. Ortiz's replacement cell phone ("November Phone"). (ECF No. 143-1 at 3.) FBI Agent Amy Giarrusso filed an affidavit in support of a search warrant application for Mr. Ortiz's November Phone, affirming that the FBI's ongoing investigation "has revealed that [Mr. Ortiz] used electronic devices like the [November Phone]." (Ortiz Nov. Aff. ¶ 11.) The affiant stated that Mr. Clase and Mr. Ortiz exchanged "multiple text messages and audio messages regarding Mr. Ortiz's receipt of a kickback" for throwing the rigged June 15, 2025 pitch. (*Id.*) The messages had described the transfer of 290,000 Dominican pesos to Mr. Ortiz, roughly equating to $4,900 at the time, which is close to the $5,000 that Mr. Ortiz was owed for throwing the rigged pitch. (*Id.*) Further, the "text and audio messages also specifically discussed the transfer of approximately 90,000 Dominican pesos" out of the aforementioned transfer of 290,000

Dominican pesos, from an associate of Mr. Clase to an associate of Mr. Ortiz. (*Id.* ¶ 12.) The affiant stated that the FBI's investigation had "shown that the money was a portion of the payment" to Mr. Ortiz for his rigged pitch on June 15, 2025. (*Id.*)

The Ortiz November Affidavit also stated that counsel for both Mr. Ortiz and Mr. Clase had separately met with the Government in September 2025, and both sets of counsel indicated that the payment of 90,000 pesos was in connection with the purchase of a horse. (*Id.* ¶ 13.) Law enforcement agents engaged in a voluntary telephone interview with the seller of the horse on or around November 4, 2025, who confirmed that Mr. Clase and Mr. Ortiz had both bought horses from him and that Mr. Ortiz had loaned Mr. Clase 90,000 pesos to complete the purchase. (*Id.* ¶ 14.) However, the horse seller had no records of the transaction and also noted to the agents that he had spoken with both Messrs. Clase and Ortiz before speaking with the FBI. (*Id.*) Based on this evidence, the affiant asserted that she had probable cause to believe that Mr. Ortiz had loaned Mr. Clase 90,000 pesos to conceal the true purpose of the June 2025 payment, that the two defendants told their respective attorneys that the kickback payment was a loan payment. (*Id.* ¶ 15.) She also had "probable cause to believe that evidence of [Mr. Ortiz] and/or [Mr. Clase's] discussions with the [seller of the horse] may be on the subject device." (*Id.*) The Ortiz November Affidavit attached the Indictment returned by the grand

jury in November. Based on the foregoing, the magistrate judge granted the warrant application and authorized the search warrant on November 14, 2025.

### III. Affidavit in Support of Search Warrant Application for Mr. Vasquez's Two Cell Phones

On January 22, 2026, a magistrate judge in the Eastern District of New York authorized a warrant to search Mr. Vasquez's two phones: Vasquez Phone-1 and Vasquez Phone-2. (*See* ECF No. 170 at 15; *see* ECF No. 171-1 "Vasquez Aff." at ¶ 1.) The warrant application attached two prior warrants issued by other magistrate judges in relation to Mr. Vasquez's devices: one authorized by a magistrate judge in the Southern District of New York to search Mr. Vasquez and any electronic devices in his possession, custody, or control, (*see id.* ¶ 4), and one authorized by a magistrate judge in the Eastern District of New York to "obtain prospective location information" for Vasquez Phone-2, (*id.* ¶ 6). Moreover, on December 10, 2025, Magistrate Judge Cheryl Pollak in the Eastern District of New York had "authorized a sealed criminal complaint charging Mr. Vasquez with conspiracy to commit wire fraud and authorized an arrest warrant." (*Id.* ¶ 5.) The initial offenses purportedly committed by Mr. Vasquez included bribery in sporting contests, wire fraud, wire fraud conspiracy, and honest services wire fraud conspiracy. (*See id.* ¶ 7.) The probable cause showing for these offenses was detailed in the SDNY warrant and the

criminal complaint issued by Magistrate Judge Pollak, which were attached to the Vasquez Affidavit as exhibits. (*Id.* ¶ 7.) In addition to these initial offenses, the Vasquez Affidavit set forth the basis for Agent Giarrusso's belief that there was probable cause to believe that, from December 2025 to January 2026, Mr. Vasquez had engaged in an effort to obstruct the government's investigation into the initial offenses, in violation of 18 U.S.C. § 1001(a) (making material false statements) and § 1512(c) (obstruction of justice). (*Id.* ¶ 8.)

On December 17, 2025, Mr. Vasquez was arrested pursuant to the arrest warrant issued by Magistrate Judge Pollak. (*Id.* ¶ 9.) Shortly after his arrest, Mr. Vasquez provided consent for the agents to retrieve Vasquez Phone-1 from a white van, which was unlocked and parked in the driveway of the residence. (*Id.*) After Mr. Vasquez's arraignment, law enforcement agents were given Vasquez Phone-2 by a woman who identified herself as Mr. Vasquez's wife. (*Id.*) Mr. Vasquez subsequently signed a form in the presence of his attorney authorizing the FBI to search Vasquez Phone-2. (*Id.*)

The Vasquez Affidavit sets forth the bases upon which there was probable cause to believe that the evidence of the subject offenses would be found on the two Vasquez phones. It incorporates the grand jury indictment that was returned in November 2025, charging Mr. Clase and Mr. Ortiz with wire fraud conspiracy and

other offenses related to the pitch-rigging scheme, (*id.* ¶¶ 16-17), and affirms that, according to the Government's investigation, Mr. Vasquez was "one of the corrupt sports bettors who participated in and profited from the illegal scheme," (*id.* ¶¶ 16-18). Based on the affiant's review of Mr. Clase's phone and data from other bettors,[7] the affiant stated that Mr. Clase and Mr. Vasquez were associated with one another. (*Id.* ¶ 19.) Further, on May 2, 2023, Mr. Vasquez had sent a $2,000 money transfer to Bettor-1, after which Bettor-1 and other bettors placed 15 pitch speed bets on Mr. Clase's pitches on the following day, May 3, 2023. (*Id.* ¶ 21.) Twelve bets won, yielding total profits of more than $47,000. (*Id.*) The next day, on May 4, 2023, Mr. Vasquez sent an audio message to a phone associated with Mr. Clase, saying:

> "[W]hen you guys go to throw it, try to do about 10, 20, or 30,000, if you guys want to do that, that's fine. But when you throw 100 and over, let me know so that we can all put down our stuff. Remember we are a team of 4 now . . . . we are all in this together. Something of 300,000 or a million if you want to do that, let's go. Every time there is an aggressive play, count on us."

