**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RCH/FTB:EWS/SMS/RMU/JS
F. #2025R00435

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 10, 2026

By ECF & E-mail

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Emmanuel Clase de la Cruz, et al.
Criminal Docket No. 25-346 (S-1) (KAM)

Dear Judge Matsumoto:

The government respectfully moves in limine to (1) admit evidence of Emmanuel Clase de la Cruz's outstanding tax liability in its case-in-chief to rebut his full-throated defense that he lacked any financial motive to commit the charged offenses, and (2) admit defendant Robinson Vasquez Germosen's proffer statements because he has triggered the waiver provision of his proffer agreement. For the reasons set forth below, the government's motions should be granted in their entirety.

## I. The Court Should Permit the Government to Admit Evidence of Clase's Outstanding Tax Liability in its Case-in-Chief to Rebut Clase's Full Throated Argument That He Lacked a Financial Motive to Commit the Charged Crimes

### A. Relevant Background

On October 23, 2026, the government obtained correspondence from Clase's accountant (the "Accountant") between the Accountant and the Internal Revenue Service ("IRS") indicating that Clase had accrued a significant unpaid tax liability for tax years 2022 and 2023 of approximately $500,000 to the IRS, and that in March 2025, he entered into a payment plan with the IRS to repay that tax debt.[1] Clase further owed over $178,000 in an unpaid tax liability for 2024, as well as several thousands of dollars to state authorities in outstanding taxes. The government promptly produced the records to Clase and his co-defendants on October 25, 2026.

[1] That information was not apparent from any tax-related documents in the government's possession prior to October 23, 2026. By contrast, the defendant plainly knew that he owed half-a-million dollars to the IRS, and indeed, defense counsel conceded, "Clase may have maybe—the term cash poor, not always had as much cash on hand." Oct. 30, 2026 Tr. at 83:24-25.

See Ex. A. On October 26, 2026, the government received and produced a business records certification for the documents from the Accountant and notified Clase that the government anticipated offering the records as "direct evidence of the defendant's motive for the charged schemes, or, in the alternative, pursuant to Fed. R. 404(b)(2)." See Ex. B. Clase did not contact the government regarding the production at that time.

During the final pretrial conference on October 30, 2026, Clase moved to preclude the government from admitting the Accountant's records because of delayed notice under Rule 404(b). Although the Court recognized that the evidence is "relevant and appropriate," the Court nevertheless precluded the government from introducing the evidence in its case-in-chief based on the timeliness of its disclosure relative to the start of trial. Oct. 30, 2026 Tr. at 95:17. The Court further held, however, that "[i]n the event that the defendants open the door and advanced [a full] throated…defense of no motive," it would "consider" whether the government be permitted "to put this evidence into a rebuttal case." Id. at 101:10-20. Counsel for Clase agreed, responding "[s]ure." Id. at 101:21.

At trial, Clase immediately advanced the full-throated defense of "no motive" that the Court had identified as a predicate for the introduction of the evidence of Clase's outstanding debt to the IRS and state tax authorities. First, in his opening statement, defense counsel made the following claims regarding Clase's finances to argue that he lacked any motive to commit the charged crimes:

- "Emmanuel's baseball contract has paid him millions of dollars to perform that job. The Government wants you to believe that Emmanuel chose to throw all that away to help some people, mostly strangers, win some bets, all in exchange for a few thousand dollars. Ladies and gentlemen of the jury, that does not make sense, and it doesn't make sense because it isn't true because Emmanuel is innocent." Trial Tr. 601:23–602:6.

- "They will ask you to believe that Emmanuel risked a fortune and his lifelong dream over a few thousand dollars." Id. 626:21–23.

Next, while cross-examining government witness Paul Mifsud, an executive with Major League Baseball, another of Clase's attorneys expanded on this theme by eliciting the following information:

- Clase received a $2 million signing bonus. Trial Tr. 696:10–12.

- In the 2023 season, Clase was due "at least $1.5 million in salary." Id. 697:11–13.

- In the 2024 season, Clase was owed "at least $2.5 million." Id. 697:14–17.

