**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RCH:EWS/SMS/RMU/JS
F. #2025R00435

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 22, 2026

By ECF & E-mail

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Emmanuel Clase de la Cruz, et al.
Criminal Docket No. 25-346 (S-1) (KAM)

Dear Judge Matsumoto:

The government respectfully submits this letter to notice additional objections to the Court's proposed jury charge. See also ECF No. 347. As set forth below, the government respectfully seeks modification of the Court's charge to: (1) include a conscious avoidance instruction, (2) adopt the government's proposed instruction on venue, and (3) revise its instructions on wire fraud conspiracy and honest services wire fraud conspiracy. Additionally, the government requests that the Court preclude the jury from considering the text of the superseding indictment (the "Superseding Indictment") as part of its deliberations.

I. A Conscious Avoidance Instruction is Warranted

In its proposed jury charge, the government submitted a proposed conscious avoidance instruction. See ECF No.281-4 at 34-35. However, the Court's draft charge does not include one. Based on the record created by the defense so far at trial, a conscious avoidance instruction is warranted here.

Although a conviction for a criminal conspiracy requires the government to prove a defendant's actual knowledge of the unlawful aims of the conspiracy, a "defendant's conscious avoidance of knowledge of the unlawful aims of the conspiracy . . . may be invoked as the equivalent of knowledge of those unlawful aims." United States v. Svoboda, 347 F.3d 471, 480 (2d Cir. 2003). Also known as "willful blindness," "[t]he conscious-avoidance doctrine applies to

a defendant who consciously avoided learning a fact while aware of a high probability of its existence." United States v. Graham, 51 F.4th 67, 83–84 (2d Cir. 2022).

"A conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that [he] intentionally avoided confirming the fact." United States v. Quinones, 635 F.3d 590, 594 (2d Cir. 2011). For a jury instruction regarding conscious avoidance to be appropriate, (1) a defendant must assert "the lack of some specific aspect of knowledge required for conviction," and (2) "the appropriate factual predicate for the charge exists, i.e., the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." United States v. Ferguson, 676 F.3d 260, 278 (2d Cir. 2011). The Second Circuit has clarified that the government is not required to choose between an "actual knowledge" and a "conscious avoidance" theory. United States v. Kaplan, 490 F.3d 110, 128 n.7 (2d Cir. 2007).

Throughout trial, each defendant has presented arguments and emphasized evidence to advance the defense that they lacked the requisite knowledge to have conspired with the alleged coconspirator bettors, many of whom have pleaded guilty pursuant to cooperation agreements to conspiring with the defendants as part of the same scheme. In doing so, the defendants have established the requisite predicate for the Court to instruct the jury regarding conscious avoidance. See Modern Federal Jury Instructions ("Sand"), Instruction 3A-2, cmt. ("Instruction 3A-2 is appropriate when a defendant has claimed a lack of any aspect of the knowledge necessary for conviction under the particular statute, or lack of knowledge as to the unlawful aims of a conspiracy, but the evidence suggests deliberate ignorance.").

For instance, during their opening statements, the lawyers for each of the defendants created the impression that the bettors acted completely independently from the defendants in committing their criminal conduct. See Tr. 625-626 (Clase) ("the government . . . won't show you any exchange between Emmanuel and anyone at all about a pitch that is going to be thrown during a baseball game; much less about a pitch that is going to be thrown for purposes of conspiring to place a bet."); Tr. 638 (Vasquez) ("So the government's own witnesses who are going to come in here are going to tell you that Robinson had nothing to do with the betting conspiracy. They don't have a message from him."); Tr. 642 (Ortiz) ("You're not going to hear from an eyewitness who heard Mr. Ortiz agree to throw rigged pitches. And probably most importantly, what you're never going to see is any evidence that Mr. Ortiz had any contact with any of these bettors.").

