CORVA
LAW 110 West 40th Street, Suite 1003 · New York, N.Y. 10018 · (646) 974-1143 · www.corvalaw.com

November 23, 2026

*Via ECF*

The Honorable Kiyo A. Matsumoto
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Emmanuel Clase de la Cruz, et al.*
Criminal Docket No. 25-346 (S-1) (KAM)

Dear Judge Matsumoto:

On behalf of all defendants, we write to oppose the government's letter dated November 19, 2026 (ECF No. 347) ("Gov't Ltr."), in which the government asked the Court to remove the missing-witness instruction from the Court's proposed charge (ECF No. 346 at 21-22). The Court should deny that request and give the instruction as to Enoc Pena in the form the Court has proposed.

The government does not dispute the facts that place Enoc Pena within its control. He is a cooperating witness who must meet with the government and testify when it asks. He remains in this country exclusively on deferred action the government obtained so he would be available to testify in this case. The government has met with him nineteen (19) times, likely for hours at a time on each occasion, including twice since it asked the Court to remove the instruction. In stark contrast, despite repeated attempts going back to December 2025, counsel for Mr. Ortiz and Mr. Vasquez have never met him. Counsel for Mr. Clase has met him on one occasion, but that was more than a year ago and before Pena ever made a single statement implicating the defendants in any of the charged crimes. Furthermore, Pena's lawyer has advised the undersigned that while Pena will testify, he will not meet with counsel for the defendants before any such testimony, despite our repeated requests, including as recently as Friday, November 20, 2026. Under those circumstances, and applicable Second Circuit law, a missing witness charge is clearly warranted here.

## BACKGROUND

### I. Enoc Pena's Relationship with the Government

Enoc Pena entered into a cooperation agreement with the United States Attorney's Office dated September 23, 2025. (3500-EP-012 ("Coop. Agmt.")). In that agreement, Pena agreed to attend every meeting the Office requests and to testify whenever the Office asks. (Coop. Agmt. ¶¶ 4(a), 4(d)). The agreement does not require him to meet with the defense. The government alone decides whether he has cooperated fully and whether to move for a sentencing reduction. (*Id.* ¶ 20). If it decides he has not, it is released from its obligations and may withdraw support for any immigration benefit, including an S Visa. (*Id.* ¶ 22). His obligations continue after sentencing. (*Id.* ¶ 4(f)).

The government has also "assisted [Pena] in obtaining deferred action to permit him to remain in the United States so that he is available to testify at trial." (Gov't Ltr. to Counsel, dated Aug. 21, 2026, at 3). On October 8, 2025, the government told Homeland Security Investigations ("HSI") that Pena "need[ed] to remain in the country to prepare for and give his testimony, should the trials occur." (3500-EP-016 at 1). When the FBI no longer needs him, the handling agent must ensure that he leaves the United States or is placed in removal proceedings. (3500-EP-016 at 2-3). On September 18, 2026, the FBI asked HSI to renew his deferred action for another year. (3500-EP-021).

The government has met with Pena on at least nineteen occasions: August 14, September 2, September 3 and September 23, 2025; February 19, 2026; and September 14, September 28, September 30, October 2, October 4, October 11, October 12, October 19, October 20, October 21, October 22, October 23, November 19, and November 22, 2026. In the documented sessions, the government reviewed specific text messages, calls and bets on pitches with him. None of the reports purports to record everything Pena said.[1]

### II. The Defendants' Access to Pena

As the government describes it: "In August 2025, counsel for Mr. Clase participated in an interview with Pena. At the conclusion of the interview, Pena executed a sworn declaration that completely denied any communications or discussions with Mr. Clase regarding gambling on baseball." (Gov't Ltr. at 3 (quoting ECF No. 98-1 at n.2)). The next month, Pena reversed course in response to the government's promises of leniency and remaining in the country, and signed his cooperation agreement. (3500-EP-012 at 15).