Based on the affiant's "training, experience, and knowledge of the investigation," the affiant stated that Mr. Vasquez was informing Mr. Clase that (i) he was working with other bettors and

[7] The Vasquez Affidavit does not specify the extent to which the "bettors" are the same individuals as the five Bettors referred to in the Ortiz and Clase Affidavits.

(ii) wanted to be informed when Mr. Clase would throw a fast pitch such that the group of Bettors could maximize their wagers. (*Id.*) The Vasquez Affidavit contains other text messages that were alleged to show coordination between Mr. Vasquez, other bettors, and Mr. Clase to place wagers based on inside information, including using coded language by referring to fixed pitches as "roosters." (*See, e.g.*, *id.* ¶¶ 22-26.)

The Vasquez Affidavit also included evidence that Mr. Vasquez made a post-arrest statement to law enforcement on January 9, 2026, affirming that he knew of one instance where Mr. Clase told Bettor-1 that Mr. Clase would throw a slower ball for a certain pitch, and that this was the only instance where Mr. Vasquez knew of a fixed pitch. (*Id.* ¶¶ 27-28.) After the proffer, Mr. Vasquez also signed the aforementioned written consent to search form in the presence of his attorney, which authorized the FBI to search Vasquez Phone-2. (*Id.* ¶ 30.) The Vasquez Affidavit contained further statements in support of the fact that evidence of the Subject Offenses was likely to be found on the two Vasquez phones. (*Id.* ¶¶ 32-36.)

## Legal Standard

The Fourth Amendment provides that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. "[A] warrant may

not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (internal quotations omitted). The central questions before the Court are whether the affidavits in this case supported the magistrate judges' determinations that there was probable cause to believe a crime had been committed and that the cell phones contained evidence of that crime, and whether any material misstatements and omissions in the affidavits tainted those probable cause determinations.

## I. Motion to Suppress

Defendants argue that evidence from their cell phones should be suppressed because the warrants were not adequately supported by probable cause and the good faith exception to the warrant requirement does not apply. (*See* ECF No. 143-1 at 14, 34; ECF No. 149 at 8.) As the Supreme Court has instructed, "probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Whether probable cause exists is not assessed on a "technical" standard, rather, the analysis incorporates the "factual and practical considerations of everyday life." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). As such, at "a probable cause determination" at its core "is a

'practical, common-sense decision.'" *United States v. Sosa*, 379 F. Supp. 3d 217, 220-21 (S.D.N.Y. 2019) (quoting *Gates*, 462 U.S. at 238). "[I]t is generally understood that 'probable cause to search is demonstrated where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)).

"[A] search or seizure pursuant to a warrant is presumed valid." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). "[T]he duty of [the] court . . . is 'simply to ensure that the magistrate had a substantial basis for conclud[ing] that probable cause existed.'" *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39). Accordingly, a magistrate judge receives "substantial deference" for his or her probable cause determination, and "doubts should be resolved in favor of upholding the warrant." *Id.* (citation modified); *Walczyk*, 496 F.3d at 157 ("[A] reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate."). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (citation modified). "Such deference derives not only from the law's recognition that probable is a 'fluid concept' that can vary with the facts of each case, but also from its 'strong preference'

that searches conducted pursuant to a warrant." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (citation modified).

Even where a warrant is authorized without probable cause, "suppression is '[a] last resort, not [a] first impulse'" in dealing with violations of the Fourth Amendment. *Clark*, 638 F.3d at 99 (quoting *Herring v. United States*, 555 U.S. 135, 140 (2009)). "The animating principle of the exclusionary rule is deterrence of police misconduct, but the extent to which the rule is so justified 'varies with the culpability of the law enforcement conduct.'" *Id.* (quoting *Herring*, 555 U.S. at 143.) Accordingly, in *United States v. Leon*, the Supreme Court, reasoning that "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations," held that evidence should not be suppressed if it was "obtained in objectively reasonable reliance [by the officers] on a subsequently invalidated search warrant." 468 U.S. 897, 921-22 (1984).

"The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance" on an invalidated warrant. *United States v. George,* 975 F.2d 72, 77 (2d Cir. 1992). However, "in assessing whether it has carried that burden," the Court is "mindful that, in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." *Clark*, 638 F.3d

at 100. "[A]gainst this presumption of reasonableness," "the Supreme Court identified four circumstances where an exception to the exclusionary rule would not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Clark*, 638 F.3d at 100 (quotations omitted). Here, Messrs. Ortiz and Clase argue that the Government's material misstatements and omissions in the affidavit "vitiates" the good faith exception under the first and third *Leon* exceptions. (ECF No. 143-1 at 14, 34.)

## II. Motion for a *Franks* Hearing

"A defendant is permitted to challenge the veracity of a search warrant in limited circumstances," such as "where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information." *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). Pursuant to the procedure set forth by *Franks v. Delaware*, 438 U.S. 154 (1978), the Court shall suppress "evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless

disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding." *Canfield*, 212 F.3d at 717-18.