- In the 2025 season, Clase "was owed at least $4.5 million." Id. 697:21–23.
- In the 2026 season, Clase "was owed at least $6 million." Id. 697:24–25.
- If an option[2] was exercised, Clase "was owed $10 million in base pay for the 2027 baseball season." Id. at 698:20–25.
- If Clase "pitched 200 or more innings between 2022 and 2026, that would result in an additional $500,000 to be paid in 2027." Id. 699:14–21. If Clase "pitched 250 innings or more during that 2022 to 2026 range, then his salary would escalate by $1 million." Id. 699:22–25. And Clase's "salary would increase or escalate by $1.5 million in 2027 and 2028." Id. 700:8–10.
- If the Guardians did not exercise their "option" with Clase, Clase could receive a buyout up to $2 million. Id. 702:16–703:8.
- Clase was entitled to $150,000 for coming in third place in votes for the 2024 Cy Young Award. Id. 704:8–705:15.
- Clase was entitled to $300,000 for being named to the All-Star Team in 2022, 2023, and 2024. Id. 705:18–707:11.
- Clase was entitled to $200,000 for winning an award for being the best closer in baseball in 2022 and 2024. Id. 707:14–708:20.

B. Clase Opened the Door to the Admission of Records of His Outstanding Tax Liability to Rebut His Argument That He Lacked Any Financial Motive to Commit the Charged Offenses

Based on the extensive representations made in Clase's opening statement and through the testimony he has so far elicited on cross-examination about his wealth and lack of financial motive, the government moves to introduce evidence from Clase's Accountant regarding his outstanding tax liability to the IRS and state tax authorities in order to rebut the defense argument already well advanced before the jury. And given the extensive nature of the argument and testimony that Clase has already put before the jury to suggest a lack of financial motive, the government seeks leave to introduce this direct motive evidence in its case-in-chief, rather than delay until its rebuttal case as the Court had previously indicated it may well be amenable to doing.

---

[2] Under Clase's contract with the Cleveland Guardians, the Guardians had the option to keep Clase as a Guardians player for the 2027-2028 season at a salary agreed to in advance. See GX-525. In other words, if the option was exercised, the Guardians would owe Clase a $10,000,000 in salary for the 2027-2028 season. Id.

1. The Tax-Related Evidence is Appropriate Rebuttal Evidence

The Second Circuit has made clear that "'rebuttal' is hardly limited to evidence that directly contradicts what it opposes." United States v. Barrow, 400 F.3d 109, 121 (2d Cir. 2005). Rebuttal instead "encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly by an adversary." Id. Applying this standard, the evidence the government intends to introduce through Clase's Accountant regarding Clase's tax liability and payment plan is quintessential rebuttal evidence.

In United States v. Khan, 787 F.2d 28 (2d Cir. 1986), the Second Circuit analyzed an analogous situation. There, the Court affirmed the admission of evidence through an expert at a drug trafficking trial to rebut certain assertions in defense counsel's opening statement. Specifically, defense counsel claimed that the jury "would not hear 'that [the defendant]'s got cars and people driving them or anything that indicates what he could have possibly done with all of this money that he made over the years,' and urged them to keep 'a close ear as you hear the testimony: Where does it indicate, that if this man is as big as they say he is, where is the money?'" Id. at 34. To rebut this assertion that the defendant lacked wealth consistent with being a drug dealer, the district court permitted the government to call a Drug Enforcement Administration agent as an expert witness. The agent testified "about the price of heroin in Pakistan, the practice of advancing heroin without cost, and even the nature of dress favored by Pakistani dealers." Id. The Second Circuit held that such evidence was permissible to rebut defense counsel's argument in his opening statement because the expert testimony showed, in contrast to the opening statement, that the defendant "did not need a large sum of money to deal in large amounts of heroin in Pakistan," and "even if [he] had made a great deal of money in the heroin trade, it would not necessarily show from the manner of his dress." Id.