Similarly, when questioning the government's witnesses, defense counsel has repeatedly emphasized that the defendants were removed from illicit communications involving the downstream bettors disseminating inside information—information that only could have originated with the defendants. See, e.g., Tr. 1351 (L. De Aza Baez) (["Question:] You've never spoken to Mr. Paca about Mr. Clase's pitches, correct? [Answer:] No. [Question:] You've also never talked to Mr. Robinson about the bets on Mr. Clase pitches, correct? [Answer:] No."); see

also Tr. 2865-2866 (E. Diaz) ("[Question:] And you've never messaged with Mr. Clase about Mr. Ortiz, correct? [Answer:] Correct, yes.).

The jury, however, is entitled to consider whether the defendants were willfully blind to the consequences of sharing inside information with their coconspirators and the further dissemination of that information to other bettors further downstream in the conspiracy. Indeed, the record amply supports that this is precisely how the scheme operated: the defendants shared inside information typically with a single person who then disseminated the information to other coconspirators. For instance, the government presented evidence of the defendants' participation in group chats with other bettors like "Con 20 & 200" where the participants discuss the rigged pitches. See e.g. Tr. 1614-1615 (A. Barnett) ("[Question:] What's the group chat called? [Answer:] Con20&200 . . .[Question:] What does Arismendy Paca say? [Answer:] Let them hit. [Question:] What does Enoc Pena say? [Answer:] But Zunino is the one dying in laughter."). The Court's instruction on conscious avoidance would permit the jury to reasonably infer that the defendants were aware that by sharing inside information with one individual, that information would then be further shared with other bettors and those other bettors would use that information to place bets on the rigged pitches themselves and would discuss the results of these bets among other coconspirators.

In a similar vein, defense counsel has also cast doubt on whether the defendants received kickback payments in exchange for the inside information, suggesting that they did not know the purpose of the money transfers at issue or that they were for some purpose other than as kickbacks. See e.g., Tr. 1911 (J. Olivo (["Question:] Have you personally loaned Enoc Pena money? [Answer:] Yes."); Tr. 1961 (J. Olivo) (["Question:] so every time you would send a payment would be through Zelle to Robinson Vasquez for the san right? [Answer:] "yes.".) The government's proposed conscious avoidance instruction would permit the jury to weigh the competing inferences presented by the government and the defense to determine whether the defendants knew that some of the payments that were sent to either the defendants' intermediaries in the Dominican Republic or to defendant Vasquez were actually kickbacks owed to the pitchers for rigging their pitches.

In sum, there has been strong evidence presented of the defendants' participation in practically every step of the charged pitch-rigging conspiracy: from providing the inside information, to being informed as to the outcome of the bets using that inside information, and then ultimately receiving kickback payments for successful bets. On this record, the appropriate factual predicate exists that the defendants were aware of a high probability that their actions contributed to the perpetuation of this criminal scheme. The Second Circuit has emphasized the low bar necessary to establish conscious avoidance. As here, where there are "sufficiently suspicious circumstances" present, "a mere failure to ask questions—even absent more affirmative steps of avoidance—can demonstrate conscious avoidance." United States v. Wedd, 993 F.3d 104, 119 (2d Cir. 2021).

Moreover, to the extent that any of the defendants argue that a conscious avoidance theory is incompatible with the government's alternative argument that they had the requisite knowledge of the conspiracy, the Second Circuit has repeatedly rejected this argument. See United States v. Lange, 834 F.3d 58, 78 (2d Cir. 2016). In any event, on direct appeal, should the Circuit determine that a conscious avoidance instruction was "erroneously given," it will constitute

"harmless error if the jury was charged on actual knowledge" and, as here, "there was 'overwhelming evidence' to support a finding that the defendant instead possessed actual knowledge of the fact at issue." United States v. Ferrarini, 219 F.3d 145, 154 (2d Cir. 2000).

In sum, the record supports instructing the jury regarding conscious avoidance. The government respectfully submits that the Court should adapt its instruction on this topic from United States v. Greebel, 15-CR-637 (KAM), ECF No. 497 at 71-72, where it instructed the jury that it "may consider whether the defendant[s] deliberately closed [] [their] eyes to what would otherwise have been obvious to [] [them]." Both the facts adduced at trial to date and Second Circuit precedent make amply clear that this instruction is warranted.