Beginning in December 2025, the undersigned sought to speak with counsel for Pena about Pena, but his counsel did not respond to multiple phone calls and emails. When the undersigned finally encountered Pena's counsel in person and over the telephone in regard to

[1] Indeed, the government elicited testimony from another cooperating witness – Enthony Diaz – that was not documented in any of the material provided pursuant to the government's obligations under 18 U.S.C. § 3500. When counsel asked the government about whether Diaz had provided that information in prior meetings, it confirmed that he had but conceded that the material, some of which amounted to *Giglio* material, was not documented in the 3500 material or otherwise disclosed to the defense.

unrelated matters, Pena's counsel made clear during those interactions that he could not talk about Pena.

In August 2026, and continuing on a rolling basis, the government disclosed reports documenting Pena's statements to the government, in accordance with its obligations under 18 U.S.C. § 3500. Based on a review of those reports, Pena's accounts since August 2025 have shifted many, many times.

On September 24, 2026, after the government represented to the Court that we had not made any attempts to speak with Pena (ECF 251 at 9 n.3), the undersigned asked the government to expressly "communicate . . . to counsel for [Pena] that [he] [was] free to speak with defense counsel about this matter and that [his] communicating with defense counsel [would] not in any way be held against [him]." Notably, the government declined that request. But the government did file a letter clarifying its prior representations, noting that "[c]ounsel for [Pena] relayed that he/she has spoken with counsel for Ortiz and counsel for Clase, and that counsel for Ortiz and counsel for Clase asked to discuss the case with counsel for [Pena]" and that "[c]ounsel for [Pena] made clear to counsel for Ortiz and counsel for Clase that he/she was not willing to discuss the case with them." (ECF 252).

On October 28, 2026, the government told the defense that it no longer intended to call Pena. Shortly afterward, the undersigned again contacted Pena's counsel and he told the undersigned that Pena would not meet with us before trial. In fact, Pena's counsel went further and specifically stated that if the defendants called Pena as a witness, they would have to "put him on cold." On November 20, 2026, Pena's counsel again advised that, although Pena would appear to testify, he would not prepare with us. As a result, Mr. Ortiz's and Mr. Vasquez's counsel have never had the opportunity to meet with Pena, and Mr. Clase's counsel has met with Pena just once, but even that was before Pena made a single statement implicating the defendants in the charged crimes.

Furthermore, given Pena's materially shifting accounts, without meaningful access to interview Pena, defense counsel could not elicit testimony from Pena without running afoul of their own ethical obligations. Notably, after defense counsel provided the government with evidence showing Enthony Diaz's knowing participation in a check fraud scheme, the government repeatedly advised the Court that given its ethical obligations, it absolutely could not "sponsor" Diaz as a witness until it had an opportunity to interview him, even though the government had spent more than 30 hours with him and had asked him – repeatedly – about his involvement in the check fraud scheme.

## DISCUSSION

### I. *Torres* and *Caccia* direct the Court to weigh Pena's relationship with the government and his refusal to meet with the defense, and both factors support the instruction.

The missing-witness inference is long settled. When a party has a material witness peculiarly within its power to produce "and fails to produce such witnesses, the jury may infer that" the witness's testimony "would be unfavorable" to that party. *United States v. Torres*, 845

F.2d 1165, 1169 (2d Cir. 1988) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)). The Second Circuit describes the "control" version of the charge as follows: "The most appropriate version of a 'missing witness' instruction, where the facts warrant it, permits the jury to draw an adverse inference against a party failing to call a witness when the witness's testimony would be material and the witness is peculiarly within the control of that party." *United States v. Caccia*, 122 F.3d 136, 138 (2d Cir. 1997). The control requirement "ensures that the inference is not available to be drawn against a party who, in comparison with an adversary, ***lacks meaningful or pragmatic access to the witness***." *Id.* at 139 (emphasis added).

Availability (*i.e.*, "meaningful and pragmatic access") therefore depends "on all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility." *Torres*, 845 F.2d at 1170 (quoting *United States v. Rollins*, 487 F.2d 409, 412 (2d Cir. 1973)). *Accord United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004) (availability "does not depend on knowledge of the witness's whereabouts but on the totality of circumstances 'bearing upon the witness's relation to the parties'").