The first prong of the *Franks* inquiry requires a showing of deliberate falsehood or reckless disregard for the truth. "[M]isstatements or omissions caused by 'negligence or innocent mistake' do not warrant suppression." *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013) (quoting *Franks*, 438 U.S. at 171). Instead, a defendant challenging misstatements or omissions in connection with a warrant must demonstrate, with "an offer or proof," *Franks*, 438 U.S. at 171, that the allegedly false statements were "made intentionally, knowingly, or with reckless disregard of the truth," *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985) (citing *Franks*, 438 U.S. at 156). This inquiry "looks to the mental states of mind of the government officials" and "is said to be a subjective test rather than an objective one." *Rajaratnam*, 719 F.3d at 153. "Whether [the affiant] had a particular mental state 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). A defendant can prove reckless disregard for the truth where "the affiant in fact entertained serious doubts as to the truth of his allegations." *Id.* at 154.

Omissions within a search warrant affidavit are "not subject

to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990), *aff'd in relevant part*, 928 F.2d 592, 604 (2d Cir. 1991). Although reckless disregard by the affiant "can sometimes be *inferred* from the omission of critical information . . . such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information." *Rajaratnam*, 719 F.3d at 154. This is particularly true where "the omission was the result of a considered and reasonable judgment that the information was not necessary to the . . . application." *Id.* at 155. It is not sufficient for a defendant to show that an affiant acted with "intent to exclude information." *Awadallah*, 349 F.3d at 67. "Rather, the reviewing court must be presented with credible and probative evidence that the omission" was "'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154 (quoting *Awadallah*, 349 F.3d at 68).

If a defendant can make the requisite showing that the false statements were deliberately or recklessly included in a warrant affidavit, or that an omission was made with the intent to mislead or made in reckless disregard such that it would mislead the magistrate, a court should proceed to the second prong of *Franks*. *See id.*; *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997). The second prong requires the reviewing court to set aside the alleged misstatements, add the alleged omissions, and

determine whether "the remaining portions of the affidavit would support probable cause to issue the warrant." *Canfield*, 212 F.3d at 718 (citation omitted). So long as there "remains a residue of independent and lawful information sufficient to support probable cause," neither a *Franks* hearing nor suppression is appropriate. *Id.* at 718; *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).

As to burden, Defendants must make a "substantial preliminary showing" for both prongs, *Salameh*, 152 F.3d at 113, by identifying with "specific[ity] the portion of the warrant affidavit that is claimed to be false." *Franks*, 438 U.S. at 171. "Affidavits or sworn or other reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* The defendant's attack on the affidavit cannot be based on "conclusory" statements and "must be supported by more than a mere desire to cross-examine." *Id.* As should be evident, "[t]he standard for entitlement to a *Franks* hearing is high." *United States v. Gogolack*, 819 F. Supp. 3d. 229, 240 (W.D.N.Y. 2026) (citing *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991)).

## Discussion

### I. Messrs. Clase's and Ortiz's Motions to Suppress, or in the alternative, for a *Franks* Hearing

Messrs. Clase and Ortiz argue that (i) the July and November Affidavits did not contain evidence of their involvement in any

crime, so they fail to establish probable cause, (ECF No. 143- 1 at 14, 16; ECF No. 145 at 1), and (ii) the affidavits contained "misrepresentations and material omissions" that warrant either suppression or, at the minimum, a *Franks* hearing. (ECF No. 143-1 at 14; ECF No. 145 at 1, 5.) Where a search warrant affidavit contains inaccuracies giving rise to a *Franks* violation, as Defendants allege is the case here, "the issuing judge's probable cause determination is not due any deference because he did not have an opportunity to assess the affidavit without the inaccuracies." *Canfield*, 212 F.3d at 717. Accordingly, the Court first examines the sufficiency of the affidavits under the *Franks* framework, then turns to whether the magistrate judges' probable cause findings are sufficiently supported by the affidavits.

### A. Ortiz July Affidavit; Clase Affidavit

#### 1. *Franks* Analysis

Mr. Ortiz argues for suppression, or, in the alternative, for a *Franks* hearing on the basis that the July Affidavit supplied a false motive by misrepresenting that Mr. Ortiz was in "debt" to lender Rock Fence Capital and that the July Affidavit misrepresented that the suspicious wagers were "outside of the bettors' regular gambling behavior." (ECF No. 143-1 at 19, 24-25, 32.) Mr. Clase joins in the second argument. For the reasons that follow, the Court finds both these arguments unavailing.

First, Mr. Ortiz's debt to Rock Fence Capital is a minor

portion of the Ortiz July Affidavit, and the two paragraphs discussing Mr. Ortiz's debt do not contain any misstatement. The Ortiz July Affidavit states in relevant part: "According to MLB, [Mr. Ortiz] is in debt to Rock Fence Capital, a firm that advances money to professional athletes in exchange for payments on future earnings," and that Mr. Ortiz's "paychecks from the Cleveland Guardians were paid directly to Rock Fence Capital." (Ortiz July Aff. ¶ 47.) These statements are entirely consistent with Mr. Ortiz's own characterization of his debt to Rock Fence, which is that Rock Fence "provided Mr. Ortiz with a lump sum payment in exchange for a percentage of Mr. Ortiz's future baseball earnings." (ECF No. 143-1 at 24; *see id.* at 25 (describing affiant's description of the debt as "correct").) That one-paragraph description of Mr. Ortiz's debt, which was accurately summarized to the magistrate judge, taken in conjunction with a passing reference to that debt, listed amongst other reasons that the magistrate judge may find supported the existence of probable cause, (*see* Ortiz July Aff. ¶ 50), cannot support Mr. Ortiz's argument that the references were "designed to mislead the magistrate judge into concluding that Mr. Ortiz owed Rock Fence Capital money and conspired with Mr. Clase and the bettors to climb out of a hole." (ECF No. 143-1 at 24.) In any event, even if the Court assumed that Mr. Ortiz had made a sufficient showing under *Frank*'s first prong, and removed the minor references to Mr.