Although Clase presents an inverse situation to Khan in that his opening statement emphasized the presence of purported wealth (rather than its absence) as proof that he did not commit the charged offenses, the principles the Second Circuit recognized in Khan apply just as forcefully here. Under Khan, the government is entitled to rebut the premise upon which defense counsel's argument regarding Clase's lack of motive relies. In particular, the government may prove that, contrary to Clase's assertions that his wealth eliminated any financial motive to commit the charged offenses, Clase was not actually as wealthy as he says he is and, in fact, had significant tax liabilities. Because Clase has made his purported wealth a centerpiece of his defense, the government is entitled to rebut it. To allow otherwise would be to leave the jury with a deeply misleading impression of Clase's financial motive (or lack thereof) to commit the crimes charged.

In sum, Clase has squarely put his motive at issue by arguing that he lacked any financial reason to participate in the charged fraudulent scheme. In response, the government must be permitted to introduce evidence to rebut his assertion and establish that he did, in fact, have a significant financial motive to commit the charged crimes because of certain economic struggles. Those economic struggles are made clear by his accrual of nearly half a million dollars in outstanding taxes owed to the IRS and his need to negotiate a plan so that he could repay that debt over time.

2. The Tax-Related Evidence is Admissible as Direct Evidence of the Crimes Charged, or Under Rule 404(b)(2)

Here, it is well-established that the evidence the government seeks to introduce is admissible as direct evidence of the charged crimes (which has no notice requirement), or, alternatively, as admissible evidence of motive under Rule 404(b)(2). The evidence should therefore be admitted under either theory.

With respect to direct evidence, as Your Honor has previously explained in the context of a debt obligation just like Clase's debt to the IRS, "[e]vidence of uncharged criminal conduct or other bad acts is relevant and properly admissible as direct evidence, as opposed to other acts evidence under Rule 404(b), if such conduct 'arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912, at *4 (E.D.N.Y. Dec. 20, 2019) (quoting United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted). "A 'trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the Indictment.'" Id. (quoting United States v. Gonzalez, 110 F.3d 936, 941–42 (2d Cir. 1997)). "Background evidence may be admitted in order to show, for example, the 'circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.'" Id. "In a number of cases within the Second Circuit, courts have admitted evidence of financial difficulty on the grounds that it is relevant and not unduly prejudicial." Id. at *11.

The Second Circuit has long recognized that it is within a district court's discretion "to admit evidence suggesting the defendant['s] motive for the crime charged," United States v. King, 560 F.2d 122, 133 (2d Cir. 1977), and evidence of a defendant's financial debt is relevant and admissible direct evidence because it tends to establish motive, see United States v. Reed, 639 F.2d 896, 907 (2d Cir. 1981) (concluding that district court "quite properly" admitted letter from bank addressed to the defendant and his wife regarding late mortgage payments and threatened foreclosure because it showed motive and was not unduly prejudicial); United States v. Polansky, 418 F.2d 444, 448 (2d Cir. 1969) (evidence of $100,000 in liabilities admissible to show motive to accept bribe); see also 2 J. Weinstein & M. Berger, Weinstein's Federal Evidence, § 401.08[5] (2026) ("In prosecutions for crimes whose purpose is pecuniary gain…evidence of…substantial indebtedness is relevant to prove the motive for committing such crimes." (citations omitted)).

Relatedly, evidence of "other acts" is admissible pursuant to Federal Rule of Evidence 404(b) if it is relevant to, among other things, motive. See Fed. R. Evid. 404(b); United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988). The Second Circuit has adopted an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate a defendant's criminal propensity. See United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002); see also United States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992). Such evidence is correctly admitted if: "(1) it is offered for a proper purpose; (2) it is relevant to a disputed trial issue; (3) its probative value substantially outweighs any possible prejudice; and (4) the trial court administers an appropriate limiting instruction." United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003) (citation omitted). Many courts have held that evidence of financial distress is admissible under Rule 404(b) to establish motive. See, e.g., United States v. Williams, 264 F.3d 561, 575 (5th Cir. 2001) (evidence that defendant had recently lost his home

in a sale was admissible because "[t]estimony regarding a specific change in Defendant's financial circumstances…is relevant to Defendant's motive and therefore admissible under Rule 404(b)"); United States v. Kuzlik, 468 F.3d 972, 975 (7th Cir. 2006) (financial condition evidence admissible under Rule 404(b) because "[t]he sorry state of [the defendant's] finances, his debts, default judgments, and bank overdrafts, was offered as evidence of his motive to embezzle").