## II. The Court Should Amend its Venue Instruction

The government respectfully requests that the Court's proposed venue instruction be clarified in several respects.

First, the Court's proposed instruction states that "[t]he superseding indictment alleges that some of the crimes charged occurred in part in this judicial district, the Eastern District of New York." ECF No. 346 at 10. The government respectfully requests that the Court strike the word "some" from this formulation. Every count charged in the Superseding Indictment is alleged to have taken place—and the government is prepared to prove by a preponderance of the evidence that they, in fact, did take place—in the Eastern District of New York.

Second, the government respectfully requests that the Court instruct the jury that in addition to Brooklyn, Queens, Staten Island, Nassau and Suffolk Counties, the Eastern District of New York also includes "the waters surrounding these counties and Manhattan, as well as the air space above the district. Travel over or through the district or waters, or the passage of a wire over or through the district or waters, is sufficient to establish venue." The government intends to argue that certain overt acts in the charged conspiracies involved such travel by individuals (such as when Enoc Pena flew from LaGuardia Airport to Cleveland on June 26, 2025 to meet with defendant Clase in furtherance of the scheme) as well as wire transfers that originated in the Eastern District of New York (such as the fund transfers that were initiated in the District, the placement of bets on online betting platforms using inside information over wires while located in the District, and the exchange of communications regarding inside information in furtherance of the scheme while located in the District). Accordingly, the facts support the addition of this proposed language. Additionally, the government's proposed formulation is consistent with the law. See United States v. Rutigliano, 790 F.3d 389, 397 (2d Cir. 2015) ("As to the wire fraud convictions, the government proved that unlawfully obtained disability benefits, wired to participants in the scheme, traveled through or over waters within the Eastern District, which are statutorily defined to also be part of the Southern District"); United States v. Ramirez–Amaya, 812 F.2d 813, 816 (2d Cir. 1987) (concluding flight over "body of water that lies within the joint jurisdiction of the Southern and Eastern Districts of New York…was sufficient to make venue in the Southern District proper"). Several judges in this District have also instructed the jury using this language. See, e.g., Charge of the Hon. Eric R. Komitee, United States v. Watson, et al., 23-CR-82 (EK), at 52-53 (attached hereto as Exhibit A); Charge of the Hon. Margo K. Brodie, United States v. Hwa, 18-CR-538 (S-2), at 20 (attached hereto as Exhibit B); Charge of the Hon. Brian M. Cogan, United States v. Alshahhi, et al., 21-CR-371 (BMC), at 52 (attached hereto as Exhibit C).

Third, the Court's proposed instruction eliminates the government's proposed language that "a defendant need not personally have been present in the district for venue to be proper." ECF No. 281-4 at 38. This formulation is necessary given the facts presented here with respect to the defendants and is consistent with Second Circuit law. See United States v. Rommy, 506 F.3d 108, 120 (2d Cir. 2007) ("a defendant need not himself have ever been physically present in a district for a conspiracy charge against him to be venued there"). Moreover, the Court's proposed instruction appears to impose a heightened burden on the government to establish "evidence that the defendant himself committed some act in furtherance of the alleged crime in this District." ECF No. 346 at 12. While the subsequent sentence makes clear that venue can be established by a co-conspirator's act rather than the direct action of a defendant, the sentence standing alone that a defendant must personally have committed some act in this District may give rise to juror confusion and is inconsistent with the law. Indeed, the Supreme Court has emphasized that a defendant need not personally have committed an overt act within the District for venue to be proper, because "the Venue Clause permits a defendant charged with conspiracy to be tried in any State in which any co-conspirator took any overt act in furtherance of the endeavor." Smith v. United States, 599 U.S. 236, 244 (2023) (emphasis added).