The government calls *Torres* "inapposite" and argues that the language of this Court's proposed charge drawn from *Torres* "was not a holding of the Court." In the government's view, the passage summarizes a defense argument the Second Circuit "implicitly rejected." (Gov't Ltr. at 1-2). The sentence the government singles out does describe the appellants' argument. *Torres*, 845 F.2d at 1169-70. But the government leaves out what the Second Circuit did with that argument. After reviewing the authorities, the *Torres* court concluded the district court "should have considered the informant's relationship to the government and his refusal to be interviewed by the defense as factors in determining whether the informant was 'equally available' to both sides." *Id.* at 1170. That is the circuit court's own conclusion, not simply a summary of the appellants' position. The Second Circuit read it the same way later that year: "Therefore, *Torres* held, the district court erred in not considering the informant's relationship to the Government and his refusal to be interviewed when it determined that the informant was 'available' to the defense." *United States v. Saa*, 859 F.2d 1067, 1076 (2d Cir. 1988). *Torres* did not reject the premise of the Court's proposed charge here. Contrary to the government's argument, the Second Circuit adopted it.

The government's other formulation fares no better. It misleadingly argues the charge is unwarranted unless the witness is "solely within the prosecution's power to call the witness to testify." (Gov't Ltr. at 3). That is not the Second Circuit's test. The phrase the government highlights appears in *Torres* only in a parenthetical, introduced by "*But cf.*," that describes out-of-circuit decisions. *Torres*, 845 F.2d at 1170. The test *Torres* actually applied asks about the witness's practical relationship to the parties. *Id. Caccia* and *Gaskin* apply the same test. *Caccia*, 122 F.3d at 139; *Gaskin*, 364 F.3d at 463. Indeed, *Caccia* forecloses the government's reading: "Though the witness was physically available to the defense, ***that is not the sole criterion of equal availability***." 122 F.3d at 139 (emphasis added).

*Torres*'s affirmance does not help the government either. *Torres* held only that refusing the requested charge was not reversible error, and every reason it gave was tied to that record. It explained that whether to give the charge "lies in the sound discretion of the trial court[,]" *Torres*, 845 F.2d at 1170-71, and noted that the trial judge had "permitted defense counsel to argue the inference themselves in summation." *Id.* at 1170. Moreover, it explained that the

"appellants apparently did not submit proposed language for their requested charge, and thus [it] [could not] determine whether the requested charge would have accurately reflected the law." *Id.* at 1171. Finally, the court found that "any error in failing to give the requested charge was harmless." *Id.*

*Caccia* confirms the point from the other side. The witness there had assisted the government as an informant and had refused a defense interview. 122 F.3d at 139. The Second Circuit recognized that "the witness was available to the defendant though he was not realistically as available to the defendant as to the Government." *Id.* at 140. It nonetheless affirmed, observing that the witness, "having ended a relationship with the Government two years previously, was not so peculiarly within the Government's control as to require the defendant's requested instruction." *Id.* at 139. Pena's relationship with the government has not ended. It is ongoing (having communicated with him as recently as a few days ago about points the defense raised in this very trial), it is governed by an agreement whose obligations continue past sentencing, and it is the reason he remains in the country.

## II. Pena is peculiarly within the government's control.

### A. The government controls Pena's obligations, his benefits and his presence in this country.

Every lever that bears on Pena's willingness to testify, and on what he says, belongs to the government. He must attend every meeting the government requests and testify whenever it asks. (Coop. Agmt. ¶¶ 4(a), 4(d)). The government alone decides whether he has cooperated fully and so earned a sentencing motion. (*Id.* ¶ 20). The government decides whether he keeps its support for any immigration benefit. (*Id.* ¶ 22). His presence in this country depends on deferred action that the government obtained so that he would be available to testify. That status lasts only while the government needs him. (3500-EP-016 at 1-3; 3500-EP-017 at 1-2). The government asked HSI in September 2026 to renew that status. (3500-EP-021). No defendant has any comparable hold on him.