Ortiz's debt, the Ortiz July Affidavit still provided probable cause for the magistrate judge to find that "the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found'" in Mr. Ortiz's July Phone. *Walcyzk*, 496 F.3d at 156 (quoting *Gates*, 462 U.S. at 238). This is particularly true given that the Clase Affidavit contained no indication that Mr. Clase was in financial distress and was similarly found by a magistrate judge to have met the probable cause standard, even though Mr. Clase, as the higher-paid pitcher, would appear to have even less of a financial incentive to engage in a pitch-rigging conspiracy.

Second, Messrs. Clase and Ortiz argued that the characterization of the wagers as "outside [the bettors'] 'regular gambling behavior'" was misleading, and "a more complete description of the bettors' 'regular gambling behavior' indicates" the opposite conclusion to be true. (ECF No. 143-1 at 25, 27.) In other words, they argue not that any part of the affidavits was false, but rather that inclusion of the omitted information as to the Bettors' gambling behavior would have meant that the conclusion drawn by the affiant -- that the Bettors' suspicious wagers were not consistent with their regular gambling patterns -- was wrong.

Here, both the Ortiz July Affidavit and the Clase Affidavit provided the facts from which the affiant drew the conclusion that the suspicious wagers were outside of the Bettors' normal patterns

-- facts which are not contested by Messrs. Ortiz and Clase. The magistrate judge is entitled to consider those facts and draw his or her own reasonable inferences, including disagreeing with the conclusions drawn by the affiant. *See United States v. Powell*, 2025 WL 27464, at *3 (E.D.N.Y. Jan. 3, 2025); *see also United States v. Jackstadt*, 617 F.2d 12, 14 (2d Cir. 1980) ("The Magistrate was entitled to make reasonable inferences from the facts stated in the affidavit."). If the mere pointing to unstated facts that could have been, but were not, included in the affidavit could rise to an "omission" designed to mislead and thus form the basis of a *Franks* violation, then every affidavit that did not exhaustively detail the investigation by law enforcement agents could be re-examined through *Franks* hearings, an untenable result. *See United States v. Mandell*, 710 F. Supp. 2d 368, 374 (S.D.N.Y. 2010) ("[A]llegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." (citation modified)). Accordingly, "[m]ere identification of additional facts that could have been included in a warrant affidavit does not entitle a defendant to a *Franks* hearing," *United States v. Savage*, 2026 WL 1785996, at *1 (S.D.N.Y. June 22, 2026), and defendants must make a "substantial preliminary showing [using] 'credible and probative evidence' that the misstatement or omission 'was designed to

mislead or was made in reckless disregard of whether [it] would mislead.'" *United States v. Hester*, 2020 WL 3483702, at *19 (S.D.N.Y. June 26, 2020) (quoting *Rajaratnam*, 719 F.3d at 154). Pursuant to these principles, the Court finds that Defendants have failed to meet their burden in asserting a *Franks* violation.

First, Messrs. Ortiz and Clase make no showing -- much less a substantial one -- "that the omissions were designed to mislead or were made with reckless disregard for whether they would mislead the issuing court." *United States v. Nejad*, 436 F. Supp. 3d 707, 721 (S.D.N.Y. 2020). Rather, Defendants invite the Court to assume that the omissions were made recklessly because some information regarding the Bettors' gambling behavior was omitted. (*See, e.g.*, ECF No. 143-1 at 26 ("Each of these statements is a misrepresentation of [Bettor-1]'s betting records, about which [affiant] knew or recklessly disregarded.").) Defendants' conclusory statements are insufficient to warrant a *Franks* hearing because they do not constitute "credible and probative evidence" of the affiant's "reckless disregard for the truth." *Rajaratnam*, 719 F.3d at 154.

Even assuming that the first *Franks* prong of deliberate falsehood or reckless disregard for the truth has been established, Messrs. Ortiz and Clase fail to make the requisite showing that any alleged omission regarding the regularity of the Bettors' wagers was material under the second *Franks* prong. The Court

examines the alleged omissions first with respect to Bettor-1, and then with respect to Individual-1, Bettor-2, Bettor-3, and Bettor-4.

According to Defendants, the affiant based the conclusion that Bettor-1's wagers on Messrs. Ortiz's and Clase's pitches were "outside of [Bettor-1's] 'regular gambling behavior'" "on 1) the idea that the two wagers on Mr. Ortiz's pitches were unusually high wagers for [Bettor-1] because the two wagers combined equaled [Bettor-1]'s highest wager on [Betting Platform-1]; and 2) [Bettor 1] supposedly only bet on pitches being balls when he bet on Mr. Ortiz's pitches." (ECF No. 143-1 at 26.) As to the first, Messrs. Ortiz and Clase argue that the existence of another bet that is equal to the combined value of the two suspicious bets indicates that Bettor-1's bet was not outside of his regular gambling behavior. But this fact was disclosed by the affiant to the magistrate judge, and Messrs. Ortiz and Clase are unclear about what precisely was misstated or omitted, much less whether any misstatement or omission was material. (*See* Ortiz July Aff. ¶ 36 ("[T]his matched [Bettor-1]'s largest wager on a single event on [Betting Platform-1].").) Second, Messrs. Ortiz and Clase argue that the statement in the Ortiz July Affidavit and Clase Affidavit that Bettor-1 had "only ever made five wagers involving Ball/HBP, and all five involved [Mr. Ortiz]" was misleading, given that Bettor-1 has also bet on strikes. (ECF No. 143-1 at 28.) There is

no basis for Defendants' argument that the affiant's omission of Bettor-1's bets on a completely different pitch outcome constitutes a falsehood, much less one rising to a *Franks* violation. Defendants' additional argument that the affiant omitted Bettor-1's gambling data on Betting Platform-2 is likewise unavailing. As the Government points out, the July Affidavits were explicit that the five Ball/HBP wagers came from Betting Platform-1's data, and in any event, inclusion of Betting Platform-2's data would likely have only strengthened the probable cause application. (*See* ECF No. 170 at 40, 42.) The fact that Defendants can point to information available to the affiant with respect to Bettor-1's gambling data that the affiant chose not to include in the Ortiz July Affidavit or Clase Affidavit does not move the Court to find that the affidavit was so lacking as to warrant suppression or a *Franks* hearing.