Consistent with the above-cited precedent, in Innis, a criminal case charging a bribery and money laundering scheme, this Court found that "evidence of defendant's debt obligations—including defendant's seeking out and obtaining a $75,000 loan…as well as documents and communications concerning the repayment of the loan—is relevant, probative of defendant's state of mind, including motive, and not unduly prejudicial." Inniss, 2019 WL 6999912, at *11. The same is true here. Clase's tax liability exceeding $500,000 and his entry into a payment plan with the IRS is relevant background for his conduct and probative of his state of mind, including motive, because it provides context for why he was willing to participate in the charged kickback scheme. Moreover, this evidence is not unduly prejudicial given that he has already placed financial motive at the centerpiece of his defense before the jury through assertions in his opening statement and his line of cross-examination.[3]

Given the foregoing, the government respectfully requests that the Court permit the government to introduce this rebuttal evidence in its case-in-chief. The expected witness who will introduce this evidence, Clase's Accountant, was included on the government's witness list prior to trial and his name was read to the jury during voir dire. Further, the Accountant's anticipated statements on direct examination, as memorialized in his material pursuant to 18 U.S.C. § 3500, were made available to defense counsel on October 27, 2026. Permitting the Accountant's testimony in the government's case-in-chief would advance judicial efficiency by eliminating the need to wait for the rebuttal case to introduce it. While ordinarily "rebuttal witnesses cannot always be anticipated as much depends on what is introduced in the defense case," United States v. Gasparik, 141 F. Supp. 2d 361, 368 (S.D.N.Y. 2001), here the rebuttal witness can readily be anticipated given that Clase has already forcefully raised this defense. It is thus unnecessary to wait for additional factual development in Clase's defense case before calling this rebuttal witness, as the question of relevance has already been answered by defense counsel's approach thus far. Given the district court's "large degree of discretion in overseeing the examination of witnesses," United States v. Estevez, 735 F. App'x 746, 747 (2d Cir. 2018) (summary order), the government respectfully requests leave to introduce the evidence at issue in its case-in-chief, rather than waiting to introduce it on rebuttal.

## II. Because Vasquez Triggered the Waiver Provision of His Proffer Agreement, His Proffer Statements Must Be Admitted

### A. Vasquez Told the Government He Knew That Clase Had Provided Inside Information About a Pitch on At Least One Occasion

On January 9, 2026, Vasquez executed a proffer agreement that provided that the government may use his proffer-protected statements "as substantive evidence to cross-examine

---

[3] Also undermining any claim of prejudice is defense counsel's own concession that Clase did not have "much cash on hand." Oct. 30, 2026 Tr. at 83:24-25.

[the defendant], should [the defendant] testify," and to "rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the defendant]" at trial or any other proceeding. See ECF No. 212, Exhibit A at ¶ 4. [redacted]

> [redacted]

ECF No. 212 at 29-30 and Exhibit B at 2.

[redacted]

---

[4] The government refers to the Defendant Robinson Vasquez as "Vasquez" in its supplemental motions in limine; however, the § 3500 material cited refers to the Defendant as "Robinson."

[5] Vasquez's statements described herein and their accompanying context are redacted because they describe information that is currently subject to proffer protection, subject to waiver. See, e.g., ECF No. 211, at 32 ("If the Government had to forgo admission of Mr. Vasquez's statements completely, the Government would be left without a remedy at trial even if Mr. Vaquez directly contradicted the proffer statements . . . The waiver provision also may not be triggered at all.") (internal citations and quotation marks omitted).