Finally, the government respectfully requests that the list of exemplar overt acts set forth by the Court in its proposed instruction—physical presence, electronic communications, phone calls, and text messages—be supplemented to add "electronic transfers of funds such as banking transfers." Here, the government intends to argue that certain electronic transfers of funds that took place in the Eastern District of New York establish venue here. This formulation is consistent with the law and the charges of other judges in this district. See, e.g., United States v. Kim, 246 F.3d 186, 191-92 (2d Cir. 2001) (venue proper in district where wires were sent and received because "the act of causing a wire to be transmitted in furtherance of a fraud is criminalized by the statute, and…a wire is 'transmitted' both where it was sent and where it was received"); United States v. Kenner, No. 13-CR-607 (JFB), 2019 WL 6498699, at *9 (E.D.N.Y. Dec. 3, 2019), aff'd, No. 21-2289, 2023 WL 4692508 (2d Cir. July 24, 2023) (Bianco, J.) (recognizing venue established in Eastern District of New York based on flow of funds through wires located in the District); see also Watson, Jury Charge, at 53.

III. The Court Should Amend its Conspiracy to Commit Wire Fraud Instruction

The government respectfully requests that the Court's proposed wire fraud instruction be amended to reflect that the first element of wire fraud does not require proof of any misstatements or omissions.

Before trial, defendants Clase and Ortiz moved to dismiss Count One on the basis that the Superseding Indictment did not allege a material misstatement or omission. The Court denied that motion and observed that "'the government need not prove an actual false statement so long as it proves a scheme to engage in some form of deception.'" United States Clase et al., No. 25-CR-346 (KAM), 2026 WL 2641646, at *3 (E.D.N.Y. Sept. 8, 2026) (quoting United States v. Connolly, 24 F.4th 821, 834 (2d Cir. 2022)); see also United States v. Klein, 476 F.3d 111, 113 (2d Cir. 2007) (emphasis added), as corrected (Mar. 8, 2007) ("[A]s commonly understood among both lawyers and laypersons, 'fraud' refers to conduct or speech intended to mislead the putative victim into parting with money or property."); United States v. Trapilo, 130 F.3d 547, 550 n.3 (2d Cir. 1997) ("The term 'scheme to defraud' is measured by a nontechnical standard. It is a reflection

of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society. The scheme exists although no misrepresentation of fact is made."); United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000) (explaining that a scheme to defraud "is characterized by a departure from community standards of fair play and candid dealings") (citation modified); United States v. Hild, 147 F.4th 103, 111 (2d Cir. 2025) (approvingly citing Trapilo and Autuori for the notion that a deceptive course of conduct that misleads investors can constitute a scheme to defraud even if a defendant's statements are not strictly false); United States v. Martin, 411 F. Supp. 2d 370, 372 (S.D.N.Y. 2006) ("a misrepresentation or omission is not a necessary element of a 'scheme to defraud' under the wire fraud statute"); A. Terzi Prods., Inc. v. Theatrical Protective Union, 2 F. Supp. 2d 485, 501 (S.D.N.Y. 1998) (Sotomayor, J.) ("I read Trapilo as underscoring the accepted notion that a defendant, by his conduct alone, can intend to deceive another and engage in a scheme to defraud, even though the defendant's statements themselves contain no misrepresentations.")

The Court's proposed jury instruction, however, provides that "the scheme to defraud is alleged to have been carried out by making false or fraudulent statements, representations, claims or documents." ECF No. 346 at 46. This sentence wrongly suggests that the government must prove a specific false statement in order to prove Count One. While the trial evidence includes ample evidence of false representations by bettors that they would abide by the Betting Platforms' terms of use, including the prohibition on wagering based on inside information, the record contains other evidence of deceptive conduct that suffices, even in the absence of a false statement. For instance, the trial evidence establishes that the defendants and their co-conspirators communicated in coded language, used straw betting accounts to place fraudulent wagers, and used intermediaries to disguise the proceeds of the crime. The government therefore respectfully requests that the Court amend its instruction to provide that all that is necessary is a "scheme to defraud" someone or something, in this case the Betting Platforms, of money or property by means of false or fraudulent pretenses or representations.