The government's letter confirms who decides whether this jury hears from Pena. The government seeks a ruling before it rests because, it says, "the resolution of this issue affects the remainder of the government's case-in-chief." (Gov't Ltr. at 1). Whether Pena testifies, and when, is the government's choice.

### B. The government has prepared Pena repeatedly.

The government has met with Pena eighteen times since August 2025, thirteen of them between September 14 and November 19, 2026. It met with him again on November 19, 2026, after telling the defense on October 28 that it no longer intended to call him. In the documented sessions, it walked him through specific messages, calls and bets. Only the government knows everything he said in those sessions, including whether he added to or changed his earlier accounts.

That imbalance is the kind *Caccia* and *Torres* describe. The government has "meaningful or pragmatic access" to Pena. The defendants have none. *Caccia*, 122 F.3d at 139. The Second Circuit has recognized what it means to ask the defense to call such a witness blind: "Since

Robert was an informant with a special relationship with the Government, from the defense perspective this would have been an enormous and probably an intolerable risk." *Saa*, 859 F.2d at 1076.

## III. Nothing the government cites gives any credible argument that the defendants have meaningful access to Pena.

### A. Mr. Clase's Counsel's interview of Pena, before he began cooperating, is not access.

The government relies on meetings between Pena and Mr. Clase's counsel, as shown by an interpreter's affidavit and a privilege log. (Gov't Ltr. at 2-3). Those meetings involved only Mr. Clase's lawyers. The government concedes that neither Mr. Ortiz's counsel nor Mr. Vasquez's counsel ever met with Pena. (*Id.* at 3). The government notes that Mr. Ortiz's counsel has reviewed the declaration that came out of those meetings, and that counsel for Mr. Clase and Mr. Ortiz presented it to the government in an effort to persuade it to decline to bring charges. (*Id.* at 3 & n.3). Having a copy of a document is not access to the witness.

In any event, the declaration obviously does not tell the defense what Pena would say now. He signed it in August 2025 and signed his cooperation agreement the next month. (ECF No. 98-1 at n.2; 3500-EP-012 at 15). The government met with him on August 14, September 2 and September 3, 2025, before the agreement was signed on September 23. In the declaration, he "completely denied any communications or discussions with Mr. Clase regarding gambling on baseball." (Gov't Ltr. at 3 (quoting ECF No. 98-1 at n.2)). The government does not suggest he would testify consistently with it. It says the opposite: his testimony would establish guilt beyond a reasonable doubt. (*Id.* at 4). A sworn account the witness has purportedly since abandoned, given before he signed his cooperation agreement and before the government's later meetings with him, is not a preview of his testimony.

### B. The government's Section 3500 production does not substitute for access.

The government counts "62 discrete items as of this writing." However, at a minimum, the reports documenting the thirteen trial preparation meetings the government has held with Pena since September 14, 2026, do not purport to record everything Pena said, and many entries cannot be followed without context. Reports written by the party that controls the witness, about sessions only that party attended, do not give the other side equal access.

*United States v. Abelis*, 146 F.3d 73 (2d Cir. 1998), shows the difference. The Second Circuit there affirmed the refusal of a missing-witness charge as to Volkov, an alleged victim of the attempted extortion, whom neither side called. *Id.* at 76, 84. The only contact with the government the opinion describes for him is that he "met with the F.B.I. in Miami to obtain protection." *Id.* at 77. The opinion describes no cooperation agreement, sentencing benefit or immigration benefit for him. Volkov declined defense interviews, but he was willing to testify and "was in fact at the trial on several occasions." *Id.* at 84. Given those facts, the court concluded, he "was not so peculiarly within the Government's control as to require the defendant's requested instruction." *Id.* (quoting *Caccia*, 122 F.3d at 139).