Defendants' arguments that the suspicious wagers placed by Individual-1, Bettor-2, Bettor-3, and Bettor-4 were outside their "regular gambling behavior" fare no better. Defendants renew their argument that the affiant should have included not just information about Individual-1's Ball/HBP bets but also her bets on strikes, and that the affiant excluded information from Betting Platform-1 as to Bettor-2. (ECF No. 143-1 at 30.) As the Court has concluded with respect to Bettor-1, these omissions -- assuming *arguendo* that they *are* "omissions" -- are of the garden variety

that any affiant could have chosen to exclude from an affidavit and, without more, are not "misleading" such that they constitute a *Franks* violation. As to Bettor-3, Defendants argue that the purportedly suspicious wager was Bettor-3's *only* wager so could not be "outside his regular gambling behavior." (ECF No 143-1 at 31.) But again, the underlying fact that Bettor-3 had only ever made one bet was disclosed to the magistrate judge, who was free to disagree with the affiant's conclusion that Bettor-3's only bet was outside Bettor-3's regular gambling behavior. (*See* Ortiz July Aff. ¶¶ 39, 41.) Finally, as to Bettor-4, Defendants argue that her wager of $500 on Mr. Ortiz's pitches across the two Betting Platforms are not incongruent with her betting activity, which averaged $454 on Betting Platform-1 and $333.72 on Betting Platform-2. (ECF No. 143-1 at 7.) Defendants ignore that the average value of Bettor-4's wagers is not the only basis on which the affiant concluded that Bettor-4's betting behavior as to the subject pitches was anomalous. (*See* Ortiz July Aff. ¶ 43 (Bettor-4's wager on Mr. Ortiz's pitch was the only wager that a pitch would be a Ball/HBP).) In all, the Court does not find any misstatement or omission that is so egregious that one could only conclude that it, even without more, was intended to mislead the magistrate judge.

In analyzing the second *Franks* prong, courts generally weigh the materiality of any misstatement or omission by "disregard[ing]

the allegedly false statements," *Awadallah*, 349 F.3d at 65, and "inserting the omitted truths," *Rajaratnam*, 719 F.3d. at 146 (citation modified). Then, assessing anew the sufficiency of the affidavit, courts determine whether the affidavit still supports a finding of probable cause. *Awadallah*, 349 F.3d at 65. Such an exercise is difficult here, because, at bottom, Defendants have not adequately shown that any false statement should be removed and any omission should be added, and it appears that much of the excluded information, for example the records from the Betting Platforms Defendants argue were omitted, would have ultimately strengthened rather than weakened the affiant's overall conclusion that the bets on Mr. Ortiz's pitches were anomalous. *See Rajaratnam*, 719 F.3d at 155 ("On a more fundamental level, we cannot conclude that the government omitted certain information about the SEC investigation with 'reckless disregard for the truth' when it is clear that fully disclosing the details of that investigation would only have *strengthened* the wiretap application's 'necessity' showing."). The Court accordingly finds that Messrs. Clase and Ortiz have failed to state a *Franks* violation meriting a hearing.

### 2. Probable Cause

Having concluded that the magistrate judge was not recklessly misled and that Messrs. Ortiz and Clase are not entitled to a *Franks* hearing, the Court assesses whether the Ortiz July Affidavit

and the Clase Affidavit support the probable cause finding made by the magistrate judge. In doing so, the Court's role is "simply to ensure that the magistrate [judge] had a substantial basis for concluding that probable cause existed." *Rosa*, 11 F.3d at 326 (internal quotations omitted); *United States v. Travisano*, 724 F.2d 341, 345-46 (2d Cir. 1983) (when determining whether probable cause exists to issue a search warrant, "it is only a probability, and not a prima facie showing of criminal activity" that is required). The Court finds that the magistrate judge's probable cause finding is amply supported.

The magistrate judges reasonably concluded that, based on the Affidavits, there was probable cause to believe that Messrs. Clase and Ortiz were engaged in a pitch-rigging conspiracy and other criminal activity, and that evidence of the offenses would be found on their electronic devices. The Ortiz July Affidavit and Clase Affidavit did so by showing that certain bettors and their wagers on Messrs. Clase and Ortiz's pitches were likely the result of coordination amongst them. The July Affidavits begin by outlining Bettor-1's history of successfully wagering on Mr. Clase's pitches on Betting Platform-2 from May 2023 through June 2025, which tended to support an inference of improper collusion between Bettor-1 and Mr. Clase. For example, of Bettor-1's 158 pitch speed bets, Bettor-1 won twice as often as he lost, and won $110,386 while losing $15,314.51. (Ortiz July Aff. ¶ 25.) Bettor-1's larger

wagers in this category had a significantly higher win rate of 88%. (*Id.*) These facts, in conjunction with geolocation data placing Bettor-1 at or near Mr. Clase's home at the time these bets were placed, are sufficient for a probable cause finding that Mr. Clase conspired with Bettor-1 and divulged inside information regarding his pitching strategy.