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Prior to trial, the government moved in limine to introduce Vasquez's proffer statements in its case-in-chief or rebuttal case should Vasquez or his attorney offer evidence or argue in a manner that triggers the waiver provision of his proffer agreement. See ECF No. 212 at 28. The Court ultimately reserved decision on whether the waiver provision was triggered based on what happens at trial. ECF No. 325 at 22. The Court further rejected without prejudice the government's proposed sanitized versions of Vasquez's proffer statements, allowing the government leave to submit revised proposed sanitized versions should the waiver provision be triggered at trial. Id. at 32. As set forth below, the government respectfully submits that Vasquez has triggered the waiver provision of his proffer agreement, and the government's proposed revised sanitized version of his proffer statements should be admitted.

B. Vasquez Has Taken the Position at Trial that He Never Knew That Clase Provided Anyone With Inside Information on Any Occasion

Based on the trial record to date, it is clear that Vasquez has triggered the waiver provision of his proffer agreement because he has presented a defense that conflicts with the above-excerpted proffer statements. Specifically, [redacted]:

- "Mr. Caraballo, just like every other witness who comes into this courtroom and takes the stand, will not tell you once that Robinson knew about anything illegal. The closest you're going to hear is that maybe a bett[o]r thought that Robinson knew something was illegal." Trial Tr. 635:21–25.

- "So the Government's own witnesses who are going to come in here are going to tell you that Robinson has nothing to do with the betting conspiracy. They don't have a message from him. They don't speak to him about it." Id. 638:2–5.

- "If Robinson signed on a plan to cheat DraftKings, a plan to make money, then he would have taken every opportunity to do that. You don't get the inside track and bet like it's a church raffle. If you know the answers to the test, you don't get half of them wrong. When DraftKings comes to testified and they say that Robinson would lose on bets by Clase, how is the Government going to explain that? That he had the answers, he needed the money, he had an opportunity to make the money, and he still lost." Id. 639:12–21.

After making these assertions, counsel for Vasquez continued to pursue this defense on cross-examination. Specifically, Vasquez's counsel showed betting records for a proxy account Vasquez held in the name of his romantic partner, Johanny Beltre de Rodriguez,[6] to a corporate representative of DraftKings, Joel Trella, which counsel filtered to only show the wagers on pitches thrown by Emmanuel Clase. Id. 900:14–906:23 (referring to Government Exhibit 17076). As particularly relevant, defense counsel reviewed the third and fourth wagers listed on government exhibit 17076 as filtered by the defense, which were bets by Vasquez (through the Beltre account) that Clase's May 17, 2025, pitch to Santiago Espinal would be slow (row 10055) and a ball (row 10056). See id. 902:17–903:18. [redacted]

---

[6] The government anticipates that the evidence will show that Beltre opened the account at Vasquez's direction and that Vasquez was the actual user of the account, not Beltre.

Nevertheless, during this cross-examination, Vasquez's counsel implied to the jury that the bets on the May 17 pitch were legitimate and were placed without inside information. Specifically, counsel noted that the dollar size of these bets was not as large as they could have been, which was meant to suggest to the jury that they would have been larger bets had Vasquez placed these bets using inside information. Id. 904:6–8 ("Okay. And just to reiterate, for all of these bets, Number 1 to 6, we know that certainly a bet could have been made for $11,500, right? A. Correct"). [redacted]

C. Vasquez Has Triggered the Proffer Waiver

Based on the above-described record, Vasquez has presented to the jury a theory inconsistent with his admission during his proffer [redacted] Vasquez therefore has waived the protections of his proffer agreement, and the government is entitled to introduce his proffer statements at trial.