## IV. The Court Should Supplement Its Honest Services Wire Fraud Conspiracy Instruction

In its proposed jury charge, the government proposed language in its honest services wire fraud conspiracy instruction that "[i]n determining the source and scope of a fiduciary duty, you may take into consideration codes of conduct, if any, that would have applied to the relationship." See ECF No. 281-4 at 22. However, the Court's draft charge has omitted this language. For the reasons set forth below, the government respectfully requests that the Court include this language.

Such an instruction is consistent with the law, as the Second Circuit on multiple occasions has affirmed convictions based on honest services wire fraud theories that at least partially relied on a defendant's violation of his employer's codes of conduct. See, e.g., United States v. Napout, 963 F.3d 163, 185 (2d Cir. 2020) ("the government's evidence was easily sufficient to prove that FIFA and CONMEBOL's respective codes of ethics expressly provided that persons bound by those codes, including, inter alia, that 'all' soccer 'officials,' such as Marin and Napout, had 'a fiduciary duty to FIFA [and] the confederations [such as CONMEBOL],' and were required to 'act with absolute loyalty' to them… Accordingly, 'the "existence of a fiduciary relationship" between [the] employee[s] and [their] employer [was] "beyond dispute."'"); United States v. Bahel, 662 F.3d 610, 617 (2d Cir. 2011) (defendant's "work performance was subject to

a variety of U.N. rules, which inform the contours of the duty Bahel owed to his employer"); United States v. Rybicki, 354 F.3d 124, 127 (2d Cir. 2003) ("Each of the insurance companies maintained a written policy that prohibited the adjusters from accepting any gifts or fees and required them to report the offer of any such gratuities.").

In this case, the government has established that Major League Baseball ("MLB") prohibits all baseball players who have a duty to perform from betting on baseball, or conspiring with sports bettors to do the same, through the players' standard contract as well as MLB's enforcement of Rule 21. See Tr. 686. Specifically, Paul Mifsud, Senior Vice President Head Baseball Operations Counsel at MLB, testified that the defendants owed a duty of loyalty to their team and MLB. See Tr. 689 ["Question:] Would it be consistent with a player's duty of loyalty to agree to accept a payment from sports bettors for throwing a certain type of pitch in a baseball game? [Answer:] It would not be consistent with that duty of loyalty."). The jury could reasonably conclude that the defendants violated the MLB's codes of conduct as part of its analysis of this charge. Accordingly, an instruction to this effect is warranted here, as the government originally proposed.

## V. The Jury Should Not Rely on the Superseding Indictment in Its Deliberations

As set forth below, the Court should decline to provide a copy of the Superseding Indictment to the jury for use in its deliberations. In the alternative, given the unique circumstances presented here, if the Court does intend to provide a copy of the Superseding Indictment to the jury, the jury should receive a redacted version or only the text of the proposed counts and not the speaking portion of the Superseding Indictment.

### A. Applicable Law

The Second Circuit has "long recognized that trial courts may, in their discretion, 'permit the jury to take a copy of the indictment into the jury room, after taking care to instruct the jury that the indictment is not to be considered evidence.'" United States v. Esso, 684 F.3d 347, 350 (2d Cir. 2012) (internal citation omitted). Where a court exercises its discretion to provide a copy of an indictment to the jury to assist in deliberations, the purpose is to serve the jury as a "helpful guide in delineating the issues the jury may be called on to decide." United States v. Press, 336 F.2d 1003, 1016 (2d Cir.1964) (internal citations omitted).