Pena is in a very different position. His willingness to testify is not independence from the government. It is performance of a duty he owes it. (Coop. Agmt. ¶¶ 4(a), 4(d)). The court in *Abelis* also noted that the government had represented that it had given the defense all of its records of conversations with Volkov. *Id.* On that last point, the court stressed: "Significantly, the government represented to the district court that it had provided the appellants with all F.B.I. records documenting conversations with Volkov, as well as Summit business records and any other material regarding him." *Id.*

We understand the government's production of Section 3500 material concerning Pena to be complete, but that does not carry the weight the production representation carried in *Abelis*. Here, the records are the government's own summaries of portions of preparation sessions the defense did not attend, with a witness it controls. Significantly, summaries of what Pena has said do not tell the defense what he would say now, and why specifically the government has opted not to call the most significant witness and the only person who directly interacted with Mr. Clase about the alleged crimes, and it gives no access to the witness himself.

### C. A mid-trial email from Pena's counsel and the government's "no objection" do not equalize access.

Pena's counsel's November 17 email, as the government quotes it, says that Pena is prepared to testify if called. (Gov't Ltr. at 3). That is a statement about willingness to take the stand, not willingness to meet. Pena's counsel has said as much: Pena will appear to testify, but he will not prepare with us. The government says only that it has no objection to a meeting if the defense asks. (*Id.*). It does not say Pena has agreed to one. It also insists that "[t]he government is unaware of any authority that imposes additional obligations on the government to make" Pena available to the defense. (*Id.*). The asymmetry is therefore built in. The government's access is compelled by the cooperation agreement. The defense's access depends on Pena's choice.

An offer to produce a cooperator for testimony is not meaningful access. In fact, the Second Circuit has said so. In *Saa*, the government promised to produce its informant, but the informant would not submit to a defense interview. 859 F.2d at 1076. The Second Circuit held that he was not meaningfully available to the defense, because calling him without knowing what he would say carried an intolerable risk. *Id.* The government in *Saa* had also withheld the informant's identity, so the facts there were stronger. But the court's reasoning about the risk of calling a cooperator blind applies with full force here. And the government's offer arrives mid-trial, after more than a year of exclusive government access and repeated government meetings, the most recent on November 19, 2026. A meeting held in the middle of trial, even if Pena were willing (and his lawyer has said consistently for nearly a year he is not), could not replicate that.

## IV. Defendants' earlier request to preclude Pena is not gamesmanship and does not forfeit the instruction.

The government argues that the defendants gave up the instruction by asking the Court to preclude Pena's testimony. (Gov't Ltr. at 4 (citing ECF Nos. 237, 255)). A defendant who asks the Court to sanction a *Brady* disclosure failure by barring a government witness has objected to the government's use of that witness against him. He has not conceded that the witness's account

would be true or unfavorable to him. The government cites no authority treating such a motion as a waiver of the missing-witness instruction.

Nor does *Torres* support the government's gamesmanship theory. *Torres* noted that a witness may not be practically unavailable where the defense has "no real interest in calling" him and is merely engaged in gamesmanship. 845 F.2d at 1170. But the court made no gamesmanship finding. It said only that the district court could have found that something else was the real deterrent: a tape recording the government planned to introduce if the informant testified, not the informant's refusal to be interviewed. *Id.* The government identifies no comparable deterrent here. Its only explanation is that Pena's statements are "replete with inculpatory information." (Gov't Ltr. at 4). That is a reason the government would call him, not a reason the defense would avoid him.

Finally, the government is wrong that its decision not to call Pena "effectively grants the defendants the relief that they sought." (Gov't Ltr. at 4). The decision is the government's own, made for its own reasons (which remain elusive to the defendants), and the government still treats it as tied to the rest of its case-in-chief. (*Id.* at 1). The jury may consider why the government made that choice.

## V. The government's own letter establishes that Pena's testimony would be material and not cumulative.

"No instruction is necessary where the unpresented testimony would be merely cumulative." *Torres*, 845 F.2d at 1169. The government does not argue that Pena's testimony would be cumulative. It argues the opposite: that Pena's testimony would "readily establish their guilt beyond a reasonable doubt." (Gov't Ltr. at 4). Testimony a party describes that way is material by definition.