After these suspicious betting patterns and circumstances had been established as to Bettor-1 and Mr. Clase, the Ortiz July Affidavit and Clase Affidavit state that Bettor-1 and a group of other Bettors colluded to place similar bets on Mr. Ortiz's pitches beginning in June 2025, wagering thousands of dollars that Mr. Ortiz's pitches in the June 15 and June 27 games would be balls/HBPs. (*Id.* ¶¶ 30-44.) The Ortiz July Affidavit and Clase Affidavits show -- and the Court finds especially convincing in its totality of the circumstances analysis -- that Mr. Ortiz's two subject pitches were thrown far outside the strike zone, including one that the catcher failed to retrieve. (*Id.* ¶ 42.) The distance of the pitches from the strike zone is significant because the wager required not merely that the pitch be outside of it, but also that the batter refrain from swinging. In contrast, a competitive pitch may generally seek to keep the ball close enough to the strike zone to induce the batter to swing. Such a pitch would result in a strike, which is generally beneficial for the pitcher's team, rather than a ball, which is generally not

beneficial for the pitcher's team. As such, the delivery of these seemingly non-competitive pitches, in conjunction with the fact that the wagers were placed before the Bettor could know which opposing player would be at-bat, strongly support the inference that the pitches may have been the result of collusion.

Mr. Ortiz argues that there is no evidence linking him to a conspiracy with Mr. Clase and the other bettors, and rather, that the July Affidavit relies only on the fact that he and Mr. Clase were teammates. (*See* ECF No. 143-1 at 16-18.) Mr. Ortiz's argument understates the affiant's allegations as to the overall pitch-rigging conspiracy, including that Bettor-1, who is closely associated with Mr. Clase, had already by June 2025 established a suspicious record of winning on Mr. Clase's pitches, including his bets that certain pitches would be Balls/HBPs. (Ortiz July Aff. at ¶¶ 24-26.) Then, in June 2025, Bettor-1, in coordination with other Bettors, began betting in large sums that Mr. Ortiz's pitches would also be Balls/HBPs. (*Id.* ¶¶ 41-43.) These facts are sufficient to support a probabilistic inference that Mr. Clase and Bettor-1 engaged in a pitch-rigging scheme that Mr. Ortiz, who is Mr. Clase's teammate on the Cleveland Guardians, eventually joined. The July Affidavits provide ample support for the magistrate judge to find that evidence of the scheme would be found on defendants' electronic devices, which is not disputed by Messrs. Clase and Ortiz. Nothing more is required.

Messrs. Ortiz and Clase argue that the July Affidavits failed to "provide any statistical context for the betting data," which is "fatal to the probable cause determination." (ECF No. 143-1 at 20-22.) The cases they cite, none of which are binding on this Court, do not support their argument that the affidavits here provided insufficient statistical context. In *United States v. Keleta*, 949 F.3d 1082 (8th Cir. 2020), the defendant had argued that the affiant "did not provide context for [his] claim that an unusually high percentage of [defendant's tax preparation business]'s tax returns claimed certain tax credits." *Id.* at 1089. The Eighth Circuit found that the *Keleta* affidavit established probable cause to search the tax preparation business, "[e]ven without the specific percentages" of taxpayers who had received refunds" (which had been provided by the affiant), because the "affidavit expressly described the percentage of returns that caught the eye of the [IRS' Scheme Development Center] as 'large,' 'high,' or 'unusually high,'" just as the affidavits did here. *See id.*[8] In light of the foregoing, the Court **DENIES** Messrs. Ortiz's and Clase's motions to suppress their phones seized pursuant to the Ortiz July Affidavit and the Clase Affidavit.

[8] The deficient affidavit in *United States v. Singh*, 972 F. Supp. 7 (D.D.C. 1997) did not provide *any* "relevant context" for the one statistic it had cited in support of a finding of probable cause to search a tax return preparation business, which had "show[ed] that 98% of [the agency's] returns . . . resulted in refunds." *Id.* at 11. Here, the affiant provided context for the statistics it cited, so the case is inapposite.

**B. Ortiz November Affidavit**

The Court next turns to the sufficiency of the Ortiz November Affidavit. On November 5, 2025, the grand jury charged Messrs. Clase and Ortiz with offenses relating to the pitch-rigging conspiracy and issued warrants for their arrest. On November 9, 2025, Mr. Ortiz was arrested and law enforcement agents seized a cell phone in his custody incident to his arrest. Five days later, on November 14, 2025, a magistrate judge authorized the November warrant, allowing the agents to search Mr. Ortiz's phone for evidence of both the Indictment Offenses and Obstruction Offenses. Mr. Ortiz argues that the five-day delay between the seizure of the device incident to Mr. Ortiz's arrest was unconstitutional, that the November Warrant was not supported by probable cause for the Obstruction Offenses, and that the November Affidavit had material omissions meriting a *Franks* hearing.

**1. Constitutionality of November Phone Seizure**

First, Mr. Ortiz's argues that the five-day delay between the seizure of the November Phone incident to his arrest and the search warrant's issuance was unconstitutional. The Court finds that the initial seizure of the phone incident to a lawful arrest to be unproblematic. *United States v. Chowdhury*, 2025 WL 2987917, at *11 (E.D.N.Y. Oct. 25, 2025) ("The seizure of evidence from a search incident to arrest requires no additional justification; rather, it is the fact that the lawful arrest which establishes

the authority to search a person, and to seize evidence from that search." (internal quotations omitted)). "The right of the police to temporarily seize a person's property pending the issuance of a search warrant presupposes that the police will act with diligence to apply for the warrant." *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). Whether the five-day delay is unconstitutional turns on "[1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay." *Id.* at 206. The Court analyzes these factors in turn.

The first factor weighs in favor of the Government. The Second Circuit noted in *Smith* its "expect[ation]" that "police officers . . . secure a search warrant in considerably less time than eleven days." *Id.* (citation omitted). Other district court cases applying *Smith* have concluded that delays longer than five days did not weigh against the Government. *See, e.g.*, *United States v. Watson*, 2023 WL 7300618, at *9 (E.D.N.Y. Nov. 6, 2023) (nineteen-calendar day delay); *United States v. Hiya*, 2024 WL 5004586, at *4 (S.D.N.Y. Dec. 6, 2024) (nine-day delay did "not favor either party"); *United States v. Kamaldoss*, 2022 WL 1200776, at *16 (E.D.N.Y. Apr. 22, 2022) (fifteen-day delay did not weigh against the government); *see also Chowdhury*, 2025 WL 2987917, at *22 ("It is true there appear to be no published decisions in this

Circuit in which a court has held that a delay of nine days or fewer between the seizure of property and the procurement of a warrant was unreasonable.”). Accordingly, the five day delay here weighs in favor of the Government.