In United States v. Barrow, 400 F.3d 109 (2d Cir. 2005), the Second Circuit held enforceable a proffer agreement similar to the one Vasquez signed. In Barrow, the defendant had admitted during proffer meetings with the government that he regularly sold crack at 215 Schaefer Street, Brooklyn. Id. at 115. At trial, however, defense counsel stated in his opening that "this is a case of mistaken identity." Id. at 114. Defense counsel also cross-examined a detective testifying for the government on discrepancies between the officer's testimony regarding one of the crack sales and his official report and accused the detective of fabricating a meeting with the defendant at 215 Schaefer Street. Id. The Second Circuit held that both defense counsel's opening statement and cross-examination question triggered the provision in the proffer agreement, which allowed the admission of the defendant's proffer statements. Id. at 119-20. In so doing, it espoused a two-part inquiry: (1) does the statement, testimony, or question which is alleged to trigger the admissibility of the proffer statement constitute a "factual assertion;" and (2) does the statement sought to be introduced "fairly rebut" that assertion. Id. Notably, the Court specifically rejected the contention that the triggering statement must directly contradict the proffer statement sought to be introduced. Id. at 120 (noting that "proper rebuttal is not limited to direct contradiction"). "[R]ather, rebuttal evidence encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary." Id. at 121.

The Second Circuit reiterated its holding in Barrow in United States v. Roberts, 660 F.3d 149 (2d Cir. 2011), observing that the waiver at issue in Barrow and Roberts constituted "'an expansive waiver'" that could reach "'any evidence, whether offered directly or elicited on cross-examination,' as well as any 'factual assertions,' whether made 'directly or implicitly.'" Roberts, 660 F.3d at 157-58 (quoting Barrow, 400 F.3d at 118-19). In evaluating whether the waiver has been triggered, district courts are "'to consider carefully what fact, if any, has actually been implied to the jury before deciding whether proffer statements fairly rebut it.'" Id. at 158 (quoting Barrow, 400 F.3d at 119). In conducting this analysis, the Roberts court observed that

district courts must evaluate the distinction between questions that challenge a witness's perception of events, and "questions accusing the witness of fabricating an event, which in the context of that case 'implicitly assert[ed] that no such [event] ever took place." Id. (quoting Barrow, 400 F.3d at 119) (modifications in Roberts). See United States v. Bryant, 520 Fed. Appx. 11, 13 (2d Cir. 2013) (affirming district court's introduction of proffer statements and observing that the Second Circuit's broad definition of rebuttal evidence includes "any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary," and that district judges are "uniquely situated to assess the impact certain evidence or arguments have made on a jury" and thus whether "testimony properly rebuts an inference that a party's adversary has sought to make" (internal quotation marks omitted)); United States v. Oluwanisola, 605 F.3d 124 (2d Cir. 2010); see also United States v. Velez, 354 F.3d 190, 196 (2d Cir. 2004) ("[A] defendant remains free to present evidence inconsistent with his proffer statements, with the fair consequence that, if he does, the Government is then permitted to present the defendant's own words in rebuttal.") (internal quotation marks and citation omitted).

As trial has progressed, Vasquez has so far made arguments and posed questions that open the door to specific proffer statements that he made on January 9, 2026. [redacted] Accordingly, the government respectfully submits that the Court should permit the government to introduce the statements set forth herein. Should Vasquez open the door to additional proffer statements during the remainder of trial, the government respectfully reserves the right to file a supplemental letter setting forth additional proffer statements that the government seeks to admit into evidence.

Even though Vasquez is on trial with two-codefendants, it is well-settled that, in a joint trial, statements by one defendant to law enforcement that implicate a co-defendant are admissible and do not violate a defendant's Sixth Amendment's Confrontation Clause rights as recognized in Bruton v. United States, 391 U.S. 123 (1968), as long as they are redacted such that the declarant's statements, when viewed in isolation, do not implicate his co-defendant. See United States v. Williams, 936 F.2d 698 (2d Cir. 1991). The Second Circuit has established a framework for the appropriate redactions to a defendant's statements or sanitization of a witness's testimony. Specifically, "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's Bruton rights." United States v. Jass, 569 F.3d 47, 56 (2d Cir. 2009) (quoting United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989) (internal quotation marks omitted) (approving substitution of neutral words "others," "other people," and "another person" for names of co-defendants)); see also United States v. Benitez, 920 F.2d 1080, 1087 (2d Cir. 1990) (upholding redaction of co-defendant's name to "friend"). The Second Circuit has also held that there is no error from admission of such a statement at a joint trial even if other evidence introduced at trial sheds light on the identity of that "other person" in the sanitized statement. See United States v. Lung Fong Chen, 393 F.3d 139, 150 (2d Cir. 2004)

(no Bruton violation even where other evidence "link[ed]" the complaining defendant to the incriminating statement), accord In re Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh, 552 F.3d 93, 133-34 (2d Cir. 2008) (same, where moving defendant complained that the combination of grand jury testimony and the incriminating statement violated Bruton; reaffirming that incriminating inference must be compelled by the statement alone).