While it is not error to give the indictment to the jury during its deliberations, the practice is fraught. Particularly where the charging document is a lengthy "speaking" indictment, large portions of the indictment may consist of "narrative drafted by the government." United States v. Watts, 934 F. Supp. 2d 451, 491 (E.D.N.Y. 2013) (KAM) (declining to read full 13-page indictment to jury and reserving decision on whether to provide full indictment to jury during deliberations). In such cases, it is appropriate for district courts to take steps to reduce the jury's reliance on the government's allegations. Id. Indeed, courts are often "concerned that overemphasis of the indictment may lead the jury to construe the indictment as evidence of guilt of the accused." United States v. Press, 336 F.2d 1003, 1016-17 (2d Cir. 1964). Even where courts agree to send indictments back with the jury during deliberations, the Second Circuit warns that "limiting instructions of the trial court are of particular importance." *Id.*

District courts do not abuse their discretion where they decline to send copies of indictments to the jury room during deliberations. See United States v. Davis, 901 F.3d 1030, 1033 (8th Cir. 2018). Indeed, the Third Circuit's Model Jury Instructions caution that "[m]any judges do not send the indictment out with the jury unless the parties request it." See Third Circuit Model Criminal Jury Instructions, Comment to 3.07, available at https://www.ca3.uscourts.gov/model-criminal-jury-table-contents-and-instructions (last visited Nov. 19, 2026). Here, the government explicitly notes that it is requesting the Court not to provide the jury with a copy of the Superseding Indictment.

B. Discussion

The government respectfully submits that a copy of the Superseding Indictment will not aid the jury and should not be provided to the jury during its deliberations. The Superseding Indictment is 29 pages in length and includes 24 pages of prefatory language. See ECF No. 80. The four relevant counts for this stage of the trial are relatively straightforward and comprise just four pages of the document. By the time the jury begins its deliberations, it will have had the benefit of approximately four weeks of trial, as well as the Court's instructions as to the law. The jury understands what this case is about, and the Superseding Indictment is simply unnecessary to assist the jury in its deliberations.

Moreover, rather than serving as a "helpful guide," Press, 336 F.2d at 1016, the Superseding Indictment will instead complicate the jury's deliberations. On October 22, 2026, the government submitted a letter explaining that a discrepancy in time zones led to an inadvertent misstatement of the facts in Paragraphs 37 and 40 of the Superseding Indictment. See ECF No. 310. While the Superseding Indictment states that Clase used his cellular telephone "in the middle of MLB games," additional investigation has shown that the phone communication occurred shortly after the games concluded. Id. The government informed the defendants and the Court that it did "not intend to argue or suggest that the May 17, 2025 messages occurred during a game," id., and it has not done so.

If the Superseding Indictment is provided to the jury, then the inadvertent factual error as to timing will, for the first time, be conveyed to the jury. The defendants may even point out the discrepancy to the jury in an effort to undermine the government's investigation and to inappropriately put the government's investigation on trial. Allowing the jury to consider the Superseding Indictment will effectively permit the defense to treat the Superseding Indictment as evidence of the quality of the government's investigation, which will contravene any jury instruction to the contrary that the Court may simultaneously offer. Further, the government will be forced, potentially through a rebuttal case, to defend its investigation, leading to a trial within a trial on matters wholly irrelevant to the essential question of the defendants' guilt.

To avoid this potential morass, the government respectfully submits that the Court should exercise its discretion to decline to send a copy of the Superseding Indictment to the jury during its deliberations. If, however, the Court determines that the Superseding Indictment would indeed be a helpful guide to the jury, notwithstanding the fact that the prefatory language includes representations as to timing that the government has not endeavored to prove in Paragraphs 37 and 40, the government respectfully submits that the Superseding Indictment should be appropriately

redacted to remove these portions or that the Superseding Indictment only contain the text of the substantive counts with which the defendants are charged.

The government further requests that the defendants be precluded from making arguments going to the integrity of the government's investigation with respect to the timing allegations in Paragraphs 37 and 40. By the time the jury begins its deliberations, the government will have proven the defendants' guilt beyond a reasonable doubt, without relying on or otherwise referencing the timing allegations in Paragraphs 37 and 40. Accordingly, while these allegations will have no bearing on the defendants' guilt, they carry a substantial risk of confusing the issues and misleading the jury. See Fed. R. Evid. 403.

## VI. Conclusion

For the reasons set forth above, the Court should grant the government's requested relief.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Eric Silverberg
Sean M. Sherman
Rebecca M. Urquiola
James R. Simmons
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (KAM) (by ECF)
Counsel of record (by ECF and email)