Pena's testimony is also not cumulative of anything else in the record. Without him, the government has no witness to the defendants' roles. This is particularly so as to Mr. Ortiz. On the government witnesses' own accounts, none of its other witnesses communicated with Mr. Ortiz. The one other witness who has spoken about Mr. Ortiz said his belief that the pitches were fixed came exclusively from what Pena told him. To our knowledge, the government has identified no other witness who claims personal knowledge of Mr. Ortiz's role. A party that calls a witness's testimony decisive, and then declines to present it, invites the inference that the testimony would not have helped it.

The government also asserts that "the substance of his testimony is abundantly clear to all parties." (Gov't Ltr. at 3). The record says otherwise. Pena swore in August 2025 that he had no communications with Mr. Clase about gambling on baseball. (ECF No. 98-1 at n.2). He later admitted that he would "give the impression to others that a bet was fixed" when he had no inside information. (3500-EP-015). His account of Mr. Ortiz has shifted since then. (3500-EP-032). The government knows what he told it in preparation. Mr. Ortiz does not. The government's description of Pena's testimony is its own characterization of an account it has chosen not to test before the jury.

## VI. A no-inference instruction is reserved for equally available witnesses, and Pena is not one.

The government asks, in the alternative, for an instruction that no inference may be drawn against either side. (Gov't Ltr. at 5). The options it cites from *Caccia* apply only to a witness who is equally available. As *Caccia* put it, "In addition to the 'control' version of a missing witness charge, we have also outlined options available to the trial court where a witness is equally available to both sides, but is not called by either side." 122 F.3d at 139. The government's letter simply assumes the key premise when it says these options apply "as here." (Gov't Ltr. at 5). Pena is not equally available, so the "control" version governs.

The government's other authorities are also inapposite. In *United States v. Johnson*, 117 F.4th 28 (2d Cir. 2024), the uncalled witnesses were not cooperators, and the defendant did not dispute that both sides had an equal opportunity to call them. *Id.* at 49-50. The court held that a no-inference instruction was within the trial court's discretion in that setting. *Id. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015), did involve a cooperating witness the government decided not to call. But defense counsel there had conceded that both sides had an equal opportunity to call him, and the court upheld the no-inference instruction on that concession. *Id.* at 843-44. The defendants here make no such concession. *Caccia* did say that no instruction, or a no-inference instruction, would have been preferable on its facts. 122 F.3d at 139-40. But that witness had ended his relationship with the government two years earlier. *Id.* at 139. Pena's relationship, on the other hand, is substantial, specific and ongoing. On this record, a no-inference instruction would tell the jury to disregard the one fact that matters most. The party that controls the witness – the one witness who supposedly has personal (albeit through hearsay) knowledge about Mr. Ortiz's alleged role – chose not to call him.

## VII. The Court should deny the request and give the instruction in the form it has proposed.

District judges have "considerable discretion in deciding when [missing witness instructions] should and should not be given." *Gaskin*, 364 F.3d at 463. The Court exercised that discretion when it, quite appropriately, included the instruction in its proposed charge. The government effectively wants an advisory opinion before it rests because the issue affects the rest of its case-in-chief. (Gov't Ltr. at 1). In other words, it wants to know the cost of not calling Pena before it decides to do so. That confirms where control lies, and it leaves the remedy in the government's hands: if the government calls Pena, the instruction falls away. The Court should deny the request to remove the instruction now.

## CONCLUSION

For these reasons, the defendants respectfully request that the Court deny the government's request to remove the missing-witness instruction and give the instruction as to Pena in the form the Court has proposed.

Respectfully submitted,

Elizabeth Geddes

Elizabeth Geddes
Corva Law LLP
110 West 40th Street, Suite 1003
New York, New York 10018
liz@corvalaw.com

Christos N. Georgalis
Paul M. Flannery
Flannery | Georgalis, LLC
1621 Euclid Avenue, Floor 20
Cleveland, Ohio 44115

*Attorneys for Defendant Luis Leandro Ortiz Ribera*

cc: All counsel of record (via ECF)