The second and third factors weigh in favor Mr. Ortiz. “Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse.” *Riley v. California*, 573 U.S. 373, 393 (2014). Although Mr. Ortiz did not request a return of the phone, a fact that the district court in *Smith* found to favor the Government, the Court finds that Mr. Ortiz nonetheless had a substantial privacy interest in his November Phone. As to the third factor, Mr. Ortiz did not have a reduced property interest in his November Phone, given that he did not “consent” to its seizure. *Smith*, 967 F.3d at 208 (finding no reduced property interest considering that the defendant owned the seized table, which had been taken from the car he was driving, and that the defendant did not consent to the seizure). There are no facts before the Court as to whether Mr. Ortiz’s interest in the November Phone was reduced compared to seizures of other phones given that the November Phone was a replacement.

The fourth factor weighs strongly in favor of the Government. At the time, the Government’s investigation into the offenses was ongoing, and the Government has sufficiently shown that the five-

day delay is explained by the active nature of the investigation, (*see* ECF No. 170 at 47), and the intervening Veteran's Day holiday and weekend. *United States v. Corbett*, 2021 WL 4480626, at *6 (E.D.N.Y. Sept. 30, 2021) ("[T]he court finds that the delay was reasonable in light of the government's continuing investigation."); *United States v. Chang*, 2024 WL 1308775, at *9-10 (E.D.N.Y. Mar. 27, 2024). In all, the balance of the four factors weighs in favor of the conclusion that the Government's short delay in seeking a search warrant was reasonable under the Fourth Amendment. In any event, even assuming that the delay was unconstitutional, the Court declines to suppress the evidence on this basis because "the record does not show that [the officer] acted with a deliberate intent to violate [the defendant]'s rights" or that the delay was "reckless or grossly negligent." *Smith*, 967 F.3d at 212.

**2. *Franks* Analysis**

Next, Mr. Ortiz argues that the November Warrant was not supported by probable cause for the Obstruction Offenses, and the November Affidavit had material omissions meriting a *Franks* hearing. (ECF No. 143-1 at 36.) Because the latter bears on the level of deference the magistrate judge receives for its probable cause finding as to the former, the Court, as before, first considers Mr. Ortiz's entitlement to a *Franks* hearing as to the November Affidavit.

As stated previously, "[t]o obtain a *Franks* hearing on a motion to suppress on the basis of alleged misstatements or omissions in a warrant affidavit, a defendant must make a *substantial* preliminary showing that (1) there were intentional misrepresentations or omissions in the warrant affidavit, or, in other words 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth'; and (2) those misrepresentations or omissions were material, or 'necessary to the issuing judge's probable cause finding.'" *United States v. Nejad*, 436 F. Supp. 3d 707, 718-19 (S.D.N.Y. 2020) (quoting *Rajaratnam*, 719 F.3d at 146) (emphasis in original). In support of his motion, Mr. Ortiz argues that the November Affidavit omitted three categories of exculpatory evidence: (i) that Messrs. Clase's and Ortiz's explanation of a horse transaction involving the transfer of funds was corroborated by two separate witnesses; (ii) that Bettor-1 had denied any conspiracy to fix pitches; and (iii) that other Bettors had likewise denied having inside knowledge of what pitches would be thrown. (*See* ECF No. 143-1 at 39-40.)

As with Mr. Ortiz's arguments regarding the July Affidavit, the Court notes that he again has failed to show that the omissions were "designed [by the affiant] to mislead, or that [they] are made in reckless disregard of whether they would mislead." *Rajaratnam*, 719 F.3d at 154 (quoting *Awadallah*, 349 F.3d at 68)

(emphasis omitted). To the contrary, the Government has provided substantial justification for the exclusion of these facts from the November Affidavit. In the November Affidavit, the Government provided the statement from one of the two witnesses that the payment of 90,000 pesos was for Mr. Clase's purchase of a horse, (Ortiz Nov. Aff. ¶ 14), and its decision to exclude a second corroborative statement by the other witness does not, on its own, signal any intent to mislead the magistrate judge, (*see* ECF No. 170 at 52). Moreover, the Government did not include Bettor-1's denials of any conspiracy to fix pitches, because by the time the November Affidavit was filed, the Government had determined that Bettor-1's denials of the conspiracy to fix pitches were false. (*See id.* at 54.) Bettor-1 had also pleaded guilty to a scheme pursuant to a cooperation agreement two months earlier in September 2025. (*See id.*) The Government did not include exculpatory statements by other Bettors, in part because some of them had not been interviewed at the time of the November Affidavit, and in part because one had admitted to involvement in the scheme before the November warrant was authorized. (*See id.*) By November, the Government had also had substantial evidence of the culpability of the other Bettors through Bettor-1's statements. (*See id.* at 54-55.) Accordingly, the omission of these allegedly exculpatory statements from the November Affidavit does not state a *Franks* violation nor merit a hearing.