The Supreme Court further confirmed this framework in Samia v. United States, 599 U.S. 635 (2023). In Samia, Samia's co-defendant's confession, which implicated Samia by name in its original form, was admitted at trial through a testifying agent "in a way that eliminated Samia's name while avoiding any obvious indications of redaction." Id. at 641. Specifically, in Samia, two men—Stillwell and Samia—committed a murder together. See id. at 640. Stillwell gave a post-arrest statement in which he admitted to driving the van used in the murder but claimed that Samia had been the shooter. See id. At trial, the government called an agent to testify to Stillwell's confession, during which the agent described Stillwell's confession without identifying Samia by name. See id. at 641-42. In particular, each time the agent referred to Samia, he referred to him only as "the other person." See id. ("He described a time when the other person he was with pulled the trigger on that woman in a van that he and Mr. Stillwell was driving.") (emphasis added by Samia Court). The trial court "instructed the jury that [the agent's] testimony was admissible only as to Stillwell and should not be considered as to Samia or [a third defendant]." Id. at 642. Samia argued that this procedure violated his rights. The Supreme Court disagreed, explaining that "the District Court's admission of Stillwell's confession, accompanied by a limiting instruction, did not run afoul of this Court's precedents" because it "was redacted to avoid naming Samia." Id. at 653.

Based on this framework and guided by the Court's observation in its decision on the government's motion in limine that "the Supreme Court and the Second Circuit have stated a preference for using "neutral noun[s] or pronoun[s]" like "you guys," "the other guy," "others," "other people," and "another person," ECF No. 325 at 28 (quoting United States v. Collins, 2023 WL 309605, at *4 (2d Cir. Jan. 19, 2023), the government respectfully proposes introducing the following sanitized version of Vasquez's proffer statements:

[redacted]

[redacted]

[redacted]

[redacted]

This proposed formulation is consistent with the Court's motion in limine decision because the words "baseball player" may refer to more than one other defendant and does not "identify any one particular defendant." ECF No. 325 at 32. Accordingly, "the admission of the statement does not run afoul of any defendant's Confrontation Clause rights when paired with a sufficient limiting instruction." Id.

For the reasons set forth herein, Vasquez has opened the door to the admission of his proffer statements, and he has made clear that he intends to open it further by arguing to the jury that was not aware of any instances where Clase had provided inside information. The government thus respectfully submits that the Court should grant this motion to introduce certain of Vasquez's admissions made at the proffer. The introduction of these statements is authorized pursuant to the proffer agreement and well-established Second Circuit law, and Vasquez has been provided ample notice of the government's intention to introduce the statements should he open the door. Moreover, the proffer statements, as proposed by the government, limit the references to other individuals and focus on defendant Vasquez, so as to ensure that the statements are admissible in accordance with Bruton, 391 U.S. at 123. Accordingly, the statements offered herein are admissible and the government should be permitted to introduce them into evidence.[7]

Finally, in an abundance of caution, the government redacts this portion of its filing and submits the unredacted version under seal.

[7] The government consents to reading the following limiting instruction to the jury in connection with the admission of the proffer statements: "You are cautioned that the evidence of one defendant's statement to the authorities after his arrest about his own conduct may not be considered or discussed by you in any way with respect to any defendant on trial other than the defendant who made the statement." See Sand, Modern Federal Jury Instructions, Instruction 5-20.

III. Conclusion

For the reasons set forth above, the Court should grant the government's applications in their entirety.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Eric Silverberg
Sean M. Sherman
Rebecca M. Urquiola
James R. Simmons
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (KAM) (by ECF and Hand Delivery)
Counsel of Record (by ECF and E-Mail)