### 3. **Probable Cause**

Having found that the November Affidavit did not contain material misstatements or omissions warranting correction, the Court now turns to whether the November Warrant was supported by probable cause. As the Government points out, Mr. Ortiz does not appear to dispute that there was probable cause to search for evidence related to the indictment offenses, and instead only argues that the November Affidavit lacked probable cause to search for evidence of the obstruction offenses. (*See* ECF No. 143-1 at 35-36.) The thrust of the November Affidavit offered in support of probable cause for the obstruction offenses is that the Messrs. Clase and Ortiz discussed the transfer of approximately 90,000 Dominican pesos, which was supposed to pass between intermediaries, and agreed to falsely represent that the transaction was for the purchase of a horse by Mr. Clase. (Nov. Aff. ¶ 12.) Along with the transfer, Mr. Clase sent an audio message to Mr. Ortiz directing him to tell Mr. Ortiz's associate, who was receiving the transfer of the funds on Mr. Ortiz's behalf, to "state that the 90,000 was payment for a horse." (*Id.*) The "horse" explanation was similarly given by lawyers for both pitchers to the Government during pre-charge presentations in September 2025. (*Id.* ¶ 13.) Based on (i) the investigation, which suggested that the 90,000 Dominican pesos transfer was a gambling payout, (ii) the audio message from Mr. Clase, and (iii) the fact

that the lawyers for Messrs. Clase and Ortiz presented the horse transaction explanation to the Government, the magistrate judge authorized the search of the November Phone for evidence related to the Obstruction Offenses.

Although this showing as to the Obstruction Offenses is weaker compared to that of the July Affidavit, the Court concludes that the magistrate judge "had a substantial basis for conclud[ing] that probable cause existed" nonetheless. *Rosa*, 11 F.3d at 326. The totality of the evidence at the time suggests that Messrs. Clase and Ortiz conspired to conceal the true purpose of certain fraudulent payments and that the Ortiz November Phone had a "fair probability" of containing evidence of the Obstruction Offenses. *Walczyk*, 496 F.3d at 156. Accordingly, the Court **DENIES** the motion to suppress the evidence from the November Phone, or in the alternative, for a *Franks* hearing.

## II. Mr. Vasquez's Motion to Suppress

Mr. Vasquez moves to suppress the evidence from the search of Mr. Vasquez's Android phone. In so moving, Mr. Vasquez does not appear to refer to the Vasquez Affidavit in support of the search warrant application but, rather, the Superseding Indictment in this case charging him with wire fraud conspiracy in violation of 18 U.S.C. § 1349 and making false statements in violation 18 U.S.C. § 1001. (*See e.g.*, ECF No. 149 at 5-6 (describing allegations from events occurring June 3, June 7, June 13, 2023, and arguing

that allegations as to Mr. Vasquez's involvement in these events was deficient).)

The Court construes Mr. Vasquez's arguments as having been made with respect to the Vasquez Affidavit instead of the Superseding Indictment. Mr. Vasquez argues that the Affidavit (i) "do[es] not establish probable ause of a violation of the wire fraud statute by Mr. Vasquez," and (ii) that a violation of the wire fraud statute did not occur given that the "allegations do not constitute a scheme to deprive [the victims] of 'traditional property interests.'" (*Id.* at 8.) The Court addressed the second argument in its September 8, 2026 Memorandum & Order, denying Mr. Vasquez's motion to dismiss Count One of the Superseding Indictment charging him with wire fraud conspiracy and incorporates its decision here. (*See* ECF No. 219.)

Turning to the first argument, the Court finds that the Vasquez Affidavit supports the magistrate judge's probable cause finding. The Affidavit contained evidence of several text message exchanges between Mr. Vasquez and Mr. Clase allegedly showing coordination of bets and efforts by Mr. Vasquez to maximize payouts for himself and the other bettors, as well as information regarding the money transfers between the bettors in advance of bets, and the payouts that the bettors received. (*See* Vasquez Aff. ¶¶ 21-24.) Further, in support of the Obstruction Offenses, the Vasquez Affidavit provided that Mr. Vasquez informed the Government in a

proffer that he was only aware of one instance in which Mr. Clase provided inside information to Bettor-1, when such a fact is belied by the numerous bets alleged elsewhere in the same Affidavit. (*See id.* ¶ 28.) Accordingly, the Court finds that the magistrate judge had more than a substantial basis to find probable cause that the subject offenses had occurred and probable cause that evidence of those offenses could be found on Mr. Vasquez's devices.

**III. Good Faith Exception**

Even if the Ortiz July Affidavit, Ortiz November Affidavit, Clase Affidavit, and Vasquez Affidavit were insufficient to support the magistrate judge's finding of probable cause, the good faith exception bars the exclusion of evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. "[T]he Court must first consider whether the officers in this case acted in an objectively reasonable manner." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 472 (S.D.N.Y. 2013). If their actions were not "objectively reasonable" and the officers violated clearly established law, then the Court must determine whether the law enforcement conduct was more than isolated negligence. *Id.*

"The extent to which the exclusionary rule is justified by [] deterrence principles varies with the culpability of the law enforcement conduct." *Herring v. United States*, 555 U.S. 135, 143 (2009). Nonetheless, the good faith rule does not apply where: (1)

"the issuing magistrate has been knowingly misled"; (2) "the issuing magistrate wholly abandoned his or her judicial role"; (3) "the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable"; and (4) "the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923).

Such exceptional circumstances are not present here. The Court has already found that Defendants have failed to make the requisite showing that the affidavits were affirmatively misleading in that they contained misstatements or omitted material facts. Nor were the affidavits "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. Instead, the affidavits contained numerous allegations and references to evidence which, considering the totality of the circumstances, supported both that criminal offenses had occurred and that the electronic devices sought to be searched would contain evidence of those offenses. Accordingly, suppression of the evidence from Mr. Ortiz's July and November Phones, Mr. Clase's Phone, and Mr. Vasquez's two phones is not warranted.

**Conclusion**

For the foregoing reasons, Messrs. Ortiz's and Mr. Clase's motions to suppress, and, in the alternative, for a *Franks* hearing

are **DENIED.** Mr. Vasquez's motion to suppress is also **DENIED.**

The parties shall confer on redactions, if any, to this Sealed Memorandum & Order, and shall jointly file a proposed redacted version for the public docket on or before September 30, 2026. If this Memorandum & Order shall remain sealed, the parties shall jointly file a letter stating the reasons for sealing by that same date.

**So ordered.**

Dated: September 28, 2026
Brooklyn, New York

**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York